## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

INTELLECTUAL VENTURES I LLC,                  :
                                              :
                Plaintiff,                    :
                                              :
        v.                                    : Civil Action No. 10-1067-LPS
                                              :
CHECK POINT SOFTWARE                          :
TECHNOLOGIES LTD., CHECK POINT                :
SOFTWARE TECHNOLOGIES, INC.,                  :
McAFEE, INC., SYMANTEC CORP.,                 :
TREND MICRO INCORPORATED, and                 :
TREND MICRO, INC. (USA),                      :
                                              :
                Defendants.                   :

---

Joseph J. Farnan, III and Brian E. Farnan, FARNAN LLP, Wilmington, DE.
Parker C. Folse III, Brooke A.M. Taylor, Lindsey N. Godfrey, SUSMAN GODFREY L.L.P., Seattle, WA; Ryan C. Kirkpatrick, SUSMAN GODFREY L.L.P., Los Angeles, CA; and John P. Lahad, SUSMAN GODFREY L.L.P., Houston, TX.

    Attorneys for Plaintiff Intellectual Ventures I LLC.


Collins J. Seitz, Jr. and Benjamin J. Schladweiler, SEITZ ROSS ARONSTAM & MORITZ LLP, Wilmington, DE.
Edward G. Poplawski, Sandra S. Fujiyama, and Olivia M. Kim, SIDLEY AUSTIN LLP, Los Angeles, CA; Vernon M. Winters, SIDLEY AUSTIN LLP, San Francisco, CA; and Bryan K. Anderson, Palo Alto, CA.

    Attorneys for Defendant McAfee Inc.


Karen Jacobs Louden, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE.
Yar R. Chaikovsky, MCDERMITT, WILL & EMERY LLP, Menlo Park, CA; David M. Beckwith, MCDERMOTT, WILL & EMERY, Irvine, CA.

    Attorneys for Trend Micro Inc., and Trend Micro Inc., (USA).

Jack B. Blumenfeld and Thomas C. Grimm, MORRIS, NICHOLS, ARSHT & TUNNELL, Wilmington, DE.
Clement S. Roberts and Joseph C. Gratz, DURIE TANGRI LLP, San Francisco, CA.

Attorneys for Defendants Check Point Software Technologies Inc. and Check Point Software Technologies Ltd. and Symantec Corporation.


Jack B. Blumenfeld and Thomas C. Grimm, MORRIS, NICHOLS, ARSHT & TUNNELL, Wilmington, DE.
Mark A. Flagel and Yury Kapgan, LATHAM & WATKINS LLP, Los Angeles, CA; Dean G. Dunlavey, LATHAM & WATKINS LLP, Costa Mesa, CA; and Andrew J. Fossum, LATHAM & WATKINS LLP, Houston, TX.

Attorneys for Defendant Symantec Corp.


**<u>MEMORANDUM OPINION</u>**


December 12, 2012
Wilmington, Delaware.

**STARK, U.S. District Judge:**

## I.   INTRODUCTION

Plaintiff Intellectual Ventures LLC I ("Plaintiff" or "IV") filed this patent infringement

lawsuit on December 8, 2010. (D.I. 1) There are four patents-in-suit: United States Patent Nos.

6,460,050 ("the '050 patent"); 6,073,142 ("the '142 patent"); 5,987,610 ("the '610 patent"); and

7,506,155 ("the '155 patent"). The patents-in-suit relate generally to methods and systems for

managing and protecting against computer viruses and receipt of "spam" email messages.

Plaintiff asserts infringement against four sets of defendants: Check Point Software

Technologies Inc. and Check Point Software Technologies Ltd. (together, "Check Point");

McAfee, Inc. ("McAfee");[1] Symantec Corp. ("Symantec"); and Trend Micro Incorporated and

Trend Micro, Inc. (USA) (together, "Trend Micro") (collectively hereinafter, "Defendants").

Presently before the Court is the matter of claim construction. The Court held a

*Markman* hearing on August 9, 2012. (D.I. 340) ("Tr.")

## II.   LEGAL STANDARDS

"It is a bedrock principle of patent law that the claims of a patent define the invention to

which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312

(Fed. Cir. 2005) (internal quotation marks omitted). Construing the claims of a patent presents a

question of law. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 977-78 (Fed. Cir.

1995), *aff'd*, 517 U.S. 370, 388-90 (1996). "[T]here is no magic formula or catechism for

conducting claim construction." *Phillips*, 415 F.3d at 1324. Instead, the court is free to attach

the appropriate weight to appropriate sources "in light of the statutes and policies that inform

---

[1]The Court approved a Stipulation and Order of Dismissal with Prejudice between IV and
McAfee on October 10, 2012. (D.I. 382, 383)

patent law." *Id.*

"[T]he words of a claim are generally given their ordinary and customary meaning . . . [which is] the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1312-13 (internal citations and quotation marks omitted). "[T]he ordinary meaning of a claim term is its meaning to the ordinary artisan after reading the entire patent." *Id.* at 1321 (internal quotation marks omitted). The patent specification "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

While "the claims themselves provide substantial guidance as to the meaning of particular claim terms," the context of the surrounding words of the claim also must be considered. *Phillips*, 415 F.3d at 1314. Furthermore, "[o]ther claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment . . . [b]ecause claim terms are normally used consistently throughout the patent . . . ." *Id.* (internal citation omitted).

It is likewise true that "[d]ifferences among claims can also be a useful guide . . . . For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Id.* at 1314-15 (internal citation omitted). This "presumption is especially strong when the limitation in dispute is the only meaningful difference between an independent and dependent claim, and one party is urging that the limitation in the dependent claim should be read into the independent claim." *SunRace Roots Enter. Co., Ltd. v. SRAM Corp.*, 336 F.3d 1298, 1303 (Fed. Cir. 2003).

