IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

INTELLECTUAL VENTURES I LLC,

    Plaintiff,

v.

CHECK POINT SOFTWARE
TECHNOLOGIES LTD., et al.,

    Defendants.

§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§

Case No. 10-cv-01067-LPS

JURY TRIAL DEMANDED

**FILED UNDER SEAL**

## IV1'S OPENING BRIEF IN SUPPORT OF ITS MOTION TO EXCLUDE THREE OPINIONS OF SYMANTEC DAMAGES EXPERT W. CHRISTOPHER BAKEWELL

Parker C. Folse III (admitted *pro hac vice*)
Brooke A.M. Taylor (admitted *pro hac vice*)
Lindsey N. Godfrey (admitted *pro hac vice*)
SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
Telephone: (206) 516-3880
pfolsc@susmangodfrey.com
btaylor@susmangodfrey.com
lgodfrey@susmangodfrey.com

Brian E. Farnan (Bar No. 4089)
FARNAN LLP
919 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 777-0300
bfarnan@famanlaw.com

Richard W. Hess (admitted *pro hac vice*)
Weston O'Black (admitted *pro hac vice*)
John P. Lahad (admitted *pro hac vice*)
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, TX 77002
Telephone: (713) 653-7859
rhess@susmangodfrey.com
woblack@susmangodfrey.com
jlahad@susmangodfrey.com

Dated: June 14, 2013

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

I.    Nature and Stage of Proceedings, Argument Summary and Statement of Facts ............... 1

    A.    Statement of the Nature and Stage of the Proceedings ............................. 1

    B.    Summary of Argument ............................................................. 2

    C.    Concise Statement of Facts ........................................................ 2

II.    Legal Standard ........................................................................... 2

III.    The Court Should Exclude Bakewell's Opinions Regarding the So-Called ████████ as Unreliable and Unhelpful to the Trier of Fact .................... 3

    A.    The ████████ on Exhibit IV-58 .............................. 3

    B.    Mr. Bakewell Bases His Opinions on Three "Facts" That Have No Evidentiary Support .............................................................. 4

        1.    Bakewell assumes, without basis, that IV calculated prices for ████ to license individual IP groups. .............................. 5

        2.    No evidence exists that IV "offered" or "presented" these or any prices to ████ .................................................. 6

        3.    No evidence exists that ████ received an offer or rejected it. ...... 9

    C.    The Court Should Exclude Mr. Bakewell's Unsupported ████ ████ Opinions. ......................................................... 9

IV.    The Court Should Exclude Bakewell's Flawed Survey-Based Opinions ............... 10

    A.    Mr. Bakewell's "Survey Methodology" ......................................... 11

    B.    Symantec's Survey Data Is Unsuited for Mr. Bakewell's Methodology and Conclusions ................................................................ 12

        1.    Symantec's online surveys do not ask respondents about accused features. ............................................................... 12

        2.    Data set included customers for all Symantec products, not just accused products. .............................................. 13

        3.    Data set included 10 years of data, but the infringing products are much newer. ...................................................... 14

|   |   | 4. | Vast majority of customers did not respond to "open ended" questions. | 15 |
| | C. | | Problems with Bakewell's Methodology Render His Conclusions Unreliable | 15 |
| | | 1. | Bakewell has no idea whether the words he and Dr. Spafford chose are they types used by Symantec customers. | 15 |
| | | 2. | Bakewell's methodology leads to absurd results | 16 |
| V. | | | Bakewell's Alternative Design Opinions Lacks a Sound Basis | 17 |
| | A. | | The Court Should Exclude Mr. Bakewell's Opinion on the '050 Alternative Design to Move Servers Outside U.S. | 18 |
| | B. | | The Court Should Exclude Mr. Bakewell's Opinion on the '610 Patent Alternative Design to Move Data Centers Outside U.S. | 19 |
| VI. | | | Conclusion | 20 |

## TABLE OF AUTHORITIES

Federal Cases

*Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.,*
  140 F.3d 494 (3d Cir. 1998) ................................................................................................11

*Conceptus, Inc. v. Hologic, Inc.,*
  771 F. Supp. 2d 1164 (N.D. Cal. 2010).............................................................................18

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
  509 U.S. 579 (1993)..........................................................................................................2, 3

*DSU Med. Corp. v. JMS Co., Ltd.,*
  471 F.3d 1293 (Fed. Cir. 2006) ..........................................................................................20

*Elcock v. Kmart Corp.,*
  233 F.3d 734 (3d Cir. 2000) ............................................................................................3, 19

*In re Paoli R.R. Yard PCB Litig.,*
  35 F.3d 717 (3d Cir. 1994) ..................................................................................................2

