IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| INTELLECTUAL VENTURES I LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 10-1067 (LPS) |
| | ) | |
| CHECK POINT SOFTWARE | ) | |
| TECHNOLOGIES LTD.; CHECK POINT | ) | REDACTED - |
| SOFTWARE TECHNOLOGIES, INC.; | ) | PUBLIC VERSION |
| McAFEE, INC.; SYMANTEC CORP.; | ) | |
| TREND MICRO INCORPORATED and | ) | |
| TREND MICRO, INC. (USA), | ) | |
| | ) | |
| Defendants. | ) | |

## SYMANTEC CORPORATION'S OPENING BRIEF IN
## SUPPORT OF MOTION FOR SUMMARY JUDGMENT

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Thomas C. Grimm (#1098)
Michael J. Flynn (#5333)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
jblumenfeld@mnat.com
tgrimm@mnat.com
mflynn@mnat.com

*Attorneys for Defendant Symantec
Corporation*

OF COUNSEL:

Mark A. Flagel
Dean G. Dunlavey
Neil A. Rubin
LATHAM & WATKINS LLP
355 South Grand Avenue
Los Angeles, CA 90071-1560
(213) 485-1234

Yury Kapgan
Suong Nguyen
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3000

Original Filing Date: June 14, 2013
Redacted Filing Date: June 21, 2013

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................iv

I.     NATURE AND STAGE OF PROCEEDINGS ....................................................1

II.    SUMMARY OF ARGUMENT..............................................................................1

III.   STATEMENT OF FACTS ....................................................................................2

IV.    APPLICABLE LAW..............................................................................................3

       A.    Summary Judgment in Patent Cases .......................................................3

       B.    A Prior Art Reference That Discloses Every Limitation of a Claimed
             Invention Invalidates the Patent Claim ..................................................3

       C.    A Patent Claim Is Invalid If the Claimed Invention Was Offered for Sale
             in the United States More Than One Year Before the Patent Filing Date ..............3

       D.    A Claim Is Not Infringed Unless Every Limitation Is Met....................3

       E.    Willful Infringement Requires "Clear and Convincing Evidence" .......4

       F.    When a Patentee's Damages Expert Does Not Meet the Daubert Standard,
             Summary Judgment of No Damages Is Proper .....................................4

V.     ARGUMENT ..........................................................................................................5

       A.    The Asserted Claims of the '050 Patent Are Invalid ............................5

             1.    '050 Patent Background .................................................................5

             2.    Townshend Is Prior Art to the '050 Patent and Discloses the Same
                   Problems and Solutions ...............................................................5

             3.    The PTO Found That Townshend Anticipates the '050 Patent ..................5

             4.    Townshend Anticipates Claims 9, 16, and 22 of the '050 Patent ..............6

             5.    Even if IV Were Able to Incorrectly Convince the Court That
                   Townshend Does Not Anticipate the Asserted Claims of the '050
                   Patent, It Renders Those Claims Obvious ...............................19

       B.    The Asserted Claims of the '142 Patent Are Invalid Due to the On-Sale
             Bar.......................................................................................................20

i

1.      Gatekeeper Was Offered for Sale and Sold More Than One Year Prior to the Filing Date of the '142 Patent ...............................................21

2.      Substantial Activity Prefatory to the Sale Occurred in the United States.............................................................................................................22

3.      The Gatekeeper Product Embodied the Purported Inventions Claimed in the '142 Patent.......................................................................24

4.      Uncontested Expert Testimony Establishes That Gatekeeper Was Ready for Patenting More Than One Year Prior to the Critical Date .......24

C.      Symantec Does Not Infringe Any Asserted Claim of the '142 Patent ................26

1.      The Accused Products Do Not Infringe Claims 1, 7, 17, 21, 22, 24, and 26 ...................................................................................................26

2.      The Accused Products Do Not Have an Organizational Hierarchy (Claims 18 and 25) ...................................................................................30

D.      Symantec Does Not Infringe Any Asserted Claim of the '610 Patent ................31

1.      '610 Patent Background ........................................................................31

2.      The Accused Symantec Products Are Located on Private Networks That Use IP Addresses in the Range 10.x.x.x and Thus Are Never "Within the Telephone Network" ...........................................................32

3.      Dr. McDaniel's Attempt to Disavow His Own Unequivocal Opinion Does Not Create a Triable Issue of Material Fact .....................33

E.      Symantec Does Not Infringe Any Asserted Claim of the '155 Patent ................34

1.      '155 Patent Background ........................................................................34

2.      The Accused Products Do Not Forward Code That Has Been Converted into Non-Executable Format....................................................35

3.      IV's Infringement Theory Is Premised upon an Erroneous Assumption ............................................................................................36

F.      Symantec Does Not Willfully Infringe the '610, '142, and '050 patents ............37

1.      Symantec's Substantial Non-Infringement and Invalidity Defenses Bar a Finding of Willful Infringement ....................................................38

2.      IV Has Not and Cannot Come Forth with Clear and Convincing Evidence That the Objectively-Defined Risk Was Either Known or So Obvious That It Should Have Been Known by Symantec .................39

G.      Summary Judgment of No Damages Should Be Granted ....................................40

VI.    STATEMENT OF RELIEF .............................................................................................40

## TABLE OF AUTHORITIES

**Page**

### CASES

*Adv. Fiber Techs. Trust v. J&L Fiber Servs.*,
674 F.3d 1365 (Fed. Cir. 2012) ...................................................................................38

*Aircraft Tech. Publrs. v. Avantext, Inc.*,
2009 U.S. Dist. LEXIS 108190 (N.D. Cal. Nov. 18, 2009)....................................39

*Allen Eng'g Corp. v. Bartell Indus., Inc.*,
299 F.3d 1336 (Fed. Cir. 2002) ........................................................................ 3, 21, 24

*Apple, Inc. v. Motorola, Inc.*,
869 F. Supp. 2d 901 (N.D. Ill. 2012) ...........................................................................4

*B.F. Goodrich Co. v. Aircraft Braking Sys. Corp.*,
825 F. Supp. 65 (D. Del. 1993) ...................................................................................23

*Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs.*,
682 F.3d 1003 (Fed. Cir. 2012) .....................................................................................4

*Cordance Corp. v. Amazon.com, Inc.*,
639 F. Supp. 2d 406 (D. Del. 2009)............................................................................40

*Cordance Corp. v. Amazon.com, Inc.*,
658 F.3d 1330 (Fed. Cir. 2011) ...................................................................................40

*Dataquill Ltd. v. High Tech Computer Corp.*,
887 F. Supp. 2d 999 (S.D. Cal. 2011)...........................................................................4

*Dynacore Holdings Corp. v. U.S. Philips Corp.*,
363 F.3d 1263 (Fed. Cir. 2004) ...................................................................................31

*Golden Bridge Tech. Inc. v. Nokia, Inc.*,
527 F.3d 1318 (Fed. Cir. 2008) .....................................................................................3

*Honeywell Int'l Inc. v. Univ. Avionics Sys. Corp.*,
585 F. Supp. 2d 636 (D. Del. 2008)......................................................................38, 39

*In re Seagate Tech., LLC*,
497 F.3d 1360 (Fed. Cir. 2007) .............................................................................4, 38, 39

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398 (2007)........................................................................................... 3, 19, 20

*Leader Techs., Inc. v. Facebook, Inc.*,
770 F. Supp. 2d 686 (D. Del. 2011)......................................................................21, 24

*Monolithic Power Sys. v. O2 Micro Int'l Ltd.*,
2007 U.S. Dist. LEXIS 84755 (N.D. Cal. Oct. 30, 2007).......................................22

*Monolithic Power Sys. v. O2 Micro Int'l Ltd.*,
  476 F. Supp. 2d 1143 (N.D. Cal. 2007) .................................................................4

*Norian Corp. v. Stryker Corp.*,
  363 F.3d 1321 (Fed. Cir. 2004) ...........................................................................39

*Pfaff v. Wells Elecs., Inc.*,
  525 U.S. 55 (1998).................................................................................... 3, 25, 26

*Pivonka v. Cent. Garden & Pet Co.*,
  2008 U.S. Dist. LEXIS 12022 (D. Colo. Feb. 19, 2008) ......................................39

*Playtex Prods., Inc. v. Proctor & Gamble Co.*,
  400 F.3d 901 (Fed. Cir. 2005) ...............................................................................4

*Riles v. Shell Exploration & Prod. Co.*,
  298 F.3d 1302 (Fed. Cir. 2002) .............................................................................4

*Robbins Co. v. Lawrence Mfg. Co.*,
  482 F.2d 426 (9th Cir. 1973) ...............................................................................23

*Robotic Vision Sys., Inc. v. View Eng'g, Inc.*,
  112 F.3d 1163 (Fed. Cir. 1997) ...........................................................................25

*Schering Corp. v. Geneva Pharms., Inc.*,
  339 F.3d 1373 (Fed. Cir. 2003) .............................................................................3

*Solvay v. Honeywell Specialty Materials LLC*,
  827 F. Supp. 2d 358 (D. Del. 2011).......................................................................4

*Tarkus Imaging, Inc. v. Adobe Sys.*,
  867 F. Supp. 2d 534 (D. Del. 2012).................................................................4, 38

*Tesco Corp. v. Weatherford Int'l, Inc.*,
  750 F. Supp. 2d 780 (S.D. Tex. 2010) ..................................................................39

*Vanmoor v. Wal-Mart Stores, Inc.*,
  201 F.3d 1363 (Fed. Cir. 2000) ...........................................................................24

## STATUTES

35 U.S.C. § 102(b) ..................................................................................................3, 22

35 U.S.C. § 102(e) .......................................................................................................5

## RULES

Fed. R. Civ. P. 56(a)....................................................................................................3

## I.   NATURE AND STAGE OF PROCEEDINGS

This is an action for patent infringement brought by Intellectual Ventures I LLC ("IV")

against Symantec Corporation ("Symantec").  It is consolidated for pretrial purposes with C.A.

No. 12-1581, an action brought by IV against Trend Micro Incorporated, and Trend Micro, Inc.

