IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

INTELLECTUAL VENTURES I LLC,

                Plaintiff,

v.

CHECK POINT SOFTWARE
TECHNOLOGIES LTD., et al.,

                Defendants.

§
§
§
§
§
§
§
§
§
§
§

Case No. 10-cv-1067-LPS

JURY TRIAL DEMANDED

**FILED UNDER SEAL**

IV1'S ANSWERING BRIEF TO SYMANTEC'S MOTION TO EXCLUDE OPINIONS OF IV1
<u>DAMAGES EXPERT MICHAEL WAGNER</u>

Joseph J. Farnan, III (Bar No. 3945)
Brian E. Farnan (Bar No. 4089)
FARNAN LLP
919 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 777-0300
(302) 777-0301
bfarnan@farnanlaw.com

Parker C. Folse III *(admitted pro hac vice)*
Brooke A.M. Taylor *(admitted pro hac vice)*
Lindsey N. Godfrey *(admitted pro hac vice)*
SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
Telephone:    (206) 516-3880
Facsimile:    (206) 516-3883

Richard W. Hess (admitted pro hac vice)
Weston O'Black *(admitted pro hac vice)*
John P. Lahad *(admitted pro hac vice)*
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, TX 77002
Telephone:    (713) 653-7859
Facsimile:    (713) 654-3386

Dated: July 12, 2013                *Counsel for Plaintiff*

# TABLE OF CONTENTS

I. Nature and Stage of Proceedings, Argument Summary and Statement of Facts ........................1

    A.      Statement of the Nature and Stage of the Proceedings ............................1

    B.      Argument Summary.........................................................................................1

    C.      Statement of Facts ............................................................................................2

II. Argument..............................................................................................................................2

    A.      Wagner Properly Considered Trend's ▮▮▮▮ Technology License.................3

          1.      The ▮▮▮▮ technology license embodies the '050 patent's technology.........................................................................................3

          2.      Comparability does not require that a litigant be a party to that contract.......................................................................................7

          3.      IV1, not Symantec, has been prejudiced by the selective and delayed production of ▮▮▮▮ discovery................................................8

    B.      Wagner Appropriately Applied Entire Market Value Rule to Products Infringing the '610 Patent and Used a Proper Set of Patent Licenses as his Baseline Agreement. ....................................................................................9

          1.      Mr. Wagner's proper and limited application of the entire market value rule............................................................................10

          2.      Mr. Wagner properly relied on three patent licenses for similar technology, each of which discloses the same royalty rate. ......................13

    C.      Wagner's Use of Symantec's Own Patent Valuation Is Reasonable....................15

    D.      Wagner's Damages Opinion on the '155 Patent Is Reasonable. ..........................17

    E.      Patent ▮▮▮▮ is Irrelevant to Reasonable Royalty .............................18

          1.      No evidence that buyer or sellers knew extent of use at time of sale. ..........................................................................................19

          2.      No knowledge of validity or infringement at the time..............................20

          3.      IV incurred significant expenses *after* ▮▮▮▮ in order to license and enforce the patents-in-suit......................................................20

III. Conclusion ........................................................................................................................20

## TABLE OF AUTHORITIES

Cases

ActiveVideo Networks Inc. v. Verizon Commc'ns, Inc.,
694 F.3d 1312 (Fed. Cir. 2012)........................................................................ 4

Amado v. Microsoft Corp.,
517 F.3d 1353 (Fed. Cir. 2008)........................................................................ 18

DataQuill Ltd. v. High Tech Computer Corp.,
887 F. Supp. 2d 999 (S.D. Cal. 2011) ............................................................. 7

ePlus, Inc. v. Lawson Software Inc.,
764 F. Supp. 2d 807 (E.D. Va. 2011) .............................................................. 14

Fonar Corp. v. Gen. Elec. Co.,
107 F.3d 1543 (Fed. Cir. 1997)........................................................................ 12

Funai Elec. Co. v. Daewoo Elecs. Corp.,,
616 F.3d 1357 (Fed. Cir. 2010)........................................................................ 12

Georgia-Pac. Corp. v. U.S. Plywood Corp.,
318 F. Supp. 1116 (S.D.N.Y. 1970).................................................................. 8

i4i Ltd. P'ship v. Microsoft Corp.,
598 F.3d 831 (Fed. Cir. 2010)........................................................................... 6

IP Innovation L.L.C. v. Red Hat, Inc.,
705 F. Supp. 2d 687 (E.D. Tex. 2010)....................................................... 16, 17

LaserDynamics Inc. v. Quanta Computer, Inc.,
No. 2:06-CV-348-TJW-CE, 2011 WL 7563818 (E.D. Tex. Jan. 7, 2011) ........ 7

LaserDynamics, Inc. v. Quanta Computer, Inc.,
694 F.3d 51 (Fed. Cir. 2012)................................................................ 4, 15, 16