It is also possible that "the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the

2

inventor's lexicography governs." *Phillips*, 415 F.3d at 1316. It bears emphasis that "[e]ven when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) (internal quotation marks omitted), *aff'd*, 481 F.3d 1371 (Fed. Cir. 2007).

In addition to the specification, a court "should also consider the patent's prosecution history, if it is in evidence." *Markman*, 52 F.3d at 980. The prosecution history, which is "intrinsic evidence," "consists of the complete record of the proceedings before the PTO [Patent and Trademark Office] and includes the prior art cited during the examination of the patent." *Phillips*, 415 F.3d at 1317. "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.*

A court also may rely on "extrinsic evidence," which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980. For instance, technical dictionaries can assist the court in determining the meaning of a term to those of skill in the relevant art because such dictionaries "endeavor to collect the accepted meanings of terms used in various fields of science and technology." *Phillips*, 415 F.3d at 1318. In addition, expert testimony can be useful "to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of ordinary skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Id.* Nonetheless, courts must not lose

3

sight of the fact that "expert reports and testimony [are] generated at the time of and for the purpose of litigation and thus can suffer from bias that is not present in intrinsic evidence." *Id.* Overall, while extrinsic evidence "may be useful" to the court, it is "less reliable" than intrinsic evidence, and its consideration "is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1318-19.

Finally, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Renishaw PLC v. Marposs Societa' Per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). It follows that "a claim interpretation that would exclude the inventor's device is rarely the correct interpretation." *Osram GmbH v. Int'l Trade Comm'n*, 505 F.3d 1351, 1358 (Fed. Cir. 2007).

## III. CONSTRUCTION OF DISPUTED TERMS

### A. U.S. Patent No. 6,460,050

The '050 patent, entitled "Distributed content identification system," generally discloses a method for classifying content of received files by creating a content identifier and then comparing that content identifier to a database of other identifiers. It was filed on December 22, 1999 and issued on October 1, 2002. The patent is directed to filtering e-mail messages, and particularly spam and viruses, by generating a digital identifier for the message, forwarding that identifier to a processing system, determining whether the forwarded identifier matches a characteristic of other identifiers, and then processing the e-mail based on the results of that determination. (*See* '050 patent col.2 ll.37-43) Plaintiff asserts that Defendants infringe claims 9, 13, 15, 16, 20, 22, and 24. (*See* D.I. 223 at 3) The parties' disputed claim limitations appearing in these claims are discussed below.

4

## 1. "data file(s)"

| Plaintiff's Proposed Construction | plain and ordinary meaning; in the alternative, "any type of text or binary data." |
|---|---|
| Defendants' Proposed Construction | "a collection of information presented as a unit to a user" |
| Court's Construction | "a collection of any type of text or binary data that retains cohesion when presented to a user" |

The parties' primary disputes concern (1) whether "data file(s)" must be presented to a user, and (2) whether "data file(s)" require a collection of information rather than any type of text or data, regardless of its structure or organization.

Plaintiff contends that "data file(s)" should be given its plain and ordinary meaning, because the inventors did not assign a particular meaning to this term during prosecution. (D.I. 223 at 4) Alternatively, Plaintiff contends that, if construed, the specification indicates that the "present invention" can be used "to classify any sort of text or binary data." Therefore, "data file(s)" should not be further limited by the additional limitations in Defendants' proposed construction. (*Id.*)

Defendants assert that Plaintiff's construction ignores the meaning of the term "file," which a skilled artisan would understand to mean "[a] complete, named collection of information" that unites various "instructions, numbers, or words into a coherent unit that a user can retrieve, change, delete, save, or send to an output device." (D.I. 224 at 15-16) (citing *Microsoft Press Computer Dictionary*, 194 (3d ed. 1997)) Defendants further contend that the term "data file(s)" must be considered as a collective unit, in order to permit the identification of the "characteristic" of such data file(s) as required by claims 9 and 25 of the '050 patent. (D.I. 224 at 15)

5

The Court will construe "data file(s)" to mean "a collection of any type of text or binary data that retains cohesion when presented to a user."[2] The Court agrees with Defendants that the plain meaning of "file" at the time of invention would signify to a skilled artisan a collection of data of sufficient coherence so as to permit the performance of various operations, such as identifying a characteristic. Counsel for Defendants acknowledged at the hearing that "data file(s)" are not necessarily presented to a user, but can instead reside as a data file in a database. (Tr. at 70-71) Hence, the Court's construction provides that the "data file(s)" must retain their cohesion if and when they are presented to a user.

2. **"determining . . . whether each received content identifier matches a characteristic of other identifiers"**

| **Plaintiff's Proposed Construction** | "determining . . . whether each received content identifier has the same characteristic as other content identifiers" |
|---|---|
| **Defendants' Proposed Construction** | "matching a content identifier to a characteristic of other identifiers" |
| **Court's Construction** | "determining . . . whether each received content identifier has the same characteristic as other content identifiers" |

Defendants indicated at the hearing (Tr. at 13-14), and confirmed in writing by letter to the Court (D.I. 326), that they had agreed to Plaintiff's proposed construction of this term. The

---

[2]The Court has determined that it must construe this claim term in order to resolve the material dispute among the parties. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) ("A determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute."); *see also generally AFG Indus., Inc. v. Cardinal IG Co., Inc.*, 239 F.3d 1239, 1247 (Fed. Cir. 2001) ("It is critical for trial courts to set forth an express construction of the material claim terms in dispute, in part because the claim construction becomes the basis of the jury instructions, should the case go to trial. It is also the necessary foundation of meaningful appellate review.") (internal citation omitted).