*In re TMI Litig.,*
  193 F.3d 613 (3d Cir. 1999) ...........................................................................................3, 9

*Kumho Tire Co., Ltd. v. Carmichael,*
  526 U.S. 137 (1999)..............................................................................................................3

*Micro Chem., Inc. v. Lextron, Inc.,*
  317 F.3d 1387 (Fed. Cir. 1991) ...........................................................................................2

*Montgomery County v. Microvote Corp.,*
  320 F.3d 440 (3d Cir. 2003) ..........................................................................................9, 10

*Oddi v. Ford Motor Co.,*
  234 F.3d 136 (3d Cir. 2000) ..............................................................................................18

*Pittsburgh Press Club v. United States,*
  579 F.2d 751 (3d Cir. 1978) ..............................................................................................11

State Cases

*Bowen v. E.I. DuPont de Nemours & Co., Inc.,*
  906 A.2d 787 (Del. 2006)..................................................................................................19

*Brandt v. Rokeby Realty Co.,*
  Civ. A. 97C-10-132-RFS, 2005 WL 1654362 (Del. Super. May 9, 2005).......................11

Federal Statutes

35 U.S.C § 284.................................................................................................................11, 13

Federal Rules

Federal Rule of Evidence 702.......................................................................................2, 3, 10

Treatises

REFERENCE MANUAL ON SCIENTIFIC EVID. 229 (2d ed. 2000) ...................................11, 12, 14, 15

Plaintiff Intellectual Ventures I LLC ("IV1") requests that the Court exclude three specific opinions proffered by Symantec damages expert W. Christopher Bakewell because they are unreliable, unsupported and unhelpful to the trier of fact.

*First*, in an attempt to low-ball IV1's damages, Mr. Bakewell concocts a "market transaction" between Intellectual Ventures ("IV") and ███ involving the patents-in-suit that never occurred. Mr. Bakewell hypothesizes this ███ licensing offer from his unsupported speculation about a single internal Intellectual Ventures spreadsheet that he cannot explain. Mr. Bakewell offers the demonstrably erroneous opinion that in December 2010, one of IV's strategic partners received and "rejected" an offer to license the patents in suit. But this offer was never made. It is not a real-world transaction. It is fiction.

*Second*, Symantec seeks to have Mr. Bakewell tell a jury that infringing features of Symantec products have little value based on an "analysis" of nine years' worth of Symantec customer survey data. But that analysis amounts only to Mr. Bakewell's electronic search-and-find for "key words" selected by himself and another putative Symantec expert. It fails every requirement for admissible survey evidence.

*Finally*, Mr. Bakewell seeks to offer opinions on a purported non-infringing design alternative—moving servers outside the U.S.—but his analysis suffers from the same flaws as the opinions offered by Trend's experts Drs. Leonard, Prakash and Tygar.

I.
Nature and Stage of Proceedings,
Argument Summary and Statement of Facts

A.   Statement of the Nature and Stage of the Proceedings

In this patent infringement lawsuit, discovery ended on November 21, 2012. The parties served opening expert reports on February 15, 2013, rebuttal reports on March 20, 2013 and

1

reply reports on April 3, 2013. All designated testifying experts have been deposed. The deadline for filing all *Daubert* and case dispositive motions is June 14, 2013. (D.I. 501).

B.    Summary of Argument

1.  The Court should exclude Symantec expert testimony based on an IV spreadsheet because those opinions lack any factual basis or grounding in real world events.

2.  Symantec's expert opinions that are based on Symantec survey data are unreliable and do not meet the legal standard for reliable survey information.

3.  Mr. Bakewell's opinions about an allegedly available alternative design lack factual support and should be excluded.

C.    Concise Statement of Facts

IV1 accuses Defendant Symantec of infringing four patents, U.S. Patent No. 6,460,050 ("the '050 Patent" or "the '050"), U.S. Patent No. 6,987,610 ("the '610 Patent" or "the '610"), U.S. Patent No. 6,073,142 ("the '142 Patent" or "the '142"), and U.S. Patent No. 7,506,155 ("the '155 Patent" or "the '155").

IV1 served reports from its damages expert quantifying the damages due from Symantec for its use of these four patents. Symantec served a rebuttal report from W. Christopher Bakewell on March 20, 2013, and a "supplemental" rebuttal report on May 17, 2013.

II.
Legal Standard

The admissibility of expert testimony is a question of law governed by Federal Rule of Evidence 702 and the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993). *See In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 749 (3d Cir. 1994). A trial court's decision to admit expert testimony under *Daubert* follows the law of the regional circuit. *See Micro Chem., Inc. v. Lextron, Inc.,* 317 F.3d 1387, 1142–43 (Fed. Cir. 1991).