(USA) (with Symantec, "Defendants").  IV asserts four patents against Symantec:  U.S. Patent

Nos. 5,987,610 ("'610 patent"), 6,073,142 ("'142 patent"), 6,460,050 ("'050 patent"), and

7,506,155 ("'155 patent").  The Court has issued a claim construction order.  Defendants'

Motion for Clarification of the Court's Construction of "Within the Telephone Network"

(D.I. 437) is pending.[1]  Fact and expert discovery is complete.  No trial date has been set.

## II.   SUMMARY OF ARGUMENT

1.      Each asserted claim of the '050 patent is invalid because it was anticipated by U.S. Patent

No. 6,829,635, issued to Townshend ("Townshend").  Townshend is directed to the same

problem as the '050 patent and teaches the solution claimed in the '050 patent.  Townshend

discloses every element of each asserted claim of the '050 patent.  The United States Patent and

Trademark Office ("PTO") agrees:  based on Townshend, the PTO has rejected each asserted

claim in the pending *inter partes* reexamination of the '050 patent.  Alternatively, each claim

was obvious in light of Townshend at the time of invention.

2.      Each asserted claim of the '142 patent is invalid because the original owner of the patent,

Park City Group, offered a product embodying each claim for sale in the United States more than

one year before filing the application that led to the issuance of the '142 patent.

3.      Symantec does not infringe any asserted claim of the '142 patent.  IV has failed to

identify any "distribution list" and "rule history" that are combined with the message "for

---

[1]    As explained further below, the outcome of the present motion for summary judgment does
not depend on the outcome of Defendants' Motion for Clarification.

delivery together" in the accused Symantec products, as required by claims 1, 7, 17, 21, 22, 24 and 26.  With respect to claims 18 and 25, IV's expert concedes that the accused products have non-infringing uses and that a customer would have to configure the product in a particular way in order to infringe under his theory.  IV has no evidence that any customer has done so.

4.      Symantec does not infringe any asserted claim of the '610 patent.  None of the accused Symantec products detects viruses "within the telephone network," as required by the claims. IV's expert conceded that "private networks" utilizing IP addresses that cannot be accessed from the public Internet "can **never** be 'within the telephone network.'"  The accused Symantec products detect viruses only using such private networks with such IP addresses.

5.      Symantec does not infringe any asserted claim of the '155 patent.  IV's infringement theory is entirely dependent upon its expert's erroneous assumption that when the accused Symantec products store an email in quarantine, the email is stored with deactivated hyperlinks. IV's expert admitted that he did not perform any testing to check his assumption and that he is unaware of any evidence supporting it.  In fact, the assumption is wrong.

6.      Summary judgment of no willful infringement as to any patent should be granted.  IV cannot satisfy the first prong of the *Seagate* test for willful infringement, *i.e.*, showing "by clear and convincing evidence that [Symantec] acted despite an objectively high likelihood that its actions constituted infringement of a valid patent."

7.      Summary judgment of no damages should be granted.  IV's damages case is based entirely upon the opinions of its damages expert, Michael Wagner.  As set forth in Symantec's contemporaneously filed *Daubert* motion, Mr. Wagner's methodologies and opinions are inadmissible because they are unreliable and unprincipled.

## III.   STATEMENT OF FACTS

        For clarity, the relevant facts are set forth in the Argument sections as appropriate.

## IV.  APPLICABLE LAW

### A.    Summary Judgment in Patent Cases

Summary judgment should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as matter of law.  Fed. R. Civ. P. 56(a).  Summary judgment is particularly appropriate in complex patent infringement actions because it is a useful tool to secure a just and speedy determination of the action and to simplify and pare down the issues.  *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 427 (2007).

### B.    A Prior Art Reference That Discloses Every Limitation of a Claimed Invention Invalidates the Patent Claim

A patent is invalid for anticipation if a single prior art reference discloses every limitation of the claimed invention.  *Schering Corp. v. Geneva Pharms., Inc.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003).  Anticipation may be decided on summary judgment if there is no genuine dispute of material fact.  *See Golden Bridge Tech. Inc. v. Nokia, Inc.*, 527 F.3d 1318, 1321 (Fed. Cir. 2008).

### C.    A Patent Claim Is Invalid If the Claimed Invention Was Offered for Sale in the United States More Than One Year Before the Patent Filing Date

A patent is invalid if "the invention was…on sale in this country, more than one year prior to the date of application for patent in the United States."  35 U.S.C. § 102(b).  To trigger the on-sale bar, the product must anticipate or render obvious the asserted claims in light of the prior art.  *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1352 (Fed. Cir. 2002).  The product must have been (1) the subject of a commercial offer for sale and (2) ready for patenting.  *See Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 67 (1998).

### D.    A Claim Is Not Infringed Unless Every Limitation Is Met

An accused product does not infringe unless it meets every limitation of the claim, either literally or under the doctrine of equivalents.  *Playtex Prods., Inc. v. Proctor & Gamble Co.*, 400

F.3d 901, 906 (Fed. Cir. 2005) (citation omitted); *Riles v. Shell Exploration & Prod. Co.*, 298

F.3d 1302, 1308 (Fed. Cir. 2002) (citations omitted).

### E.   Willful Infringement Requires "Clear and Convincing Evidence"

A patentee must prove willful infringement through "clear and convincing evidence" that

(1) "the infringer acted despite an objectively high likelihood that its actions constituted

infringement of a valid patent" and (2) "this objectively-defined risk . . . was either known or so

obvious that it should have been known to the accused infringer."  *In re Seagate Tech., LLC*, 497

F.3d 1360, 1371 (Fed. Cir. 2007).  The first inquiry is a question of law decided by the Court.

*Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs.*, 682 F.3d 1003, 1005-07 (Fed. Cir.

2012).  District courts routinely dispose of willful infringement claims based on this objective

prong.  *See, e.g., Tarkus Imaging, Inc. v. Adobe Sys.*, 867 F. Supp. 2d 534, 537 (D. Del. 2012)

(Stark, J.) (granting summary judgment of no willful infringement); *Solvay v. Honeywell

Specialty Materials LLC*, 827 F. Supp. 2d 358, 366 (D. Del. 2011) (Robinson, J.) (same).

### F.   When a Patentee's Damages Expert Does Not Meet the *Daubert* Standard, Summary Judgment of No Damages Is Proper

"The testimony of a damages expert in a patent suit who relies on non-comparable

licenses in reaching his royalty rate should be excluded."  *Dataquill Ltd. v. High Tech Computer

Corp.*, 887 F. Supp. 2d 999, 1022 (S.D. Cal. 2011).  Where a patentee's expert witness relies

upon a faulty damages methodology, summary judgment of no damages is proper.  *See, e.g.,

Monolithic Power Sys. v. O2 Micro Int'l Ltd.*, 476 F. Supp. 2d 1143, 1154-56 (N.D. Cal. 2007);

*Apple, Inc. v. Motorola, Inc.*, 869 F. Supp. 2d 901, 924 (N.D. Ill. 2012) ("[A] failure of proof,

whether with respect to liability or to remedy . . . ends a case").

## V.   ARGUMENT

### A.   The Asserted Claims of the '050 Patent Are Invalid

#### 1.   '050 Patent Background

The '050 patent is directed towards a distributed file classification system.  '050 patent

(App. at 179-88).  Within the system, client computers generate identifiers for files and submit

the identifiers to a central server.  The patent specification largely focuses on a system for

determining whether email messages are spam or junk.  *See, e.g.*, *id.*, Fig. 2 (App. at 181).  IV

asserts independent claims 9, 16, and 22 of the '050 patent against Symantec.

#### 2.   Townshend Is Prior Art to the '050 Patent and Discloses the Same Problems and Solutions

The original '050 patent application was filed on December 22, 1999.  *Id.* (App. at 180).

IV alleges a conception date of November 13, 1998.  Pl.'s Third Supp. Resp. Defs.' Interrog.

No. 2 (App. at 409).  The Townshend patent is prior art because its original application was filed

on July 1, 1998.  Townshend (App. at 157); 35 U.S.C. § 102(e).  The Townshend patent issued

on December 7, 2004.  Like the '050 patent, Townshend describes a distributed system for

determining whether email messages are bulk/junk.[2]  Townsend, Fig. 1 (App. at 158).  As

discussed below, Townshend alone invalidates all the asserted claims.

#### 3.   The PTO Found That Townshend Anticipates the '050 Patent

On September 12, 2012, Symantec filed a request with the PTO for *inter partes*

reexamination of the '050 patent.  On December 11, 2012, the PTO granted the request and

issued an office action rejecting all 25 claims of the '050 patent.  12/11/12 Office Action in '050

Reexamination at 2 (App. at 426).  The PTO concluded that Townshend anticipates all of the

claims IV is asserting against Symantec.  *Id.* at 4 (App. at 428).  On February 11, 2013, IV filed a

---

[2]   IV's expert agreed that "bulk email" and "junk email" are synonyms.  McDaniel Dep. 57:3-
6 (App. at 633).

response to this office action, making arguments attempting to distinguish Townshend and other prior art.  2/11/13 Amendment in '050 Reexamination (App. at 500-56).  As discussed below, IV's attempts to distinguish Townshend have no merit.

### 4.    Townshend Anticipates Claims 9, 16, and 22 of the '050 Patent

#### a.    Comparison of Townshend to the '050 Patent

Both Townshend and the '050 patent describe a system for detecting spam or bulk email, as illustrated in the figures shown on the front cover of each patent (letters in brackets added):



Townshend, Fig. 1 (App. at 158)



'050 patent, Fig. 2 (App. at 181)

The systems disclosed in both patents are directed toward detecting spam emails.  The '050 patent describes spam email as "unsolicited e-mail which is usually sent out in large volumes over a short period of time with the intent of inducing the recipient into availing themselves of sales opportunities or 'get rich quick' schemes."  '050 patent at 1:17-20 (App. at 183).  Townshend uses the term "bulk" email, rather than the terms "spam" and "junk" used in the '050 patent, but all three terms refer to the same thing.  *Compare id.* at 1:10-20 *with* Townshend at 1:13-33 (App. at 164).  In particular, Townshend is directed to email that is "unsolicited" (Townshend at 1:16), "undesired" (*id.* at 1:27), and fraudulent (*id.* at 1:48-52).  This is exactly the type of email that the '050 patent calls "spam."