Lucent Techs., Inc. v. Gateway, Inc.,
580 F.3d 1301 (Fed. Cir. 2009)............................................................ 7, 10, 11

Marine Polymer Techs, Inc. v. HemCon, Inc.,
672 F.3d 1350 (Fed. Cir. 2012)........................................................................ 13

Multimedia Patent Trust v. Apple, Inc.,
No. 10-CV-2618-H (KSC), 2012 WL 5873711 (S.D. Cal. Nov. 20, 2012) ......... 16, 17, 18

ResQNet.com v. Lansa Inc.,
594 F.3d 860 (Fed. Cir. 2010)................................................................. passim

Tec Air, Inc. v. Denso Mfg. Mich., Inc.,
     192 F.3d 1353 (Fed. Cir. 1999)....................................................................................... 12

Uniloc USA, Inc. v. Microsoft Corp.,
     632 F.3d 1292 (Fed. Cir. 2011)....................................................................... 4, 12, 13, 14

Versata Software v. SAP Am., Inc.,
     __ F. 3d __, 2012-1029, 2013 WL 1810957 (Fed. Cir. May 1, 2013)............................... 3

Statutes

35 U.S.C. 284............................................................................................................................ 19

Rules

Fed. R. Civ. P. 26(a)(2)(B)(i) & (D) .............................................................................................. 8

I.
Nature and Stage of Proceedings,
Argument Summary and Statement of Facts

A.    Statement of the Nature and Stage of the Proceedings

In this patent infringement lawsuit, discovery ended on November 21, 2012. The parties

served opening expert reports on February 15, 2013, rebuttal reports on March 20, 2013 and

reply reports on April 3, 2013. All designated testifying experts have been deposed. The deadline

for filing all *Daubert* and case dispositive motions was June 14, 2013. (D.I. 501). This is IV1's

Answering Brief to Symantec's *Daubert* motion regarding IV1 damages expert Michael Wagner.

B.    Argument Summary

1.    To determine a baseline royalty rate for the '050 Patent, Mr. Wagner properly

relied on a license between ███████████████ ███████████ ████████████

████████████████ Mr. Wagner ensured that the agreement was technically and economically

comparable, and then adjusted the rate pursuant to the *Georgia-Pacific* factors.

2.    For the '610 Patent, and in accord with Federal Circuit precedent, Mr. Wagner

applied his royalty rate to the entire value of Symantec's '610-infringing products. In so doing,

Mr. Wagner carefully explained how the function enabled by the '610 Patent drive sales and

customer demand for the infringing products.

3.    As part of analyzing a baseline royalty for the '142 Patent, Mr. Wagner

appropriately considered a Symantec-commissioned, ████████████████████████████

████████████████████████████████████████ Those

comparable patents' royalty rates, confirmed by Symantec executives, demonstrate that Mr.

Wagner has a sound basis for '142 Patent damages calculation.

1

4.      Mr. Wagner based his opinion that Symantec owes ███████████ ██████ for infringing the '155 Patent on the best available patent license agreements, properly adjusted through Mr. Wagner's *Georgia-Pacific* analysis.

5.      Symantec's repeated protest—that for each patent-in-suit Mr. Wagner should have based his opinion solely on ████████████████—deserves no weight and is unsupported by law. In his detailed report, Mr. Wagner carefully considered each ████████████ and the testimony of the ██████████ before concluding that the ███ prices were not probative.

C.      <u>Statement of Facts</u>

IV1's retained damages expert, Michael Wagner, submitted his opening expert report on February 15, 2013. On February 22, 2013, Mr. Wagner submitted a corrected and supplemental opinion, based in part on Symantec's failure to supplement its discovery responses to include 2012 financial data until February 8, 2013. *See* Exh. A, Feb. 21, 2013 email from R. Hess to S. Nguyen. Mr. Wagner submitted a second corrected and supplemental opinion on March. 9, 2013, based in part on Symantec's failure to provide complete 2012 data when it supplemented its financial data discovery on February 8, 2013, and its supplementation with additional, corrected financial data on February 25, 2013. *See id.*; Exh. B, Mar. 9, 2013 Wagner Report ¶ 1.[1]

II.
<u>Argument</u>

One might aptly summarize Symantec's *Daubert* attack on IV1 damages expert Michael Wagner this way: Strike his entire opinion because Mr. Wagner relied on comparable technology

---

[1] While Symantec's failures in part necessitated Mr. Wagner's supplemental reports, Symantec's opening brief omits any mention of its tardy financial data production or its delay in correcting issues with its supplemental production. Instead, Symantec's brief repeatedly characterizes Mr. Wagner's supplemental reports as being submitted for the purpose of "increasing his reasonable royalty opinion[s]." (D.I. 512 at 2–3).

and patent licenses that result in damages greater than the ██████████████████ in suit. This is, however, not a proper *Daubert* challenge. Instead, it is a quintessential expert dispute to be resolved by a jury after vigorous cross-examination.