6

Court, therefore, will adopt that construction.

### 3. "file content identifier"/"file content ID"/"digital content identifier"/"digital content ID"

| | |
|---|---|
| **Plaintiff's Proposed Construction** | "a digital identifier reflecting at least a portion of the content of a data file" |
| **Defendants' Proposed Construction** | "an identifier for the contents of a file [or digital content], that is not a portion or portions of the content" |
| **Court's Construction** | "A digital content identifier reflecting at least a portion of the content of a data file, but not constituting merely an excised portion of that data file. For clarity, an excised portion of the content of a data file that has been encoded and/or compressed for transmission is not a [file content identifier/file content ID/digital content identifier/digital content ID]. However, the presence of an excised portion of a data file (whether encoded, compressed or otherwise) does not prevent something other than that excised portion from being classified as a [file content identifier/file content ID/digital content identifier/digital content ID]." |

The parties indicated at the hearing that they had reached an agreement concerning the underlying concept described by these claim limitations (Tr. at 14), and later submitted to the Court specific language describing the concept they had agreed upon (D.I. 326). The Court, therefore, adopts the parties' agreed language as its construction for these terms.

7

**4.** **"digital content identifier created using a mathematical algorithm unique to the message content"**

| | |
|---|---|
| **Plaintiff's Proposed Construction** | "a digital content identifier (defined above) created using a mathematical algorithm; the identifier being particular to the message content" |
| **Defendants' Proposed Construction** | "digital content identifier created using a mathematical algorithm never corresponds to more than one message content" |
| **Court's Construction** | "a digital content identifier (defined above) created using a mathematical algorithm; the identifier being particular to the message content (e.g., every time the same algorithm is run on the same content the same value results)" |

The parties' dispute concerns whether the digital content identifier must be completely "unique" rather than merely "particular" to the message content. According to Plaintiff, the digital content identifier need not be completely unique to specific message content, since the "presence of the same identifiers for similar messages is a fundamental aspect of the invention." (D.I. 223 at 7) Thus, Plaintiff argues, "a content identifier *may* correspond to more than one message content as long as the identifier is particular to the content from which the content identifier is created." (*Id.* at 8)

Defendants argue that this limitation "requires that the message content in question be the only message content that has that identifier," because "[a]n identifier would not be 'unique' if it corresponded to two different messages." (D.I. 224 at 19) Specifically, Defendants point out that the inventors used the term "particular" elsewhere in the claims of the '050 patent, indicating that they intended the terms "unique" and "particular" to have different meanings. (*Id.*)

The Court concludes that Plaintiff's proposed construction best comports with the

8

intrinsic record. The specification describes an embodiment in which spam is identified based

on the receipt of messages "similar" to previously identified spam messages. ('050 patent col. 6

ll.13-17) Defendants' proposed construction would appear to improperly exclude this

embodiment.[3] "[A] construction that excludes a preferred embodiment is rarely, if ever,

correct." *C.R. Bard, Inc. v. United States Surgical Corp.*, 388 F.3d 858, 865 (Fed. Cir. 2004)

(internal quotation marks omitted).

### 5. "file content identifier generator agent(s)"

| Plaintiff's Proposed Construction | "software running on a computer that creates and transmits file content identifiers to a second tier system" |
|---|---|
| Defendants' Proposed Construction | "software running on a computer that creates file content identifiers" |
| Court's Construction | "software running on a computer that creates and transmits file content identifiers to a second tier system" |

The parties agree that this limitation requires "software running on a computer that

creates file content identifiers," but dispute whether the limitation further requires that the

created file content identifiers be transmitted to a second-tier system, as Plaintiff's proposed

construction would require.

Plaintiff argues that both the claims and specification require that the file content

identifier generator agent(s) transmit the file content identifiers to a second-tier system. (*See*

D.I. 223 at 9) Specifically, Plaintiff notes that Claim 9 recites "receiving, on a processing

system, file content identifiers for data files from a plurality of file content identifier generator

---

[3]To avoid further confusion or dispute, the Court's construction explains in a parenthetical what
is meant by "unique" in the context of the asserted claims.

9

agents," indicating that the agents transmit the file content identifiers for receipt by a second-tier

processing system. (D.I. 240 at 13)  Plaintiff also observes that the specification describes an

embodiment in which incoming emails are processed through a first-tier site "to generate and

transport digital IDs to the second tier system," for further processing. (*See* D.I. 223 at 9; '050

patent col.4 ll.16-29)

Defendants respond that Plaintiff's proposed construction improperly imports limitations

from the specification. According to Defendants, the claims do not recite a second-tier system,

nor do they recite the transmission of file content identifiers to such a system. (D.I. 224 at 17)

Defendants further argue that the specification discloses certain embodiments in which a third-

tier system – rather than a second-tier system – receives file content identifiers. (*See id.* at 18;

'050 patent, Fig. 3; *id.* at col.5 ll.31-35)

The Court will adopt Plaintiff's proposed construction. The Court agrees with Plaintiff

that Claim 9 implies that the file content identifiers are transmitted by the agents, for receipt by

the processing system. The specification, in turn, confirms that the file content identifiers are

transmitted to a second-tier system. Specifically, Figure 2 "illustrates the general process of the

present invention" and explains that "in the present invention, a digital identifier engine on the

first tier system . . . will generate a digital identifier," and "the digital identifier is then forwarded

to a second tier system." ('050 patent, Fig. 2; *id.* at col.3 ll.30-45)  Contrary to Defendants'

assertion, Figure 3 does not describe a third-tier system. Instead, the description of Figure 3

states that "one or more digital identifiers will be generated . . . and transmitted to the second tier

system." (*Id.* at col.5 ll.14-17)  The "third-tier" structure identified by Defendants is a third-tier

database that is part of the second-tier system. (*Id.* at col.5 ll.17-20) ("In the example shown at

FIG. 3, second tier system 30 includes a second tier server 210 in a third tier database 220."))