Rule 702 requires that expert testimony, in order to be admissible, must "assist the trier of fact to understand the evidence or to determine a fact in issue." Expert testimony may be

admitted at trial *only* if: "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." FED. R. EVID. 702; *see also Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 141 (1999).

Under Third Circuit precedent, these requirements comprise "three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit." *Elcock v. Kmart Corp.,* 233 F.3d 734, 741 (3d Cir. 2000). The party offering expert testimony—here Symantec—bears the burden to show that it meets all of the standards for admissibility. *See Daubert,* 509 U.S. at 592 n. 10; *In re TMI Litig.,* 193 F.3d 613, 663 (3d Cir. 1999).

### III.
### The Court Should Exclude Bakewell's Opinions Regarding the
So-Called ████████████████ as Unreliable and Unhelpful to the Trier of Fact

To justify the minuscule sums he calculates for Symantec's use of the patents-in-suit, Symantec's damages expert, Mr. Bakewell, attempts to fabricate support for those sums in the form of a fictional offer to license the patents-in-suit. But there is no evidence that Intellectual Ventures ever made ███ an offer as Mr. Bakewell hypothesizes. This fact alone guts Mr. Bakewell's use of this non-offer in his analysis of a hypothetical negotiation.

A.   The ████████████████ on Exhibit IV-58

On Feb. 7, 2012, IV1 produced a native electronic spreadsheet to defendants with the file name ████████████████. *See* Exh. 1, IV1_PROD003 Transmittal Letter].[1] Defense counsel first used a print out of that Excel file, labeled IV-58, at the deposition of IV1 corporate representative Richard Harris on Sept. 14, 2012. *See* Exh. 2, IV-58.

---

[1] ████████████ was, thus, one of ███ native file spreadsheets that IV1 produced in this lawsuit. IV1 also produced ████ individual TIF images comprising over ████ individual documents. The number of TIFs does not include the ██ spreadsheets. *See* Hess Decl. ¶¶ 3–5.

The previous two sentences comprise the entire factual record regarding IV-58. No other information about IV-58 has been developed, whether from other documents, other discovery requests, or through fact witness testimony. No defendant asked IV1 about IV-58 in any interrogatory or request for admission.

Defense counsel examined three IV witnesses about IV-58: Harris, Sanjay Prasad and Don Merino. None of them recognized it or could identify it. *See* Exh. 3, Harris Tr. 131:12–21; Exh. 4, Prasad Tr. 60:14–20; Exh. 5, Merino Tr. 134:6–15. And although Trend and Symantec propounded 183 corporate representative topics to IV1, no topic identified IV-58 as a subject about which defendants sought more information.

The spreadsheet itself, IV-58, contains three worksheets titled ███████████████ ██████ The ████████████████████████████████████████████████████ ███████████████ ' In the column labeled IIF1 ████████████████████ ██████████████████, the Summary page lists a █████████████████ █████████████████ *See* Exh. 2, IV-58.



The subsequent worksheet, "███████████████████████████████ █████████████████████████." It includes ████████████████ different ██████████████, including the four containing the patents-in-suit. From this spreadsheet, Mr. Bakewell excises four rows, one for each █████████ containing a patent-in-suit, for purportedly *individual* "prices" ranging from █████████████. The final worksheet has 209 rows and is called "Data."

B.   Mr. Bakewell Bases His Opinions on Three "Facts" That Have No Evidentiary Support

Despite the sparse factual record that Defendants have developed regarding IV-58,

---

[2] As shown in eighth column of the "Pricing" worksheet, the ██████████ containing the patents in suit (313, 402, 657 and 767) are ████████████."

Symantec's damages expert bases an entire section of his report on that document. *See* Exh. 6, Bakewell Report ¶¶ 186–197. Bakewell then repeatedly references his erroneous conclusions about IV-58 in order to bolster other opinions he offers. *See id.* ¶¶ 227–231, 233–234, 495 & 648. According to Mr. Bakewell's Report, IV-58 shows that Intellectual Ventures was willing— and indeed, actually offered ▮ the opportunity—



Mr. Bakewell also opines, based on IV-58, that IV offered these licenses to ▮ on ▮ ▮s—where ▮ could ▮ ▮.