In both the '050 patent and Townshend, computers send and receive emails.  These computers are labeled "[A]" in the figures above.  Townshend at 4:66 – 5:2 (App. at 165-66); McDaniel Dep. at 60:3-61:2 (App. at 634).  In both the '050 patent and Townshend, the computers send emails to, and receive emails from, an email server, labeled "[B]" in the figures above.  In the '050 patent, the email server is called the "First Tier System."  '050 patent at 3:32-40 (App. at 184); McDaniel Dep. at 61:4-18 (App. at 634).  In Townshend, it is called the "Email Server" or "Electronic Mail Server."  Townshend at 4:66 – 5:2 (App. at 165-66).  In both the '050 patent and Townshend, this Email Server / First Tier System communicates with a central server, labeled "[C]" in the figures above, to identify spam/bulk emails.  In the '050 patent, the central server is called the "Second Tier System."  '050 patent Fig. 2.  In Townshend, it is called the "Central Server."  Townshend Fig. 1.  Although both Townshend Fig. 1 and '050 patent Fig. 2 show only a single Email Server / First Tier System, each patent explains that there are actually multiple First Tier Systems that communicate with the same Second Tier System.  '050 patent at 7:18-23 (App. at 186); Townshend at 3:53-55, 5:25-27 (App. at 165-66).

### b.    Steps Performed by the Townshend Second Tier System

The asserted independent claims of the '050 patent each claim a method consisting of three steps. Each of these steps is performed by the Second Tier system. IV's expert concedes that Townshend discloses the first two steps. IV incorrectly disputes whether Townshend clearly discloses the third step. It does.

The steps performed by the Central Server in Townshend (the Second Tier System in the '050 patent) are summarized in Townshend Figs. 3 and 4.



Townshend, Fig. 3 (App. at 160)

In Townshend Fig. 3, the steps on the left-hand side of the figure, plus step 342, are performed by the "Email Server"/"Electronic Mail Server" (corresponding to the "First Tier

8

System" in the '050 patent). The steps on the right-hand side, except for step 342, are performed

by the "Central Server" (corresponding to the "Second Tier System" in the '050 patent).

Townshend Fig. 4 shows the steps performed by another version of the Townshend

"Central Server." This Central Server / Second Tier System performs every step performed by

that depicted in Fig. 3, as well as the two additional steps 420 and 424. McDaniel Dep. at 119:19

– 120:8 (App. at 648).



Townshend, Fig. 4 (App. at 161)

> ### c.      Townshend Discloses the '050 Patent "Receiving" /
> "Collecting" First Step

The first step in each asserted claim requires "receiving" or "collecting" identifiers from

a plurality of other computers. '050 patent at 8:15-19, 8:46-50, 9:20-24 (App. at 186-87). Fig. 2

of the '050 patent, reproduced above, shows this as an arrow labeled "Digital ID" going from the

First Tier System to the Second Tier System.  Likewise, Fig. 1 of Townsend, also reproduced above, shows this as an arrow labeled "Message Signature generated [from] email message" going from the "Email Server" (corresponding to the "First Tier") to the "Central Server" (corresponding to the "Second Tier").  Both the "Digital ID" in the '050 patent and the "Message Signature" in Townshend can be generated from the email message by the plurality of Email Servers / First Tier Systems, using a mathematical algorithm known as a "hash function."  '050 patent at 3:65 – 4:3 (App. at 184); Townshend at 6:40-57 (App. at 166).[3]

In Townshend, after the identifier/signature/hash is generated, it is transmitted to and received by the Central Server / Second Tier System.  Townshend, Fig. 3 element 364, Fig. 4 element 404 (App. at 160-61).  This satisfies the first step of each asserted claim of the '050 patent.  Rubin Invalidity Report ¶¶ 382-90, Exhibit 050-A (App. at 778-80, 809-34).  Dr. McDaniel agrees that Townshend discloses this first step of each of asserted claims 9, 16 and 22.  McDaniel Dep. at 66:17 – 68:3 (App. at 636); McDaniel Validity Report ¶ 88 (App. at 609-10).

### d.     Townshend Discloses the '050 Patent "Determining" / "Comparing" / "Characterizing" Second Step

The second step in each asserted claim requires comparing the received identifiers with other identifiers that have been collected at the Second Tier System.  For two of the asserted claims, the Court has construed the second step as a whole (D.I. 425 at 6, 13):

| Claim | Second Step | Construction |
|---|---|---|
| 9 | determining, on the processing system, whether each received content identifier | determining, on the processing system, whether each received content identifier |

---

[3]   A "hash function" is a mathematical algorithm that takes a long string of data, such as an email message, and computes a short numerical value – a "hash" or "identifier" – which represents that larger string of data.  McDaniel Infringement Report ¶ 183 (App. at 588).  Hashing algorithms are designed such that, while identical messages will generate the same identifier/hash, it is extremely unlikely that two different messages will produce the same identifier/hash.  *Id.* ¶ 184 (App. at 588-89).

|    | matches a characteristic of other identifiers | has the same characteristic as other content identifiers |
|----|-----------------------------------------------|----------------------------------------------------------|
| 16 | comparing, on the second computer, the digital content identifier to a characteristic database of digital content identifiers received from said plurality of first computers to determine whether the message has a characteristic | N/A |
| 22 | characterizing the files on the server system based on said digital content identifiers received relative to other digital content identifiers collected in the database | classifying the files on the server system by comparing their digital content identifiers to other digital identifiers collected in the database |

In the system shown in '050 patent Fig. 2, the identifiers are collected in a database that is part of the Second Tier System. '050 patent at 3:1-2, 5:17-19, Fig. 3. (App. at 181, 184-85). Likewise, as shown in Townshend Fig. 1, Townshend discloses storing the identifiers in a "Received Signature Store" database that is part of the Central Server / Second Tier System. Dr. McDaniel agrees that Townshend discloses a database of identifiers and that Townshend's Central Server / Second Tier System compares the received identifiers with other identifiers collected in that database (just like the '050 patent). *See* McDaniel Dep. at 62:11 – 64:7, 69:6-18 (App. at 635-36).

### (1)   Determining the "Count" in Townshend Meets the '050 Second Step

When the Townshend Central Server / Second Tier System compares the received identifiers with other identifiers collected in the "Received Signature Store" database, it generates a "count" of the number of times that the identifier has been seen by the Second Tier System.[4] This is shown as step 370 of Townshend Fig. 3 and step 408 of Townshend Fig. 4.

---

[4]   Both Townshend and the '050 patent make clear that the number of times the Central Server / Second Tier System sees a particular identifier determines whether the associated email file is bulk/junk/spam. '050 patent at 6:2-10 (App. at 185); Townshend at 3:55-67, 7:9-17, 10:19-24 (App. at 165, 167-68). This is because identical, mass-distributed emails will have the same identifier, whereas unique, individual emails will have unique identifiers (and thus have a "count" or "frequency" of just one). *See* note 3, *supra*.

Townsend explains that one way to generate this count is to compare the identifier against each of the other identifiers collected in the Signature Store and determine how many matching identifiers have been received within a threshold period of time. *Id.* at 8:18-21 (App. at 167).

Townshend's generation of counts satisfies the "determining" / "comparing" / "characterizing" step of the asserted claims. Indeed, Townshend describes the generation of counts by the Central Server / Second Tier System as "a set of one or more computer processes that operates upon received message signatures to generate and transmit ***data indicating which signatures represent bulk electronic mail***." *Id.* at 3:55-58 (App. at 165) (emphasis added). By generating the count – data that "indicat[es]" whether an identifier for a message represents bulk email – the Townshend Central Server / Second Tier System is "determin[ing] whether the message has a characteristic" of being bulk/junk email and is "classifying" the message as either bulk/junk email or not. Thus, it satisfies the second step of the '050 patent claims.

The language of the '050 patent claims further confirms that Townshend's count is sufficient to meet the "determining" / "comparing" / "characterizing" limitations. For example, dependent claim 8 contains the limitation "wherein said characteristic comprises junk e-mail ***and said characteristic is defined by a frequency of appearance of a file content ID***." '050 patent at 8:9-12 (App. at 186) (emphasis added). Dr. McDaniel agreed that the count in Townshend is a frequency of appearance. McDaniel Dep. at 70:15-23, 151:24 – 152:7 (App. at 637, 656). By computing that frequency/count – a quantity that claim 8 expressly notes "***define[s]***" the characteristic of junk email – the Townshend Central Server / Second Tier System "determines" that characteristic and "classifies" the corresponding message. Similarly, claim 14, which depends from asserted claim 9, states that "said step of determining identifies said e-mail as SPAM by tracing the rate per unit time a digital ID is generated." '050 patent at 8:38-40 (App.

at 186).  This is another explicit statement that the "determining" step of the '050 patent can be performed by tracing the frequency for an identifier, which Townshend explicitly discloses.

In sum, by comparing the received identifier with other identifiers in the "Received Signature Store" database and thereby determining the frequency of the identifier – the count that "indicates" whether the message is bulk (Townshend at 3:55-58 (App. at 165)) and that "defines" the characteristic of junk email ('050 patent at 8:9-12 (App. at 186)) – Townshend satisfies the second step of each asserted claim.  Rubin Invalidity Report ¶¶ 391-98, Exhibit 050-A (App. at 780-81, 809-34); Rubin Invalidity Reply ¶¶ 117-27 (App. at 868-70).