Mr. Wagner has provided a careful, meticulously supported opinion that hews closely to the legal standards for patent infringement damages. The Court should deny Symantec's motion.

A.   <u>Wagner Properly Considered Trend's ███████ Technology License</u>

The heart of Symantec's *Daubert* challenge on the '050 Patent concerns Mr. Wagner's consideration of an agreement between ████████████ ████████████████████████ in support of his *Georgia Pacific* analysis. Following this analysis, Mr. Wagner applied ████████ ███ royalty (for enterprise products) and ████ ██████ royalty (for consumer products) to Symantec's '050-infringing product royalty base, calculating total damages of █████████ ███████████████████████████████████████████████████████████

1.   <u>The ████████ technology license embodies the '050 patent's technology.</u>

Symantec argues that the ████████ license is "irrelevant" and "cannot be comparable" to a hypothetically negotiated patent license because the ██████ license is not a patent license, but a license for █████████ to use ██████developed technology ██████████████████ ██████████████████ Specifically, Symantec argues that *ResQNet.com v. Lansa Inc.*, 594 F.3d 860 (Fed. Cir. 2010) requires excluding Mr. Wagner's opinions about ████ ████ because ███████████████████████████████████████. (D.I. 512 at 8).

Symantec is wrong. It points to no prohibition on an expert considering technology licenses as part of a hypothetical negotiation analysis. To the contrary, Federal Circuit precedent allows consideration of such agreements. *See, e.g., Versata Software v. SAP Am., Inc.*, __ F. 3d __, 2012-1029, 2013 WL 1810957 (Fed. Cir. May 1, 2013) (affirming damages expert's opinion that used software product license as comparable for purpose of valuing hypothetical license);

*ActiveVideo Networks Inc. v. Verizon Commc'ns, Inc.,* 694 F.3d 1312, 1333 (Fed. Cir. 2012) (affirming damage expert's use of two agreements, one of which did not involve patents in suit or the technologies in the case, and the other which included both patents and software services).

Indeed, far from *requiring* exclusion of the ▮▮▮▮▮ agreement, the Federal Circuit's recent damages decisions insist that damages experts "carefully tie proof of damages to the claimed invention's footprint in the market place." *See LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012) (quoting *ResQNet.com, Inc. v. Lansa, Inc.,* 594 F.3d 860, 869 (Fed. Cir. 2010)); *Uniloc USA, Inc. v. Microsoft Corp.,* 632 F.3d 1292, 1317 (Fed. Cir. 2011) (same). Here, because the ▮▮▮▮▮ agreement *licenses*▮▮▮▮▮▮▮▮▮▮ ▮▮, it is by far "the most reliable license in this record." *ResQNet.com,* 594 F.3d at 872.

The case on which Symantec principally relies, the Federal Circuit's decision in *ResQNet.com*, contains no bar on using technology licenses. The *ResQNet.com* majority did not exclude expert testimony for basing an opinion on software licenses *because they were software licenses*. Rather, the excluded expert erred by basing his opinion on software licenses that bore "no relation to the claimed invention." *See ResQNet.com*, 594 F.3d at 870.[2]

In *ResQNet*, the plaintiff's damages expert, Dr. David, based his opinion on five "re-branding or re-bundling licenses" that, among other things, "furnished finished software products." *Id.* But, the majority noted, none of those five licenses "showed any discernible link to the claimed technology." *Id.* The Court repeatedly emphasized the requirement that the party offering a comparable agreement must link that agreement to the patent license in a hypothetical negotiation. ResQNet.com's expert offered "little or no evidence of a link between the re-

---

[2] *ResQNet.com* is also distinguishable because the unrelated licenses in that case included licenses to "finished software products." *ResQNet.com*, 594 F.3d at 870. ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

bundling licenses and the claimed invention," *id.* at 871, and the licenses he used "were absolutely silent on any relation to the patents in suit." *Id.*

The facts here are clearly distinguishable from *ResQNet.* In August 2009, Trend Micro entered into a ████████ ████████ with ████████ which, like Trend and Symantec, is an internet security provider. *See* Exh. D, (TMIVA0045747–764). That agreement licensed ████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████ *Id.* at TMIVA0045759.

Indeed, the ████████ ████████ license, unlike the software product license in *ResQNet,* covers the precise infringing technology embodied in the '050 Patent: ████████ ████████████████████████ Trend products call this technology ████████. Per Dr. McDaniel, IV1's technical expert:

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████

*See* Exh. E, McDaniel Inf. Report (Symantec), at ¶ 215.

As noted in Mr. Wagner's report and testimony, the ████████████████████████ ████████ *See* Exh. F, Wagner Tr. Vol. 1 82:15–20; Exh. G, Wagner Feb. 15, 2013 Report ¶ 177. Thus, the ████████████ closely outlines the ████████ technology and is unlike the software product license in *ResQNet.*[3]

---

[3] Trend did not, in fact, sell Trend's antivirus scanning engine (████) as a product. *See* Exh. C, Maddison Tr. 50:16–19. Instead, through the ████████ agreement, Trend licensed ████████ ████████████████████████████████████████████████████

Symantec infringes the '050 patent through the same, ████████████████████ which Symantec calls ██████████████ As Dr. McDaniel explained:

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████

See Exh. E, at ¶¶ 173–197.