10

6. **"an indication of the characteristic"/"identify the existence or absence of said characteristic"/"indicating the presence or absence of a characteristic"**

| **Plaintiff's Proposed Construction** | |
|---|---|
| "an indication of the characteristic" (claim 9) | "a descriptor of the content (e.g., spam, virus, junk email, copyrighted)" |
| "identify the existence or absence of said characteristic" (claim 16) | "identify whether or not the message is of a certain type or classification" |
| "indicating the presence or absence of a characteristic" (claim 22) | "indicating the presence or absence of a characteristic (e.g., spam, virus, copyright, bulk email)" |
| **Defendants' Proposed Construction** | |
| "an indication of the characteristic" (claim 9) | "the result of a true/false test for a property of the content" |
| "identify the existence or absence of said characteristic" (claim 16) | "providing the result of a true/false test for the existence or absence of the property of the content" |
| "indicating the presence or absence of a characteristic" (claim 22) | "providing the result of a true/false test for the presence or absence of a property of the content" |
| **Court's Construction** | |
| "an indication of the characteristic" (claim 9) | "a descriptor of the content (e.g., spam, virus, junk email, copyrighted)" |
| "identify the existence or absence of said characteristic" (claim 16) | "identify whether or not the message is of a certain type or classification" |
| "indicating the presence or absence of a characteristic" (claim 22) | "indicating the presence or absence of a characteristic (e.g., spam, virus, copyright, bulk email)" |

The parties dispute whether these limitations must be the result of a true/false test or whether they may, instead, be the result of something else, such as probability, likelihood, or related scores.

11

The specification states "in essence, the classification is a true/false test for the content based on the query for which the classification is sought." ('050 patent col.3 ll.14-16) Defendants contend that this statement limits the scope of the invention to the use of true/false tests for identifying or indicating the presence or absence of characteristics. (*See* D.I. 224 at 12)

The Court, however, agrees with Plaintiff that, when properly read in context, the single sentence upon which Defendants' constructions are based is describing the use of true/false tests as merely an example of identifying or indicating the existence of a characteristic. The adjacent sentences in the specification begin with exemplary language such as "[i]n one aspect of the system" ('050 patent col.3 ll.10-11) and "[f]or example" (*id.* at col.3 l.16), suggesting that "in essence" (in context) is likewise intended as exemplary rather than definitional or limiting language. The Court discerns nothing in the claims or the specification suggesting that the use of true/false tests is a defining feature of the claimed invention.[4] The Court, therefore, will adopt Plaintiff's proposed construction.

---

[4] Defendants emphasize that the inventors described the "essence" of the "present invention" as involving a true/false test. (D.I. 224 at 12-13) The use of the phrase "present invention," however, is not dispositive. *See Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 1121, 1136-37 (Fed. Cir. 2011) (noting that "use of the phrase 'present invention' or 'this invention' is not always so limiting, such as where the references to a certain limitation as being the 'invention' are not uniform, or where other portions of the intrinsic evidence do not support applying the limitation to the entire patent").

7.    **"characterizing the files on the server system based on said digital
content identifiers received relative to other digital identifiers
collected in the database"**

| **Plaintiff's Proposed Construction** | "classifying the files on the server system by comparing their digital content identifiers to other digital identifiers collected in the database" |
|---|---|
| **Defendants' Proposed Construction** | "classifying with a true/false test the files on the server system by comparing said digital content identifiers with other digital identifiers collected in the database" |
| **Court's Construction** | "classifying the files on the server system by comparing their digital content identifiers to other digital identifiers collected in the database" |

At the hearing, the parties agreed that the proper construction of this term turns on the

same disputes already resolved by the Court in connection with the preceding term. (*See* Tr. at

24-29; D.I. 326) The Court agrees. Hence, for the same reasons given in connection with the

preceding term, the Court adopts Plaintiff's construction here as well.

**B.    U.S. Patent No. 6,073,142**

The '142 patent, entitled "Automated post office based rule analysis of e-mail messages

and other data objects for controlled distribution in network environments," was filed on June

23, 1997 and issued on June 6, 2000. It relates generally to providing an efficient way for

corporate organizations to control the handling of emails and other data objects, particularly by

preventing viruses, through implementation of a secondary post office at which administrators

can review emails that have triggered business rules before their delivery to an intended

recipient. Pursuant to business rules, messages are gated, then reviewed by an administrator, and

eventually (if safe) directed to their intended recipients.

13

1.    **"database of business rules"/"business rules"**

| Plaintiff's Proposed Construction | plain and ordinary meaning; alternatively "a data structure that stores one or more sets of business rules"  "business rules" to have its plain and ordinary meaning |
|---|---|
| Defendants' Proposed Construction | "storage of statements that each specify an antecedent condition and the action to be applied when that antecedent condition is satisfied"  "business rule:" "a statement of an antecedent condition and the action to be applied when that antecedent condition is satisfied" |
| Court's Construction | "storage of statements that each specify one or more antecedent condition(s) and the consequent action(s) to be applied when the specified antecedent condition(s) are satisfied; ultimately only a single consequence results for each business rule" |

The parties' dispute concerns: (1) the meaning of "database" and (2) the number of

antecedent conditions and consequent actions associated with a business rule.