Mr. Bakewell arrives at this conclusion by creating three "facts" out of whole cloth.



| Erroneous "Facts" Relied on by Bakewell for his ▮▮▮ Opinion |
| --- |
| • Erroneous Fact #1: IV-58 "calculated" prices for ▮ ▮▮. |
| • Erroneous Fact #2: IV "offered" or "presented" these IV-58's "prices" to ▮ |
| • Erroneous Fact #3: ▮ "rejected" these prices and found them "unacceptable." |

    1.   <u>Bakewell assumes, without basis, that IV calculated prices for ▮ ▮</u>
<u>▮.</u>

According to Mr. Bakewell, IV-58 shows that IV determined prices at which to license ▮ ▮ in December 2010, shortly before this lawsuit began. *See id.* ¶¶ 188, 191. But there is nothing in IV-58 on which Mr. Bakewell could base this opinion. Mr. Bakewell knows nothing about IV-58, and nothing connects the numbers in the spreadsheet to real world business decisions IV made about ▮.

At his deposition, Mr. Bakewell could not identify who generated or created IV-58.



Mr. Bakewell did not know in whose files at Intellectual Ventures IV-58 was located, but offered ▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐

And testimony from senior IV witnesses about so-called ▐▐▐▐▐▐▐ contradicts Bakewell's conclusion that IV-58 contains "▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐ ▐▐▐▐▐▐▐ Exh. 5, ▐▐▐▐▐ 134:6–135:21 ▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐ Bakewell cites to other portions of ▐▐▐▐▐ deposition, but omits this portion that contradicts Bakewell's unsupported opinion.

    2.   <u>No evidence exists that IV "offered" or "presented" these or any prices to</u> ▐

Even more egregious than the unsupported speculation regarding the contents of IV-58, Mr. Bakewell also misrepresents the use that IV made of that document. According to Mr. Bakewell's report, ▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐ ▐▐ ▐▐▐▐▐▐▐. Mr. Bakewell's Report was clear and unequivocal, and repeatedly states that IV *actually offered* these prices to ▐▐▐ two days before filing this lawsuit:

---

[3] The "properties" of the native file from which IV-58 was printed identify the user who last modified the file. Mr. Bakewell initially testified ▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐ But no one from the Defendants—lawyer or expert—attempted to ascertain information from IV1 based on the user identified in the native document's properties.



But there is not a single document anywhere in the record that shows IV presenting or offering IV-58's "prices"—or any prices—to ▮▮▮ at any time, let alone on December 6, 2010. Mr. Bakewell appears to simply have made it up. Asked to back up his repeated and bald statements that IV offered these prices to ▮▮▮ Mr. Bakewell demurred.



---

[4] The chart above is a screen shot from Mr. Bakewell's report, but this chart is not an IV document. It is chart that *Mr. Bakewell* prepared. Despite the introductory language stating that IV "presented the following to ▮▮▮ IV did not present it or anything like it to ▮▮▮ Confronted at his deposition, ▮▮▮



Then Mr. Bakewell conceded that he has no evidence for his opinion that IV offered these "prices" on IV-58 to ▮▮▮▮ to license the patents-in-suit:

3.    No evidence exists that ▮ received an offer or rejected it.

Because Mr. Bakewell has no idea if or when IV-58 was sent to ▮  Mr. Bakewell's

opinion that ▮ "rejected" an offer to license ▮

is also unreliable. Exh. 6, ¶ 119. Mr. Bakewell points to no document showing that ▮ received

IV-58 or any ▮, and no document showing that ▮

rejected any offer. There is simply no basis in the record for Mr. Bakewell's conclusion that ▮

received an offer and ▮ ▮

▮ ▮ Mr. Bakewell's report cites nothing and provides

no support for this supposed "fact." Because it is fiction.

C.    The Court Should Exclude Mr. Bakewell's Unsupported ▮ Opinions.

The "facts" on which Mr. Bakewell bases his ▮ opinion do not exist. Instead,

Mr. Bakewell has strung together a chain of inferences from one document that he does not

know anything about, and on which no witness sheds any light. And when pressed on his

Report's conclusions, Mr. Bakewell largely concedes that he is opining in a fact-free zone.

Before permitting an expert to provide an opinion, the Court "should assess whether there

are good grounds to rely on this data to draw the conclusion reached by the expert." *In re TMI*

*Litig.* 193 F.3d at 697. "If the data underlying the expert's opinions are so unreliable that no

reasonable expert could base an opinion on them, the opinion resting on that data must be

excluded." *Montgomery County v. Microvote Corp.,* 320 F.3d 440, 448 (3d Cir. 2003).

In *Microvote*, the Third Circuit affirmed the exclusion of Mr. Naegle, an expert who had

relied on a document prepared by Microvote, but admitted "that he did not know what the

document was, who created it, or how it was created." *Id.* at 448–449. Like Mr. Bakewell,

Mr. Naegle "could not identify the source or basis" for the documents he relied on. *Id.* at 449.