### (2) Generating the "Bulk Signature Element" as Shown in Townshend Fig. 4 Independently Meets the '050 Second Step

While the count shown in Townshend Fig. 3 is sufficient, by itself, to satisfy the second step limitation in each of the asserted claims, Townshend Fig. 4 goes even further.  In particular, in the Townshend Fig. 4 embodiment, after the Central Server / Second Tier System compares the received identifiers with other identifiers collected in the "Received Signature Store" database and determines the count, it generates a second result.  First, it compares the count against a predetermined threshold value, such as 10.  Townshend at 10:19-27; Townshend Fig. 4, element 420 (App. at 161, 168).  Then, if the count exceeds the predetermined threshold, it broadcasts a "bulk signature element" to the Email Servers / First Tier Systems, indicating that the email corresponding to the identifier is bulk/junk email.  *Id.* at 10:20-24, 10:64 – 11:5 (App. at 168-69).  Even Dr. McDaniel concedes that this comparison of the count to the predetermined threshold value satisfies the second limitation of each asserted claim.  McDaniel Dep. at 124:6 – 125:15 (App. at 649); Rubin Invalidity Report ¶ 397, Exhibit 050-A (App. at 781, 809-34); Rubin Invalidity Reply ¶ 128 (App. at 870-71).

13

**e.      Townshend Discloses the '050 Patent "Outputting" /
"Responding" / "Transmitting" Third Step**

The third step in each asserted claim requires sending an indication of a characteristic of

the data file (i.e., an indication of whether the email is bulk/junk or not) from the Second Tier

System back to the First Tier System.  As shown in Townshend Fig. 1 and as discussed above,

the Townshend Central Server / Second Tier System sends back two results to the Email

Server/First Tier System, each of which independently satisfies this element.  The first result is

the "count," which is described in Townshend as "indicat[ing]" whether the email is bulk/junk

(Townshend, 3:55-58 (App. at 165)), and which is described in '050 patent claim 8 as

"defin[ing]" whether the email is junk ('050 patent, 8:9-12 (App. at 186)).  The second result is

the bulk email signatures shown in Fig. 4 that result when the Second Tier Server performs the

threshold comparison and determines that the count exceeds the threshold.

In the Townshend Fig. 3 embodiment, when the Email Server / First Tier System receives

the count from the Central Server/Second Tier System, it compares the value to a predetermined

threshold value, such as 10.  Townshend at 8:54-61 (App. at 167).  If the count exceeds the

threshold, the email is marked as bulk; if the count is less than or equal to the threshold, the

email is not marked as bulk.  *Id.*  The count itself, therefore (and as per the language of both

Townshend and the '050 patent), indicates *and* defines whether the email has the characteristic

of being bulk/junk.

In the Townshend Fig. 4 embodiment, the threshold value comparison is performed at the

Central Server / Second Tier System.  The Townshend specification explains that the bulk email

signatures can be broadcast to the same Email Servers / First Tier Systems that initially

transmitted the identifiers to the Central Server / Second Tier System, as well as to other Email

Servers / First Tier Systems.  *Id.* at 10:64 – 11:5 (App. at 168-69); *see* McDaniel Dep. at 126:17-

25 (App. at 650).  Any email whose signature/hash matches one of these bulk signatures is treated as bulk email.[5]

The dispute between the parties concerning whether Townshend discloses the third step of the asserted claims centers, in part, on a set of related phrases that the Court has construed.  IV incorrectly argues that neither the "count" nor the "bulk email signatures" of Townshend satisfies these phrases, as they have been construed by the Court (D.I. 425 at 11):

| Claim | Third Step | Construction of Underlined Phrase |
|---|---|---|
| 9 | outputting, to at least one of the source systems responsive to a request from said source system, <u>an indication of the characteristic</u> of the data file based on said step of determining. | a descriptor of the content (e.g., spam, virus, junk email, copyrighted) |
| 16 | responding to a query from at least one of said plurality of computers to <u>identify the existence or absence of said characteristic</u> of the message based on said comparing. | identify whether or not the message is of a certain type or classification |
| 22 | transmitting a substance identifier from the server to the client agent <u>indicating the presence or absence of a characteristic</u> in the file. | indicating the presence or absence of a characteristic (e.g., spam, virus, copyright, bulk email) |

### (1)   Sending the "Count" in Townshend Meets the '050 Third Step

As noted above, Townshend expressly states that its count "indicat[es] which signatures represent bulk electronic email."  Townshend at 3:55-58 (App. at 165).  Indeed, knowing only the count and the "predetermined threshold" value, the Townshend Email Server / First Tier System knows whether an email is bulk or not.  *Id*. at 8:54-61 (App. at 167).  Dr. McDaniel admitted that Townshend explicitly states that the count indicates whether a message has the characteristic of being bulk email:

---

[5]   The idea behind this embodiment is that, if a particular identifier is known to correspond to junk email, it can be more efficient to give advance notice of that identifier to all First Tier Systems, thereby allowing them to screen out the corresponding junk email without having to communicate with the Second Tier System. This, of course, requires that there be an initial determination of whether an identifier corresponds to a junk email, in response to requests from one or more First Tier Systems.

Q: So the Townshend patent says that the count indicates which signatures represent bulk email, right?

A: Yes.

Q: And bulk email, that's a characteristic, right?

A: The bulk email is a characteristic.

Q: So Townshend says that its counts indicate a characteristic.

A: Well, what Townshend says, this was written, again, without the benefit of the Court's claim construction.

Q: **So Townshend says that its counts indicate the presence of something that the Court says is a characteristic, right?**

A: **Yes.**

McDaniel Dep. at 105:12-106:3 (App. at 645-46) (emphasis added).

To avoid Townshend's clear language and its expert's concession, IV argues that Townshend does not mean what it says – i.e., that Townshend must have used "indicating" in a way that is inconsistent with the way the Court used the word.  In this manner, IV tries to argue that the third step is not met because the "count" does not satisfy the "indication of the characteristic" and related constructions given above.  McDaniel Dep. at 136:12-22, 140:7 – 142:3, 150:18 – 151:23 (App. at 652-54, 656).

IV's transparent attempt to avoid a finding of anticipation is without merit.  The Court did not ascribe any special or non-standard meaning to the word "indicating" when construing the patent claims.  Indeed, the Court's construction for the phrase in claim 22 that starts with the word "indicating" also begins with the word "indicating."  The Court's construction and Townshend both reflect the plain and ordinary meaning of "indicating."  Moreover, as discussed above, Townshend's statement that its count "indicat[es]" whether an email is bulk is entirely consistent with, and bolstered by, claim 8 of the '050 patent, which specifies that a frequency

16

(such as the Townshend count) "***define[s]***" the characteristic of being junk email.  '050 patent at 8:9-12 (App. at 186).

A number that "define[s]" a characteristic plainly: (1) "descri[bes]" that characteristic, (2) "identif[ies]" whether the message has that characteristic, and (3) "indicat[es]" the presence or absence of that characteristic.  Thus, Townshend meets the Court's constructions as to the third limitation of each asserted claim.  Rubin Invalidity Report ¶¶ 491-95, Exhibit 050-A (App. at 782-83, 809-34); Rubin Invalidity Reply ¶¶ 117-27 (App. at 868-70).

### (2)   Sending the "Bulk Email Signatures" in Townshend Independently Meets the '050 Third Step

IV makes two arguments regarding the bulk email signatures, neither of which has any merit.  First, IV argues that the "responding" portion of the third step in claims 9 and 16 (there is no similar requirement in claim 22) is not met by Townshend's sending of "bulk email signatures."  According to IV, the bulk signatures in Townshend are not sent "in response" to a request or query from the Email Server / First Tier System, but rather their transmission is only "triggered" by the request or query.  McDaniel Dep. at 136:12-22, 140:7 – 142:3 (App. at 652-54).  The '050 patent provides absolutely no support for this imaginary, and meritless, distinction.

As shown in Townshend Fig. 4, when the Central Server / Second Tier System receives an identifier (aka "signature"), a series of steps is set in motion – including step 416 ("transmit counts") and step 424 ("transmit bulk signature elements . . .").  Each of these steps is done in response to the signature arriving.  Dr. McDaniel concedes that step 416 is done in response to the query, but he argues that step 424 somehow is not.  McDaniel Dep. at 141:24 – 142:10. (App. at 653-54).  Rather, he argues that step 424 is "triggered" by the query (*id.* at 128:18-23 (App. at 650)) and then attempts to draw an imaginary distinction between actions that are

17

"triggered by a request" and those that are "responsive to a request."  Yet Dr. McDaniel did
concede that:

> Q: If the Court were to determine that something that is triggered by a request is
> responsive to a request, would that mean, in your opinion, that Townshend Figure
> 4 meets the requirement of clam 9 that the output be responsive to a request?
>
> * * *
>
> A: May I have a moment?
>
> (Witness reviews document(s).)
>
> A: I would have to say yes.

McDaniel Dep. at 138:7-16 (App. at 653).  Since there is nothing in the '050 patent that supports
IV's purported distinction, the Court should reject it.

IV's second argument is much like its argument against Townshend's "count," namely, it
claims that Townshend's bulk email signature does not satisfy the "indication of the
characteristic" because it is sent in the form of a hash value.  McDaniel Dep. at 139:15-22 (App.
at 653).  Here again, IV's position has no merit.  Dr. McDaniel agrees that in the system
described in Townshend, the Central Server / Second Tier System will send out a bulk email
signature if and only if the corresponding message is a bulk email.  He also agrees that by
sending out a bulk email signature, the Central Server / Second Tier System is saying that the
signature/hash corresponds to a bulk email.  *Id.* at 130:15-24, 131:13-16 (App. at 651).

A signature that is sent if and only if the email message has the characteristic of being
bulk email, and that is interpreted by the recipient to mean that an email is bulk, plainly:
(1) "descri[bes]" the characteristic of the message, (2) "identif[ies]" whether the message has
that characteristic, and (3) "indicat[es]" the presence or absence of that characteristic in the
message, and thus satisfies each of the Court's constructions in the table above.  Townshend thus
meets the third limitation of each asserted claim.  Rubin Invalidity Report ¶ 496, Exhibit 050-A

18

(App. at 783, 809-34); Rubin Invalidity Reply ¶ 128 (App. at 870-71).  Because Townshend

discloses each element of each asserted claim of the '050 patent, summary judgment that each

claim is invalid should be granted.[6]

> **5.      Even if IV Were Able to Incorrectly Convince the Court That Townshend Does Not Anticipate the Asserted Claims of the '050 Patent, It Renders Those Claims Obvious**

Even if IV could succeed in its attempt to create some razor-thin distinction between the

asserted '050 patent claims and the Townshend prior art, Townshend would still render the '050

patent obvious as a matter of law.  "The combination of familiar elements according to known

methods is likely to be obvious when it does no more than yield predictable results."  *KSR Int'l*

*Co. v. Teleflex Inc.*, 550 U.S. 398, 416 (U.S. 2007).  In this case, Dr. McDaniel testified that,

even in his view, a trivial modification to Townshend Fig. 3 would satisfy every asserted claim.