The connection between the ████████ license and the infringing technology appears on the face of the ████████ agreement. That agreement specifies that the ██████████ ████████████████████████████████████████ ██████████████████████████████ 9. Given the overlapping footprints of the ████ ████ agreement and the technology identified in the '050 patent, this agreement is highly probative. Symantec's complaints plainly go to the weight that the jury should afford Mr. Wagner's testimony and not its admissibility. *See i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 857–58 (Fed. Cir. 2010) (affirming trial court's admission of Mr. Wagner's damages opinions and finding that he grounded his baseline agreement on sufficient facts and evidence).

████ ████ ██████████████████████████████████
████████████████████████████████████████
██████████████████████████████████████ ████
████ ██████████████ echnology comparable to the '050 Patent, ████████████████
████████████████████████.

Given the strong technical and economic comparability of the ████████ agreement to the hypothetical patent license, the other cases Symantec cites are likewise inapt. Like *ResQNet,*

those cases exclude testimony for lack of comparability, not based on whether an agreement licenses a technology or a patent. *See, e.g., Lucent Techs., Inc. v. Gateway, Inc.,* 580 F.3d 1301, 1328 (Fed. Cir. 2009) (excluding opinion for considering licensing agreements "radically different from the hypothetical agreement under consideration"); *DataQuill Ltd. v. High Tech Computer Corp.*, 887 F. Supp. 2d 999, 1023 (S.D. Cal. 2011) (excluding expert who provided "no analysis at all of the economic differences" between ostensibly comparable patent agreements and the hypothetical agreement). Mr. Wagner appropriately considered the *Georgia-Pacific* factors related to his baseline agreement to ensure its economic comparability. *See* Exh. G, at ¶¶ 222–261; 290–292; 295–299; Exh. F, 100:2–20 (discussion of the factors that decrease the reasonable royalty from the baseline agreement).

    2.    <u>Comparability does not require that a litigant be a party to that contract.</u>

Symantec also speciously argues that the ███████ agreement cannot be probative of reasonable royalty because █████████████████████████ Symantec's sole authority for this notion is a magistrate's decision in *LaserDynamics Inc. v. Quanta Computer, Inc.*, No. 2:06-CV-348-TJW-CE, 2011 WL 7563818 (E.D. Tex. Jan. 7, 2011). (D.I. 512 at 7–8).

Symantec's bald misuse of this case goes beyond the fact that it is obviously not authoritative nor precedential. Symantec also selectively edited its quotation from that decision in a way that conceals the magistrate's actual decision. Here is the magistrate's two-sentence analysis, with the significant omitted portions from Symantec's brief in bold italics:

> The Philips/ACI agreement did not involve either Plaintiff or Defendants, ***and licensed an unspecified number of patents for optical disk technology.*** This agreement is not probative ***under Georgia-Pacific factors 1 or 2*** because it involves neither party.

*Id.* at *3; (D.I. 512 at 7–8). By carefully excising the words "under *Georgia-Pacific* factors 1 or 2" Symantec artfully changed the meaning of the magistrate's decision. ***Of course*** an agreement

that did not involve Plaintiff or Defendant would not be probative under GP factors 1 or 2, as those two factors concern the licensing activities of "the patentee" and "the licensee," respectively. *See Georgia-Pac. Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).[4] ███████████████████████████ ████████ ███████████████ ████████ █████████ to fall under GP factor 12. Exh. F, 90:19–93:3. GP factor 12 concerns "the portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions." *Georgia-Pac. Corp.*, 318 F. Supp. at 1120. This factor is not limited to consideration of parties' licenses or even the precise patent or technology. Both Symantec and Trend are significant competitors in this industry, thus rendering the ██████████ license on point as a license to an analogous invention in a comparable business. *See* Exh. G, at ¶ 10.

3.  IV1, not Symantec, has been prejudiced by the selective and delayed production of ██████████ discovery

In a single sentence in its opening brief, Symantec weakly objects to Mr. Wagner's consideration of the ██████████ agreement because it "had no ability to take discovery" on it. Symantec asserts that "IV did not disclose its intent to use this agreement as its benchmark until after the close of fact discovery." (D.I. 512 at 8). This short comment misleads in two ways.