Regarding the parties' first dispute, the Court agrees with Defendants that a database

need not be a data structure, as the specification describes data structures as merely one

possibility for storing the business rules. (*See* '050 patent col.16 ll.41-44) ("The rules may be

internally stored . . . by any of a number of useful implementing data structures.") The Court

will adopt Defendants' proposal that "database" be construed to mean "storage of statements."

Regarding the second dispute, the parties agree that a business rule may include one or

more antecedent conditions. (Tr. at 95 ("There can be any number of antecedents . . . .")) The

parties also agree that a particular business rule may have multiple actions associated with it.

(*Id.* at 111) The possibility that a particular business rule may have multiple associated actions

14

is confirmed by the specification. (*See* '142 patent col.4 ll.8-12 ("In accordance with the present invention, the rule engine operates with the database to apply the business rules to each e-mail message, in order to determine a set of actions (one or more) to be applied to the e-mail message."); *id.* Table 7 (describing consequent "Copy and Release" actions for a business rule))

It is not entirely clear where the parties disagree, as it appears to be undisputed that a particular business rule may have multiple antecedents, and multiple actions, associated with it. To the extent that the parties disagree over whether a business rule may only result in a single consequence (resulting from the application of one or more actions), the Court's construction clarifies that each business rule results in a single consequence, but that consequence itself may consist of either a single action or multiple actions. This construction comports with the specification, which indicates that the invention performs only those actions with the requisite priority levels. (*See id.* at col.19 l.50 to col. 20 l.22) (describing process of action list processing based on priority of action(s) relative to current priority level set by administrator)

## 2. "[combines/combining] the [email message/data object] with a new distribution list . . . and a rule history . . ."

| **Plaintiff's Proposed Construction** | "affixes/affixing to the email message (1) address information for at least one new destination post office for receiving the email message for review by an administrator associated with the destination post office, and (2) information identifying the reasons [or at least one reason] why the email message was designated for administrator review by at least one rule engine" |
|---|---|

| **Defendants' Proposed Construction** | "combining the e-mail message [or data object], a new distribution list, and a rule history into a wrapped message"<br><br>"rule history:" "a list identifying each of the [or at least one] business rule(s) whose antecedent condition was satisfied by the e-mail message [or data object]" |
|---|---|
| **Court's Construction** | "combining the e-mail message [or data object], a new distribution list, and a rule history, for delivery together, where a rule history identifies each of the [at least one] business rule(s) whose antecedent condition was satisfied by the e-mail message [or data object]" |

The parties' briefing highlighted a number of disputes concerning: (1) the differences, if any, between combining and affixing; (2) whether a rule history was required to specify only the business rule(s) or also the reason(s); (3) whether a "wrapped" message was required; and (4) whether the rule history need to be in a "list" format. (*See, e.g.*, D.I. 223, 224, 238, 240) During the hearing, Plaintiff agreed to accept the use of the word "combining" rather than "affixing," as well as the identification of business "rules" rather than "reasons." (Tr. at 80-81) Defendants, in turn, acknowledged that neither a "wrapped message" nor a list is required. (*Id.* at 96, 99-100) The Court's construction reflects the parties' concessions.

3.   **"an organizational hierarchy of a business, the hierarchy including a plurality of roles, each role associated with a user"**

| **Plaintiff's Proposed Construction** | "organizational structure of a business, including a plurality of roles, each role associated with a user" |
|---|---|
| **Defendants' Proposed Construction** | "a business's rankings of its roles, containing multiple levels and each level comprising at least one organization role to which at least one individual is assigned" |
| **Court's Construction** | "a business's rankings of its roles, containing multiple levels and each level comprising at least one organization role to which at least one individual is assigned" |

The parties dispute whether the term "organizational hierarchy" requires a ranking of roles and levels. The Court agrees with Defendants that the ordinary and customary meaning of "hierarchy" involves ranking. (*See* D.I. 224 at 24) The Court is unpersuaded by Plaintiff's argument that the inventors acted as their own lexicographer.[5] The portion of the specification on which Plaintiff relies for its lexicography argument states, in relevant part: "[a]n organizational database 111 stores organizational information, including an organizational hierarchy of organizational roles and the individuals assigned to such roles." ('142 patent col.6 ll.8-13) The Court agrees with Defendants that this statement does not equate organizational hierarchy and organizational information; rather, it suggests that an organizational hierarchy can be part of organizational information. (*See id.*; Tr. at 113; D.I. 224 at 24)

---

[5]Plaintiff's lexicography argument (*see, e.g.*, Tr. at 109-10) appears to be in tension with its contention that the plain and ordinary meaning of "hierarchy" does not require any ranking (*see* D.I. 223 at 18).

4.   "persistently storing," "primary message store . . . for receiving and
non-persistently storing e-mail messages," and "secondary message
store . . . for receiving therefrom, and persistently storing an e-mail
message"

| Plaintiff's Proposed Construction | |
|---|---|
| "persistently storing" (claims 7, 21, 22, 25, 26) | "storing in memory that remains intact when a device is turned off, but not necessarily permanent storage" |
| "primary message store . . . for receiving and non-persistently storing e-mail messages" (claim 7) | plain and ordinary meaning |
| "secondary message store . . . for receiving therefrom, and persistently storing an e-mail message" (claim 7) | plain and ordinary meaning (apart from "persistently storing," defined above) |
| **Defendants' Proposed Construction** | |
| "persistently storing" (claims 7, 21, 22, 25, 26) | "storing for extended periods of time" |
| "primary message store . . . for receiving and non-persistently storing e-mail messages" (claim 7) | "a first mechanism that stores short lived email to which the rules do not apply" |
| "secondary message store . . . for receiving therefrom, and persistently storing an e-mail message" (claim 7) | "a second mechanism that stores emails to which at least one rule applies" |
| **Court's Construction** | |
| "persistently storing" | "storing for extended periods of time (for example, hours or days as opposed to seconds)" |

Following the hearing, the parties agreed to the "plain and ordinary meaning" for each of

the claim limitations listed above, with the exception of "persistently storing" and "non-

persistently storing." (D.I. 326)  The parties disagree as to the nature and length of time that

qualifies as "persistent" storage in the context of the claimed invention.