Mr. Bakewell's analysis of IV-58 suffers from all of the defects that resulted in the expert's exclusion in *Microvote* and many, many more. Mr. Bakewell does not know what IV-58 is or what it was used for, other than his own speculation. He does not know who created it, its source or basis. And his assumptions about IV-58 are contradicted by the spreadsheet itself.[5]

But more fundamentally, there is no support for Mr. Bakewell's conclusions that the amounts listed on IV-58 were ███████████████████ █ ████. There is no support for his opinion that these "prices" were presented to ███ at any time. And there is no support for his opinion that ███ ███████████.

Mr. Bakewell's hypothetical license negotiation analysis does not provide him with license to make up events. Symantec wants to present Mr. Bakewell, cloaked as a damages expert, to tell a jury that about a fictional transaction, a story cobbled together from his counterfactual inferences about a single document Mr. Bakewell misunderstands. This is not permitted under *Daubert* or Rule 702, and the Court should exclude these opinions.

IV.
The Court Should Exclude Bakewell's Flawed Survey-Based Opinions

Symantec also seeks to present a jury unreliable information under the guise of expert testimony in a second way: through Mr. Bakewell's purported analysis of Symantec survey data. The Court should exclude Mr. Bakewell's opinions about the value of the patents-in-suit to Symantec customers because he uses a flawed methodology to analyze an irrelevant data set.

---

[5] Mr. Bakewell assumed in his report that the ██████ ████████ in IV-58 were calculated based on ████████████████ for those groups. Exh. 6, ¶ 188. Based on that assumption, Bakewell lifts the four ████████████ without actually checking to see if they were, in fact, based on ████████ They were not, but Bakewell could not explain the discrepancy. Exh. 7, 65:8–66:1; 68:13–69:24. But he admits he should have used the correct number. Exh. 7, 72:1–25. That information is easily obtained from ████████████ that were introduced at the first deposition in this case in September 2012. *See, e.g.,* Exh. 8. IV-11, IV-12 & IV-13. Mr. Bakewell testified that he ██████████ ████████████ He did not.

Third Circuit case law sets out rigorous requirements to ensure the reliability of expert testimony based on survey results. *See Pittsburgh Press Club v. United States*, 579 F.2d 751, 759 (3d Cir. 1978); *see also Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 516 n.14. (3d Cir. 1998). Courts also rely on the Federal Judicial Center's "Reference Guide on Survey Research," in REFERENCE MANUAL ON SCIENTIFIC EVID. 229 (2d ed. 2000) ("Fed. Reference Manual"). *See, e.g, Brandt v. Rokeby Realty Co.*, Civ. A. 97C-10-132-RFS, 2005 WL 1654362 (Del. Super. May 9, 2005).

Before seeking to admit such testimony, the proponent must demonstrate that the survey and its analysis meet generally accepted survey principles. *Pittsburgh Press Club*, 579 F.2d at 759. This requires examining a proper universe and choosing a representative sample. *Id.* Methods should be used to "minimize sampling and procedural errors." *Id.* Additionally,

> the persons conducting the survey must be experts; the data must be properly gathered and accurately reported. It is essential that the sample design, the questionnaires and the manner of interview meet the standards of objective surveying and statistical techniques.

*Id.* Mr. Bakewell's analysis of Symantec customer data fails all of these safeguards.

A.    Mr. Bakewell's "Survey Methodology"

Mr. Bakewell earned an MBA with a concentration in finance. The purpose of his foray into consumer opinion survey analysis appears to be his attempt to comply with the statutory mandate for patent damages: determining a "reasonable royalty for the use made of the invention" by Symantec. 35 U.S.C § 284.

Instead, Mr. Bakewell obtained and purported to analyze customer satisfaction data

Mr. Bakewell and another Symantec expert, Dr. Spafford, divined a series of "key words" that they alone believed were "related" to the infringing features of Symantec's accused products. Mr. Bakewell's staff then searched the survey responses to an open-ended question in those surveys to see if these key terms appeared. If they did, Mr. Bakewell counted the number of times, then divided by total responses to get a "percentage." *See* Exh. 9, Bakewell Attachments, Exh. 9.0.

Then, based on what Mr. Bakewell presumes is a "low" percentage, he opines that this

**B.** <u>Symantec's Survey Data Is Unsuited for Mr. Bakewell's Methodology and Conclusions</u>

The problems with Mr. Bakewell's analysis start with his data and continue through his methodology. Those problems render Mr. Bakewell's conclusions unreliable.

    1.    <u>Symantec's online surveys do not ask respondents about accused features.</u>

Mr. Bakewell attempted to glean insight about specific accused features of particular accused products by searching for key words in responses to open-ended survey questions. But

. *See* Fed. Reference Manual at 8 ("Surveys not conducted specifically in preparation for, or in response to, litigation

may provide important information, but they frequently ask irrelevant questions or select inappropriate samples of respondents for study.")