Dr. McDaniel testified that, in his opinion, the Central Server / Second Tier System's

actions depicted in Fig. 3 of Townshend – computing the count and sending it to the Email

Server/First Tier System – do not satisfy the '050 patent claims because what he calls the

"intelligence" is performed in Fig. 3 in the First Tier System rather than the Second Tier System.

*See* McDaniel Dep. at 83:13-21 (App. at 640).  The "intelligence" that Dr. McDaniel refers to is

the most trivial sort of intelligence imaginable: taking a number and determining whether it

exceeds some fixed, predetermined threshold value, e.g., is it greater than 10 or not.  *Id.* at 83:22

---

[6]    As noted above, the PTO has rejected each of the asserted claims based upon Townshend. IV has responded to those rejections by arguing, incorrectly, that Townshend does not anticipate because it returns a number (count) from the Second Tier System to the First Tier System, which the First Tier System must interpret and that a number that must be interpreted by the recipient is not an "indication" of a characteristic.  *E.g.*, 2/11/13 Amendment in '050 Reexamination at 22 (App. at 521); Wenke Lee Decl. ¶¶ 15, 19, 26 (App. at 491-92, 494).  In the unlikely event that the Court were to agree with this position, then Symantec is entitled to summary judgment of non-infringement because it is undisputed that                    REDACTED

– 84:4, 97:8-11 (App. at 640, 643).  As set forth above, Dr. McDaniel's assumption that the claims require this comparison to be made at the Second Tier System is contrary to the Court's claim constructions and to dependent claims 8 and 14 of the '050 patent.  (Furthermore, as set forth above, Fig. 4 of Townshend shows precisely this intelligence – the comparison of the count to a predetermined threshold – present at the Second Tier System.)  But even ignoring his erroneous assumption and Fig. 4, Dr. McDaniel's testimony about Fig. 3 is a concession that the asserted claims at a minimum are invalid as obvious.

In particular, Dr. McDaniel testified that if the threshold and the count comparison step of Townshend Fig. 3 were moved from the First Tier System to the Second Tier System, the resulting system would be functional and would satisfy every asserted claim.  *Id.* at 80:21 – 82:24 (App. at 639-40).  He further testified that emails would be treated in exactly the same way by a system that did the threshold comparison on the Second Tier System as by a system that did the threshold comparison on the First Tier System.  *Id.* at 95:13 – 97:14 (App. at 643).  In other words, Dr. McDaniel testified that one could take the "familiar elements" from Townshend (count and threshold), combine them according to "known methods" from Townshend (comparison), performed at a location that Townshend itself teaches (on the Second Tier System, as disclosed by Townshend Fig. 4), yielding "predictable results" (treating emails in exactly the same way as the system disclosed in Townshend Fig. 3) in a manner that satisfied the asserted claims of the '050 patent.  *See KSR*, 550 U.S. at 416.  Townshend, therefore, both anticipates and renders obvious all of the asserted claims.

## B.  The Asserted Claims of the '142 Patent Are Invalid Due to the On-Sale Bar

Park City Group, Inc. ("PCG") is the original assignee and prior owner of the '142 patent.  PCG's corporate witness testified under oath that PCG sold a product called Action Gatekeeper (a/k/a "Gatekeeper") to an entity called The Boots Company PLC ("Boots") more than one year

before the filing date of the '142 patent.  Although Boots – which runs a chain of pharmacies called "Boots the Chemists" – was based in the United Kingdom, testimony from PCG's CEO and numerous other witnesses (including the inventors) demonstrates that substantial activity related to that first sale occurred in the United States.  The same witnesses confirmed, and IV has admitted, that Gatekeeper embodied the inventions claimed in the '142 patent.  Furthermore, **uncontested** expert testimony establishes that Gatekeeper was "ready for patenting" more than one year prior to the filing date of the '142 patent.  Accordingly, the asserted claims of the '142 patent are invalid.

### 1.   Gatekeeper Was Offered for Sale and Sold More Than One Year Prior to the Filing Date of the '142 Patent

The filing date of the '142 patent is June 23, 1997.  To determine whether a product was commercially offered for sale prior to June 23, 1996 (the "critical date"), the Court applies "traditional contract law principles." *Allen Eng'g*, 299 F.3d at 1352 (citations omitted).  The Federal Circuit has instructed courts to look to the language used by the parties to determine whether an offer was intended, and also to "consider the circumstances surrounding the making of the offer," including, *inter alia*, "the context of any prior communications or course of dealing between the parties" and "whether the communication contains detailed terms." *Leader Techs., Inc. v. Facebook, Inc.*, 770 F. Supp. 2d 686, 723-24 (D. Del. 2011) (Stark, J.) (citation omitted) (finding patent invalid under the on-sale bar).

On or about September 29, 1995 – nine months before the critical date – PCG sent Boots a letter                                REDACTED

PARKCITY_0006236-6246 (App. at 20-30) (emphasis added) (the "Letter Agreement").  The Letter Agreement identified commercial terms relating to pricing and payment for the software licensing deal. *Id.*

21

A Boots representative executed the Letter Agreement no later than October 18, 1995. *Id.* PCG's corporate representative confirmed that the Letter Agreement concerned the sale of Gatekeeper. Fields Dep. at 52:9-54:21 (App. at 326-27).

Exhibit A to the Letter Agreement                    REDACTED

                                       PARKCITY_0006239-44 (App. at 23-28). It also included a "Functional Definition" for Gatekeeper that accurately described the product. Fields Dep. at 56:18-57:3 (App. at 327). As set forth in Exhibit A,          REDACTED


PCG and Boots also entered into                    REDACTED

       and a software escrow agreement. Each had an effective date of September 29, 1995. PARKCITY_0006247-77 (App. at 31-61). Testimony of PCG's corporate witness, along with contemporaneous documentary evidence, confirms that these materials reflect a sale of the Gatekeeper product to Boots. Fields Dep. at 52:9-57:3 (App. at 326-27);       REDACTED


**2.      Substantial Activity Prefatory to the Sale Occurred in the United States**

While                          REDACTED

courts including this Court apply the principle that "substantial activity prefatory to a sale" that takes place in the United States – whether or not the actual sale is consummated here or an offer is made here – is sufficient to render the invention "on sale" in the United States within the meaning of 35 U.S.C. § 102(b). *See Monolithic Power Sys. v. O2 Micro Int'l Ltd.*, 2007 U.S. Dist. LEXIS 84755, at *14 (N.D. Cal. Oct. 30, 2007) (*citing Robbins Co. v. Lawrence Mfg. Co.*,

482 F.2d 426 (9th Cir. 1973)); *see also B.F. Goodrich Co. v. Aircraft Braking Sys. Corp.*, 825 F. Supp. 65, 71-72 (D. Del. 1993) (citing *Robbins*).  While the *Aircraft Braking* case found mere "telephone communications and preparation of proposals" in the United States to be insufficient to trigger the on sale bar (825 F. Supp. at 72), the activity here was far more extensive.

First, PCG and Boots personnel met in Park City, Utah on multiple occasions between January 1995 and March 1996.  They discussed the development of the PCG products, as well as the business requirements, integration, and account management of those products, including Gatekeeper.  Bennion Dep. at 51:1-52:14 (App. at 481); Fields Dep. at 125:17-20 (App. at 332); Geiger Dep. at 83:16-84:16 (App. at 315); Tondevold Dep. at 20:23 – 27:7 (App. at 342-44);

REDACTED

Second,                                        REDACTED

Third,                                          REDACTED

REDACTED

### 3.    The Gatekeeper Product Embodied the Purported Inventions Claimed in the '142 Patent

To trigger the on-sale bar, the product sold must anticipate or render obvious the asserted claims in light of the prior art. *Allen Eng'g*, 299 F.3d at 1352 (citation omitted).  IV confirmed in an interrogatory response that Gatekeeper embodied the asserted claims of the '142 patent.  Specifically, citing only documents that describe Gatekeeper, IV stated that each asserted claim of the '142 patent was conceived at least as early as May 1996.  *See* Pl.'s Third Supp. Resp. Defs.' Interrog. No. 2 at 6-7 (App. at 408-09).  This admission is sufficient on its own to prove that the patented invention was the subject of the sale.  *See Leader Techs*., 770 F. Supp. 2d at 716 (*citing Vanmoor v. Wal-Mart Stores, Inc.*, 201 F.3d 1363, 1366 (Fed. Cir. 2000)).  Moreover, PCG's corporate witness and numerous other individuals associated with PCG in the 1995-96 timeframe confirmed that Gatekeeper embodied the claims of the '142 patent.  Fields Dep. at 100:17-101:1 (App. at 330); Bennion Dep. at 63:9-13 (App. at 484); Geiger Dep. at 16:20-17:8, 19:14-21:13 (App. at 311-12); Tondevold Dep. at 61:24-62:1 (App. at 346-47); Wood Dep. at 93:11-13 (App. at 379).

### 4.    Uncontested Expert Testimony Establishes That Gatekeeper Was Ready for Patenting More Than One Year Prior to the Critical Date

The requirement that a product be "ready for patenting" may be satisfied "in at least two ways: by proof of reduction to practice before the critical date; or by proof that prior to the critical date the inventor had prepared drawings or other descriptions of the invention that were

24

sufficiently specific to enable a person skilled in the art to practice the invention." *Pfaff*, 525 U.S. at 67-68.  The product need not be "ready for patenting" at the time of the offer for sale, so long as it subsequently becomes ready for patenting prior to the critical date.  *Robotic Vision Sys., Inc. v. View Eng'g, Inc.*, 112 F.3d 1163, 1168 (Fed. Cir. 1997).