First, IV1 disclosed Mr. Wagner's "intent to use" the ██████████ agreement when IV1 timely served Mr. Wagner's expert report on Feb. 15, 2013. Nothing requires IV1 to disclose the bases for its expert opinions *before* the expert report deadline. *See* Stip. and Order Amending 2d Am. Scheduling Order (D.I. 461); Fed. R. Civ. P. 26(a)(2)(B)(i) & (D) (requiring expert reports

---

[4] *See id.* (identifying first two factors as "1. The royalties **received by the patentee** for the licensing of the patent in suit, proving or tending to prove an established royalty; 2. The rates paid **by the licensee** for the use of other patents comparable to the patent in suit.").

to include "the basis and reasons" for all opinions to be disclosed "at the times and in the sequence that the court orders").

Second, even assuming that IV1 had some obligation to preview the bases for its expert reports before the November 21, 2012 close of fact discovery (it didn't), it would have been physically impossible for IV1 to give Defendants such a sneak peek. *Trend did not produce the* ███████ *agreement until November 21, 2012,* when it dropped the disk containing the agreement in the mail. Exh. H. Symantec knows this because IV1 told Symantec. *See* Exh. I, (2/27/2013 email from R. Hess). Symantec had and has the ability to learn more about the ███ ███ agreement from its co-defendant Trend. IV1 did not and does not.

As discussed in greater detail in IV1's Response to Trend's Motion to Exclude Mr. Wagner, it is IV1 who has been prejudiced by Defendants' failure to provide timely discovery as to the ██████ agreement. Trend's corporate representative was not prepared to answer any questions about the ██████ license. *See* Exh. J, Chen Tr. 145:8–12. IV1 had to threaten a motion to compel to receive the license, which, as noted, Trend produced via mail on the last day of discovery. *See* Exh. K, (Nov. 8, 2013 email from W. O'Black). After Trend produced the ███ ███ agreement, IV1 deposed the Trend executive who signed it, ██████████ who could provide few details on the ██████ agreement. *See* Exh. C, 48:4–9; 51:4–52:18; 52:22–53:17.[5]

B.    <u>Wagner Appropriately Applied Entire Market Value Rule to Products Infringing the '610 Patent and Used a Proper Set of Patent Licenses as his Baseline Agreement.</u>

Symantec also criticizes Mr. Wagner's opinion regarding the damages due to IV1 for Symantec's infringement of the '610 Patent. For that patent, Mr. Wagner applied a ██████

---

[5] After IV1 served Mr. Wagner's opening expert report, Trend produced additional, previously-withheld ██████ documentation, as well as summary spreadsheets of ██████ royalty payments that were prepared at the request of Trend's counsel. Both Trend and Symantec now seek to rely on Trend's untimely production to discredit Mr. Wagner's opinion. IV1 objects to this selective and late-produced information, seeks to exclude it, and will also move *in limine* to bar Defendants' use of this information.

royalty rate to Symantec's '610-infringing product royalty base, calculating total damages of ████████. *See* Exh. B (2d Corrected/Supp. Report at 5).

Symantec attacks on two grounds: (1) It faults Mr. Wagner's application of his concluded royalty rate to the entire value of Symantec product revenue for certain portions of the '610-Patent royalty base; (2) Symantec challenges Mr. Wagner's use of three licenses to Trend's ████ ████ as his baseline agreement, where two of those licenses also ███████████████.

Symantec's first criticism falls short because Mr. Wagner properly employed the "entire market value rule" ("EMVR") due to the singular importance of the patented technology to particular Symantec products, as approved by Federal Circuit case law. Symantec's second attack fares no better: all of the ████████ licenses considered by Mr. Wagner as his baseline agreements apply the same royalty rate, regardless of whether they settle litigation or not.

      1.    <u>Mr. Wagner's proper and limited application of the entire market value rule.</u>

Mr. Wagner's use of the entire market value was appropriate because the '610 patent's technology is fundamental to Symantec's '610-infringing products, it drives demand for those products, and forms a substantial basis for consumer demand for those products. *See* Exh. F, 191:3–12; Exh. E, at ¶ 52. ████████████████████████████████

████████████████████████████████████████

████████████████ *See id.*; Exh. G, at ¶ 300. Symantec's '610-accused products ████ ████████████████████████. *Id.* ¶¶ 445–48, 466.

In such situations, the use of the EMVR is appropriate. In *Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1337 (Fed. Cir. 2009), the Court described the "fundamental relationship between the entire market value rule and the calculation of a running royalty damages award:"

Simply put, the base used in a running royalty calculation can always be the value

> of the entire commercial embodiment, as long as the magnitude of the rate is within an acceptable range (as determined by the evidence). . . .There is nothing inherently wrong with using the market value of the entire product, especially when there is no established market value for the infringing component or feature, so long as the multiplier accounts for the proportion of the base represented by the infringing component or feature.