The specification distinguishes "non-persistent" from "persistent" storage as follows:

> [D]uring the gatekeeping phase storage is transient, typically for only
> as long as necessary to process the messages.  In contrast the
> gatekeeping message index and gatekeeping message store are used
> for persistent storage of gated messages until reviewed and
> processed, which may require storage for extended periods of time
> (e.g., 30 days).

('142 patent col.8 ll.32-38)  Defendants contend that neither the claims nor the specification

impose a strict temporal or physical limitation on "persistent" storage, and instead only require

that a message be stored until it can be reviewed. (D.I. 238 at 18)

The Court agrees with Plaintiff that more is required to meaningfully distinguish

persistent storage from non-persistent storage. (D.I. 223 at 19)  Therefore, the Court will adopt a

variation of Plaintiff's proposed construction and construe "persistent storage" to mean "storing

for extended periods of time (for example, hours or days as opposed to seconds)."  This

construction is consistent with the specification's example of 30 days while also preserving a

meaningful distinction between persistent and non-persistent storage.

### 5. "automatically reviewing the [email message/data object] after a specified time interval to determine an action to be applied"

| Plaintiff's Proposed Construction | |
|---|---|
| "automatically reviewing the email message after a specified time interval to determine an action to be applied" (claim 22) <br><br> "automatically reviewing the data object after a specified time interval to determine an action to be applied" (claim 25) | "computer determination of an action to be applied to [the email message/data object] after a specified period of time" |
| **Defendants' Proposed Construction** | |
| "automatically reviewing the email message after a specified time interval to determine an action to be applied" (claim 22) <br><br> "automatically reviewing the data object after a specified time interval to determine an action to be applied" (claim 25) | "after a specified period of time, applying at least one business rule of 'the second post office' to the selected e-mail message to determine an action to be applied" (claim 22) <br><br> "after a specified period of time, applying at least one business rule defined by 'the recipient other than a specified recipient' to the data object to determine an action to be applied" (claim 25) |
| **Court's Construction** | "computer determination of an action to be applied to [the email message/data object] after a specified period of time" |

The parties dispute whether the business rules applied during the automatic review

process must be limited to applying a "rule of the second post office." The Court agrees with

Plaintiff that the intrinsic record does not require the application of a rule of the second post

office during the automatic review step. Plaintiff correctly notes that nothing in the claims nor

specification requires that a business rule necessarily "belongs" to or is otherwise unique to a

particular post office; nor does the intrinsic record provide any clear guidance for distinguishing

among rules of various post offices. (D.I. 240 at 20-21)

Although Defendants correctly note that the specification suggests that the gatekeeping post office may apply "its own set of business rules," and highlights the benefits of having multiple post offices with "independent sets of business rules," the Court agrees with Plaintiff that this language does not *require* that such rules be unique to each particular post office.[6] (*Id.* at 20) Moreover, the portions of the specification cited by Defendants generally describe the independent business rules and/or post offices with permissive language such as "may," "if," and "can," indicative of optional aspects of the invention. (*See id.* at 21; '142 patent col.4 ll.47-54) Moreover, not every benefit or advantage of an invention is necessarily incorporated into a claim limitation. *See i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 844 (Fed. Cir. 2010) (holding that "could be edited" and "can be created" did not limit claim scope); *E-Pass Techs., Inc. v. 3Com Corp.*, 343 F.3d 1364, 1370 (Fed. Cir. 2003) ("An invention may possess a number of advantages or purposes, and there is no requirement that every claim directed to that invention be limited to encompass all of them.").

---

[6] Preceding claim language already makes clear that the automatic review step is performed by the "second post office" or "recipient other than a specified recipient."

### 6. "rule engine"

| Plaintiff's Proposed Construction | plain and ordinary meaning |
|---|---|
| Defendants' Proposed Construction | "a mechanism that applies the business rules, in order to determine a set of actions to be applied" |
| Court's Construction | "a mechanism that applies the business rules, in order to determine a set of actions (one or more) to be applied" |

During the hearing, the parties agreed to a compromise construction (*see* Tr. at 86),

which the Court will adopt.

### C. U.S. Patent No. 5,987,610

The '610 patent, filed on February 12, 1998 and issued on November 16, 1999, relates

generally to a method for virus screening within a telephone network before it is communicated

to an end user. The patent, "Computer Virus Screening Methods and Systems," is directed to

"screen[ing] computer data for viruses within a telephone network before communicating the

computer data to an end user." ('610 patent col.1 ll.59-61)

### 1. "routing a call between a calling party and a called party of a telephone network"

| Plaintiff's Proposed Construction | "transmitting a voice or data transmission between a party initiating a voice or data transmission and a party receiving a voice or data transmission" |
|---|---|
| Defendants' Proposed Construction | "determining and securing, for a call, the communication path between the telephone line of a calling party and the telephone line of a called party" |
| Court's Construction | "transmitting a voice or data transmission between a party initiating a voice or data transmission and a party receiving a voice or data transmission" |

The parties dispute: (1) whether "telephone network" should be limited to telephone lines

22

or should include data networks and non-telephone line communication networks, and

(2) whether "routing a call" requires determining and securing a particular path for a call along a

telephone line.