Instead, the respondents used by Mr. Bakewell were asked ██████████████ ████████████████████████████████████████████████████████████████ ████████████' Exh. 10, S-214, Question 3. Mr. Bakewell then "mines" the responses to this open-ended question for the "key terms" he and Dr. Spafford generated.[6] But the question prompting the responses does not ask █████████████. The surveys were █████████ ████████████████████████████, 7, 239:15. And, as many of the responses make clear, ████████████████████████████████████,"[7]

On a fundamental level, Mr. Bakewell's methodology is unreliable because the data set he uses is unsuited for the task. Mr. Bakewell cannot draw conclusions about the extent of use for particular patented features using survey responses that have nothing to do with Section 284's (1) extent of use; or (2) particular patented features.

2.    <u>Data set included customers for ██████████████████████</u>.

Worse, Mr. Bakewell's analysis attempts to demonstrate some mathematical rigor that does not exist. For example, Mr. Bakewell reports that "Of █████ survey respondents who included comments, only █████ percent commented on a term relating to the '050 patent." But Mr. Bakewell has no idea how many of those █████ respondents actually used an accused product.

---



[6] ████████████████████████████████████████████████████████ ████████████ *See* Exh. 10, S-214 at SYMIV00819698 & Exh. 11, S-216 at SYMIV00819686.
[7] *See, e.g.*, Exh. 12, S-217 at 1 ████████████████ █ █ ████ ████████████████████████████████████████████████████ ████████████████████████████████████

Those ▮▮▮ survey respondents (which included only those who "registered") included Symantec customers who bought any of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ are not accused products. Exh. 7, 219:4–15. For example, the enterprise survey included customers for ▮ products, only ▮ of which are even *potentially* accused products (no version information is available for what products were surveyed, and not all versions are accused). *See* S-216 at 8.

But Mr. Bakewell didn't exclude users of those non-accused products from his results. Exh. 7, 242:11–243:15. *See* Fed. Reference Manual at 240 ("The definition of the relevant population is crucial because there may be systematic differences in the responses of members of the population and nonmembers.").

In sum, Mr. Bakewell's "data" (and the denominator for his quotients) include the responses of customers *for products that have nothing to do with malware protection*. Many survey respondents—the number is unknown—could not have been expected to volunteer praise (or criticism, see below) for specific attributes of a particular antivirus feature, because their product not only lacks that feature—it has nothing to do with virus detection at all.[8]

3.     Data set included 10 years of data, but the infringing products are much newer.

The sets of customer data Mr. Bakewell "analyzed" go back to 2004. But Symantec's products that infringe the '050 and '610 Patents[9] were not on sale until 2008 and 2009, when half or more of the data had been collected.[10] Bakewell Report ¶ 96. Mr. Bakewell did nothing to segregate out the responses from users of non-infringing products who, of course, would not be

---

[8] Although Mr. Bakewell uses the surveys to opine on extent of use, he also admitted in his deposition that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮. Exh. 7, 239:21–242:10.

[9] Bakewell did not use customer data to analyze the extent of use of the '155 Patent.

[10] This assumes, of course, an even distribution of respondents per year. This is impossible to know using the undated survey responses on which Mr. Bakewell relies.

expected to comment on whether they used infringing features because those features didn't exist at the time that the customer was surveyed. Exh. 7, 200:8–201:17. *See* Fed. Reference Manual at 12 ("A survey that provides information about a wholly irrelevant universe of respondents is itself irrelevant.").

    4.    <u>Vast majority of customers did not respond to "open ended" questions.</u>

The entire universe of Symantec customer responses constituted nearly ██████████ responses: Mr. Bakewell started with ███████ for his '050 analysis, and ███████ for the two other patents. Mr. Bakewell, however, ignored the responses from █████████████ these respondents because they did not answer the open-ended questions. *See* Exh. 9, Bakewell Attachments, Exh. 9.0 (excluding ██ percent (all but ██████ surveys) for the '050 "analysis," and ██ percent (all but ██████ surveys) for the '610 and '142 "analyses.").

Mr. Bakewell made no attempt to analyze the differences between those who did and didn't answer open-ended questions. He just excluded those responses which in this case comprised between ██████ percent of the data. *See* Fed. Reference Manual at 15 ("To assess the impact of nonresponse to a particular question, the survey expert should analyze the differences between those who answered and those who did not answer.").