Defendants' invalidity expert, Professor Aviel Rubin, has opined that "the Action Gatekeeper product was sufficiently described such that one having ordinary skill in the field of the technology could have made and used the claimed inventions of the '142 patent more than one year before the June 23, 1997 filing date of the '142 patent, and in particular no later than January 9, 1996."  Rubin Invalidity Report at ¶¶ 1235-39 (App. at 784).  In reaching this conclusion, Dr. Rubin relied upon PCG documentation for Gatekeeper created more than one year prior to the '142 patent's June 23, 1997 filing date.  *See id. at* Ex. 142-G (App. at 835-65).  Dr. Rubin showed how each limitation of each asserted claim was described in the prior art Gatekeeper documentation.  *Id.* at ¶¶ 2000-2116 (App. at 785-808).

The responsive expert report of IV's expert, Dr. McDaniel, did not dispute Dr. Rubin's conclusion that the prior art Gatekeeper documentation provided an enabling description of the claimed inventions of the '142 patent.  Nor did Dr. McDaniel offer any opinion that a limitation of the asserted claims was not described in the Gatekeeper documentation as of January 9, 1996, much less by the June 23, 1996 critical date.  To the contrary, Dr. McDaniel embraced – and even adopted – Dr. Rubin's conclusion.  *See* McDaniel Invalidity Report ¶ 257 (App. at 615-16) ("Dr. Rubin *concedes* that the Action Gatekeeper product that embodied the claims of the '142 Patent was sufficiently described no later than January 9, 1996.") (emphasis added).

To the extent that Dr. McDaniel quarreled with Dr. Rubin's analysis supporting the conclusion that the Gatekeeper product was "ready for patenting" prior to the critical date, his

sole criticism was based on a legal irrelevancy:  the fact that the claims of the '142 patent were

not reduced to practice by January 9, 1996.  *See id.* at ¶ 255 (App. at 615) ("***I disagree*** that the

claimed inventions of the '142 Patent ***were reduced to practice by January 9, 1996***.") (emphasis

added).  Leaving aside that Dr. McDaniel's statement mischaracterized Dr. Rubin's opinion, the

Supreme Court has held that reduction to practice is not a necessary requirement of the on-sale

bar, but is simply one way of showing that an invention is "ready for patenting."  *See Pfaff*, 525

U.S. at 66 ("[J]ust because reduction to practice is sufficient evidence of completion, it does not

follow that proof of reduction to practice is necessary in every case.").  An enabling description

prior to the critical date (which Dr. McDaniel did not dispute) is all that is required.  *Id.* at 67-68.

     For the foregoing reasons, the '142 patent is invalid by virtue of the offer for sale and sale

of the Action Gatekeeper product more than one year prior to the '142 patent's filing date.

### C. Symantec Does Not Infringe Any Asserted Claim of the '142 Patent

     IV has alleged that a number of Symantec email products (collectively, the "'142

Accused Products") infringe claims 1, 7, 17, 18, 21, 22, 24, 25, and 26 of the '142 Patent.  As set

forth below, IV has failed to establish that these products satisfy each limitation of the asserted

claims.  Accordingly, summary judgment of non-infringement should be granted.

#### 1. The Accused Products Do Not Infringe Claims 1, 7, 17, 21, 22, 24, and 26

     The '142 patent is directed towards a system and method for providing automatic deferral

and review of e-mail messages and other data objects in a networked computer system, by

applying "business rules" to the messages as they are processed by "post offices."  '142 patent at

Abstract (App. at 87).  Claims 1, 7, 17, 21, 22, 24, and 26 require that "the distribution engine

automatically ***combines the e-mail message with a new distribution list*** specifying at least one

destination post office for receiving the e-mail message for review by an administrator associated

with the destination post office, ***and a rule history*** specifying the business rules that were
determined to be applicable to the e-mail message by at least one rule engine." '142 patent at
27:22-29, 29:51-56, 30:66 – 31:5, 31:21-27, 32:26-32, 33:9 – 34:3 (App. at 125-28).  The Court
has construed "combining the email message with a new distribution list . . . and a rule history
specifying the business rules that were determined to be applicable to email message by at least
one rule engine" as "combining the e-mail message, a new distribution list, and a rule history, for
delivery together, where a rule history identifies each of the [at least one] business rule(s) whose
antecedent condition was satisfied by the e-mail message" and has construed "business rules" as
"statements that each specify one or more antecedent condition(s) and the consequent action(s)
to be applied when the specified antecedent condition(s) are satisfied; ultimately only a single
consequence results for each business rule."  (D.I. 425 at 14-16).  Because the '142 Accused
Products do not combine the message with a new distribution list or with a rule history in the
manner required by the Court's construction, they do not infringe.

### a.    The Accused Products Do Not Combine the E-Mail Message [Data Object] With a Rule History

The '142 Accused Products do not combine the email message with a rule history.  IV
first asserted that this combination limitation is met because the administrator can examine
messages "by reviewing their 'message status settings' and incident history."  McDaniel
Infringement Report ¶ 149 (App. at 569); *see also id.* at ¶¶ 151-152 (App. at 570-71).  IV later
retracted this argument – McDaniel Supplemental Report ¶ 2 (App. at 628) ("Accordingly,
merely showing the 'reasons' does not suffice under the Court's construction.") – and now points
only to a "header" that is added to messages called the "X-Brightmail-Tracker" header (the
"Tracker").  *Id.*  This Tracker argument also fails.

27

In his report, Dr. McDaniel states that the Tracker "records the antecedent conditions – or rules – satisfied by the message" by providing "the Rule IDs" triggered by the message. McDaniel Infringement Report ¶¶ 150-53 (App. at 569-71). The "rules" that Dr. McDaniel points to in the '142 Accused Products are not "business rules," as that term has been construed by the Court, because these "rules" (also sometimes called "filters" by Symantec) contain only the antecedent conditions that messages must satisfy. McDaniel Dep. at 795:10-18 (App. at 676). Dr. McDaniel concedes that the Rule IDs in the Tracker do not identify the consequent action taken for the message. McDaniel Reply Report ¶ 39 (App. at 623-24). The actions taken on messages are defined by separate entities known as "policies." McDaniel Dep. at 795:19-22 (App. at 676). In the '142 Accused Products, multiple rules / filters can each correspond to the same policy. *Id.* at 796:22 – 797:4 (App. at 676). Likewise, a single rule / filter can correspond to multiple policies. *Id.* at 798:2 – 800:25 (App. at 677). If you only know the rule / filter that was satisfied for a message, and you don't know which specific policy was triggered – out of the several policies that may associated with that rule / filter – then you do not know which action was taken on the message. *Id.* at 805:18 – 806:4 (App. at 678-79). Because the Rule IDs that IV points to do not identify which specific consequent action was taken, they do not "identif[y] . . . the business rule" as required by the Court's construction of the "combining" term, and summary judgment of non-infringement should be granted. *See* Spafford Non-Infringement Report ¶¶ 316-27, 360-65 (App. at 737-38, 745).

> ### b.    The Accused Products Do Not Combine the E-Mail Message [Data Object] With a New Distribution List

IV has failed to provide any evidence that the '142 Accused Products combine a data object with a new distribution list. Dr. McDaniel makes the conclusory assertion that this claim limitation is met because "[t]o direct a message to the quarantine instead of the intended

recipient, the distribution mechanism of the Accused Products combines the message with a new distribution list specifying at least one destination post office, *i.e.*, the quarantine or similar repository for review.  The distribution list specifies the addresses or locations – which can be a single address or location – associated with the quarantine or similar repository for review." McDaniel Infringement Report ¶ 146 (App. at 567).  While he says that the distribution list "can be" one of several things, he never actually says what the distribution list is for each of the '142 Accused Products or provides any evidence that this distribution list is delivered together with the message.  Dr. McDaniel's expert report cites to certain source code files that allegedly perform the combining step, but when asked about it at deposition, he conceded that the source code files cited in his report don't actually perform the purported combining.  McDaniel Dep. at 833:19 – 835:10 (App. at 683-84).  Rather, Dr. McDaniel simply pronounced that the combining "necessarily has to happen" because the destination "has to get addressed somehow."

Dr. McDaniel is mistaken.  As Symantec's corporate designee explained, REDACTED

Because the '142

Accused Products do not combine an email message or data object with a new distribution list, summary judgment should be granted with respect to claims 1, 7, 17, 21, 22, 24, and 26.  *See* Spafford Non-Infringement Report ¶¶ 336-44 (App. at 740-41).

### 2. The Accused Products Do Not Have an Organizational Hierarchy (Claims 18 and 25)

Claims 18 and 25 require (1) "storing a database including *an organizational hierarchy* of a business, the hierarchy including a plurality of roles, each role associated with a user" and (2) that "at least one business rule defines an action for deferring delivery of an email message [data object] based upon a role of a recipient user in the *organizational hierarchy*."  '142 patent at 29:63-65, 30:2-5, 32:38-40, 32:44-47 (App. at 126-27).  The '142 Accused Products do not meet either of these two limitations.

#### a. Symantec Mail Security for Exchange, Mail Security for Domino and Email Security.cloud

IV did not articulate an infringement theory for claims 18 and 25 with respect to the Symantec Mail Security for Exchange, Mail Security for Domino, or Email Security.cloud products.  *See* McDaniel Dep. at 811:14-812:15 (App. at 680); McDaniel Infringement Report ¶ 171 (App. at 579-80).  Accordingly, summary judgment of non-infringement with respect to those products should be granted.

#### b. Other Accused Products

IV argues that the remaining '142 Accused Products infringe claims 18 and 25 because they include an optional group policy feature that can allow a customer to set policies that apply to arbitrarily defined groups of users.  *See* McDaniel Infringement Report ¶ 171 (App. at 579-80).  This feature is an optional one, and it is only active if a customer specifically configures it. *Id.*  Dr. McDaniel acknowledges, however, that even customers that do enable the feature can configure it in a non-infringing way, and thus that the products – and the group policy feature

specifically – have uses that do not infringe claim 18 or 25.  McDaniel Dep. at 814:11-25 (App. at 681).