*Id.* at 1338. In *Lucent,* the Federal Circuit reversed a jury's damages award where the basis of the damages calculation was unclear. The Court "assum[ed] the jury did apply the entire market value rule." *Id.* at 1336. According to the Court, the jury erred because of "the lack of evidence demonstrating the patented method of the Day patent as the basis—or even a substantial basis— of the consumer demand for Outlook." *Id.* at 1337. Instead, the patented method—a "date picker" tool for Microsoft Outlook's calendar function—was "but a very small component of a much larger software program" that played a "minor role in the overall program." *Id.*

Here, Symantec's ███████████████ are the very embodiment of the '610 Patent, and thus satisfy the *Lucent* requirement to demonstrate that that the patented method is "a substantial basis of . . .consumer demand." According to Dr. McDaniel,



Exh. E, at ¶ 52; *id.* ¶ 53 ████████████████ ██████████ Mr. Wagner identifies ███████████ ████████████████ ███████████. *See* Exh. G, at ¶¶ 314–336. Mr. Wagner concluded, ███████ ████████████████ ███████ *d.* ¶ 336.

This far exceeds the evidence that the Federal Circuit has previously required (including after *Lucent*) to show that the patented invention was the basis for customer demand for an

infringing product. *See, e.g., Funai Elec. Co. v. Daewoo Elecs. Corp.,* 616 F.3d 1357, 1375–76 (Fed. Cir. 2010) (affirming damages award where patented feature "furthered goals" consumers desired for smaller, cheaper, faster and more reliable VCRs); *Tec Air, Inc. v. Denso Mfg. Mich., Inc.*, 192 F.3d 1353, 1361–62 (Fed. Circ. 1999) (same, where evidence showed one customer's demand for patented method of balancing injection molded fans); *Fonar Corp. v. Gen. Elec. Co.,* 107 F.3d 1543, 1552–53 (Fed. Cir. 1997) (same, where infringer's technical literature emphasized infringing feature).

Symantec premises its entire EMVR attack on the faulty notion that in order to employ the EMVR, an infringing product can only have a single feature that is the sole basis for customer demand. This is not the law, and Mr. Wagner addressed this issue head on:



Symantec cites the Federal Circuit's decision in *Uniloc* as barring use of the entire product value unless the patented feature is the product's only basis for customer demand.

---

[6] In none of the cited Wagner testimony did Mr. Wagner "concede" that the '610-patented feature does not drive consumer demand. Mr. Wagner testified that demand for '610-infringing products, as with all products, is driven by more than one feature, including the patented feature.

*Uniloc* did not overrule *Lucent*, which remains good law.[7] *See Uniloc USA v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011) (affirming trial court's exclusion of expert opinion where Uniloc "conceded customers do not buy Office or Windows because of Product Activation and said it would not base a royalty calculation on the entire market value of the products."). *Uniloc* is plainly distinguishable here, because Dr. McDaniel and Mr. Wagner's reports demonstrate that

████████████████████████   ███████████████████   ████████████████████████████████

> 2.    Mr. Wagner properly relied on three patent licenses for similar technology, each of which discloses the same royalty rate.

Mr. Wagner determined his '610 Patent baseline royalty rate with reference to three

████████████████████████   ████████████████████   ███████████████   █████████████████

████████████████████████████████   Exh. G, at ¶ 337. The parties addressed the

███████████   during claim construction, *see* D.I. 240 at 30, and Symantec asserts a continuation-in-part of that patent as prior art against three patents-in-suit, including the '610. *See* Exh. E, at ¶¶ 216–217. Indeed, the '610 Patent lists the ███████ among its "references cited." Exh. G, at ¶ 341. Arguing the non-comparability of the ██████ ignores the role the patent family has played in this case: Symantec claims patents are so closely related that they are prior art, but for damages, it denies that these comparable parents have *any* relevant relationship to the patents-in-suit.

The Court ordered production of agreements in class codes that match those of the patents-in-suit. Trend produced several licenses to the ████████████ , including to ████████████

████████████████████

- ████████████████████████████████████████████
  ████████████████████████████████████

---

[7] In fact, the Federal Circuit's recent *en banc* decision *Marine Polymer Technologies, Inc. v. HemCon, Inc.*, 672 F.3d 1350 (Fed. Cir. 2012) shows that the Court does not limit the EMVR to situations where an infringing product has a single basis for demand. *See id* at 1360 (affirming, by an equally divided court, that substantial evidence supported jury's damages award when the infringing feature was "critical to the core hemostatic function of the accused products").



The foregoing bullets distill some elements of these comparable agreements. ████████

██████████████████████████████████████████████████████████████████████████████████

████████████████████████████  ███████████████████████████████████████████████████

█████████████████████████████████████████████. *See* Exh. G, at ¶¶ 342–388. Dr.

McDaniel also found the ████████ comparable to the '610 Patent. *See* Exh. E, at ¶¶ 216–217.

Symantec complains of Mr. Wagner's use of the first two agreements (████████

████) and never mentions the third ██████████████). According to Symantec, Mr. Wagner

improperly used the ████████ and ████████ agreements, principally because those agreements

████████████████████ and thus represent "coercive" settlement agreements. (D.I. 512 at 15).