The Court agrees with Plaintiff that "telephone network" should be construed to include

more than telephone lines; it also includes data networks and other non-telephone line

communication networks.  (*See* D.I. 223 at 24-26)  Both the claims and specification describe

"computer data" and/or "data calls" for communicating such data to end users.  ('610 patent

claims 1 and 11; *id.* at col.1 ll.59-61) ("Embodiments of the present invention advantageously

screen computer data for viruses within a telephone network before communicating the

computer data to an end user.")[7]  Moreover, the specification distinguishes between a "public

switched telephone network" and "[o]ther connection means such as . . . cellular data," further

suggesting that the invention is not limited to traditional telephone lines.  (*Id.* at col.12 ll.43-51)

For similar reasons, the Court further agrees with Plaintiff that "routing a call" does not

require securing a particular path along a telephone line.  (*See* D.I. 223 at 26-29)  The portion of

the specification relied on by Defendants, stating that the telephone network "determines and

secures an appropriate path," relates only to "a circuit-switched connection."  (*Id.* at col.3 ll.38-

41)

---

[7]The doctrine of claim differentiation further supports Plaintiff's proposed construction.  Claim
23 recites a "telephone network," while claim 24 specifies "wherein the telephone network
includes a public telephone network."  This suggests that the "telephone network" of claim 23
(and claim 1) is something more than the traditional "public telephone network" recited in claim
24.

### 2.    "within the telephone network"

| Plaintiff's Proposed Construction | "in the voice or data network connecting the calling party and called party, exclusive of the networks of the called party and calling party" |
|---|---|
| Defendants' Proposed Construction | "in and between nodes that communicate signals between pairs of telephone lines" |
| Court's Construction | "in the voice or data network connecting the calling party and called party, exclusive of the networks and gateway nodes of the called party and calling party" |

The parties dispute the boundaries of the telephone network, and, more specifically,

where "within" the claimed telephone network virus detection may occur. The parties agree that

the inventors surrendered claim scope during prosecution of the application leading to the '610

patent, but disagree as to the precise scope of that disclaimer.

During prosecution, the Examiner rejected claims as obvious over the Ji reference in

view of Hile. The Ji reference, U.S. Patent No. 5,623,600, discloses an invention in which virus

detection is applied to messages and files transferred into or out of a network, and is performed

by a novel "gateway node." ('600 patent col.3 ll.57-63; *id.* at col.4 ll.53-55) In response to the

Examiner's rejection, the applicants amended their claims to include the limitation "within a

telephone network;" the applicants then argued that their rejected claims were patentably distinct

from the Ji reference because, "[b]y performing virus screening within a telephone network,

computer viruses can be mitigated without requiring virus-detecting gateway nodes." (D.I. 214

Ex. K, 6/23/99 Amendment at 7, A00355)

In this way, the applicants distinguished their claimed invention from the prior art by

excluding gateway nodes from "within the telephone network," by making clear that the virus

detection scheme of the claimed invention could be implemented "without requiring virus-

24

detecting gateway nodes" that were required by the Ji reference. Unlike Plaintiff's proposed

construction – which only excludes "networks" – the Court's construction will also exclude the

"gateway nodes," as this is the language used in both the Ji reference and the applicants' remarks

to the Examiner.

### 3. "identification code"

| Plaintiff's Proposed Construction | "telecommunications or other network address" |
|---|---|
| Defendants' Proposed Construction | "a set of symbols that identify" |
| Court's Construction | "a set of symbols that identify" |

The '610 patent mentions the term "identification code" only once, noting that "a query

to a database . . . can include an identification code of the calling party and/or an identification

code of the called party." ('610 patent col.5 ll.21-26) The parties dispute whether the

"identification code" must be a telecommunications or other network address, or whether it can

more broadly be construed to require only "a set of symbols that identify" the calling or called

party. Plaintiff contends that "Defendants' reference to 'symbols' – a word absent from the

specification[,] would not help the jury resolve issues of infringement and invalidity." (D.I. 223

at 32) Defendants respond that "[t]he specification uses both the word 'address' and the word

'code,' but never associates the two together." (D.I. 224 at 39)

The Court agrees with Defendants that, in light of the sole mention of the term

"identification code" in the specification, that term is properly construed to indicate a set of

symbols that serve to identify the calling or called party. Defendants' proposed construction is

consistent with the specification and would not be too difficult or confusing for a jury.

25

### D.     U.S. Patent No. 7,506,155

The '155 patent was filed on May 31, 2005 and issued on March 17, 2009.  It claims

priority to an application filed on June 22, 2000.  It relates generally to a method for eliminating

the threat of viruses transmitted on a computer network by rendering the viruses inoperable

before they can be executed on a recipient's computer.  The '155 patent is entitled, "E-mail virus

protection system and method."

### 1.     "converting . . . from an executable format to a non-executable format"

| Plaintiff's Proposed Construction | "rendering the executable code inoperable" |
|---|---|
| Defendants' Proposed Construction | "transforming the executable code into a copy that cannot open any processes or applications" |
| Court's Construction | "transforming the executable code into a version that cannot open any processes or applications" |

The '155 patent specification describes, in relevant part, "a conversion process that

eliminates all executable code leaving only alphanumeric message text.  This process will

generally create a readable copy of the attachment, but will not allow the attachment to open any

processes or applications, including executable virus code." ('155 patent col.3 ll.59-63)

Elsewhere, the specification further discloses that after the conversion process "eliminates all

executable code leaving only alphanumeric message text," "[a]ny imbedded hyperlinks or email

addresses, while still identifiable as links or addresses, are rendered inoperable as executable

'links.'" (*Id.* at col. 3 ll.39-43)