C.    <u>Problems with Bakewell's Methodology Render His Conclusions Unreliable</u>

Not only are the data flawed for the purposes Mr. Bakewell uses them, Mr. Bakewell's methodology itself is unreliable and completely foreign to the standards required for expert testimony on opinion survey data.

    1.    <u>Bakewell has no idea whether the words he and Dr. Spafford chose are they types used by Symantec customers.</u>

At the heart of Mr. Bakewell's analysis are the "key words" that he and Dr. Spafford created and used to search the customer responses. These key words were not picked with an eye

toward what *consumers* or *enterprise customers* would associate with the infringing products. They are words that Dr. Spafford and Mr. Bakewell believe ███████████████████████ ███████████████████████ ." Exh. 7, 221:19–224:12.[11]

Neither Mr. Bakewell nor Dr. Spafford have any training in opinion survey methodology, Exh. 7, 230:7–17. No one pre-tested their selected terms with actual customers to see if, in fact, Symantec customers would use those terms to describe the infringing features. Exh. 7, 227:9–228:2 (validity testing limited to making sure search terms were truncated appropriately).

While the words that two putative experts (including a computer scientist) use to describe accused features might differ from those used by customers in a survey, Symantec's experts do not adjust or account for this in any way. Mr. Bakewell did nothing to determine whether Symantec customers understand what language Symantec or its experts use to describe infringing features. *See* Fed. Reference Manual at 10 ("Experts prepared to design, conduct, and analyze a survey generally should have graduate training in psychology (especially social, cognitive, or consumer psychology), sociology, marketing, communication sciences, statistics, or a related discipline."). Neither Dr. Spafford nor Dr. Bakewell has such qualifications.

    2.    <u>Bakewell's methodology leads to absurd results</u>

One particularly strange feature of Mr. Bakewell's methodology has the strong potential to infect the conclusions it generates. Mr. Bakewell merely *counted* the number of times that key words appeared in responses to open-ended questions, and did not consider whether the comments were positive or negative. Exh. 7, 217:6–11.

---

[11] Mr. Bakewell offered a narrative description of the rigor he employed during the "process" of generating these key words. ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████

Many of those responses contained —indeed, Mr. Bakewell agreed that respondents who view features ███████████████████ ███████████████████████ These respondents' views, ████████████ would "count" as evidence of interest or value, simply because people were ████████ ████—exactly the opposite of what Mr. Bakewell is attempting to discern.

Did survey respondents interpret Mr. Bakewell's key terms the way that he does? What errors were introduced by considering the views of customers who did not buy accused products? What is the systematic effect and risk of bias from excluding over █ percent of available data? Mr. Bakewell does not know the answer to any of these questions. The jury, too, will be in the dark if it is permitted to hear the results of this junk science. The only reliable and trustworthy conclusion is that Mr. Bakewell's survey opinions are neither reliable nor trustworthy.

## V.
### Bakewell's Alternative Design Opinions Lacks a Sound Basis

The Court should also exclude Mr. Bakewell's opinions on Symantec's proposed alternative designs for the '050 and '610 Patents that involve locating servers or data centers outside the United States. IV1 has moved to exclude the opinions of three experts retained by Symantec's co-defendant Trend Micro on the same issue.

Mr. Bakewell's opinions suffer from the same flaws afflicting the opinions Drs. Leonard, Prakash and Tygar.[12] Mr. Bakewell relies exclusively on the short, conclusory and unsupported opinion of Symantec's non-infringement expert Dr. Spafford and on private, unsworn interviews of Symantec employees. Mr. Bakewell has done no independent work to evaluate the feasibility of the proposed alternatives, and he isn't aware if any has been done. These proposals lack any sound economic proof or grounding in sound factual predicates and should be excluded.

---

[12] IV1 incorporates its Motion to Exclude Trend's Experts' Opinions on the '050 and '610 Alternative Design ("Offshoring Servers") including the cases cited in its supporting papers.

A.    The Court Should Exclude Mr. Bakewell's Opinion on the '050 Alternative Design to Move Servers Outside U.S.

Mr. Bakewell opines that Symantec could have moved ███████████████████ at the time of first infringement. He relies on an undocumented "interview" with Dr. Spafford, whose report containing his entire analysis of this design alternative encompasses two paragraphs. *See* Exh. 14, Spafford Report ¶¶ 399–400. As with the Trend experts, both Dr. Spafford and Mr. Bakewell rely on a private interview of an interested party, here Symantec executive ███████████. *Id.* ¶ 400; Exh. 7, 260:8–18. This is insufficient. *See Conceptus, Inc. v. Hologic, Inc.*, 771 F. Supp. 2d 1164, 1179 (N.D. Cal. 2010) (dismissing defendant's asserted non-infringing alternative as unavailable where the "only support" for its availability was a portion of an expert report that relies on private conversations with defendant's employee).