Accordingly, IV's infringement theory devolves into whether Symantec induces infringement.  In order to establish liability for induced infringement, a patentee must show, among other things, that the defendant's actions led to direct infringement of the patent. *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1274 (Fed. Cir. 2004).  To meet this requirement, the patentee must either (1) demonstrate that the defendant's product necessarily infringes the patent when used or (2) point to specific instances of direct infringement.  *Id.* at 1275-76.  Dr. McDaniel concedes that the products have non-infringing uses (McDaniel Dep. at 814:11-25 (App. at 681)), so IV cannot establish that the products necessarily infringe.  Dr. McDaniel also concedes that he is not aware of any specific Symantec customer that has configured the accused products in the allegedly infringing way.  *Id.* at 816:5-17 (App. at 681).  Because IV has not established that anyone has used the accused products in a manner that directly infringes claim 18 or 25 of the '142 patent, summary judgment should be granted.

### D.    Symantec Does Not Infringe Any Asserted Claim of the '610 Patent

Symantec does not infringe the '610 patent because its products do not detect viruses "within the telephone network," as required by the sole asserted claim.

#### 1.    '610 Patent Background

The '610 patent relates to a method for detecting computer viruses within a telephone network.  IV asserts dependent claim 7, which depends from claim 1 and thus requires detecting viruses "within the telephone network."  *See* '610 Patent at 14:40-41, 66 (App. at 151).

### 2. The Accused Symantec Products Are Located on Private Networks That Use IP Addresses in the Range 10.x.x.x and Thus Are Never "Within the Telephone Network"

By way of background, every computer that communicates using the Internet Protocol (IP) is assigned an IP address, which takes the form x.x.x.x, where each "x" is a number between 0 and 255.  Certain IP addresses are assigned for special purposes.  For example, addresses whose first number is equal to 10, *i.e.*, any address in the range 10.0.0.0 to 10.255.255.255, are assigned for use by "private internets."  RFC 1918: Address Allocation for Private Internets (App. at 76); Spafford Reply Report ¶ 8 (App. at 750).

IP addresses in the 10.x.x.x range are "often used by corporations and homes to create private, secure networks that, by definition, cannot be accessed from the public Internet." McDaniel Validity Report ¶ 44 (App. at 608).  These private networks cannot be accessed from the public Internet because routers operated by Internet service providers (ISPs) are configured to drop or reject any packets that are sent to 10.x.x.x addresses.  *Id.*; McDaniel Dep. at 667:12 – 668:23 (App. at 671); Spafford Reply Report ¶ 9 (App. at 750); RFC 1918: Address Allocation for Private Internets, SYMIV00819860 (App. at 77).

The Court construed the phrase "within the telephone network" to mean "in the voice or data network connecting the calling party and called party, exclusive of the networks and gateway nodes of the called party and calling party."  D.I. 425 at 24.  A private network that is outside of the calling and called parties' networks and that utilizes the 10.x.x.x IP address range cannot be accessed from a public Internet connection.  As a result, this private network is not a part of the "network connecting" the calling and called party, when those parties are connected via the Internet.  This result follows whether or not Defendant's motion for clarification is granted, because Defendants' proposed clarification is narrower than the Court's existing

construction, and it retains the "network connecting the calling party and called party" requirement, in particular. *Id.*

IV has accused Symantec hosted network security products sold under the Symantec.cloud brand of infringing claim 7 of the '610 patent. McDaniel Infringement Report ¶ 82 (App. at 559). Customers of these products arrange for emails, webpages, or instant messages to be directed to a Symantec.cloud data center that is connected to the Internet. Once there, they are sent to Symantec computers to be scanned for malicious or otherwise unwanted content. *Id.* ¶¶ 89, 91-92 (App. at 560-63); Spafford Reply Report ¶¶ 12-22 (App. at 751-54).

The Symantec servers that scan for and detect viruses in the accused Symantec.cloud products are all located on private networks that utilize IP addresses in the 10.x.x.x address range. Charrett Decl. ¶¶ 3-5 (App. at 877-78); Spafford Reply Report ¶¶ 12-22 (App. at 751-54);

REDACTED

Dr. McDaniel does not dispute this fact. McDaniel Dep. at 659:2-11, 671:21-25 (App. at 669, 672). Moreover, Dr. McDaniel has admitted that private networks with such 10.x.x.x IP addresses can never be "within the telephone network." McDaniel Validity Report ¶ 44 (App. at 608). Thus, the '610 Accused Products do not infringe asserted claim 7 because they do not detect viruses "within the telephone network," as required by the claim. *See* '610 Patent at 14:40-41, 66 (App. at 151).

### 3. Dr. McDaniel's Attempt to Disavow His Own Unequivocal Opinion Does Not Create a Triable Issue of Material Fact

In his Validity Report, Dr. McDaniel unequivocally states that a network with the IP address range of 10.x.x.x is ***never*** "within the telephone network" because such a network is private and cannot be accessed from the public Internet:

> All IP addresses visible in Dr. Rubin's screenshots are part of private, unroutable networks that belong to the well-known IP address ranges 192.168.x.x and

33

> 10.x.x.x. These two ranges are often used by corporations and homes to create private, secure networks that, by definition, cannot be accessed from the public Internet. In other words, ***no Internet service provider (ISP) will route to private networks using the address ranges of*** 192.168.x.x or ***10.x.x.x, and these private networks can never be "within the telephone network."***

McDaniel Validity Report ¶ 44 (App. at 608) (emphasis added). Dr. McDaniel's statement is correct. Spafford Reply Report ¶¶ 7, 10, 22 (App. at 750, 754).

Dr. McDaniel offered his opinion that 10.x.x.x private networks ***can never be*** "within the telephone network" in his Validity Report, in an attempt to distinguish prior art. McDaniel Validity Report ¶ 44 (App. at 608). After he realized that his statement conclusively established that Symantec did not infringe, he served a "supplemental" expert report, where he claimed that Defendants had taken the statements of his validity report "out of context" by applying them to IV's infringement theory. McDaniel Supplemental Report ¶ 3 (App. at 628-29). However, Dr. McDaniel offered no explanation as to why a statement made in an attempt to preserve validity should not be applicable in the "context" of analyzing IV's infringement theory. *Id.*; McDaniel Dep. at 675:21 – 676:16 (App. at 673). Dr. McDaniel's attempt to disavow his own unequivocal statement does not create a legitimate disputed issue of material fact.

### E. Symantec Does Not Infringe Any Asserted Claim of the '155 Patent

Symantec does not infringe the asserted claims 2 and 3 of the '155 patent because its products do not "forward[] the non-executable format" of the email message, as required by the claims. Even IV's expert has conceded that there is no evidence that Symantec's products perform this required step.

#### 1. '155 Patent Background

The '155 patent relates to a method of protecting a network against viruses contained in e-mail messages as executable code. IV asserts dependent claims 2 and 3. Claim 3 depends from claim 2, which in turn depends from claim 1. *See* '155 Patent at 6:28-42 (App. at 201).

Both asserted claims require, among other things, "converting . . . executable code from an executable format to a non-executable format" and then "forwarding the non-executable format to a recipient of the e-mail message." *Id.* at 6:32-37.  Claim 3 requires that the "executable code" be a "hypertext link" and that the hypertext link be "deactivat[ed]" during the "converting" step.  *Id.* at 6:40-42.  While claim 2 does not require that the executable code be a hypertext link, IV's infringement theory for claim 2 points to the same hypertext links as its infringement theory for claim 3.  McDaniel Infringement Report, Ex. J (App. at 596-602).

## 2.   The Accused Products Do Not Forward Code That Has Been Converted into Non-Executable Format

IV has accused a number of Symantec Products of infringing the '155 patent ("'155 Accused Products").  McDaniel Infringement Report ¶ 199 (App. at 593).  The '155 Accused Products scan incoming emails, and emails meeting certain criteria are diverted to a Quarantine area.  Spafford Non-Infringement Report ¶ 269 (App. at 736).

When a user views a message that contains a hypertext link in the Quarantine area, the link is displayed in a non-exercisable way such that the user cannot activate it (i.e., the user cannot open the webpage by clicking on the link).  *Id.*  Although the message is displayed in this manner,                           REDACTED

### 3.     IV's Infringement Theory Is Premised upon an Erroneous Assumption

IV's theory for how the "forwarding" element is met is reflected in Dr. McDaniel's Reply

Report, in which he argues that "the Accused Products forward messages with potentially

dangerous hyperlinks to the End User Quarantine . . . ."  McDaniel Infringement Reply ¶ 76

(App. at 625); *see* McDaniel Infringement Report ¶ 211 (App. at 594-95).  To meet the

requirement that the forwarded message is *non-executable*, Dr. McDaniel offers the opinion that

the Quarantine "stores the messages with deactivated hyperlinks where their recipients can

access them."  McDaniel Infringement Reply ¶ 76 (App. at 625).  Yet Dr. McDaniel's reports are

devoid of any evidence showing that the Quarantines of the '155 Accused Products store

messages with deactivated hyperlinks.  So is the '155 Patent Claim Chart submitted by IV.

Where it should cite whatever evidence supposedly shows that the message stored in the End

User Quarantine is in a non-executable format, the chart simply states: "*See above.*  A recipient

of the message receives the non-executable format."  McDaniel Infringement Report, Ex. J (App.

at 596-602).