No rule prohibits consideration of settlement agreements. Even the cases cited by

Symantec recognize the "well-settled" rule that "settlement agreements entered into in the

context of litigation may be considered," although based on the circumstances "they have

minimal probative value." *ePlus, Inc. v. Lawson Software Inc.*, 764 F. Supp. 2d 807, 813

(E.D. Va. 2011). But in other circumstances, the Federal Circuit recognizes that settlement

agreements can be "the most reliable license" available. *See ResQNet*, 594 F.3d at 861 ("This

14

court observes as well that the most reliable license in this record arose out of litigation."); *LaserDynamics, Inc. v. Quanta Computer,* 694 F.3d 51, 77 (Fed. Cir. 2012) (noting the court permitted consideration of settlement license on remand in *ResQNet.com* because "other licenses . . .did not even mention the patents-in-suit or show any other discernible link to the claimed technology").

Here, Symantec's expert asserts that ██████████████████████████████████ ██████████████████" and identifies no '610-Patent comparable license agreements that he believes Mr. Wagner should have used instead. *See* Exh. P, at ¶ 210.[8] The ██ █████████ licenses analyzed by Mr. Wagner constituted the most probative agreements ███████████ ████████████████████████████████████████████████. Symantec is free to disagree—and indeed, its and Trend's counsel already cross examined Mr. Wagner for two days about his choices. But this dispute concerns Mr. Wagner's conclusions, not his methodology.

C.   <u>Wagner's Use of Symantec's Own Patent Valuation Is Reasonable.</u>

Symantec also criticizes Mr. Wagner's '142 Patent damages opinion. For that patent, Mr. Wagner applied a ████████ royalty rate to the '142-infringing product royalty base, calculating total damages of ████████. *See* Exh. B, ¶ 15.

According to Symantec, Mr. Wagner should not have relied on a patent valuation on which *Symantec itself relied.* As part of its ███████████████████████████████████ Symantec engaged █████████████████ to perform a valuation of certain ████████ assets,

---

[8] For his '050 comparable licenses, Mr. Bakewell *only* considers litigation settlements. *See* Exh. P, Bakewell Mar. 20, 2013 Report, ¶ 202 ██████████████████████████████████████ ████████████); *see also* Exh. R, Bakewell May 17, 2013 Suppl. Report ¶ 3 (almost—but not quite—acknowledging his error, once pointed out by Mr. Wagner, that the █████████████ ██████████████████ but noting that it does not change Mr. Bakewell's opinions).

including its ███████ patents. *See* Ex. Q, (██████ Valuation) █████████████████████

██████████████████████████████████████████ *Id.* at 6.



████████████████████████████. Exh. G, at ¶¶ 506–07.

No one from ██████ has disputed the valuation. No Symantec executive has disputed the average patent royalties in similar areas. And although Symantec relied on ██████ work to provide accurate and materially complete financial information to its investors, Symantec now says that the valuation is too unreliable for Mr. Wagner to use.

Because the ██████ valuation rates specifically relate to comparable patents, the two cases Symantec cites as requiring exclusion do not apply. *See IP Innovation L.L.C. v. Red Hat, Inc.*, 705 F. Supp. 2d 687, 691 (E.D. Tex. 2010); *Multimedia Patent Trust v. Apple, Inc.*, No. 10-CV-2618-H (KSC), 2012 WL 5873711 (S.D. Cal. Nov. 20, 2012). In *IP Innovation*, the court found "another reason" to exclude damages testimony because the expert used two industry surveys as a royalty rate "starting point" that were far too general for the patent in suit, which dealt with the "desktop switching" feature of a computer operating system. One of the proffered surveys addressed average royalties in the "computer and electronics products manufacturing industry" and the other the "software industry." *IP Innovation*, 705 F. Supp. 2d at 691. Those generic

industries "encompass much more than the desktop switching feature at issue," and the expert had no evidence that the royalties "are in any way comparable to the patents-in-suit." *Id.*

In *Multimedia Patent Trust*, the plaintiff—represented by Symantec's counsel here—proffered damages expert testimony that relied on "various industry surveys" and "generic industry data." *Multimedia Patent Trust*, 2012 WL 587371 at *9. Nothing else in the unreported decision describes the level of generality embodied in those data and surveys, although the Defendants argued the data "has no nexus to the parties, the patents or the accused products." *Id.* The court excluded opinions based on the industry data, finding that it "is not tethered to the relevant facts and circumstances of the present case," and plaintiff did not provide "any explanation of how this industry data is related to the facts of this case." *Id.* at *9.

In contrast, the ▇▇▇ valuation relied on by Mr. Wagner is closely tied to the facts and circumstances of this case. ▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. *See* Exh. G, at ¶ 504; Exh. E, at ¶¶ 218–21. The valued patents were evaluated because ▇▇▇▇▇▇▇▇▇▇▇ Indeed, the accused products in this case ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Mr. Wagner properly relied on the same patent valuation and reasonable royalty estimate on which Symantec relied.