Plaintiff contends that these portions of the specification support its proposed

construction as including the direct elimination of executable code, leaving only alphanumeric

text, without requiring the creation of any copy or other version of that code. (*See, e.g.*, D.I. 223

at 33-35) Defendants focus, instead, on the language indicating that the conversion process "generally" will create a readable copy, and that imbedded hyperlinks or email addresses will remain "still identifiable," albeit in non-executable form. (*See* D.I. 238 at 3)  From this portion of the language, Defendants argue that the conversion process necessarily involves creating a copy or version of the executable code. (*See id.*)  According to Defendants, the term "converting" cannot mean "deleting," since the claims require "forwarding the non-executable format to a recipient" after the conversion step, yet deleting the executable code would leave nothing to forward. (D.I. 224 at 4)

The Court agrees with Defendants that, in light of the claim language and specification, the "converting" process involves transforming the executable code into a non-executable copy or version[8] that cannot open any process or applications.  The Court's construction is consistent with the specification, which indicates that the conversion process will "generally create a readable copy" of the executable code, and any non-executable links or email addresses will remain "still identifiable."  This indicates that a copy or version of the executable code is produced as a result of the conversion process.

### 2. "forwarding the non-executable format"

| Plaintiff's Proposed Construction | plain and ordinary meaning |
|---|---|
| Defendants' Proposed Construction | "sending to a new recipient the copy that cannot open any processes or applications" |
| Court's Construction | "forwarding the version that cannot open any processes or applications" |

The phrase "forwarding" has a plain and ordinary meaning that requires no construction.

---

[8]Defendants acknowledged at the hearing that the non-executable copy need not be an identical copy. (Tr. at 134)

The Court's construction combines the plain and ordinary meaning of "forwarding" with the Court's previous construction of "non-executable format" in connection with the conversion process, as described in connection with the preceding term.[9]

### 3. "retains an appearance, human readability, and semantic content of the e-mail message"

| Plaintiff's Proposed Construction | "retains substantially the same appearance, human readability, and semantic content of the email message, such that all or substantially all alphanumeric text in the email message remains human readable" |
|---|---|
| Defendants' Proposed Construction | "keeps the visual display, human readability, and meaning of the email" |
| Court's Construction | "retains substantially the same appearance, human readability, and semantic content of the email message, such that all or substantially all alphanumeric text in the email message remains human readable" |

Plaintiff contends that the claimed invention does not require the complete retention of the original message's identical characteristics, but instead requires only "retaining as much as possible of the appearance, readability, and semantic content" of that message. (D.I. 223 at 38) According to Plaintiff, its proposed construction recognizes that "it may be impossible to maintain an identical appearance after eliminating executable code." (*Id.*)

Defendants suggest that Plaintiff's proposed construction is too subjective and would risk rendering the asserted claims indefinite. (D.I. 224 at 7) Defendants further cite to the prosecution history of the parent application of the '155 patent, noting that there the applicants

---

[9]Plaintiff conceded at the hearing that the construction of "non-executable format" would, in part, depend upon and follow from the Court's construction of the related "converting" limitation. (Tr. at 119)

distinguished prior art by arguing to the Examiner that "the recipient of the email message is . . .

able to see . . . any human-readable content for which the e-mail message was sent in the first

place." (*Id.*) (citing 8/12/03 Amendment at 5, 12)

The Court will adopt Plaintiff's proposed construction. The parties appear to agree on

the general concept achieved by the claimed invention (Tr. at 143-44) and, in the Court's view,

Plaintiff's construction best captures that concept.

### 4.   "deactivating the hypertext link"

| Plaintiff's Proposed Construction | "rendering the hypertext link inoperable as an executable link to the specified URL, while leaving alphanumeric text that is identifiable as a hypertext link" |
|---|---|
| Defendants' Proposed Construction | "to render the hypertext link inoperable" |
| Court's Construction | "rendering the hypertext link inoperable as an executable link to the specified URL, while leaving alphanumeric text that is identifiable as a hypertext link" |

Plaintiff contends that its proposed construction captures the various features of the

deactivation process by specifying that the claimed invention "(1) renders inoperable the

hyperlinks to potentially dangerous websites; (2) prevents the recipient from opening the link's

specified URL; and (3) ensures the deactivated URL is still identifiable by alphanumerical text."

(D.I. 223 at 40) In support of its proposed construction, Plaintiff cites to a portion of the

specification describing a preferred embodiment of the claimed invention as follows:

> The e-mail portion of the Internet e-mail received from (201) is passed through a conversion process (205) that eliminates all executable code leaving only alphanumeric message text. Any embedded hyperlinks or email addresses, while still identifiable as links or addresses, are rendered inoperable as executable "links."

29

('155 patent col.3 ll.37-43) Defendants criticize Plaintiff's proposed construction as being unclear as to the meaning of "specified URL," finding ambiguity in whether it refers to the URL to which the hyperlink apparently redirects to (i.e., the intended, non-malicious URL) or, instead, refers to the URL to which the hyperlink actually redirects to (i.e., the hidden, malicious URL). (D.I. 224 at 10) Plaintiff responds that each hyperlink has only one "specified URL" destination, which in the context of the claimed invention refers to the destination to which the user would actually be redirected to upon clicking the hyperlink. (Tr. at 124-25)

The Court agrees with Plaintiff that its proposed construction is consistent with the intrinsic record and will not confuse the jury as to the meaning of "specified URL" address. Therefore, the Court will adopt Plaintiff's proposed construction.

## IV.   CONCLUSION

For the foregoing reasons, the Court will construe the disputed claim terms in the patents-in-suit consistent with this Memorandum Opinion. An appropriate Order follows.