And again, these experts' opinions contain only their conclusions: Neither Mr. Bakewell nor Dr. Spafford were able to identify any testing, feasibility analysis, or studies that were performed to show that Symantec could have implemented this alternative without any effect on customers. Exh. 7, 260:19–261:2. And neither of their reports quantified *any* costs of implementing this fundamental change to Symantec's system architecture. An "expert's opinion must be based on the methods and procedures of science rather than on subjective belief or unsupported speculation." *Oddi v. Ford Motor Co.*, 234 F.3d 136, 158 (3d Cir. 2000) (affirming trial court's exclusion of a design engineer who conducted no tests, performed no calculations, and "used little, if any, methodology beyond his own intuition").

At his deposition, however, Mr. Bakewell announced a new opinion: that implementing the server relocation would cost "less than ██████ or so, or in that area." Exh. 7, 261:18–264:16. This is not in his report, although Mr. Bakewell attempted to claim that it was. In fact, the portion of his report that identifies cost components for an alternative design concerns a

*different* purported alternative design, one that has nothing to do with moving Symantec servers outside the United States. Exh. 7, 263:20–264:5. Even then, Mr. Bakewell shielded his new opinions from scrutiny and cross examination. He credited that new information to his private interview and insisted that "████████████ would be the person to ask for more specifics regarding that." Exh. 7, 264:6–16. *See Bowen v. E.I. DuPont de Nemours & Co., Inc.*, 906 A.2d 787, 796 (Del. 2006) (refusing to permit expert to "hide behind" other expert's model "and be relieved from having to defend its applicability.").

As with the Trend experts, Mr. Bakewell could not answer deposition questions about specific Symantec technologies despite the fact that they were identified in his report. And Mr. Bakewell could not answer whether the proposed alternative design took into account ████████ ████████████████████████████ When pressed, Mr. Bakewell testified that he did speak with ████████████████████, but could not identify which ones.

Q:    ████████████████████████████████
      ████████████

A.    ████████████████████████████████
      ████████████

Exh. 7, 266:25–267:7.

"Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *See Elcock*, 233 F.3d at 749. Mr. Bakewell's opinions concerning this purported acceptable and available alternative design to the '050 Patent should be excluded.

B.    The Court Should Exclude Mr. Bakewell's Opinion on the '610 Patent Alternative Design to Move Data Centers Outside U.S.

Mr. Bakewell's Report and testimony regarding the related '610 Patent alternative design amounts to the same conclusion-only opinion. Mr. Bakewell did no analysis to identify the costs of the '610 alternative design to locate data centers outside the U.S. Again, Mr. Bakewell relies on a private interview of another Symantec employee, ███████████, but did nothing to confirm what ████████ was telling him was accurate. Exh. 6, ¶ 363.

████████ apparently believes that there would have been "████████████████████ ████" for Symantec to implement the '610 alternative design if the change had been ████████ ████████████████████." *Id.* This claim does not bear scrutiny.

In 2008, Symantec ████████████████████████████. Symantec's position is that it could have avoided alternative design costs if it had just designed its ████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████

Again, Mr. Bakewell has attempted to shield the bases of his opinions from scrutiny by relying on private and unsworn interviews of interested parties. A jury should not be permitted to hear Mr. Bakewell's unsupported speculation. *See DSU Med. Corp. v. JMS Co., Ltd.*, 471 F.3d 1293, 1309 (Fed. Cir. 2006) (design alternatives require "grounding in sound economic and factual predicates").

## VI.
## Conclusion

IV1 respectfully requests that the Court exclude Mr. Bakewell's testimony on the three topics identified above.

Dated: June 14, 2013

Respectfully submitted,

FARNAN LLP

/s/Brian E. Farnan
Brian E. Farnan (Bar No. 4089)
919 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 777-0300
bfarnan@farnanlaw.com

Parker C. Folse III (admitted *pro hac vice*)
Brooke A.M. Taylor (admitted *pro hac vice*)
Lindsey N. Godfrey (admitted *pro hac vice*)
SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
Telephone:     (206) 516-3880
pfolse@susmangodfrey.com
btaylor@susmangodfrey.com
lgodfrey@susmangodfrey.com

Richard W. Hess (admitted *pro hac vice*)
Weston O'Black (admitted *pro hac vice*)
John P. Lahad (admitted *pro hac vice*)
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, TX 77002
Telephone:     (713) 653-7859
rhess@susmangodfrey.com
woblack@susmangodfrey.com
jlahad@susmangodfrey.com

*Attorneys for Plaintiff*