At his deposition, Dr. McDaniel admitted that he was not aware of any actual evidence

showing that Symantec's Quarantine stores a non-executable format of the message:

> Q: In Paragraph 76 you say, among other things -- and I am reading from the
> fourth line down.  It refers to, quote, the end-user quarantine and says that it,
> quote, stores the messages with deactivated hyperlinks where the recipients can
> activate.  Correct me if I am wrong, but I don't think you cite to any evidence that
> it stores the messages with deactivated hyperlinks.  *Are you aware of any
> evidence that it stores the messages with deactivated hyperlinks?*
>
> A: *I am not.*

McDaniel Dep. at 644:6-18 (App. at 666) (emphasis added).  Indeed, Dr. McDaniel admitted that

*he does not know* whether the message stored in the Quarantine is in its original executable

format or in a transformed non-executable format:

Q: So the e-mails that are stored in the quarantine – on the hard disk of the quarantine [are] in the original version, not the transformed version?

* * *

Q: If you know.

A: ***I don't know.***

McDaniel Dep. at 643:14-22 (App. at 666) (emphasis added).

Dr. McDaniel's ignorance as to this critical issue is not surprising, as he conceded that he did not conduct, or even personally observe, ***any*** of the Symantec product testing that his report relies upon.  McDaniel Dep. at 611:2 – 612:8 (App. at 663).

In reality, Symantec's products do not operate as Dr. McDaniel assumed.  As Symantec's corporate designees explain,                                   REDACTED

                                                                     Because there is never a non-executable format of the message forwarded in Symantec's system, the '155 Accused Products do not infringe.

### F.     Symantec Does Not Willfully Infringe the '610, '142, and '050 patents

The crux of IV's willful infringement allegations is that Symantec allegedly "gained knowledge" of the '610, '142, and '050 patents[7] through the prosecution of certain patents that were issued or assigned to Symantec, and such evidence is sufficient to present the issue of willful infringement to the jury.  Pl.'s First Supp. Resp. Symantec's First Set Interrogs. ("Interrog. Responses") at 5-6 (App. at 417-18).[8]  IV misunderstands the controlling case law.

---

[7]     To date, IV has not accused Symantec of willfully infringing the '155 patent.

[8]     IV also claimed that Symantec "gained knowledge of [the '050 patent] at least as early as October 3, 2003."  Interrog. Responses at 6 (App. at 418).

### 1. Symantec's Substantial Non-Infringement and Invalidity Defenses Bar a Finding of Willful Infringement

Under *Seagate*'s objective prong, "legitimate defenses to infringement claims and credible invalidity arguments demonstrate the lack of an objectively high likelihood that a party took actions constituting infringement of a valid patent" and are grounds for granting a motion for summary judgment of no willful infringement. *See, e.g.*, *Honeywell Int'l Inc. v. Univ. Avionics Sys. Corp.*, 585 F. Supp. 2d 636, 642 (D. Del. 2008) (Thynge, Mag. J.) (citation omitted) (granting summary judgment of no willful infringement); *Adv. Fiber Techs. Trust v. J&L Fiber Servs.*, 674 F.3d 1365, 1377-78 (Fed. Cir. 2012) (affirming grant of summary judgment of no willful infringement due to defendant's non-infringement and invalidity arguments).

This Court has held that *Seagate*'s objective prong "cannot be satisfied" where the defendant has asserted "reasonable claim construction positions" and "credible non-infringement theories even under the Court's different constructions." *See Tarkus*, 867 F. Supp. 2d at 537 (Stark, J.) (granting summary judgment of no willful infringement). "[E]xtensive argument from both sides," "significant time [spent by the Court] deciding the proper construction of disputed terms," and a "detailed Memorandum Opinion addressing claim construction," all suggest that the "proper claim construction was a sufficiently close question to foreclose a finding of willfulness." *Id.* (citation omitted). In this case, there was extensive briefing on claim construction (and a limited issue relating to the "within the telephone network" language of the '610 patent remains pending) which resulted in a 5-hour hearing and a 32-page claim construction opinion. (D.I. 425.) Furthermore, as set forth in this brief, Symantec has compelling – indeed, dispositive – invalidity and non-infringement arguments. Accordingly, IV cannot meet the objective prong of *Seagate*.

If there were any need for further evidence, "reexamination proceedings are . . . relevant to the issue of willful infringement." *See Tesco Corp. v. Weatherford Int'l, Inc.*, 750 F. Supp. 2d 780, 794 (S.D. Tex. 2010). The PTO's December 11, 2012 order granting the reexamination petition for the '050 patent and rejecting all of the asserted claims shows a "colorable challenge to the validity" of that patent, further demonstrating that IV cannot establish an objectively high likelihood that Symantec took actions constituting infringement of the '050 patent. 12/11/12 Office Action in '050 Reexamination at 4 (App. at 428). *See Pivonka v. Cent. Garden & Pet Co.*, 2008 U.S. Dist. LEXIS 12022, at *6 (D. Colo. Feb. 19, 2008) (granting summary judgment of no willful infringement based on PTO reexamination order).

### 2.    IV Has Not and Cannot Come Forth with Clear and Convincing Evidence That the Objectively-Defined Risk Was Either Known or So Obvious That It Should Have Been Known by Symantec

Even assuming that IV could meet the objective prong, it cannot show by clear and convincing evidence that "this objectively-defined risk . . . was either known or so obvious that it should have been known to the accused infringer." *Seagate*, 497 F.3d at 1371. IV alleges that Symantec "became aware" of the '610, '142, and '050 patents through the prosecution of its own patents. "[K]nowledge of a patent does not mean willfulness." *Honeywell*, 585 F. Supp. 2d at 644 (citation omitted). *See Aircraft Tech. Publrs. v. Avantext, Inc.*, 2009 U.S. Dist. LEXIS 108190, at *7-8, n.3 (N.D. Cal. Nov. 18, 2009) (citations/quotations omitted) (rejecting plaintiff's "suggest[ion] that [defendant's] awareness of the [patents-in-suit] is sufficient to show willful infringement" because "knowledge of a patent does not mean willfulness" and granting summary judgment of no willful infringement); *Norian Corp. v. Stryker Corp.*, 363 F.3d 1321, 1332 (Fed. Cir. 2004) (no willful infringement even though defendant stipulated to knowledge of the patents). And with regards to IV's "awareness through prosecution" theory, courts have held

that the alleged infringer's introduction to and knowledge of the patent-in-suit by way of PTO office action is insufficient to rise to willful infringement. *See, e.g., Cordance Corp. v. Amazon.com, Inc.*, 639 F. Supp. 2d 406, 413-17 (D. Del. 2009) (Thynge, Mag. J.) (granting summary judgment of no willful infringement because defendant's notice of the patent-in-suit by way of Office Action in the prosecution of its own patent was insufficient), *overruled on other grounds in Cordance Corp. v. Amazon.com, Inc.*, 658 F.3d 1330 (Fed. Cir. 2011).

IV has nothing to substantiate its allegation of willful infringement beyond Symantec's prosecution of its own patent applications. This evidence does not come close to satisfying either prong of the willfulness test. Accordingly, summary judgment of no willful infringement should be granted.

### G. Summary Judgment of No Damages Should Be Granted

IV relies exclusively on the theories of its expert, Michael Wagner, to quantify its damages for alleged infringement of the four patents asserted in this case. Concurrently with this Motion, Symantec has filed a *Daubert* motion to exclude the testimony of Mr. Wagner with respect to the asserted patents. *See* Symantec's Brief in Support of Its *Daubert* Motion to Exclude the Testimony of Intellectual Ventures' Damages Expert, Michael Wagner. Summary judgment of no damages should be granted as to each patent for which the Court sustains the *Daubert* challenge to Mr. Wagner's unprincipled and unreliable opinions. See supra, at 4.

## VI. STATEMENT OF RELIEF

Based on the undisputed facts and for the foregoing reasons, Symantec respectfully requests that the Court grant summary judgment that: (a) the asserted claims of the '050 and '142 patents are invalid; (b) the asserted claims of the '142, '610 and '155 patents are not infringed; (c) Symantec has not willfully infringed any patent; and (d) IV cannot recover any damages.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

Jack B. Blumenfeld (#1014)
Thomas C. Grimm (#1098)
Michael J. Flynn (#5333)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@mnat.com
tgrimm@mnat.com
mflynn@mnat.com

*Attorneys for Defendant Symantec
Corporation*

OF COUNSEL:

Mark A. Flagel
Dean G. Dunlavey
Neil A. Rubin
LATHAM & WATKINS LLP
355 South Grand Avenue
Los Angeles, CA  90071-1560
(213) 485-1234

Yury Kapgan
Suong Nguyen
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA  90017
(213) 443-3000

June 14, 2013
7292957.1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 14, 2013, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on June 14, 2013, upon the following in the manner indicated:

Joseph J. Farnan, III, Esquire                          *VIA ELECTRONIC MAIL*
Brian E. Farnan, Esquire
FARNAN LLP
919 North Market Street, 12th Floor
Wilmington, DE  19801
*Attorneys for Plaintiff*

Parker C. Folse, III, Esquire                          *VIA ELECTRONIC MAIL*
Brooke A.M. Taylor, Esquire
SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA  98101-3000
*Attorneys for Plaintiff*

John P. Lahad, Esquire                          *VIA ELECTRONIC MAIL*
Weston O'Black, Esquire
Richard W. Hess, Esquire
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 1500
Houston, TX  77002
*Attorneys for Plaintiff*

Karen Jacobs Louden, Esquire                          *VIA ELECTRONIC MAIL*
Michael J. Flynn
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
Wilmington, DE  19801
*Attorneys for Trend Micro Incorporated
and Trend Micro, Inc. (USA)*

Yar R. Chaikovsky, Esquire                                    *VIA ELECTRONIC MAIL*
D. Stuart Bartow, Esquire
Michael F. Martin
MCDERMOTT WILL & EMERY LLP
275 Middlefield Road, Suite 100
Menlo Park, CA  94025
*Attorneys for Trend Micro Incorporated*
*and Trend Micro, Inc. (USA)*


David M. Beckwith, Esquire                                    *VIA ELECTRONIC MAIL*
MCDERMOTT WILL & EMERY LLP
4 Park Plaza, Suite 1700
Irvine, CA  92614-2559
*Attorneys for Trend Micro Incorporated*
*and Trend Micro, Inc. (USA)*



                                        */s/ Michael J. Flynn*
                                        Michael J. Flynn (#5333)