D.    Wagner's Damages Opinion on the '155 Patent Is Reasonable.

Symantec criticizes Mr. Wagner's damages opinion on the '155 Patent, where Mr. Wagner determined that Symantec owes ▇▇▇▇▇▇▇▇▇▇▇▇▇ *See* Exh. G, at ¶ 628. Symantec again faults Mr. Wagner's analysis for (1) ▇▇▇▇▇▇▇▇▇▇▇▇

17

 and (2)

████████████████████████████ [9]

Symantec also complains that Mr. Wagner arbitrarily and without explanation increased the reasonable royalty from the ████████████████████ Wrong. Mr. Wagner explained in detail the principal grounds on which he based his '155 damages opinion. *See* Exh. G, at ¶ 626. These include, but are not limited to:



Of course, a patent that the parties know is valid and infringed (that is, the scenario present at the hypothetical negotiation) would naturally command a higher royalty than one where validity and infringement are uncertain. *See Amado v. Microsoft Corp.,* 517 F.3d 1353, 1361–62 (Fed. Cir. 2008) ("Prior to judgment, liability for infringement, as well as the validity of the patent, is uncertain, and damages are determined in the context of that uncertainty. Once a judgment of validity and infringement has been entered, however, the calculus is markedly different because different economic factors are involved.").

E.     Patent ████████████ is Irrelevant to Reasonable Royalty

For each of the patents-in-suit, Symantec argues that Mr. Wagner erred in considering and rejecting the f████████████████████████████████████

████████████     Symantec erroneously claims that Mr. Wagner "ignore[d] the evidence" surrounding ████████████████ although his 220-page Report addresses ████████████

---

[9] This is addressed in § II.E below. Licenses that end litigation can be probative. *See* § II.B.2.

separately and extensively. *See* Exh. G at ¶¶ 196–209 ('050 Patent); 396–403 ('610 Patent); 510–14 ('142 Patent); 578–84 ('155 patent) ███████████████████████████████████ .

    Symantec's brief lacks any discussion or legal support for the proposition that ████ ██████████ bears any relation to a hypothetical negotiation about *Symantec's* use of the patents in suit. IV ████ intellectual property, in part, to obtain a return on investment for its investors, ████████████████████████ It is unsurprising that an investor seeks to purchase assets for the lowest possible price. But it is also irrelevant to the damages Symantec owes for its *use* of the patents-in-suit. *See* 35 U.S.C. § 284 (requiring "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer").

    1.   <u>No evidence that buyer or sellers knew extent of use at time of sale.</u>

    IV's ████████████████████ bears little connection to the hypothetical negotiation because, while the hypothetical negotiators have perfect knowledge of defendant's use of the patented technology, the actual sellers here did not, and indeed, could not have known. Even crediting *defendants'* experts, █████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████ Buyers and sellers are not expected to predict, years into the future, the direction of the market or the types of technology that infringers will use.

    When deposed, the specific ██████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████. Defendants are free to argue to a jury why their conclusions

are right and Mr. Wagner's conclusions are wrong, but his methodology is sound and admissible.

    2.    <u>No knowledge of validity or infringement at the time.</u>

████████████████████████████████████████████████████

███████████████████████████████████ In the hypothetical negotiation, on the other

hand, the parties assume that the patent is both valid and infringed. Logic dictates that the royalty

rate due following a hypothetical negotiation would increase with these assumptions.

    3.    <u>IV incurred significant expenses *after* acquisition in order to license and enforce the patents-in-suit</u>

    Symantec's insistence that Mr. Wagner should have credited the ████████████

███████ ignores a real-world consideration that IV (or any buyer) would have taken into

account that makes the █████████████ meaningless for the purpose of establishing a

reasonable royalty for Symantec's use of the invention. IV incurred █████████████

████████per patent-in-suit in order to successfully license and enforce those patents—and

continues to do so today. ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████but ignores the high costs to enforce those patents.

III.
<u>Conclusion</u>

    The Court should deny Symantec's Motion to Exclude.

Dated: July 12, 2013

Respectfully submitted,

FARNAN LLP

/s/ Brian E. Farnan
Joseph J. Farnan, III (Bar No. 3945)
Brian E. Farnan (Bar No. 4089)
919 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 777-0300
bfarnan@farnanlaw.com

Parker C. Folse III (admitted *pro hac vice*)
Brooke A.M. Taylor (admitted *pro hac vice*)
Lindsey N. Godfrey (admitted *pro hac vice*)
SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
Telephone:      (206) 516-3880
pfolse@susmangodfrey.com
btaylor@susmangodfrey.com
lgodfrey@susmangodfrey.com

Richard W. Hess (admitted *pro hac vice*)
Weston O'Black (admitted *pro hac vice*)
John P. Lahad (admitted *pro hac vice*)
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, TX 77002
Telephone:      (713) 653-7859
rhess@susmangodfrey.com
woblack@susmangodfrey.com
jlahad@susmangodfrey.com

*Attorneys for Plaintiff*