```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                    IN AND FOR THE DISTRICT OF DELAWARE

 3                              - - -
     INTELLECTUAL VENTURES I, LLC,
 4                                    :  CIVIL ACTION
                     Plaintiff,       :
 5   v                                :
                                      :
 6   CHECK POINT SOFTWARE TECHNOLOGIES LTD., :
     et al.,                          :  NO. 10-1067-LPS
 7                   Defendants.      :
     ----------------------------------------
 8   INTELLECTUAL VENTURES I, LLC,
                                      :  CIVIL ACTION
 9                   Plaintiff,       :
     v                                :
10                                    :
     TREND MICRO INCORPORATED, et al. :
11   INC. (USA),                      :  NO. 12-1581-LPS
                     Defendants.      :
12                              - - -

13                        Wilmington, Delaware
                          Thursday, August 29, 2013
14                        Oral Argument Hearing

15                              - - -

16   BEFORE:        HONORABLE LEONARD P. STARK, U.S.D.C.J.

17   APPEARANCES:              - - -

18
                  FARNAN, LLP
19                BY:  BRIAN E. FARNAN, ESQ.

20                    and

21                SUSMAN GODFREY L.L.P.
                  BY:  PARKER C. FOLSE, III, ESQ., and
22                     BROOKE A.M. TAYLOR, ESQ.
                       (Seattle, Washington)
23
                      and
24

25                                Brian P. Gaffigan
                                  Registered Merit Reporter
```

1    APPEARANCES:  (Continued)

2

3            SUSMAN GODFREY L.L.P.
             BY:  WESTON O'BLACK, ESQ.,
4                 JOHN P. LAHAD, ESQ., and
                  RICHARD W. HESS, ESQ.
                  (Houston, Texas)
5

6                      Counsel for Plaintiff

7            MORRIS NICHOLS ARSHT & TAYLOR, LLP
             BY:  JACK B. BLUMENFELD, ESQ.
8
                     and
9
             LATHAM & WATKINS, LLP
10           BY:  MARK A. FLAGEL, ESQ.
                  (Los Angeles, California)
11
                     and
12
             LATHAM & WATKINS, LLP
13           BY:  DEAN G. DUNLAVEY, ESQ.
                  (Costa Mesa, California)
14
                      Counsel for Symantec Corp.
15

16           MORRIS NICHOLS ARSHT & TAYLOR, LLP
             BY:  KAREN JACOBS, ESQ., and
17                MICHAEL J. FLYNN, ESQ.

18                   and

19           McDERMOTT WILL & EMERY, LLP
             BY:  YAR R. CHAIKOVSKY, ESQ., and
20                D. STUART BARTOW, ESQ.
                  (Menlo Park, California)
21
                      Counsel for Trend Micro Incorporated
22                    and Trend Micro, Inc. (USA)

23

24

25

1                        - oOo -

2                 P R O C E E D I N G S

3              (REPORTER'S NOTE:  Oral argument hearing was

4     held in open court, beginning at 10:09 a.m.)

5              THE COURT:  Good morning, everyone.

6              (The attorneys respond, "Good morning.")

7              THE COURT:  I'll have you put your appearances

8     on the record for me, please.

9              MR. FARNAN:  Good morning, Your Honor.  Brian

10    Farnan on behalf of the plaintiffs.  With me today from

11    Sussman Godfrey is Parker Folse, Brooke Taylor, Richard

12    Hess, John Lahad, Weston O'Black.  And from Intellectual

13    Ventures, we have Brian Platt and Melissa Finocchio.

14             THE COURT:  Welcome to all of you.

15             MR. FARNAN:  Thank you.

16             MR. BLUMENFELD:  Good morning, Your Honor.

17             THE COURT:  Good morning.

18             MR. BLUMENFELD:  Jack Blumenfeld from Morris

19    Nichols for Symantec.  Along with Mark Flagel from Latham

20    and Watkins, Dean Dunlavey from Latham & Watkins, and

21    they're both going to be presenting for Symantec today.

22             Behind them, Yury Kapgan from Quinn Emanuel,

23    Neil Rubin from Latham & Watkins; and in the first row in

24    the back, David Majors who is in-house at Symantec.

25             THE COURT:  Okay.  Thank you.  Welcome.

1          MS. JACOBS:  Good morning, Your Honor.  For

2     Trend Micro, Karen Jacobs for Morris Nichols.  I have here

3     with me, Yar Chaikovsky and Stuart Bartow from McDermott

4     Will & Emery.

5          We also have in the back, John Chen, who is

6     senior director and chief intellectual property counsel at

7     Trend Micro.  Thank you.

8          THE COURT:  Thank you.  Welcome.  You can all

9     have a seat.

10          We're all here for a number of motions, a number

11     of matters that you have all put in front of us.  I hope

12     that you have conferred on how you might like to split up

13     the time.

14          Mr. Folse, any thoughts on that?  Or Ms. Taylor.

15          MS. TAYLOR:  Your Honor, we have spoken and

16     unfortunately didn't come to an agreement.  We're at the

17     Court's pleasure but we thought it might be appropriate to

18     start with some of IV's motions.  In particular, IV's motion

19     to exclude Dr. Spafford with respect to the '050 claim

20     construction.

21          THE COURT:  What is the defendants' proposal?

22          MR. FLAGEL:  Our proposal, Your Honor, is the

23     defendants' summary judgment motions are case dispositive.

24     So it seems as though we should go patent by patent and

25     the defendants should present and then IV should present.

1           I think that the Daubert motion that Ms. Taylor

2   just mentioned really should go after summary judgment

3   because the summary judgment argument on the '050 will

4   materially inform the Daubert argument with respect to

5   Dr. Spafford with respect to that patent.  So we think we

6   ought to be summary judgment, patent by patent.  And then

7   Daubert, motion by motion.

8           THE COURT:  Now, there are several defense

9   summary judgment motions; correct?

10          MR. FLAGEL:  Yes, they are.

11          THE COURT:  I think each them addresses more

12   than one patent; correct?

13          MR. FLAGEL:  Yes.  But what we would propose

14   because some of the motions are common, so, for example, we

15   would propose starting with the defendants' common motion

16   for summary judgment of validity of the '050 and moving to

17   the common motion for summary judgment of infringement on

18   the '042, and then moving to the common motion for

19   noninfringement of the '610, and going back and forth, and

20   then moving to the individual summary judgment motions.

21          THE COURT:  I see.  All right.  What would be

22   the problem with that approach?

23          MS. TAYLOR:  We're at the Court's pleasure, Your

24   Honor.  If that is how you would like to proceed, we're okay

25   with that.

1          THE COURT:  I think it does makes sense to start

2     with the summary judgment.  If that is how the defense wants

3     to proceed, that's how we'll proceed, and the plaintiff will

4     have a chance to put in their say at each of the break

5     points that the defendants suggest.

6          Mr. Folse.

7          MR. FOLSE:  As I understand it, could you let us

8     know what your plan is with regard to the scheduling, when

9     we would break?  Because the one risk we're having by having

10    the motion go first is if it goes on and on and on, then we

11    don't get equal time for the motions that IV has filed.

12         THE COURT:  Right.  So in terms of when we're

13    going to break, I don't know other than we will have at

14    least one break, perhaps multiple breaks.  There is two

15    hours allocated for each side, so if they want to use all

16    their time on summary judgment, I'm not going to stop them,

17    but that won't preclude you from having the rest of your

18    time to address your motions, if that is what you have saved

19    your time for.

20         MR. FOLSE:  Thank you.

21         THE COURT:  Does that answer your question?

22         MR. FOLSE:  Yes, sir.

23         THE COURT:  So we'll begin as defendants proposed.

24         MR. FLAGEL:  Thank you, Your Honor.  Could I

25    have slide 7, please.

1            Your Honor, my name is Mark Flagel.  I'm

2    from Latham & Watkins.  I'm here to present on behalf of

3    defendants for this first motion and Symantec generally.

4            The first motion that we want to talk about

5    is one that we think is very straightforward; and I hope to

6    convince you, Your Honor, by the end of my comments that in

7    all of your years on the bench you have never seen and in

8    all years on the bench you are not likely to see a more

9    straightforward anticipation case than we have right here.

10            THE COURT:  That is a pretty bold claim.

11            MR. FLAGEL:  It is.  And I'm going to try and

12    show you why I said it.

13            So what I have done here first, Your Honor, is

14    put the Townshend reference is the reference that we believe

15    anticipates the asserted claim.

16            This is Figure 3 of Townshend, and we color

17    coordinated it.  There are three basic elements of the

18    asserted independent claims.  And I've carved out Figure 3

19    that corresponds to each of those elements.

20            The first element, which is completely

21    undisputed, the receiving the content identifier.  You have

22    a first tier search of the server, and then you have a

23    second tier system, central server.  What happens is the

24    central service receives a content identifier created using

25    mathematical algorithm.  Everybody agrees, IV agrees, its

1    expert agrees, Townshend discloses this element because the

2    first tier server converts an e-mail to a hash ID, sends a

3    signature ID to the central server.

4          The second element of the asserted claims is

5    comparing the received identifier, comparing that ID,

6    comparing that hash value to other content identifiers to

7    determine whether the associated file has a characteristic.

8          Now, again, everybody agrees, IV agrees, their

9    expert agrees, that Townshend discloses comparing the ID

10   with other IDs to see if you have seen this file before.

11         IV claims that this particular figure doesn't

12   anticipate because what this figure shows is that Townshend

13   generates a count.  It asks how many times have I seen this

14   file?  And it determines what that number is.  And I'm going

15   to talk a little bit later about why that alone anticipates,

16   but let me just point that out for a moment and it will

17   become clear why I'm doing that.

18         What I have shown is that Townshend matches

19   those files and find out how many times have I seen this?

20   And, by the way, this is exactly what the '050 teaches, to

21   determine whether an e-mail is junk.  Have I seen it a lot

22   in a short time period?  If I have, it's junk.  If I

23   haven't, it's not.  And,

24         Then the third element of all the claims is

25   transmitting an indication of the presence or absence of the

1    characteristic in response to the query.  So I'm sending

2    something back to the first tier to try and indicate, to

3    tell the first tier does it have a characteristic or doesn't

4    it?  Is it junk or isn't it?  And,

5              What the Figure 3 shows is that Townshend

6    teaches a predetermined threshold.  And if the count is

7    above the predetermined threshold, the e-mail is bulk.  If

8    it's below the predetermined threshold, it's not.

9              The '050 patent teaches this, too.  But what

10   does IV say?  IV says, ah, this doesn't anticipate, this

11   figure all by itself, because a count is just a number.

12   That is all a count is.

13             Now, Dr. McDaniel was asked at his deposition --

14   this is on pages 80 to 82 and we pointed this out in our

15   obviousness section but you will see how it's relevant to

16   anticipation in a moment.

17             Dr. McDaniel was asked:  Okay.  What if the

18   comparison to the threshold happened on the central server?

19   And the central server then knew, ah, it's above the

20   threshold, it's bulk.  And then send a message back saying

21   it's bulk.  Would that have all the elements of the asserted

22   claims?

23             His answer?  Yes.

24             And that's at pages 80 to 82.

25             Now, if you could go to the next slide, please.

1              What we see interestingly in Figure 4 of the

2    Townshend patent is Townshend discloses exactly, exactly the

3    comparison on the central server that Dr. McDaniel admitted

4    would anticipate.  Because you see there is the first step,

5    receiving; there is the second step, comparing.  Have I seen

6    this file before?  Yes, I have.  How many times?  And,

7              Then you see does the count exceed the threshold?

8    That comparison is made on the central server.  And then if

9    the answer is yes, the central server transmits what it

10   calls a bulk electronic signature element to the first tier

11   saying, hey, this is bulk.

12             Very straightforward.  Every single claim

13   element is anticipated in Figure 4.  And I'll show you why

14   in Figure 3 as well.

15             So what did Dr. McDaniel say about this when

16   confronted at his deposition with Figure 4, after having

17   given the testimony that I just mentioned that, ah, if you

18   do this threshold comparison on the central server, you do

19   have an anticipated reference?  Here is what he said.

20             Does Figure 4 -- this is column 10 of the

21   Townshend patent.  Does it meet the first limitation?

22             Yes.

23             Next slide.

24             Does Figure 4 meet the second limitation?  Does

25   Townshend teach the second limitation?

1                   Yes.

2                   Next slide.

3                   Does Figure 4 teach the first limitation of

4      claim 16?

5                   Yes.

6                   Next slide.

7                   Does it teach the second limitation of claim 16?

8                   Answer:  Yes.

9                   How about claim 22?  Does it teach the first

10     element?

11                  Yes.

12                  Next slide.

13                  Does it teach the second element?

14                  Yes.

15                  So now we're left with the third element.  And

16     the third element, you will remember, is you have already --

17     you have transmitted an ID.  You compared the ID.  You found

18     out it's associated with a characteristic.  The third

19     element says sending back an indication of the characteristic.

20                  So what is IV's argument?  IV's argument is

21     that, well, we know there is two things that are sent back.

22     We know the count gets sent back, and we know the bulk

23     e-mail signature gets sent back.

24                  If we can have the next slide, please.

25                  So the final element, Your Honor, of claims 9

1   and 16 talks about an output that is in response to the

2   inquiry that indicates the presence or the absence of the

3   characteristic.

4          Claim 22 doesn't have the responsive part.  It

5   just says outputting an indication of the presence or

6   absence of a characteristic.

7          We think that an expert opinion in a report

8   that says these elements aren't disclosed cannot create

9   an issue of fact when the reference itself unambiguously

10  discloses this.

11         How is it disclosed?  First, it's disclosed by

12  the count.  Townshend unambiguously teaches that the count

13  is sent back and that the first tier understands the count

14  specifically.  There is a predetermined threshold.  If the

15  count is above the threshold, it's bulk.  If it's below the

16  threshold, it's not.  That is an indication of the

17  characteristic.

18         The '050 teaches it.  Claim 8 says that the

19  characteristic of junk is defined by the frequency, by the

20  count.

21         Claim 16 -- excuse me.  Let me look at the

22  patent.  Excuse me, Your Honor.  Claim 14, which depends

23  from claim 9, specifically says that the determination step

24  is performed by generating a count.  And then that count is

25  sent back and the first tier understands.  It indicates the

1    presence or absence because if it's above the threshold,

2    it's bulk.  If it's below the threshold, it's not.

3              In addition, Figure 4, the bulk e-mail signature

4    itself most certainly indicates the presence or absence of

5    a characteristic.  It's the last step in the process.  It

6    compares the threshold.  If the threshold is exceeded, it

7    immediately sends back the bulk e-mail signature.  Game,

8    set, match.

9              Now, what does IV say?

10             Next slide, please.

11             Dr. McDaniel was asked.  All right.  Tell us

12   why, what are all the reasons the third element is not

13   disclosed.  You have admitted the first two elements are

14   all disclosed.

15             He says:  With the count, it's responsive but

16   it doesn't indicate a characteristic.  He says with respect

17   to the bulk e-mail signature, well, that is not responsive

18   because it's the count that is responsive.  The bulk e-mail

19   signature is not responsive.

20             And he says:  And the bulk e-mail signature, it

21   also doesn't indicate a characteristic.

22             Now, that last statement was a little bit mind

23   boggling.  The bulk e-mail signature, it's called the bulk

24   e-mail signature.  In column 9 of Townshend, it talks about

25   exactly how that tells the first tier that the e-mail

1    associated with this identification is bulk.  How is it that

2    this doesn't identify the characteristic?

3            At page 8 of their opposition brief, IV makes a

4    categorically false statement.  I believe it was unintentional

5    but if you look at this, you will see this is very interesting.

6    What they say is the bulk e-mail signature does not indicate

7    a characteristic because it's the e-mail server that marks an

8    e-mail as bulk?  Hmm.  And they have two passages.  And if you

9    look at those two passages, what you see is Townshend teaching

10   that if an e-mail is determined to be bulk by the central

11   server, it sends the bulk e-mail signature that is attached

12   to the ID and says, hey, this e-mail is bulk.  So if the first

13   tier receives a new e-mail, finds out it has got an ID and

14   it's the same ID, the first tier then marks the new e-mail as

15   bulk so it doesn't have to bother the central server.

16           So what those passages absolutely conclusively

17   establish is the bulk e-mail tells the first tier, hey,

18   anything with this ID, it's bulk.  Is that an indication of

19   a characteristic?  Of course it is.

20           Here is one last point; and I apologize for not

21   making this in our brief.  Of course, the e-mail itself is

22   marked at the first tier.  The '050 teaches the same thing.

23   Look at every figure in the '050.  The mail processing is

24   done at the first tier.  Why?  Because the second tier never

25   gets the e-mail.

1           The central server in Townshend and the second

2    tier in the '050, they get an ID.  You convert the file

3    to an ID and it goes to the central server.  The central

4    service processes the ID, sends back information to the

5    first tier that then interprets what it gets and then says,

6    okay.  Does that tell me the presence or absence of a

7    characteristic?  And then it does something.

8           The central server cannot mark an email because

9    it never has one.  So, of course, mark can count a decision

10   to delete or a decision to go forward.  Those things happen

11   on the first tier system.  And it's an identical teaching,

12   Your Honor.  It's identical in Townshend and in the '050.

13   And if we look at, I'll look at the count and then at the

14   bulk e-mail signature.

15           If I can go to the next slide.

16           We asked Dr. McDaniel:  Do you agree that count

17   is a frequency?

18           It is.

19           So here, the '050 patent -- we're talking

20   about the '050, the asserted patent, it teaches that the

21   characteristic of being junk is defined by a frequency.

22   That is what the text says.

23           So the patent, the asserted patent says that the

24   count defines whether an e-mail is or isn't junk.

25           Next slide, please.

1                    Of course, it's undisputed that what Townshend

2      teaches is when it sends the count, it is responding to the

3      query.

4                    His testimony:  The count is responding to the

5      query.

6                    Next slide, please.

7                    Then we asked him about the Townshend patent.

8      We have established in the '050, they determine whether

9      something is junk by counting.  And Townshend teaches.

10                   Does the Townshend patent say that the count

11     indicates which signatures represent bulk e-mail?

12                   Yes.

13                   Next slide, please.

14                   So Dr. Townshend has essentially -- excuse me.

15     Dr. McDaniel has essentially acknowledged every single

16     element is anticipated by Townshend, the first two by Figure

17     4 and the third element by Figure 4 with respect to the count.

18                   Now, the bulk e-mail signature also independently

19     satisfies that last element of indicating a characteristic

20     and of responding to the query.

21                   Now, again, as I said before, what Dr. McDaniel

22     said is, well, if you look at the flowchart, the first thing

23     that goes back is the count.  That may be true, but the

24     second thing that goes back is the bulk e-mail signature,

25     and it won't go back unless there is a query and it is

1   responding to the query.  If you look at the flowchart, that

2   is the end of the process.  The determination is made that

3   the count exceeds the threshold and the signature is sent back.

4           And he admitted, by the way.  We asked him:

5   Well, would you agree if the Court acknowledges something is

6   triggered by a query, if triggered means by responsive to,

7   would you agree it is disclosed?

8           Yes.  Dead bang yes.

9           All right.  So we think that the reference is

10  absolutely clear.

11          Then the next argument is, and we talked about

12  this already, the bulk e-mail signature doesn't even indicate

13  that it's bulk.

14          Well, wait a minute.  If you look at column 9,

15  lines 22 to 38, it describes exactly what the bulk e-mail

16  signature is, and it clearly and unambiguously tells the

17  first tier system that this file has been marked as bulk.

18          They make this last ditch argument, which I

19  almost don't even understand, to say, oh, that is just a

20  hash value.  It's transmitted as a hash value.

21          Townshend teaches that the bulk e-mail signature

22  is sent back to tell the first tier system that any file

23  that comes with this identification should be marked as

24  bulk, because both Townshend and the '050 teach, hey, let's

25  figure out if we know something about a file, and if we do,

1    we don't have to bother the central server again.  We can

2    preprocess.  The '050 teaches that in column 5.  It's all

3    there.

4                Next slide, please.

5                21.

6                So this is just the conclusion, Your Honor.  As

7    we have seen, Figure 4, given Dr. Daniel's admission and on

8    its face, the unambiguous language, it is kind of eerie how

9    similar these two references are, how similar, virtually

10   identical what they teach is.  And Figure 4 has each element.

11               And Figure 3 does, too.  I want to go over that

12   very quickly, if I can.

13               Can we have the next slide.

14               So with Figure 3, which we saw Figure 3, the

15   central server receives the identification, determines

16   whether it has a match, determines how many times it has

17   seen it, gets the count, returns the count to the first

18   tier.  And the first tier says, ah.  Is it above the

19   predetermined threshold?  Bulk.  Is it below?  Not bulk.

20               Dr. McDaniel concedes if the first element

21   disclosed, then the comparison is disclosed.

22               Next slide, please.

23               They argue, though, that the second and third

24   elements aren't met because the count itself is just a

25   number.  And they say a number in that context doesn't

1    constitute, describe or indicate a characteristic.

2              But again, as we talked about, Townshend at

3    column 3, lines 55 to 57 and at column 7, lines 7 to 30,

4    Townshend explicitly teaches data -- that the count is

5    itself data indicating which signatures represent bulk

6    e-mail.  And,

7              The '050 patent itself explicitly teaches that

8    a characteristic "is defined by a frequency of appearance."

9    That is in claim 8.  It's also in claim 14, and it's in the

10   specification, column 6, the first 10 or 15 lines.

11             Dead bang, by definition, Townshend Figure 3, all

12   by itself, establishes and shows and teaches every element of

13   these claims.

14             Next slide, please.

15             Then the last point I would like to make in this

16   argument, Your Honor.  This is sort of the prelude to the

17   Spafford Daubert which we will get to much later.

18             But Intellectual Ventures, they contend in their

19   infringement contentions what they do is they point to the

20   Symantec system and what happens on the Symantec system is it

21   doesn't retrieve a count, it retrieves what is called a score.

22   It's a number between minus 127 and plus 127, and that number

23   is sent back to the first tier.  And Intellectual Ventures

24   says that is infringing.

25             Well, in their brief they argue -- and this is

1    from their briefing, their Spafford brief at page 10 --

2    they argue a likelihood probability or score describes the

3    content just as much as, if not more than, true/false, yes

4    or no.  So that very claim just puts the exclamation point

5    on Townshend.

6              Next slide, please.

7              Here is why.  Let's just think about an example.

8    And our first point, Your Honor, is there is absolutely no

9    principled distinction that would allow them to maintain

10   their infringement contention and yet avoid invalidity.  Why?

11   Let's take in the Symantec system a score that is retrieved

12   of 25.  And let's take in the Townshend system a count that

13   is retrieved at 25.

14             Next slide, please.

15             So the Symantec score, we acknowledge it's one

16   factor.  What the first tier does in the Symantec system is

17   it looks at the scores and it looks at a bunch of other

18   things and it makes a determination of whether a file is

19   malicious or isn't malicious, but the score of 25 versus

20   the score of 1, that will never tell you, at the first tier

21   alone, whether or not a characteristic is present or absent.

22   It will just give you a reputation score that is higher than

23   another reputation score.

24             The count, though, if you look at Townshend,

25   Townshend teaches you have a predetermined threshold and the

1       count is a number that single-handedly is determinative of

2       whether or not from is a characteristic that is present or

3       absent.  If the number is above the threshold, characteristic

4       is present.  If the number is below the threshold, the

5       characteristic is absent.

6               So Figure 4 really is sort of the beginning

7       and the end of the inquiry.  But Figure 3, you don't even

8       have to get there because IV's infringement contentions just

9       give us the exclamation point.  We know if we look at

10      Townshend, it teaches one thing.  You look at the title,

11      look at the abstract, look at the description of the

12      invention.

13              It talks about what are we here about?  Same

14      thing as the '050.  There is a lot of spam out there.  You

15      have to figure out something spam.  Spam, junk, all the same

16      thing.  Townshend, there is a lot of bulk out there.  We

17      have to figure it out.  How are we going to do it?  We are

18      going to find out how many times we see this file in the

19      threshold short time frame.  The '050 teaches the same

20      thing, column six.

21              Then we're going to take that count, we're

22      going to compare it to the predetermined threshold either at

23      the first tier or the second tier or both.  And based on the

24      count alone, within that threshold, we are going to know.

25              If you look at the three claim elements in the

1   asserted claims, there has never been, in my more than

2   20 years of practicing patent law, there has never been a

3   more clearly matching anticipatory reference.  We think

4   that is why the Patent Office rejected these claims and will

5   finally reject the claims, and we just don't see another

6   conclusion.

7            THE COURT:  You are drawing on their

8   infringement contentions for additional persuasive effect.

9   In an anticipation analysis, can I consider those

10  infringement contentions?

11           MR. FLAGEL:  I think so.  I don't think it's

12  dispositive.  It's purely being shown to you, Your Honor, as

13  sort of an exclamation point because, on the one hand, they

14  want to say in Figure 3, a number is just a number.  It

15  doesn't mean anything.  And if you don't understand it in

16  this context until you construe it on the first tier, it

17  can't possibly be anticipatory, but at the same time, they

18  want -- not only do they want to say that a number in the

19  Symantec system, which is an entirely different number which

20  doesn't establish anything, is infringing.  They even want

21  to preclude our expert from arguing that the Symantec number

22  is not infringing.

23           So it's really, that's the overlap with the

24  Spafford motion, but I think the answer to your question is

25  it really doesn't matter because this point really is just

1    to add emphasis, Your Honor, and just to explain here is

2    why Figure 3, all by itself, really does.  You don't even

3    need to get to the Figure 4 comparison of the threshold

4    in sending the bulk e-mail signature because the count, both

5    references, the '050 and Townshend both teach that the count

6    is determinative.  You look at a particular time frame, you

7    see if you have seen this e-mail too times, and if you have,

8    you mark it as bulk.

9            THE COURT:  So I think it's a strong

10   anticipation argument but we haven't talked about the burden

11   of proof.  I've got to find clear and convincing.  So help

12   convince me how what you have just gone over is actually

13   clear and convincing.

14           MR. FLAGEL:  Your Honor, I guess all I can say

15   is that if you look at McDaniel, he admits straight up, the

16   first element is there.  Second element is there.  Those are

17   his admissions.  And on the third element, we just have his

18   opinion that even though the count is responsive, it's not

19   an indication of the characteristic.

20           But Townshend, in quotes, "teaches" the count

21   is an indication that the e-mail is junk or not junk.  It

22   teaches it.  And an opinion saying, oh, I don't think this

23   number is an indication of a characteristic can't create an

24   issue of fact when the teaching reference actually uses that

25   language and quotes it.  It's exactly the language from the

1    claim.  The count indicates the characteristic.

2           Similarly, with the bulk e-mail signature, Your

3    Honor.  Their only argument is, well, it doesn't indicate a

4    characteristic because the first tier marks the e-mail.  And

5    as I mentioned, of course, the first tier marks the e-mail.

6    It does it in the '050, too.  The first tier is the only

7    tier that ever has the e-mail.  It has to mark the e-mail.

8    And why does it mark the e-mail?  Because it has been told

9    by the central server that this e-mail is bulk.

10           One last thing, and we quoted this in our reply

11    brief, Your Honor.  We asked Dr. McDaniel:  Okay.  Would

12    you agree with us that if the first tier understood X,

13    whatever X was, the word true, the number 10, anything,

14    if the first tier understood X to mean that a file had has

15    a characteristic, would you agree that X would be an

16    indication of a characteristic?

17           Answer:  Yes.

18           That is the beginning and the end of it, Your

19    Honor.  Because there is no dispute here that the first tier

20    system understands, interprets the count, applies it to the

21    known predetermined threshold and knows, is it junk or is it

22    not junk?, and certainly looks at the bulk e-mail signature

23    and knows that every other new e-mail that comes in that has

24    the identical hash gets marked as bulk.  How does it know

25    that?  Because it's been told that.  Townshend is explicit

 1    in that regard, Your Honor.  There is no issue.  It's plain

 2    language.

 3              THE COURT:  Notwithstanding all that, would you

 4    acknowledge on this third element, I have at least a battle

 5    of the experts?  They have an expert who is willing to come

 6    and take the cross-examination that is coming and tell us

 7    why Townshend doesn't say what you say it says for the third

 8    element?  Why isn't a triable issue?

 9              MR. FLAGEL:  Well, I certainly can't disagree they

10    have an expert that is willing to come in and testify to that

11    effect.  But I'll just repeat what I just said, which is that

12    an expert's opinion cannot and does not create an issue of

13    fact where two things are true.  One, the reference itself

14    explicitly and unambiguously contradicts the expert; and, two,

15    the expert's own admissions, when applied to that reference,

16    undercut that expert's contrary opinion.

17              Here, we have a reference that teaches explicitly

18    that the count is a response that indicates the presence or

19    the absence of a characteristic and that the bulk e-mail

20    signature indicates the presence of bulk.  It explicitly

21    teaches that.  And we have an express admission from this

22    very same expert that if the first tier understands something

23    sent to it by the second tier to indicate the presence or

24    absence of something, then it does.  It qualifies.  And that

25    just simply undercuts his contrary opinion.

```
 1                    THE COURT:  Do you want to touch on obviousness?

 2                    MR. FLAGEL:  Your Honor, really, no.  It's in

 3   the papers, and we think that is pretty straightforward.  We

 4   essentially showed that he acknowledged that if you add the

 5   element to Figure 3 that Figure 4 adds, it's all there.  So

 6   that is really the obviousness argument.

 7                    THE COURT:  All right.  Then we'll hear from the

 8   plaintiff on the validity of the '050.

 9                    MR. FLAGEL:  Thank you, Your Honor.

10                    MR. LAHAD:  If I may approach, Your Honor?

11                    THE COURT:  You may.  Yes.

12                    MR. LAHAD:  Here are copies of the slides, Your

13   Honor.

14                    THE COURT:  Thank you.

15                    (Slides passed forward.)

16                    MR. LAHAD:  Your Honor, I'm John Lahad of

17   Sussman Godfrey for the plaintiff.

18                    If I could have the first slide, please.

19                    In Eli Lilly v Barr Labs, Your Honor, the

20   Federal Circuit, as the Court recognized, said that a moving

21   party seeking to invalidate a patent at summary judgment

22   must submit such clear and convincing evidence of invalidity

23   so that no reasonable jury could find otherwise.

24                    In this case, Your Honor, defendants have not

25   and cannot meet their burden to show by clear and convincing
```

1    evidence that the Townshend patent anticipates or renders

2    obvious the asserted claims of the '050 patent as a matter

3    of law.   There are several factual disputes, not just one or

4    two with respect to both anticipation and obviousness, and

5    these factual disputes should be resolved by a jury.

6              I'd like to address anticipation first, if I

7    may.

8              There are two embodiments in Townshend, Your

9    Honor, as we discussed.   Neither embodiment, contrary to

10   defendants' argument, discloses each limitation of the

11   asserted claims, certainly not by clear and convincing

12   evidence and certainly not as a matter of law when IV's

13   expert opines otherwise.

14             If I could have the next slide, please.

15             The three independent claims at issue here are 9,

16   16, and 22.   And in particular, the parties dispute whether

17   or not the Townshend patent anticipates the second and third

18   claim steps of the independent claims.   The determining step

19   and outputting step of claim 9, the comparing and responding

20   step of claim 16, and the characterizing and transmitting

21   steps of claim 22.

22             Next slide, please.

23             THE COURT:   So the first element of each of

24   those three claims, it's undisputed that that is anticipated

25   in Townshend?

1           MR. LAHAD:  Yes, sir.

2           THE COURT:  Thank you.

3           MR. LAHAD:  I'm going to use claim 9 as an

4   exemplary claim, Your Honor.  The remaining dependent

5   claims, 16 and 22, use different language but use similar

6   concepts and similar construction.

7           In claim 9, the determining step is

8   "determining, on the processing system, whether each

9   received content identifier matches a characteristic of

10  other identifiers; and ..."

11          The third step requires "outputting, to at least

12  one of the source systems responsive to a request from said

13  source system, an indication of the characteristic of the

14  data file based on said step of determining."

15          I'm going to address these two steps, embodiment

16  by embodiment.

17          Can I have the next slide, please.

18          With respect to the first embodiment, described

19  in Figure 3 of Townshend, defendants argue that Townshend's

20  generating a count at the central server meets the second

21  determining step.  And the Court determined, excuse me,

22  construed the step to mean "determining ... whether each

23  received content identifier has the same characteristic as

24  other content identifiers."

25          Now, the construction here, claim term has these

1    ellipses, the three dots between "determining" and

2    "whether," but if you go back on slide, that determining

3    has to be on the processing system.

4              Contrary to defendants' motion, Townshend's

5    central server does not determine whether each received

6    identifier has a characteristic.

7              Next slide, please.  The next one, too.

8              And the characteristic under the Court's

9    constructions are things like spam, virus, junk, copyright,

10   bulk.  The central server simply generates a count.  That

11   count does not have any characteristic information.

12             At the very least, Your Honor, the parties

13   and their experts dispute whether the count says anything

14   other than how many times a message has been encountered.

15   And contrary to defendants' argument, whether or not you

16   have seen an e-mail a lot, whether or not you have seen an

17   e-mail before tells us nothing about the content of that

18   e-mail.  It could be legitimate.

19             There is an impression left by the argument that

20   if high in number, then junk or malicious or unwanted e-mail.

21   But there is no relation between number and a characteristic

22   as construed by the Court.

23             THE COURT:  No correlation whatsoever between the

24   number of times and whether or not it has the characteristic

25   of junk or spam?

1                MR. LAHAD:  I don't think there is a correlation

2      between the two, Your Honor.

3                THE COURT:  Is that your view on infringement

4      also?

5                MR. LAHAD:  Is that our view on infringement?

6      Absolutely, Your Honor.  I think it's consistent with

7      the idea that a count by itself, for example, 11 or 25,

8      says nothing about whether the e-mail at issue has a

9      characteristic.  Now, it is a factor and the claims of the

10     '050 patent describe the frequency as a factor determining

11     whether or not.

12               THE COURT:  It's a factor or it has no correlation

13     at all?  It seems like contradictory statements.

14               MR. LAHAD:  In the sense that the count itself

15     alone says nothing about the content of the e-mail, that

16     is true.  The count can inform the determination as to the

17     characteristic.  So to answer the Court's question, there is

18     some correlation between a count and a characteristic but a

19     count on its own is not a characteristic, or indication of a

20     characteristic.

21               Defendants rely on a single sentence in

22     Townshend that uses the word "indicating," but Townshend

23     clearly explains -- next slide, please.  This is the portion

24     of the Townshend specification that defendants rely on, and

25     they rely on the "indicating" language in this portion of

1    the specification.  But other portions of the specification

2    say that matching of the characteristic occurs at the e-mail

3    server.  That is not what the claims require.  The claims

4    have a locational requirement.

5                You can go to the next slide, please.

6                Right after, in the paragraph right after the

7    language that defendants rely on, there is this paragraph

8    that describes how the e-mail server determines whether or

9    not the e-mail is bulk.

10               Next slide, please.

11               Again, in another portion of the specification,

12   at column 8, it describes how the e-mail server determines

13   whether or not the e-mail is bulk or not bulk.  It is not

14   the count that says this is bulk or not bulk.  It is not the

15   central server that says this is bulk or not bulk.  It is

16   the e-mail server that determines whether or not it is bulk

17   or not bulk.

18               Can I go to the next slide, please.

19               This is addressing Dr. McDaniel's report at

20   paragraph 93.  He describes how defendants' expert, Dr.

21   Rubin mischaracterizing the function of the central server

22   in Townshend.  It matches signatures to counts and nothing

23   more, and it certainly does not determine whether a content

24   identifier matches a characteristic of other content

25   identifiers.

1           Now, in their briefs as we touched on,

2   defendants say that a count can be a frequency.

3           Let's go to the next slide, please.

4           An e-mail can be classified as having a

5   characteristic based on a frequency.  And this argument

6   underscores defendants' entire approach to this motion,

7   Your Honor.  They grab words found in one patent.  They

8   grab words found in the Court's construction.  They grab

9   words found in Townshend, ignore context, and then argue

10  anticipation and hope that the Court doesn't look too

11  closely at either patent for your construction.

12          The '050 does state that it can classify files

13  based on the frequency in which a message is received within

14  a time frame.

15          Defendants argue, well, because Townshend counts

16  with some kind of frequency, then Townshend anticipates,

17  but defendants' argument -- this is the point, Your Honor --

18  it's not that the characteristic cannot be determined by the

19  frequency, it's the characteristic is not determined at the

20  processing system as the claims require.  It's not determined

21  at the central server or the second tier.  Defendants

22  repeatedly ignore the location requirement present in the

23  claim language.

24          In their reply brief and argument, defendants

25  attempt to make hay about marking e-mails.  This argument is

1    a red herring.  The claim is not about marking, neither

2    is IV's argument.  The e-mail server does mark the message

3    but only after the e-mail server, not the central server,

4    determines the e-mail has a characteristic.

5            The dispute is not about what tags the e-mail

6    per se, what marks it or checks the box.  The dispute

7    between the parties and their experts is which component

8    decides that the message should in fact be so marked.

9    Contrary to defendants' arguments, there is at least a fact

10   issue as to whether generating a count in Figure 3 of

11   Townshend in that embodiment meets the second step of the

12   asserted independent claim.

13            If I could have the next slide, please.

14            Staying with the first embodiment, moving on

15   to the third step.  There is likewise a fact issue as to

16   whether generating a count meets the third step of the

17   asserted independent claims, the outputting step.

18            If I could have the next slide, please.

19            The primary dispute here, Your Honor, is whether

20   the count constitutes an indication of the characteristic.

21   And the Court construed an indication of the characteristic

22   to mean a descriptor of the content, e.g., spam, virus,

23   junk e-mail, copyrighted.  Townshend makes clear that the

24   count is not an indication of the characteristic as construed

25   by the Court.  This is explained in paragraph 89 of Dr.

1    McDaniel's report.

2             If I could have the next slide, please.

3             I'm not going to read it to the Court, but

4    essentially Dr. McDaniel opines the count, does not tell

5    you anything about the content.  It does not describe the

6    content as required by the Court's construction.  It does

7    not tell you that it is spam.  It does not tell you it is

8    virus.  It does not tell you it is junk e-mail or material

9    protected by copyright.

10            Contrary to defendants' argument, a count does

11   not tell you that an e-mail is both.  Defendants again rely

12   on that one sentence for column 3 in the specification, but

13   a person of ordinary skill in the art wouldn't read that

14   one line in isolation which is what the defendants want the

15   Court to do.  The person of ordinary skill in the art would

16   read the entire specification of Townshend.  And Townshend

17   is clear that the determination of whether an e-mail is bulk

18   or not bulk happens not in the central server, not at the

19   second tier, not at the processing system but at the e-mail

20   server.

21            In their reply -- next slide, please -- they

22   talk about -- excuse me.  Defendants discuss the system

23   being designed to understand that this number means that the

24   e-mail is bulk, but this is a vague, sloppy and inaccurate

25   description of Townshend, Your Honor.  Townshend as

1    described in the specification is designed so that any

2    determination of what the count means, bulk/not bulk occurs

3    in one location on the e-mail server, not in the processing

4    system, not on the central server as the asserted claims

5    require.

6          Defendants also argue that our position here is

7    inconsistent with our motion to strike the faulty opinion of

8    Dr. Spafford.  That is another red herring.  The positions

9    are not inconsistent, and there is a distinction.

10         As I explained, the count indicates nothing.

11   It's just a number.  11 tells you nothing more about the

12   content than 1,100.

13         If I could have the next slide, please.

14         By contrast, the score returned by Symantec's

15   accused products represents, as one of Symantec's own

16   employees testified, an indication that a file is malicious.

17         Mr. Egan is a high ranking executive at

18   Symantec, and I asked him:  What type of information is the

19   client requesting from the server?

20         And he said:  What it gets back is information

21   about the prevalence of files.  And then he says, you know,

22   minus 127 to plus 127 to give some indication as to whether

23   it is malicious or it is legitimate.

24         So contrary to the blurring of -- defendants'

25   attempt to blur the lines between invalidity and infringement,

1    it's clear that in the case of infringement, Symantec's

2    score indicates as to whether the file is malicious or

3    legitimate, the count does no such thing.

4              At the very least again, Your Honor, these are

5    issues of material fact associated with the first embodiment.

6    Counsel for defendant said that this provides an exclamation

7    point on their argument.  I disagree, Your Honor.  I think

8    this is yet another question mark for the jury to resolve.

9              If I could have the next slide, please.

10             The second embodiment of Townshend is a little

11   bit different than the first embodiment but suffers from the

12   same shortcomings and more, Your Honor.

13             In the second embodiment, in addition to sending

14   counts, the central server sends bulk signature lines, but

15   the second embodiment like the first does not meet the

16   second step because the listening e-mail server is the one

17   that compares the central element to signatures generated

18   for an e-mail to determine whether the e-mail is bulk.

19             If I could have the next slide, please.

20             This is from column 9 of Townshend which

21   describes a listening electronic mail server receives a bulk

22   signature element from the central server.  The listening

23   e-mail server then compares -- I think there is a typo in

24   the patent -- of the bulk signature element to signature

25   elements generated for an electronic mail message.

1              If I could have the next slide, please.

2              Also in column 10 and on to column 11, it says,

3    "In the manner similar to that previously described, these

4    electronic mail servers compare the broadcasted bulk

5    signature element to any signature elements of any received

6    electronic mail messages."

7              If you compare this disclosure from Townshend

8    to claim 16 of the '050 patent -- if I could have the next

9    slide -- claim 16 of the second step says "comparing, on

10   the second computer, the digital content identifier to a

11   characteristic database of digital content identifiers

12   received from said plurality of first computers to determine

13   whether the message has a characteristic."

14             Contrary to defendants' argument, the

15   functionality on the central server is not the last step.

16   The last step occurs at the e-mail server, on the first

17   tier.  Again, defendants ignore the locational requirement

18   present in the claims.

19             In their briefing and in their argument,

20   defendants point to testimony from Dr. McDaniel.

21   Dr. McDaniel has testified the second embodiment does not

22   disclose the second step.  Defendants argue that IV

23   misleadingly cites to this testimony because it is about

24   Figure 1.

25             If I could have the next slide, please.

 1                    I take exception to that, Your Honor, because

 2     Figure 1 shows both the first and second embodiment and,

 3     moreover, counsel's questions expressly referred to the

 4     second embodiment.

 5                    Counsel asked:  "So the system as described by

 6     column 10 -- described in column 10 of the '050 patent and

 7     depicted in Figure 1, that anticipates claim 9 of the '050

 8     patent, correct?"

 9                    Dr. McDaniel responds:  "No, it does not."  Here

10     are his reasons.

11                    So at least Dr. McDaniel testified that the

12     second embodiment does not disclose the second step.  The

13     defendants and their experts feel otherwise, and the jury

14     should resolve that dispute.

15                    THE COURT:  If it turns out that one embodiment

16     of Townshend anticipates the '050, then that is anticipation;

17     correct?

18                    MR. LAHAD:  Yes.  If one embodiment of Townshend

19     meets all the claimed steps, alone, then I would agree, Your

20     Honor, that is anticipation.

21                    THE COURT:  So didn't Dr. McDaniel say in his

22     deposition, I think it was around page 124-125, talking

23     about Figure 4, that Townshend, at least some embodiment of

24     Townshend does meet Step 2 of the '050 patent.  He said that

25     in his deposition, didn't he?

1            MR. LAHAD:  Yes, he did, Your Honor.  He

2    testified differently in this part of his deposition, over

3    21 hours of deposition testimony.

4            I will admit there is some inconsistency among

5    his testimony.  Defendants asked the questions.  If they

6    weren't happy with the answers, then I think that that is

7    something they can cross-examine him on at trial.

8            THE COURT:  But it's not enough to support a

9    clear and convincing finding that the second limitation is

10   present if they get him to admit that just once?

11           MR. LAHAD:  Well, I don't think that it's

12   clear and convincing evidence if there is ambiguity in his

13   testimony if that is what you are relying on.  If he says X

14   and he also says Y -- strike that.  If he says X and he says

15   not X, I think that is a question for the jury to decide and

16   they can cross-examine him on that at trial.

17           Moving on to Townshend's second embodiment, the

18   third step.  Townshend's second embodiment likewise does not

19   disclose a third step of the asserted claims for two separate

20   reasons.

21           First, the bulk signature elements, like the

22   counts, are not indications of the characteristic as construed

23   by the Court.  As mentioned above and as Dr. McDaniel

24   testified, the bulk signature elements are not indications of

25   the characteristic, they're just hashes.  Indeed, if they were

1    indications of the characteristic, that is, if they actually

2    describe the content, there would be no need for the e-mail

3    server to do any kind of comparison or determination once it

4    received the bulk e-mail signature elements.

5           Defendants argue at page 8 of their reply that

6    Townshend teaches that the central server will generate

7    and transmit data indicating which signatures represent an

8    electronic mail.  Again, they're relying on that one sentence

9    from column 3 in Townshend, but the first supporting portion

10   from column 3 states explicitly at the e-mail server, not

11   the central server, determines whether an e-mail is bulk.

12          Plus, column 3 is discussing the first embodiment,

13   not the second embodiment.  It's a totally different embodiment

14   and they're mixing and matching and conflating the embodiments

15   in order to reflect what is here and show anticipation.

16   That is not clear and convincing evidence.

17          The second supporting section they point to in

18   their brief is from column 10.  That section however --

19   excuse me.  Defendants' argument however ignores that that

20   section discusses how the second embodiment compares and

21   determines whether the e-mail is bulk at the e-mail server.

22   So whether this embodiment discloses an indication of the

23   characteristic as construed by the Court is another fact

24   question.

25          Another dispute here is whether or not Townshend

1    contemplates like the '050 a query response relationship

2    between the first tier and the second tier.

3            If I could have the next slide, please.

4            Claims 9 and 16 in their third step contemplate

5    a query response relationship.  Excuse me.  Claim 9 says

6    outputting responsive to a request.  Claim 16 says

7    responding to a query.

8            The second embodiment does not send indications

9    of characteristics, assuming that an embodiment discloses

10   indications of a characteristic, which it does not, but

11   sends nothing in response -- excuse me -- does not send an

12   indication of a characteristic in response to queries as

13   required by claims 9 and 16.

14           For example, claim 9 says outputting, claims

15   16 says responding, but the bulk signature is broadcast.

16   Broadcasting is not a response to a query.

17           In their reply at pages 6 and 7, defendants

18   argue for the first time that the claim language supports

19   their position that the e-mail is sent in response to a

20   query.  They point to language in the claims "at least one

21   of the source systems."  But defendants expert has not

22   espoused this position.  There is no citation to any portion

23   of this argument in his report.

24           Can I have the next slide, please.

25           This is covered by, this is addressed by

1   Dr. McDaniel in his report where he says that "Dr. Rubin

2   does not describe any request from the source system or

3   first tier or a response from the processing system or

4   second tier, as required by the claims."

5           Additionally, Your Honor, there is no -- the

6   bulk signature elements aren't sent in response to a query

7   because the bulk central elements are not sent every time

8   the e-mail server sends a message signature.  How can a

9   bulk central element be responsive to a request query when

10  they're sometimes not even sent?  So if I query you, Your

11  Honor, I'm expecting a response.  If you query me, you are

12  expecting a response.  But if you get nothing back from me,

13  how is that responsive in any way?

14          Again, even the scenario -- excuse me.

15  (Clearing throat.)  So in addition to a lack of response,

16  even in the scenario where there is a response, the bulk

17  signature element is not an indication of the characteristic.

18          Defendants point to Townshend's disclosure of

19  transmitting bulk signatures to e-mails servers that do

20  transmit.

21          Can I go to the next slide, please.

22          Again, given this scenario, Townshend does not

23  disclose indications of a characteristic of the e-mail

24  server that performs the comparison.

25          This slide, Your Honor, I apologize, demonstrates

1   how in some situations the bulk signature element is not

2   sent.  The bulk signature element is only sent when there

3   is a threshold when the element or the count exceeds a

4   threshold, which is why there is no response -- excuse me --

5   why this element, why this embodiment does not disclose a

6   query response relationship as required by the claims.

7           Defendants also make an argument about triggering,

8   Your Honor.  And that comes up a lot.  The bottom line as far

9   as triggering goes, Your Honor, is no one knows what this word

10  means.  The Court has not construed it.  It's not in the '050

11  patent.  It's not in the Townshend patent.  It's another red

12  herring.

13          In sum, Your Honor, there are multiple factual

14  disputes involving both embodiments of Townshend and two of

15  the three steps of the independent asserted claims of the

16  '050 patent.  These disputes should be resolved by the jury

17  after they have heard from each party's experts.

18          Even though Mr. Flagel didn't mention it, I

19  would like to discuss obviousness.

20          The defendants likewise have not met their burden

21  to show the asserted claims of Townshend are obvious.  In

22  fact, the defendants give very short shrift to obviousness in

23  their motion.  They don't address it with expert testimony.

24  They don't even address secondary considerations of

25  nonobviousness.  It's an afterthought for them.

1          But the standard is the same:  Clear and

2     convincing evidence.  Recognizing that they can't meet the

3     anticipatory standard, they try for obviousness, again,

4     based on Townshend alone but this motion bears no better.

5          As we argued in our brief, Your Honor, this

6     Court has repeatedly denied motions for summary judgment in

7     the absence of expert evidence of nonobviousness.

8          If I could have the next slide, please.

9          In the *Invista* case, the Court found that without

10    expert testimony on a particular obviousness argument, the

11    accused infringer could not carry their burden of infringing

12    evidence.

13         Next slide, please.

14         The Court reached the same conclusion in the

15    *Asahi Glass* case.  In their reply, the defendants purport

16    to find expert support for their contention that Townshend

17    alone renders the asserted claims obvious.

18         Next slide.

19         They point to Exhibit 050-A as part of Dr.

20    Rubin's expert report.

21         If I could have the next slide, please.

22         What they're pointing to, Your Honor, is this

23    boilerplate language at the top of this claim chart appended

24    to Dr. Rubin's report, saying that, well, Townshend renders

25    those claims obvious in view of the level of ordinary skill

1    in the art.  They add the same boilerplate language to

2    another chart and another chart and every other exhibit

3    attached to Dr. Rubin's expert report on this patent.

4              Hedging a bet by including boilerplate

5    recitations of this or that do not rise to the level of

6    expert testimony or opinion.  That is, of course, a finding

7    of obviousness as a matter of law.

8              In fact, in the non-boilerplate sections of

9    Dr. Rubin's report, he does not adopt the position that the

10   Townshend patent alone is obvious.

11             Next slide.

12             In his report, he says:  "In my view, these

13   patents are invalid as anticipated by the prior art under

14   35(102) and obvious in light of the prior art under 35(103)

15   as follows:"

16             And you will note, Your Honor, Dr. Rubin does

17   not contend in his expert report that Townshend renders

18   obvious the asserted claims of the '050 patent.

19             In addition to trying to conjure up evidence --

20   excuse me -- expert evidence of nonobviousness -- excuse

21   me -- obviousness, the defendants attempt to backfill their

22   motion by characterizing differences between Townshend and

23   the '050 as trivial or minor.

24             Hopefully, I have made clear, Your Honor, that

25   IV and its experts strongly disagree with this characterization.

1    The differences between the '050 and the Townshend patent

2    are not trivial.

3              But stepping back, Your Honor.  Obviousness

4    requires examining a handful of facts.

5              If I could have the next slide, please.

6              "the scope and content of the prior art; the

7    differences between the claimed invention and the prior art;

8    the level of ordinary skill in the art; and any relevant

9    secondary considerations ..."

10             Defendants don't even mention secondary

11   considerations in their motion, but the Federal Circuit has

12   repeatedly emphatically and recently held that objective

13   evidence of nonobviousness must be taken into account in

14   due time.

15             If I could have the next slide, please.

16             In the *Ortho-McNeil* case, the court said:  "As

17   this court has repeatedly explained, this evidence is not just

18   A cumulative or confirmatory part of the obviousness calculus

19   but constitutes independent evidence of nonobviousness."

20             In other words, secondary considerations are not

21   some side dish you can ignore.  In fact, in the *Plantronics*

22   case last month, the Federal Circuit said that factfinders

23   must withhold judgment on an obviousness challenge until

24   they consider all relevant evidence including that relating

25   to the objective considerations.  And that is in the

1    *Plantronics v Aliph* case from last month.

2            Earlier this month, the court found in *Apple v*

3    *ITC* that the ITC erred to the extent it did not analyze

4    secondary considerations, and they reversed the ITC's

5    decision on obviousness based on its failure to analyze

6    secondary considerations of nonobviousness.

7            Additionally, Your Honor, whether a party

8    has shown these secondary considerations are themselves

9    questions of fact.

10           If I could have the next slide.

11           As the Federal Circuit said in *In Re:*

12   *Youngblood*.  "Whether the party has shown unexpected

13   results, solved a long-felt need, established commercial

14   success, or established copying also are questions of fact."

15           In their reply, defendants attack the nexus

16   between the secondary considerations and the claimed invention.

17           This lacks merit for two reasons, Your Honor.

18   First, there is a nexus between the claimed invention and

19   the secondary considerations.  As Dr. McDaniel explained

20   in his report, the '050 patent solved the volume problem,

21   reduced the protection gap and improved virus protection

22   performance.

23           In addition, Your Honor, defendants' argument

24   ignores the evidence of a nexus are necessarily raised or is

25   necessarily raised with evidence of a secondary indicia.

1            If I could have the next slide, please.

2            The court in *Hildebrand v Steck* -- if I could

3    have the next slide, please -- which is a District of

4    Colorado case, said there "... new facts can shed

5    considerable light on the existence of a probative nexus.

6    Indeed, it is often the case that 'raising the commercial

7    success issue necessarily raised in the nexus issue as

8    well.'"

9            So the idea here is even though defendants

10   disagree on the strength of the evidence, the jury should

11   be allowed to weigh what, if any, effect secondary

12   considerations of nonobviousness have on this case.

13            In sum, Your Honor, this is a laundry list of

14   factual disputes that precludes summary judgment.

15            THE COURT:  A couple of questions before you

16   sit.  I think Dr. McDaniel has put in an unsworn statement

17   in support of your response for this motion for summary

18   judgment.  I do have that; correct?

19            MR. LAHAD:  We initially filed our response.  We

20   appended his expert report.  We omitted a declaration from

21   Dr. McDaniel confirming the validity of his report and the

22   copies thereof that were appended.  So, yes, that is.  As I

23   understand, we have since rectified that.

24            THE COURT:  I see.  And then your view of the

25   '050 patent, the second -- your view is that the marking as

1    junk or bulk must occur at the second tier system?  That

2    that is the limitation or a limitation of the '050 patent;

3    is that correct?

4              MR. LAHAD:  Yes.  The claims of the '050 patent

5    expressly include a location requirement, determining on the

6    processing system on the second tier.

7              THE COURT:  So you may have just answered the

8    question.  I want to answer why it is or how it is you

9    interpreted that the location has to be the second tier

10   system and you are basing that on the claim language "on the

11   processing system;" is that right?

12             MR. LAHAD:  Yes, Your Honor.  Throughout the

13   patent, in the '050, the second tier system is equated to

14   the processing system.  If you look at the claims, for

15   example, in claim 9, "determining, on the processing

16   system."  But if you take a step back and look at the

17   entirety of claim 9, all of the steps, "receiving, on a

18   processing system, file content identifiers."

19             So when the -- let me step back.

20             There are two tiers:  the first tier and the

21   second tier.  According to the claims, the first tier sends

22   a file content identifier to a second tier.  The first tier

23   is described in the claims as a source system.  It's also

24   described as a first computer.  The second tier is described

25   in the claims as a processing system.  It's also described

1    as a second computer.  So the location requirement is

2    expressly found in the claims themselves.

3              THE COURT:  Okay.  Thank you.  Is there anything

4    else you want to say on this?

5              MR. LAHAD:  No, sir.  Thank you.

6              THE COURT:  Great.  Is there any rebuttal?

7              MR. FLAGEL:  Yes, please.  Very quickly, Your

8    Honor.

9              First, I wanted to cite you a case,

10   *MEHL/Biophile International Corp. v Milgraum*, 192 F.3d 1362.

11             What that stands for is the proposition, the

12   Federal Circuit saying that the expert testimony contradicting

13   the plain language of the reference does not create a genuine

14   issue of fact.  And you will see, Your Honor, that the

15   Federal Circuit affirms summary judgment of anticipation all

16   the time despite expert opinions to the contrary.  It happens

17   a lot.

18             With respect to Figure 3, I think Mr. Lahad made

19   one comment.  We want you to look at one line in the spec.

20             That's not true.  We're asking you to look at

21   the entire teaching.  The teaching of Townshend is exactly

22   the same as the teaching in '050.  They are eerily identical.

23             With respect to Figure 4, the question you just

24   read.  Let's just suppose that the '050 claims require you

25   to do the conversion at the central server and determine

1    whether a count is above the threshold and that the file is

2    bulk.  Figure 4 absolutely unequivocally demonstrably shows

3    that.

4              What do they do to tell you that that is not

5    true?  They say look at column 9.  We talked about that

6    during the first conference.  They say look at column 9, and

7    they put up some language out of context where they argue

8    that what this shows is that the first tier receives that

9    bulk e-mail signature and then marks an e-mail and marks the

10   e-mail as bulk.

11             Your Honor, I would implore you, read the abstract

12   of the Townshend and also look at column 9 and column 10

13   because it's clear as a bell -- and you can't avoid summary

14   judgment by completely misreading and mischaracterizing the

15   reference.  It's clear as a bell that the bulk e-mail

16   signature is determined at the central server.  They do the

17   comparison and the determination is made and a bulk e-mail

18   signature is created saying this e-mail is bulk.  It then gets

19   sent to the first tier, and the first tier uses it to look at

20   new e-mails that come in.

21             The '050 teaches this, too, in column 5 -- 4, 5

22   and 6.  Why?  Because you don't want to bother the central

23   server every time.  A new e-mail comes in, you look at the

24   ID, you say I have already seen an ID that I know is bulk.

25   And they look at the bulk e-mail signature they've got and

1    say, aha, I know it's bulk.  How do I know it's bulk?

2    Because the central server created the bulk e-mail signature,

3    which is described in column 9 of Townshend unambiguously,

4    and is sent over in response indicating that this e-mail is

5    bulk.

6              So, Your Honor, we think again, for all the

7    reasons that I have said -- one last comment.  I'm not sure

8    what that testimony that Mr. Lahad put up on the stand was

9    supposed to demonstrate, but I can tell you that Dr.

10   McDaniel's expressed unambiguous admission that the second

11   element of all those claims was disclosed in Figure 4 came

12   later, seven or eight pages later in his deposition, when he

13   was -- when he looked at it and said, oh, yeah.  It's there.

14   It's there.

15             Of course it's there.  Because the identifications

16   are compared.  You look to see what you know about it.  You

17   know it has got a count.  If you know the count is above the

18   threshold you know it's bulk, or if you know it is below

19   the threshold you know it's not, and then you send an

20   indication.

21             I have never seen a more direct parallel

22   reference than this one, Your Honor.  Thank you.

23             THE COURT:  All right.  Thank you.  Do

24   defendants want to move on to some other common invalidity

25   points?

1              MR. FLAGEL:  Yes, I think we will move on to the

2      '142.  The on sale bar invalidity issue.

3              THE COURT:  All right.  Fine.

4              MR. CHAIKOVSKY:  Good morning, Your Honor.

5              THE COURT:  Good morning.

6              MR. CHAIKOVSKY:  Yar Chaikovsky from McDermott

7      Will & Emery on behalf of the defendants.

8              So here we have an interesting motion for

9      summary judgment.  I think the sole dispute that we're going

10     to have here, we'll see when they come up, but the sole

11     dispute we have with respect to whether this patent is

12     invalid and whether it's anticipated and was offered for

13     sale is whether it was for sale in this country, in the

14     United States.

15             We will not have a dispute about the critical

16     date.  We know what that is.  June 23rd, '96.

17             That the Gatekeeper bought product by Park City

18     Group actually embodied the asserted claims.

19             That it was ready for patenting by January 9th,

20     as so admitted by their expert.  And,

21             That it was sold to Boots prior to the critical

22     date.

23             So again it's going to be about was it in the

24     United States.

25             So we get from the Supreme Court *Pfaff v Wells*

1    the state of law in 1988 in terms of what does it mean to

2    be a commercial offer for sale.  The product must be the

3    subject of a commercial offer for sale.

4            That's been even more recently -- this is not in

5    our briefing because here we have a case that was decided by

6    the Federal Circuit on August 14th.  *Hamilton Beach Brands v*

7    *Sunbeam Products*, 2013 Westlaw 4081872.  We're focusing on

8    page 3, but it's a good read for the entirety of the case.

9            In *Hamilton Beach*, the Federal Circuit affirmed

10   a summary judgment finding of invalidity for an offer for

11   sale.  And in that offer for sale, the offer was made by a

12   European supplier to Hamilton Beach, a U.S. entity.

13           So Hamilton Beach was making products.  They had

14   a patented product.  Hamilton Beach had designed the product.

15   But eventually how the Federal Circuit -- different than how

16   the District Court came out actually.  The District Court

17   determined there was summary judgment.  The District Court

18   determined that Hamilton Beach had made an offer that was

19   then consummated, a sale was consummated, but the Federal

20   Circuit actually said, no, the European entity made an offer

21   for sale and that is enough.  Made an offer to sale to the

22   United States.  And Hamilton Beach, done, invalidates the

23   '142 patent.

24           So what do we have here is we have a

25   misunderstanding by Intellectual Ventures of the law.  They

1    like to focus that we need a buyer in the United States.

2    That is not the focus.  In fact, the focus in *Hamilton*

3    *Beach*, for example, is just the offer was made.  An offer

4    was made into the United States.  There was no acceptance.

5    That offer was made in Europe.

6              So, again, if you look at the statute, 102(b),

7    it does not say that the buyer must be in this country.  And

8    we'll go over a few other cases.  It just says on sale in

9    this country.

10             Similarly, in *Linear Tech*, the Federal Circuit

11   in 2001.  We have a U.S. seller sold to a European buyer.

12   Now, in that case, there was no sale.  The sale was not

13   accepted.  But if it had been accepted by the European

14   buyer, the Federal Circuit said in that case there would

15   have been a sale, so the buyer did not need to be in the

16   United States.

17             And so Park City Group's sale to Boots, even

18   though they're in England, invalidates the '142 patent.

19             What do we have?  We have a letter agreement

20   from Park City Group to be a sale.  It's admitted by Park

21   City Group's CEO, their 30(b)(6) deponent, Mr. Fields, that

22   it was a sale.  And that is Exhibit 11, page 52.

23             It was sent by a facsimile -- the document says

24   via facsimile -- from the U.S. on or about September 29th,

25   1995.

1        Again, Mr. Fields confirms that there was an

2   agreement done on September 29th in his deposition testimony

3   that is cited in that first bullet.

4        Obviously, the document has commercial terms in

5   it.  I don't think we'll have a dispute on that.

6        Countersigned by Boots on October 18th.

7        The acceptance was reported by telephone.  And,

8        Eventually signed all papers returned to Park

9   City Group on around November 1, 1995.  And that is

10  Exhibit 15, and we'll see that on the screen.

11       Here is the commercial terms letter that we

12  have.  Again, September 29th, from Park City Group.  They're

13  in Utah, sent via by facsimile to Boots.

14       We have the commercial offer.  I'm not going to

15  go into the details of the agreement.  And,

16       On November 1st, 1995, we have Boots sending

17  it back to Park City, in Utah, saying "Dear Scott," and that

18  commercial terms letter, one of the things sent back, in

19  addition to other agreements that make up the entirety of

20  the transaction and saying:  "Further to my confirmation to

21  you on the telephone that the above documentation had all

22  been signed on behalf of this Company."

23       So they have spoken on the phone in between that

24  prior agreement being sent and now this being executed.  "I

25  have the pleasure enclosing one original of each duly signed

1   by our Company Secretary," sending it back to the United

2   States.

3          Again, looking at *Hamilton Beach*, is this a

4   consummation of a offer for sale given the prior agreement

5   that was sent by Park City Group?  Or, actually, this Boots,

6   this Boots could be an offer for sale themselves which

7   eventually is accepted by performance -- by performance by

8   Park City.  No one disputes that Park City then develops

9   the Gatekeeper in the United States for Boots.

10         So in either direction, whether I actually look

11  at this offer for sale sent by Park City, or I look at this

12  as the offer for sale or acceptance by Boots in the United

13  States, either way, we have a transaction that is occurring

14  in the United States.  There is no evidence, no evidence

15  that this all transpired in England.

16         Next, in addition to having a commercial sale,

17  we must have the patent ready for patenting.  And what is

18  interesting on the ready for patenting, Your Honor, is you

19  can prove it one of two ways according to *Pfaff v Wells*.

20         First, you can do reduction to practice or we

21  can do it by proof that prior to the critical date, the

22  inventor had prepared drawings or other descriptions that

23  were sufficiently specific to enable a person skilled in

24  the art to practice the invention.  One or the other.

25         So let's see what happens next.  Next slide.

1           So what happens next is that, again, Dr.

2    McDaniel's deposition -- well, I should say in his expert

3    report, I apologize, he notes that Dr. Rubin opines that the

4    Action Gatekeeper sufficiently described meeting that second

5    part of the facts ready for patenting, not the first part.

6    Dr. Rubin didn't say it was reduced to practice.

7           Next slide.

8           Well, Dr. Rubin responds to an irrelevancy.  I

9    disagree that they were reduced to practice by January 9th.

10          Well, that is not what Dr. Rubin was saying.  If

11   you remember *Pfaff*, again, what Dr. Rubin was saying, it's

12   ready for patenting because the proof, the description

13   sufficiently described to enable someone to practice the

14   invention.  That is exactly the quote that is in his report;

15   and he says this no later than January 9th, prior to the

16   critical date.  And we then have Dr. McDaniel responds with

17   an irrelevancy.

18          So we have no contrary evidence to this

19   statement on the ready for patenting.

20          In fact, two paragraphs later.  This is

21   paragraph 255.  Two paragraphs later, when responding to

22   a different anticipatory reference, Trend Micro's own Ji

23   patent.  What does Dr. McDaniel emphasize here?  And this

24   goes to the inconsistencies of Dr. McDaniel.  Well, we

25   got him again on the '142.  He concedes that the Action

1   Gatekeeper -- you know, he is using Dr. Rubin's conception

2   that's the actual Action Gatekeeper product that embodied

3   the claims that was sufficiently described no later than 9

4   January 9th.

5           So he is agreeing with the second part of the

6   "or" test for ready for patenting.  Why is he doing that in

7   this context?  In order to predate JI as an anticipatory

8   reference.

9           So paragraph 255 he responds with an

10  irrelevancy.  It wasn't reduced to practice.  We don't say

11  it was reduced to practice.  Dr. Rubin doesn't say it was

12  reduced to practice.

13          257, he uses the fact that it was sufficiently

14  described by January 9th.

15          So I don't think there is any dispute on the

16  ready for patenting.  It's all about whether it was in the

17  United States.

18          So I am happy to leave my time in response with

19  additional evidence and addition issue we have when I hear

20  their opposition, but other than that we would say that by

21  clear and convincing evidence the '142 patent has been sold

22  in the United States and it is invalid.

23          THE COURT:  Okay.  That's fine.  We'll hear from

24  the plaintiffs then.

25          MR. O'BLACK:  Good morning, Your Honor.

1          THE COURT:  Good morning.

2          MR. O'BLACK:  Weston O'Black on behalf of

3   Intellectual Ventures.

4          Your Honor, there are three independent reasons

5   why the on sale bar doesn't apply:

6          First, the September 29th, 1995, letter, which

7   is what defendants are going all in on now and say that is

8   the offer that invoked the bar, cannot invoke Section 102(b)

9   as a matter of law.

10          Point 2 is there is a fact issue.  Even if you

11   agree with defendants' interpretation of Section 102(b) that

12   merely sending an offer from the USA to a foreign country

13   invokes the bar, you still can't find summary judgment because

14   there is a fact issue whether that September 29th letter was

15   an offer at all under U.S. contract principles.  And,

16          Third, there is a fact issue about the '142

17   invention was conceived, whether it was conceived by

18   September 29th which the defendants are now saying is the

19   offer.

20          Now, Mr. Chaikovsky said that Intellectual

21   Ventures concedes that the Gatekeeper product embodies the

22   '142 patent.  That is right, we do.  But the Gatekeeper, this

23   offer was an offer and originally an agreement to, if you

24   assume it was an offer, to develop that Gatekeeper product.

25   It eventually became, but there is no evidence, much less

1    than clear and convincing evidence, and the defendants haven't

2    met their burden to show that the invention was conceived by

3    September 29th.  We'll go through all of this.

4            On the first point.  Your Honor, even if you

5    assume all the facts that defendants have said is true.  So

6    if you assume that that September 29th letter is a

7    commercial offer, it was sent from the USA to England, you

8    still can't find the on sale bar as a matter of law.

9            No case, Your Honor, no case has ever held that

10   102(b) applies just because a U.S. seller sends an offer to

11   a foreign country, and certainly no case has ever held that

12   102(b) applies when the actual terms of that alleged offer

13   specifically and explicitly require that there must be

14   secret and exclusive use by the foreign buyer in the foreign

15   country.  And they can't transfer and sell the invention

16   anywhere else, which is exactly the circumstances here.

17   That is because it doesn't make sense under the statute.

18           So what does the statute mean, on sale in this

19   country?

20           It's our position that on sale in this country

21   means available for purchase in this country.  That is

22   entirely consistent with the policy behind the statute.

23           This is the *Aguayo* case which defendants cited.

24   I'm using Symantec's briefs because they're both the same,

25   but Symantec cited it in footnote 10 of its reply.

1          The *Aguayo* case discussed the policy that is

2     discussed in other cases that the reason behind the "in this

3     country" limitation is to prevent the American public from

4     relying on the facts that the invention is available for

5     purchase in the USA.

6          So, Your Honor, if you want to come to the USA

7     and get a patent, you can't put your invention on sale in

8     this country more than a year before you file the

9     application.

10         THE COURT:  Does it depend on where the product

11    is used or just where you can purchase it?

12         MR. O'BLACK:  Well, where the product is used

13    would be the public use forum.  On sale bar is more focused

14    on the USA.

15         THE COURT:  So if you can come to the United

16    States and actually walk out of somebody's store with it but

17    with no right to use it on American soil, you would say it

18    is for sale in the United States?

19         MR. O'BLACK:  Available for purchase in this

20    country.  That's right.  That is not what happened here.

21    Let's talk about that.

22         In this *Aguayo* case, there was a U.S. seller who

23    made an offer to a U.S. buyer and they consummated the deal

24    in the U.S., and the court held because the offer for sale

25    and the acceptance were all in the U.S., the invention was

1    sufficiently accessible to the U.S. public to trigger the on

2    sale bar.

3            But here, there is absolutely no risk that

4    the U.S. public would think Park City Group was putting

5    Gatekeeper on sale in the USA when it had, by making -- by

6    making an explicit and confidential sale of an invention of

7    a product to Boots in the U.K. for installation in the U.K.

8    and only Boots is used in the U.K. and Boots couldn't

9    transfer it for use anywhere else.

10           And the case on point is *B.F. Goodrich*, Your

11   Honor.  It's actually from this court.  There were two

12   decisions.  The first one was denying summary judgment,

13   the stage we're in, and the second one was denying the

14   reconsideration after a full trial on the merits.

15           In *B.F. Goodrich*, like here, there was a U.S.

16   seller and a European buyer.  And the U.S. seller in *B.F.*

17   *Goodrich* traveled to Europe and made the first proposal

18   to sell the product in a confidential meeting in Europe.

19   Exactly what happened here.

20           Here, the first, the first even mention of

21   Gatekeeper, which is mentioned in our brief, is on June 19th

22   -- sorry -- June 13th, 1995.  Inventor Fred Geiger went

23   over to Nottingham, England where Boots is based, and that

24   is the first time he even mentioned the word "Gatekeeper."

25   A month later, another Park City member, Jeff West traveled

1    to Nottingham with, as the letter said, which I will show

2    you later, the purpose of reaching agreement on the

3    commercial terms of creating Gatekeeper.

4            Now, in *B.F. Goodrich*, after the U.S. seller

5    had made that confidential proposal in Europe, there was

6    discussions back and forth between the countries.  And the

7    court said -- here is how the court characterized those

8    discussions.  They were extensive commercial, technical and

9    financial proposal sent from the U.S. to the European

10   buyers.  And in *B.F. Goodrich*, there was a proposal of terms

11   of the sale which was sent from the U.S. to the European

12   buyers.  Under those facts, the court said 102(b) did not

13   apply as a matter of law.

14           The circumstances here are even more compelling

15   because the actual offer in this case requires that the sale

16   and exclusive use be in the U.K., under confidential terms.

17           So defendants cited *Linear Technology*, which, by

18   the way, had a full trial on the merits before deciding that

19   there was clear and convincing evidence of an on sale issue.

20   And later says, in *Linear*, there was a foreign seller -- I'm

21   sorry.  In *Linear*, there was a foreign buyer who sent an

22   offer to a U.S. seller.  That offer didn't have any

23   restrictions on use or where the invention would be sold.

24           Unlike here and unlike in *B.F. Goodrich*, *Linear*,

25   the U.S. seller didn't go to Europe to have confidential

1    proposals to decide who the buyer would be and unlike

2    here -- excuse me.  The contract in *Linear* was actually

3    consummated in the USA and was accepted in the USA.

4          Defendants mention things about British law and

5    things like that.  It's irrelevant because under the *Group*

6    *One* test in the Federal Circuit, U.S. contract law applies

7    so we have uniformity on the on sale issue.  And under U.S.

8    law, the contract is created where the acceptance occurs.

9          *Linear* is also distinguishable because again the

10   purported offer didn't require, didn't have limitations on

11   how the invention would be used and where it would be sold.

12         *Hamilton Beach* is no different.  *Hamilton Beach*,

13   it's actually -- there is nothing novel about *Hamilton Beach*.

14   *Hamilton Beach,* it was a foreign seller who was putting the

15   offer, who was putting the invention for sale in the U.S.

16   Foreign seller said here U.S.  You can buy my invention.  It

17   was on sale in the USA.  The difference between there and

18   *Linear* is that in *Linear*, there was absolutely no concern

19   about who was buying the product, whether it would be

20   someone who is a foreign buyer or a U.S. buyer.  They were

21   just making it generally available for purchase, which is

22   completely different than the facts here.

23         Your Honor, if defendants' legal position is

24   correct that 102(b) is triggered just because an offer is

25   sent from the U.S. to a foreign buyer, regardless of its

1    terms, then the "on sale in this country" limitation and the

2    policy behind it is meaningless.

3              Now, let's change gears.  We want to talk about

4    the fact issues.

5              Your Honor, I don't think anybody will contest

6    that the on sale inquiry is highly fact intensive.  So let's

7    assume for the purposes of this fact discussion that you

8    agree with defendants' legal position that merely sending an

9    offer from the U.S. to a foreign country triggers 102(b).

10             Even if that is right, there are fact issues

11   about whether that September 29th letter which defendants

12   now say is the offer that triggers the statute, whether it's

13   even an offer at all.  Here is why.

14             Well, first, let's discuss the law that governs.

15   Under the fact test, only an actual commercial offer can

16   trigger 102(b) and U.S. contract law determines whether in

17   fact there has been an offer.

18             The evidence shows that the September 29th letter

19   was not an offer at all.  It was just a memorialization of a

20   prior agreement.  And that's the key.  If the September 29th

21   letter was just memorializing a prior agreement, it's not a

22   commercial offer under the fact test.

23             The actual contract would be formed the moment

24   the prior oral agreement was made, and that is the contract

25   that will have to apply in the fact test.  And there is no

1    evidence about -- well, there is fact questions about when

2    that contract was actually formed, and those fact questions

3    will have to be resolved by the jury before the Court can

4    apply the fact test.

5              Now I'm getting ahead of myself but we'll get

6    there.

7              So, first of all, whether there was a prior

8    oral agreement is a question of fact.  And there are several

9    factors here.  If you actually look at the September 29th

10   letter, it indicates that it was just a memorialization of a

11   previous oral agreement rather than the agreement.  And you

12   start with, under *Group One*, the Federal Circuit says you

13   have to look closely at the language of the proposal.  So

14   let's start with the first sentence.

15             The first sentence says the purpose is to

16   document the commercial terms upon which we agree.

17   Document.  In other words, memorialize the commercial terms.

18             On that, the defendants are going to get back up

19   and say:  Well, this just says these are the terms that Park

20   City Group agrees to offer.  Right?  But they have already

21   weighed in on this, and they can't change course now.

22             In their reply brief, they actually quote this

23   language and these brackets are from defendants, and they

24   say that this language means the commercial terms upon which

25   the parties, the Park City Group and Boots, have already

1    agreed.

2              There is more.

3              A second indication is that Boots signed this

4    on October -- it's hard to tell -- looks like October 18th,

5    1995.  That is several weeks after the other agreements were

6    signed, which is September 29th, which indicates that for

7    this agreement, Boots wasn't really concerned with signing

8    it at all because it was just to memorialize their agreement.

9              Then probably the most compelling point is Park

10   City Group actually never signed it.  And Boots apparently

11   wasn't concerned that Park City signed it.  So this -- there

12   is a fact issue about whether this is the agreement because

13   it's not signed by both parties.

14             That brings us to Fact Issue 2, which is a

15   dependent fact issue.  When and where did the actual offer

16   and acceptance happen?

17             Now, again, defendants have the burden by clear

18   and convincing evidence to prove when and where the actual

19   agreement happened that triggered the on sale bar.  And,

20   frankly, Your Honor, they just decided not to develop these

21   facts surrounding the sale of Boots.  There are huge gaps

22   in the evidence.  And we're going to discuss those here.

23             But all the evidence and all the gaps in the

24   evidence have to be resolved in IV's favor since we're the

25   nonmovant.  So let's discuss those gaps.

1          Well, as mentioned, the first time Gatekeeper

2     was even discussed was when Inventor Fred Geiger was in the

3     U.K. on June 13th.

4          A month later, Jeff West, who is another Park

5     City Group employee, goes to the U.K. and visits Boots.  He

6     is there for an entire week.  And this is what he -- here is

7     the letter where he says the purpose of the visit.

8          "This agreement is required ..."  "Before my

9     departure we need to reach an agreement on the requirements

10    for the ... Gatekeeper development.  This agreement is

11    required in order for us to formally begin the design and

12    development of these enhancements.  I want to allow

13    sufficient time to review these topics."

14          Your Honor, if the previous agreement happened

15    on this trip in the U.K., then under defendants' own

16    interpretation of 102(b), the on sale bar didn't apply.

17          So what happens next?  Well, there are some back

18    and forth discussions between the parties, not unlike those

19    of *B.F. Goodrich*, and then there is a gap.  There is a gap

20    between in the last few weeks of September, before this

21    September 29th what defendants now say is the offer that

22    triggers the bar.

23          So what happened during this gap?  There aren't

24    communications.  That indicates that the last discussions,

25    the last negotiations before entering into an agreement that

1    were done by phone or maybe in person in the U.K., possibly

2    a person in the U.S. -- there is no evidence either way --

3    or by the parties' U.K. attorneys.

4            Here, this is Symantec Exhibit B, it

5    specifically refers to how Park City Group had a U.K.

6    counsel who was negotiating the terms of the agreement.

7    It's possible, even likely, that the U.K. counsel -- the

8    attorneys on both sides took over the negotiations at the

9    end and that the agreement was made between the attorneys

10   as agents.  But, again, the sale under 102(b) would be in the

11   U.K. and defendants own test, defendants own interpretation

12   of 102(b), the on sale bar would be triggered.

13           Oh, and I should mention.  A case on point is

14   one we cited.  It's from the Northern District of California

15   by Judge Koh called *Abaxis*.  In *Abaxis*, Judge Koh held that

16   the mere possibility that an offer and acceptance happened

17   in a foreign country rather than in the U.S., even in that

18   case where all the summary judgment evidence indicated the

19   offer and acceptance was in the USA, the court denied

20   summary judgment.  Because, again, defendants have the

21   burden by clear and convincing evidence to show when the

22   offer was made and all inferences have to be resolved in

23   favor of plaintiff.

24           Let's go to the third fact issue:  Was the '142

25   invention conceived by September 29th, 1995?

1              The on sale bar doesn't apply until the

2     invention is conceived.  And defendants have the burden to

3     show conception before what they now say is the offer which

4     is September 29th, 1995.  And they have that burden by

5     clear and convincing evidence.  Here is some background.

6              In their original brief, defendants were

7     pointing to communications over a variety of time period,

8     some even going back to January 1995, saying that those

9     communications between Boots and Park City related to the

10    offer to sell Gatekeeper.

11             We responded and said no.  The very earliest

12    the invention was even a glean in the inventor's eyes was on

13    that June 13th visit by Fred Geiger.  And now in their reply

14    today, the defendants are focusing in on the September 29th

15    letter from the U.S. to England saying this is the offer

16    that triggers the bar.  So now the question is, is that

17    invention conceived by September 29th, 1995?

18             And here is their evidence regarding conception.

19    It's IV's interrog response and Mr. Chaikovsky pointed to

20    this date that was discussed in McDaniel's report.

21             In IV's interrog response, we said that most of

22    the claims for the '142 patent was conceived at least as

23    early as January 1996.

24             Well, saying that something was conceived by

25    January of 1996 isn't clear and convincing evidence as a

1   matter of law that the invention was conceived on

2   September 29th, 1995, three or four months earlier.

3                So let's look at the timeline.

4                Where did we get that -- where did IV get that

5   January 1996 conception date?  We got it straight from the

6   Inventors Wood and Fred Geiger who were the two '142

7   inventors who were deposed.

8                Fred Geiger had a meeting on June 13th, which we

9   keep talking about.  Here is what he said.  He didn't say

10  the invention was conceived.  Here is his actual testimony.

11               "I said something ..."  At the meeting, "I said

12  something about Gatekeeper, and they loved the name.  And it

13  kind of caught ... It was something like, oh, you want a

14  Gatekeeper ...  They didn't know what it was, but they

15  wanted it.  And then we started to talk about what it was

16  ... I mean this was a gleam -- this was the very, very

17  beginnings of the concept of what became Gatekeeper."

18               It's hardly clear and convincing evidence of

19  conception by June 13th, 1995.

20               So what does the other inventor say?  William

21  Wood -- oh.  And they also say Inventor Geiger couldn't pin

22  down exactly what claim, what portion of the claims he had

23  invented or when exactly they were invented.

24               So what does Wood say?  We know there is a fact

25  issue, Your Honor, because co-inventor William Wood did not

1   even join the Boots project until late October or early

2   November of 1995.  So the invention could not have been

3   conceived by what defendants now say the offer was made on

4   September 29th, 1995.

5            Here is what William Wood said:

6            "Question:  When did you first become involved

7   in the Gatekeeper product development?

8            "Answer:  Late October, early November, I was

9   approached by Bob Fratelka, who was the vice president of

10   research and development ... he had approached me and

11   basically said that there was a project that Fred wants me

12   to work on.  He didn't give me much details.  And Fred

13   basically filled me in."

14            William Wood, unlike Fred Geiger, was asked when

15   exactly do you think the invention was firm in your mind?

16            He said between January and February of 1996,

17   which is where IV gets that January 1996 date in its

18   interrogatory response which defendants are relying on.

19            Here is what he said.

20            Those ideas for the '142 patent that you just

21   mentioned a second ago, when did they become firm in your

22   mind?

23            High level things, probably early January,

24   February, a rough concept.  We met with Boots in December,

25   mid December, and they basically had come back with some

1    additional requirements that weren't in the letter of

2    intent, as I call it.

3              The letter of intent that he is referring to is

4    the September 19th, 1995 letter.

5              So at this time, Your Honor, the record

6    already has IV's interrog response about this January 1996

7    conception date.

8              Just in the interest of having a more complete

9    record, we would now like to offer a supplementary exhibit

10   which just has this portion of William Wood's testimony that

11   we just went over.

12             THE COURT:  Do you want to pass something up?

13             MR. O'BLACK:  Sure.

14             THE COURT:  Sure.  You may do so.

15             (Document passed forward.)

16             MR. O'BLACK:  As you can see from his testimony,

17   Your Honor, William Wood confirmed what he calls the letter

18   of intent, which is the September 29th, 1995 letter, did

19   not have all the requirements for what became the '142 patent.

20   That's the short answer, and that's the short answer for why

21   the Court should deny summary judgment showing that there is

22   no conception by the date the defendants say the offer was

23   made.

24             But the long answer is we can actually look at

25   the September 29th, 1995 letter and see that it doesn't show

1    conception.

2              The Fed Circuit in *Datamize* says defendants here

3    will have the burden to show that that letter unambiguously

4    on its face requires all the patented features.

5              So let's look at the letter.

6              In the letter, there is a list of requirements

7    at a high level.  Keep in mind, Your Honor, at this time no

8    code was written for Gatekeeper.  The Gatekeeper development

9    hadn't even started.  Will Wood has just joined the project

10   who is a co-inventor on the patent.  That's obvious because

11   here there is no post office for receiving and redistributing

12   e-mail messages on a computer network.

13             These requirements are ambiguous about where

14   the intelligence should be housed.  It's possible, when you

15   read these requirements, it could be that the intelligence

16   for doing this processing would be housed on individual

17   sender's computers.  The processing happens before the

18   e-mail is even sent.  The process doesn't happen at a post

19   office when the e-mail is received.

20             There is no database of business rules mentioned

21   in the letter.

22             There is no rule engine to selectively apply the

23   business rules in the letter.  And,

24             There is no distribution engine that combines

25   the e-mails with the rule history and distribution list.

1            So that brings us to discussing fact issue 3,

2    which is the defendants can't get summary judgment because

3    there is no clear and convincing evidence that the invention

4    was conceived by when they now say the offer was made, which

5    is September 29th, 1995.

6            So now where does that leave the Court?  We have

7    another dependent fact issue because now the jury will have

8    to decide when the invention was conceived.

9            In our case, there is a twist which was recently

10   described in the Federal Circuit opinion on August 10th.  In

11   our case, there was an agreement to develop what became the

12   Gatekeeper product and the '142 invention eventually.  And

13   the Fed Circuit said:  In cases like that where you have an

14   agreement that remains open, the offer, under the fact test,

15   is applied at the time conception is made if conception is

16   after the offer.  So the jury is going to have to decide,

17   before the Court applies the fact test, when the invention

18   was conceived.

19           So that means, just to reiterate, that if the jury

20   decides the '142 invention was conceived after September 29th,

21   1995 -- well, actually let me rephrase because now everything

22   becomes interdependent which is even more reason why the jury

23   should take these issues up.

24           The jury is first going to have to decide when

25   the agreement -- when the actual offer and when the actual

1    agreement to develop Gatekeeper was made.  And whenever the

2    jury decides that date, then the jury is going to have to

3    decide if the '142 invention was conceived before or after.

4    And if it's conceived after, they'll have to decide the

5    conception date and that is the date that applies under the

6    Section 102(b) analysis.  This Court can't make a ruling as

7    a matter of law and apply the fact test until those facts

8    are decided.

9              So just to conclude, and then if you have any

10   questions.

11             In their reply brief and the argument today,

12   defendants are steering clear of the actual terms of the

13   Park City/Boots -- Park City and Boots agreement which

14   mandate a confidential sale for exclusive and -- exclusive

15   use in the U.K.

16             Instead, they're hinging their whole argument

17   on the September 29th, 1995 argument which they say is the

18   offer.  That is because it's sent from the USA to Europe.

19   But that argument just can't win summary judgment, Your

20   Honor, because of all the intertwined fact issues about when

21   the invention was conceived and when the actual offer and

22   agreement was made.  Under the Federal Circuit precedent,

23   those fact issues have to be resolved before the Court can

24   apply the fact test.

25             THE COURT:  All right.  So Mr. Chaikovsky

1   referred us to a slide with an excerpt from Dr. McDaniel's

2   expert report, paragraph 257.  Do you agree that there, at

3   least your expert is acknowledging that the Gatekeeper

4   product embodying the '142 patent was sufficiently described

5   no later than January 9th, 1996?

6           MR. O'BLACK:  I definitely disagree with that.

7   I think what he was saying is that Dr. Rubin concedes so

8   that Dr. Rubin can't make this invalidity argument.  I don't

9   think that Dr. McDaniel -- as Mr. Chaikovsky said, I don't

10  agree with the premise that Dr. McDaniel endorsed Dr.

11  Rubin's position.

12          THE COURT:  So he is just characterizing

13  Dr. Rubin's position?

14          MR. O'BLACK:  That's my read of it, Your Honor.

15          THE COURT:  And if we were to read it that it

16  was Dr. McDaniel's conception as well, how, if at all, would

17  that impact what the Court should do with this motion?

18          MR. O'BLACK:  Your Honor, Dr. McDaniel's is

19  not an inventor on the '142 patent.  I think, because the

20  defendants bear the burden of clear and convincing evidence,

21  I think the jury is going to have to hear the testimony of

22  the actual inventors and look at the actual documents to

23  conclude as to when it was conceived.

24          THE COURT:  Is there anything else?

25          MR. O'BLACK:  That's it for now.  Thanks.

1          THE COURT:  We'll hear rebuttal.

2          MR. CHAIKOVSKY:  Your Honor, again, you probably

3    caught on to where I'm going to be heading through my entire

4    argument.

5          I didn't hear anything from IV's counsel that

6    created an issue of fact.  In fact, what I just heard from

7    our presentation confirms that there was either an offer for

8    sale or a sale in the United States legally.  There aren't

9    any factual issues.  And we'll go over it, one by one.

10          As you just frankly pointed out, with respect

11    to the ready for patenting issue, I guess the first issue,

12    none of this we heard was in their briefing.  It's all new.

13    So we object actually to everything that was just brought up

14    factually with respect to the conception date and everything

15    we just heard.  All new arguments contrived in order to

16    create a factual dispute where none exists.

17          Secondly, no one disputes what the facts are.

18    Those facts are the facts.  So if you are going to grant

19    our motion, please grant our motion.  If you are going to

20    deny it, deny it, and we won't present it to the jury.

21          The facts here are not in dispute.  There are no

22    disputed facts.  It's a legal issue as to whether this is

23    offered for sale in the United States or on sale.  We're

24    not limiting ourselves to an offer for sale in the United

25    States.

1          If I go to the *Pfaff v Wells* test, there was an

2    incorrect reading by counsel from IV of the August case.

3    *Pfaff* requires two things:  a commercial sale or offer for

4    sale and that it be ready for patenting prior to the

5    critical date.  Not that there be some conception at the

6    time of the offer for sale.  And as he mentioned, it could

7    be open.  And if it opened prior to the critical date,

8    January 9th, and as their expert conceded, unlike what

9    they just said, we actually had a ready for patenting by

10   January 9th.  They even showed the CEO of Park City saying

11   we had conception by January 9th and we had it opened by

12   January 9th.

13          Again, their expert did concede it because in

14   order to overcome the Ji reference prior art.  That is

15   exactly why he cites Dr. Rubin's concession for ready for

16   patenting.  He is trying to avoid the Ji patent.

17          Now, I guess they can run away from that and

18   they won't avoid the Ji patent which also anticipates the

19   '142 patent, but that is exactly why Dr. McDaniel actually

20   relies on that concession is to overcome the Ji patent and

21   that January 9th date to establish a pre, predating the Ji

22   patent on January 9th, whether by conception or reduction to

23   practice.

24          So again, no factual dispute.  Nothing legally

25   that has changed whether something is ready for patenting or

1    not.  Do we have an offer for sale?  I didn't hear any

2    dispute that we actually have an offer that was then kept

3    open at some point in time, and a product that was actually

4    made by the Park City Group in the United States.

5            Well, did they make it pro-bono?  Did they make

6    it with no agreement being made between the parties?  In

7    fact, one of the first things Mr. O'Black mentioned when he

8    got up here is he actually said this is a memorialization of

9    the prior agreement.  The September 29th letter.

10           Well, if it is, I had an offer and I had a sale

11   and I've got a confirmation that I have got an offer for

12   sale of the product, which again is eventually ready for

13   patenting on January 9th.  I didn't understand that argument

14   in the least bit.  It was just confirming factually that the

15   parties, Park City being in the United States, had a product

16   that was offered for sale or sold in the United States.

17           Going to the case law that Mr. O'Black

18   mentioned.  He forgot a few of the cases that the parties

19   discussed.

20           One was *MPS, Monolithic Power Systems* v *O$_2$Micro*

21   from the Northern District of California.  In that case,

22   Judge Wilken actually found an offer for sale where there

23   were activities that occurred in the United States but the

24   offer was to an entity in Taiwan.  In fact, the offer

25   occurred in Taiwan.  The jury verdict, JMOL.  She denied the

1    JMOL in that case.

2              In *Robbins*, I think I heard a mischaracterization

3    of the *Robbins* case.  They said that was an U.S. activity.

4    That was an offer to Tasmania, Australia.  And the court was

5    then deciding whether there was an acceptance or not.

6              *Linear* Tech, same thing.  European supplier.

7    And I think I heard a characterization of it being U.S.

8    based.  Not true.

9              *Hamilton Beach*, why relevant?  Again, European

10   supplier, distributor.  And the court, the Federal Circuit

11   in both *Linear* Tech, *Hamilton Beach*, the Federal Circuit

12   decided the issue.

13             *B.F. Goodrich,* here from the District of

14   Delaware in 1993.  The sale and offer for sale, all of that

15   in Europe, totally distinguishable.  That is all in Europe.

16   There is no evidence that the sale was consummated in the

17   U.S. or that an offer came from the United States in *B.F.*

18   *Goodrich*.  Completely distinguishable.

19             And then the *Abaxis* case.  Again, the evidence

20   there, unlike here which they have admitted even in their

21   argument, it wasn't clear where the offer for made or when

22   the offer was made.  We don't have that here.

23             We have, whether you say the letter of

24   September 29th is the offer or the return by Boots or the

25   prior agreement, we clearly have an offer that was made by

1   a party.  It doesn't have to be that letter on that date,

2   but we have an offer of the Gatekeeper that is accepted and

3   a product is made.

4        Now, I could go on, Your Honor.  I mean I don't

5   want to eat our party's time.  But we have -- and I guess

6   one other case I would like to point out.

7        If you would go to slide 180 of our slides.

8        *Robotic Vision*.  The "product need not be 'ready

9   for patenting' at the time of the offer."

10       What I heard here, and I know in August they

11  were focused on conception, that's what he wanted to focus

12  on.  But again *Pfaff v Wells*, the Supreme Court, and again

13  August no different, the fact that an offer can be made.

14  What is important is that it be ready for patenting before

15  the critical date.  There is no other test in Pfaff v Wells

16  from the Supreme Court.

17       In fact, can I see your slide, slide 15 of

18  Intellectual Ventures?

19       Oh, sorry.  Computer 2?

20       THE COMPUTER OPERATOR:  Yes.

21       MR. CHAIKOVSKY:  There we go.  Hey.

22       What I saw here is prefatory sales activity

23  occurring.  No one disputing we then have an offer letter

24  sent on September 29th.

25       There might have been an agreement beforehand.

1   There was some discussion of a memorialization of an

2   agreement beforehand.  But, in fact, we've got the parties

3   discussing this deal before the 29th.

4            And to further that prefatory activity -- how do

5   I go to the doc cam?

6            (Elmo settings adjusted.)

7            So this is an internal produced by Park City,

8   which is represented by the Sussman firm representing IV.

9   Internal Park City document, August of 1995.

10           Talking about developing -- Jeff West is from

11  Park City.  Talking about developing contract terms and

12  conditions, contract points.  Renew List A.  Must have

13  additions to be included in a contract addendum.

14           List A includes Gatekeeper enhancement.

15           These are all cited.  That was Exhibit -- I

16  apologize.  That was Exhibit 17 to our summary judgment

17  motion.

18           Exhibit 18 goes on further.  And this is Scott

19  Collins from Park City to Gary Flood of Boots, and Fred

20  Geiger you heard about, the CEO of Park City.

21           So September 8th, 1995.  The development of

22  Gatekeeper will not begin until November 1st due to prior

23  commitments.

24           So again we're going to create this.

25           Scott to send List A -- that is what we heard

1    referred to the last document -- revised with input from

2    Gary from Boots.  And based on the above points and List A

3    is the contractual terms that ends up in the September 29th

4    letter.  I will show you that.  And that is Exhibit 18.

5              Exhibit 19 to our summary judgment motion,

6    further, Boot contract open issues, September 5th.

7              Again, remember that List A includes Gatekeeper.

8    We have some open items like the date.  And this is all

9    happening in Park City documents.  Park City is doing this

10   in the United States.  Internal memorandum.

11             Eventually, they do get to the letter which Mr.

12   O'Black characterizes as memorializing a prior agreement.

13             I'll find it here.  I apologize.

14             That is Exhibit 10.  That is the letter.

15             The reason why I just want to point that out,

16   if you go to Bates stamp 6239, we see, oh, List A which the

17   party Park City was talking about here in the United States.

18   And Item No. II, Gatekeeper.

19             So whether you want to call it some

20   memorialization, whether you want to call this the offer

21   letter.  They eventually make the offer here on September 9th,

22   no later than.  And the parties create a product, and there

23   is a product created.

24             THE COURT:  So with all that, what is the

25   critical date?

1          MR. CHAIKOVSKY:  The critical date for the

2    patent, Your Honor, I've got right here, is June 23rd, 1996.

3    So it was ready for patenting by January 9th, 1996, and the

4    critical date is five months later.

5          THE COURT:  And with all of what you have shown,

6    in your view as a matter of law, does it matter which of

7    those activities occurred in the United States or it doesn't

8    matter?

9          MR. CHAIKOVSKY:  There does need to be an offer

10   for sale or a sale consummated in the United States.  So

11   there needs for an offer, for example, made in the United

12   States or received in the United States.  For example,

13   *Hamilton Beach*, if you look at the case, offer from Europe

14   into the United States.  So it was an offer received into

15   the United States by *Hamilton Beach*.

16         THE COURT:  Is it your position that the

17   September 29th letter is clearly and convincingly an offer

18   for sale in the United States?

19         MR. CHAIKOVSKY:  Without a doubt, Your Honor.

20   And beyond a reasonable doubt, not just clear and convincingly.

21   Yes, Your Honor.

22         THE COURT:  So it doesn't matter whether it's

23   memorialization of a prior agreement or it is in fact the

24   agreement?

25         MR. CHAIKOVSKY:  Obviously if it's a

1    memorialization, there, by clear and convincing evidence,

2    had been a prior agreement.  So, yes, it does not matter if

3    it's a memorialization of a prior agreement.

4              THE COURT:  If that prior agreement happened in

5    England.

6              MR. CHAIKOVSKY:  If there was evidence -- okay.

7    If that prior agreement happened in England and there was a

8    consummated agreement in England, then, Your Honor, maybe I

9    would agree with you.  There is no evidence of that.  In

10   fact, I will show you one more piece of evidence to say

11   there wasn't a prior agreement.

12             THE COURT:  The burden is on you to show me that

13   that didn't happen; isn't that right?

14             MR. CHAIKOVSKY:  Absolutely.

15             Your Honor, on June 27th, 1996, again Park City,

16   and it's from their production, produces a letter from Boots

17   to Park City where -- and again it's their legal attorney,

18   and I'm going to go back to that November 1st letter to show

19   that there is no prior agreement.  The first agreement was

20   or offer was that September 29th.

21             I got two pieces of evidence, but I started with

22   this one.  June 27th, 1996.  Their legal counsel for Boots

23   writes back, again, Scott Collins at Park City Group.  The

24   purpose of this letter is to record the agreement reached

25   between Boots Company and Park City Group with regard to the

1    variation of the commercial terms agreement between Boots

2    and PCG, Park City Group, dated September 29th, 1995, and

3    countersigned on behalf of Boots, as we saw the signature,

4    on October 18th, 1995.  The commercial terms agreement.

5              THE COURT:  Where in the record is that November

6    letter you are showing us now?

7              MR. CHAIKOVSKY:  So this is the June 27th, 1996,

8    Your Honor.  This was not an exhibit to our summary judgment

9    motion.  I actually pulled this out in preparation for the

10   oral argument so I admit this was not attached.

11             But this again shows that when they amended

12   the agreement, and they want to make an amendment, the

13   agreement they refer to is the letter of September 29th and

14   that counter signature we saw on October 18th.  Nothing

15   else.  Not a prior agreement.  No other prior agreement.

16   That's the agreement between the parties.  And,

17             Then if you recall, the November 1st letter --

18   accepting everything that I believe showed they did not,

19   right? -- is from Boots back to Park City in the United

20   States.  The commercial terms letter is that September 29th

21   agreement.

22             So he is saying:  Further to my confirmation and

23   above, I have pleasure in enclosing one original of each,

24   duly signed by our company secretary.

25             THE COURT REPORTER:  I'm sorry, sir.  Could you

1    repeat that?

2              MR. CHAIKOVSKY:  I have pleasure in enclosing

3    one original of each, duly signed by our company secretary.

4              THE COURT REPORTER:  Thank you.

5              MR. CHAIKOVSKY:  So this was an acceptance at

6    that point on November 1st, enclosing the acceptance on

7    October 18th that is mentioned in that later letter in 1996,

8    Your Honor.

9              So there was no prior agreement.  We have an offer.

10   We have an offer for sale or consummated sale in the United

11   States at the very least with this agreement in November

12   1st, 1995, sent back accepting everything that Park City was

13   offering.

14             THE COURT:  So I guess I'm a little confused.

15   It does rest on what the evidence shows about the September

16   1995 agreement or it does not?

17             MR. CHAIKOVSKY:  I'm not sure I understand your

18   question, Your Honor.  I'm not sure.

19             THE COURT:  Well, the burden is on you to prove

20   by clear and convincing evidence at least that there was an

21   offer for sale; correct?

22             MR. O'BLACK:  The burden is on us to show there

23   was an offer for sale or sale, yes.

24             THE COURT:  And your position is that that has

25   to occur in the United States?

1            MR. CHAIKOVSKY:  The sale has to occur or offer

2      for sale has to occur, yes, in the United States, Your

3      Honor.  There can be receipt of an offer for sale.  *Hamilton*

4      *Beach* is an example of a receipt for an offer for sale in

5      the United States.  Some aspect of the offer for sale must

6      occur in the United States.

7            THE COURT:  So is it important for the Court to

8      understand on what day it is that you contend the record

9      shows that offer for sale or sale occurred?

10           MR. CHAIKOVSKY:  I think it is important.

11     Again, what I would say, Your Honor, is both the November --

12     excuse me.  The September 29th letter is clear.  There is an

13     offer from Park City Group offering the Gatekeeper product,

14     is accepted by Boots on the 18th, sent back to Park City

15     Group on November 1st.

16           So, one, you have the offer for sale.  Two, you

17     have a consummated sale that is then sent back to the United

18     States on November 1st, 1995.

19           So both actions independently, independently.

20           The September 29th, 1995 letter can be an offer

21     for sale.

22           The November 1st, 1999, letter can be one of two

23     things.  It can be the consummation of that sale received

24     in the United States.  And, again, we have performance

25     according to that consummation of that sale.

1          Again, we saw from IV's counsel that we can also

2     have a sale by contract law.

3          You also have the consummation of the sale by

4     Gatekeeper in the United States by Mr. Geiger and his

5     activities in the United States.

6          But that November 1st, 1995 letter, which is

7     Exhibit 15 -- I didn't read it in the record, I'm sorry,

8     which is Exhibit 15.  The November 1st, 1995, letter also,

9     pursuant to *Hamilton Beach* -- if, for some reason, the Court

10    were in doubt the September -- which we don't.  Again,

11    beyond a reasonable doubt, that was an offer.  But if, for

12    some reason, they were to doubt, then again when they send

13    their executed, on October 18th, letter back to the U.S. on

14    November 1st, 1995, again, here you have either an offer

15    for sale that is accepted by Park City, because they execute

16    on it, they build, there can be no doubt how do we have a

17    building of the Gatekeeper product.

18          THE COURT:  Well, I think where I'm getting lost

19    perhaps is the dispute is where did these things happen and

20    which portion of it happened in the United States.

21          So the argument as I understand it from the plain-

22    tiffs is to the extent there is any murkiness or uncertainty

23    about what day you all are relying on, how can I find clear

24    and convincing evidence as to where that occurred if you are

25    not even committing to when it occurred?

1          MR. CHAIKOVSKY:  We are committing.  Again, I

2    just think it's the abundance of evidence is clear.  The

3    September 29th date is a clear offer for sale from Park City,

4    Utah.  It's not a prior memorialization of an agreement as we

5    just stepped through.  We have that offer for sale.

6          We also have a consummated sale based on this

7    letter on November 1st sent from London to Park City.  There

8    is no evidence to contradict that.

9          So we have both an offer for sale on September 29th.

10   We have the agreement executed and returned to the United

11   States on November 1st.  Either one of them independently is

12   an on sale bar because we have this ready for patenting on

13   January 9th.

14          THE COURT:  Even if on September 15th, in

15   England, two CEOs met and that is where they actually shook

16   hands and reached a deal.

17          MR. CHAIKOVSKY:  That might be different facts.

18   We don't have those facts in the record, Your Honor.  They

19   didn't present those facts in the record.  And the letter I

20   showed you from the summer of '96 amending this agreement

21   between the parties where the agreement was the offer and

22   the countersignature on October 18th, and that is how it was

23   referred to by the lawyers for Boots shows by clear and

24   convincing evidence there was no prior agreement.  That is

25   the agreement.

```
 1                THE COURT:  I do want to get that June letter

 2   into the record.  So if you could submit that to us with a

 3   letter just telling us what that is, just get that to us in

 4   the next couple of days that would be good.

 5                Before you conclude on this, you said, I think

 6   when you stood up for your rebuttal, you all are so confident

 7   that this is a legal question, you don't even want to go to

 8   trial on it either way, win or lose.  The issue is going to

 9   be over on your motion.  Did I understand that correctly?  You

10   want me to grant summary judgment for them if I don't agree

11   with you?

12                MR. CHAIKOVSKY:  The issue is we do not see the

13   factual issues that are in dispute.  What I heard here was a

14   creation of -- an attempt to create factual issues which are

15   not in their brief.  It was a purely legal issue of whether

16   this is on sale in the United States.  That's a legal

17   question, Your Honor.

18                THE COURT:  So if I deny the motion, what happens?

19                MR. CHAIKOVSKY:  If you deny the motion, then,

20   Your Honor, I guess there is no sale in the United States.

21                THE COURT:  Okay.

22                MR. FLAGEL:  Your Honor, from Symantec's

23   perspective, we want to preserve that issue for trial if you

24   deny the motion.

25                THE COURT:  On the last point, you are not
```

1      speaking for Symantec evidently.

2                  MR. CHAIKOVSKY:  No.

3                  THE COURT:  All right.  We're getting at least

4      close to where we should take a break, but I know there is

5      maybe one more issue that is common to the summary judgment

6      motion; is that correct?

7                  MR. FLAGEL:  Yes, Your Honor.  Noninfringement

8      of the '610 patent.

9                  THE COURT:  About how long do you think that

10     might take, Mr. Chaikovsky?

11                 MR. CHAIKOVSKY:  For the opening presentation,

12     probably also short, about 10 to 15 minutes.

13                 THE COURT:  All right.  I think we'll give

14     everyone a break.  We'll aim to keep it to about 15 to

15     20 minutes.  We'll be in recess.

16                 (Brief recess taken.)

17                 *      *      *

18                 (Proceedings reconvened after recess.)

19                 THE COURT:  Have a seat.

20                 We'll have you pick up, Mr. Chaikovsky.  Go

21     ahead.

22                 MR. CHAIKOVSKY:  Thank you, Your Honor.  Before

23     we run to the '610, I just wanted to raise one more issue.

24                 Although we believe by clear and convincing

25     evidence there is no doubt this letter came from Park City

1    in Utah, given the comments we had at the end, Trend Micro

2    also similar to Symantec would like to resolve this as a

3    triable issue if you decide to deny our motion for summary

4    judgment.

5             THE COURT:  Okay.

6             MR. CHAIKOVSKY:  So now we can go to the '610

7    patent.

8             Next slide.

9             So we'll go through the full build.

10            Your Honor, if you recall from the Markman

11   hearing, we had a dispute between the parties, "within a

12   telephone network."  You have already resolved that the

13   gateway nodes of the calling party and the called party

14   and their respective networks are not included within the

15   telephone network.  And so we know what we have here on the

16   left and the right are not part of the telephone network of

17   what we have on slide 42.

18            The green line that we have or yellow line

19   whatever color comes out here -- this is supposed to be

20   green -- is suggestive of what is within the telephone

21   network, whether that is a voice or data network as Your

22   Honor has construed.

23            The dispute here on summary judgment involves

24   whether this third-party network or third-party network,

25   whether it be Trend's or Symantec, for example, that could

1    have a gateway node, is somehow part or within the telephone

2    network as Your Honor has construed to date.

3              Focusing on an admission that IV has made on

4    slide 43, back on February 15th of this year, defendants

5    expert, Dr. Avi Rubin, ran a demonstration of a piece of

6    prior art.  The NAV-IEG product.

7              We can see the demonstration here that is run.

8    There are other parts of the demonstration that Dr. Rubin

9    ran.

10             In response to that demonstration and that prior

11   art, what does Dr. McDaniel do?  Again, he criticizes Dr.

12   Rubin for having run that demonstration on a "private

13   network" rather than "what the claim requires within the

14   telephone network."

15             How does he come to that conclusion?  How does

16   Dr. McDaniel come to the conclusion of it's in a private

17   network?

18             Well, we see that in the paragraph at the bottom

19   of 44.  Slide 44?

20             "Dr. Rubin's product demonstrations ... fail to

21   demonstrate the products operating 'within the phone network

22   ...'"

23             Why is that?  All IP addresses visible in

24   Dr. Rubin's screen shots, we saw one of them on slide 43,

25   are part of a private unroutable network that belongs to the

1    well known IP address ranges 192.168.x.x and 10.x.x.x ...

2    When you are in these ranges, these private networks can

3    never be "within the telephone network."

4              That is in Exhibit 9, at paragraph 44 of our

5    summary judgment briefing.  Never.  If you have got those

6    addresses, you are never within the telephone network.

7              And that was again, similarly to our last

8    summary judgment motion, in order to overcome a prior art

9    reference.  He made that statement.

10             So what happens next?

11             Well, on April 3rd and April 12th, 2013,

12   Symantec and Trend both serve expert reports demonstrating

13   that all scanning in their accused products occur on those

14   private networks -- networks that have those address ranges.

15   Networks that he said can never be within the telephone

16   network.

17             Well, on April 14th, one day before his

18   deposition, McDaniel was issued a supplemental report

19   alleging in conclusory fashion no explanation that his

20   statements were taken "out of context."

21             Well, I don't know how you take this out of

22   context.  Those are the addresses.  Those private networks

23   can never be within the telephone network.  There is nothing

24   taken out of context here.  It's very clear.

25             So what does he then do at his deposition?  IV

1    argues in their opposition brief at page 34 that Dr.

2    McDaniel criticized Dr. Rubin's demonstrative because it os

3    completely isolated from the public Internet.  That is what

4    IV's attorney's argument is.

5                Again, remember, in the supplemental report, no

6    explanation.

7                In the summary judgment opposition, well, what

8    he meant was it was completely isolated from the public

9    Internet.  That was the criticism.

10                But in his deposition, which occurred obviously

11    before the opposition:

12                "Question:  So it's your conclusion that, in

13    fact, a NAT interface to the public Internet was still

14    active?

15                "Answer:  I have no idea.

16                "Question:  So you had no idea whether it was

17    isolated from the public Internet?

18                "Answer:  I experiment.  Relevant parts of the

19    experiment were isolated from the Internet.

20                "Question:  But the virtual computers that were

21    used in that experiment, you don't know whether they were

22    isolated from the public Internet or not?

23                "Answer:  I have no idea."

24                The McDaniel transcript, 663, lines 10 through

25    665, line 14.  He has no idea whether they were isolated

1     from the public internet or not.  Very different than what

2     the attorney argument is today in order to overcome our

3     summary judgment motion.

4              Now, beyond Dr. McDaniel admitting those

5     addressable networks can never be and, therefore, Symantec

6     and Trend do not infringe because their networks are

7     addressable with the exact same range as Dr. McDaniel has

8     suggested can never be within the telephone network.  So on

9     that basis alone, summary judgment should be granted.

10             THE COURT:  Before you move on to the second

11    one, do your own experts opine that that is correct or is

12    it entirely based on your interpretation of Dr. McDaniel?

13             MR. CHAIKOVSKY:  As we showed, our experts do

14    opine.  On April 3rd and April 12th, they served reports

15    that all Symantec and Trend networks occur on private

16    networks -- on those private networks.  Those networks are

17    not within the telephone network.  They apply them before

18    the telephone network and this on top of it, because of the

19    addressable range, they have opined that it's not within the

20    telephone network.

21             THE COURT:  So they do expressly opine the same

22    conclusion that you say Dr. McDaniel opined as well?

23             MR. CHAIKOVSKY:  Yes, sir.

24             THE COURT:  You can move on to your other point.

25             MR. CHAIKOVSKY:  So on that basis alone, summary

1   judgment should be granted as clear and convincing evidence

2   than we do not infringe.

3           Now, in addition to that, as we note, the '610

4   patentees disclaimed all gateway node and their respective

5   networks as outside the telephone network in order to secure

6   issuance of the patent.  They overcame, again, the Ji

7   reference.

8           So we additionally have the Court's motion for

9   clarification, and summary judgment is appropriate for this

10  additional reason.  Just like I had two reasons last time,

11  I've got two reasons this time.

12          The Court recognized the disclaimer in its

13  claim construction order.  Your Honor, your language in your

14  order.

15          "The applicants distinguished their claimed

16  invention from the prior art by excluding gateway nodes" --

17  not just gateway notes of the called party or calling party,

18  which is how the construction currently reads, but gateway

19  nodes, all of them -- "from 'within the telephone network,'

20  by making clear that the virus detection scheme of the

21  claimed invention could be implemented 'without requiring

22  virus detecting gateway nodes'" -- that is from the

23  prosecution -- "that was required by the Ji reference."

24  That is from your Markman order.

25          And then recognizing the disclaimer the

1    applicants made in the '610 patent.

2         So what does that mean?  Well, here we have the

3    image of Ji which we also saw during the Markman.

4         So the applicants argued that node 30, these are

5    all the node 30 all surrounding inside these networks of Ji

6    and the gateway nodes.  So there is one gateway node, 32/33

7    in each of these three options.

8         The applicants argued that the nodes 30 and the

9    gateway node in these networks, the three networks, were

10   "mutually exclusive" to the telephone network.  Telephone

11   network being what is in green.

12        None of the networks, none of the gateway nodes

13   or the networks behind them is what the applicant argued was

14   disclaimed.  That my virus scanning is within the telephone

15   network.  Not in these networks.

16        I don't care whether one of these is a called

17   party or calling party or a third party.  I have disclaimed

18   that anything behind the gateway node and the respective

19   network behind it is not part of this invention.

20        And so this, we see Ji, one network, the calling

21   party, could be, for example, the called party could be the

22   other.  The third one, third party private network.  It

23   doesn't matter which one I associate it with.  This fact is

24   in overcoming Ji, they say gateway nodes, the networks

25   behind them.

1          Here, we have Dr. McDaniel's addressable ranges

2     are not part -- by claim construction alone are not part of

3     the invention, not part of the "within the telephone

4     network."  And on that basis additionally, if you clarify

5     the claim construction pursuant to the disclaimer, we don't

6     infringe.

7          So under either basis, whether the claim

8     construction is clarified or not, neither Symantec or Trend

9     infringe the '610 patent.

10          THE COURT:  Did you plan to come back to the

11     clarification motion or is this it?

12          MR. CHAIKOVSKY:  That's it, Your Honor.

13          THE COURT:  That's it.  So one of the issues

14     that is raised there is whether or not this invention would

15     actually work if I clarify the claim construction as you

16     request.  Do you have a response to that?

17          MR. CHAIKOVSKY:  Your Honor, given another

18     disclosure, I mean I'm not the expert here but given the

19     disclosure of the patent discloses the switching offices and

20     various offices and processors tied to those switching

21     offices, not disembodied as they would suggest but tied to

22     those switching offices -- you can have a computer at a

23     switching office.  That is not in a network or a gateway

24     node of a network behind it.

25          So, again, understanding you interpreted the

1   claims to be voice or data, but you can have, for example,

2   in a telephone network, you have a switching office, the

3   switching office itself.  America Tech was the assignee of

4   the patent, if you recall.  So they have a telephone network

5   and they have a switching office.  They have computers

6   attached to their switching offices that they own or they're

7   tandem offices that they owned, and they would then do the

8   virus detection on their own in their network.

9           Now, if you extrapolated that into data and go

10  with the data that you construed, again, data is part of it,

11  similarly, that would be like Comcast or Cox Communication

12  running on a cable network and the virus detection is

13  happening at their offices along the way and they add that

14  virus detection at those offices.

15          So, no, the invention actually would work.

16  Thank you.

17          THE COURT:  Thank you.  We'll hear from the

18  plaintiffs.

19          MR. LAHAD:  Your Honor, before I respond to the

20  issue on the motion for summary judgment of the '610, I want

21  to add a cited specification of the '050 patent that the

22  Court requested earlier with respect to the location element

23  of the processing system.  And that's at column 2, lines 30

24  to 44, and also Figure 2.  I think that's, of course, the

25  locational aspect of the processing system and the fact the

1    processing system is on the second tier.

2            With respect to '610 infringement, defendants

3    offer one argument and they say their accused products are

4    not within a telephone network as construed by the Court.

5            This argument uses underlying factual disputes

6    with respect to that element, factual disputes with respect

7    to the other claim limitations and is based on that one out

8    of context statement by IV's expert.  But, Your Honor, this

9    statement does not a summary judgment record make, especially

10   when there is a dispute as to the meaning of that statement.

11           Defendants argue that their products reside on

12   private networks.  They're not connected to the Internet.

13   So according to defendants, that this means their products

14   are not within telephone network as construed by the Court.

15           This figure taken from Dr. Spafford's report

16   shows that the mail towers, which Dr. Spafford alleges

17   perform the accused functionality, are connected to the

18   Internet.  And all of these elements are owned or operated

19   by Symantec in their data centers.

20           Dr. Tygar, in his report, ignores this figure

21   which shows Trend Micro's accused product, private networks

22   and all, sit within and connected to the Internet, the

23   public Internet.

24           Now, the first time that we see this opinion

25   by either expert is after Dr. McDaniel makes this out of

1    context statement.

2              To be clear, neither Dr. Spafford, nor Dr. Tygar,

3    adopted "private networks" position before Dr. McDaniel makes

4    this statement.

5              I think I was a little unclear before.  This

6    idea of private networks not being within the telephone

7    network as construed by the Court is not one of Dr. Spafford

8    or Dr. Tygar's original ideas.

9              THE COURT:  But it is ultimately on my record now?

10             MR. LAHAD:  Yes, it is.  Yes, sir.

11             In their replies, defendants continue to claim

12   that some components are somehow not connected to the

13   Internet.  They argue that, "Connections of private networks

14   to the internet, which then delivers the results of private

15   network screening, do not bring those networks 'within the

16   telephone network.'"

17             What they're essentially arguing is networks

18   that are connected to networks that are connected to the

19   Internet aren't connected to the Internet.  That doesn't

20   make any sense.  And that is inconsistent with two figures

21   that we saw before from Dr. Tygar and Dr. Spafford when the

22   accused products are connected to the Internet.

23             They attempt to draw similarity in the second

24   half of their statement by saying, just as the connection

25   of these networks -- excuse me -- of the networks of the

1    calling and called parties to the Internet do not bring

2    those networks within the telephone network.

3          But the Court's construction does not draw

4    the line at "connecting" or "connecting."  The Court's

5    construction properly draws the line at "networks," and

6    which network is affiliated with which party.  Is it

7    affiliated with the called party?  If so, then it is not

8    within the telephone network as construed by the Court.

9    But the called party is still connected to the Internet.

10          By contrast, defendants' private networks are

11    connected to the Internet but not affiliated to the called

12    or calling party, which means they're outside of the

13    telephone network.

14          These traits of the private networks and how

15    they correspond with the telephone network as construed by

16    the Court creates a fact issue for the jury to resolve.  And,

17          To be clear, Your Honor, that is not the only

18    fact issue with respect to the '610 patent.  The parties

19    also dispute whether the accused products perform this

20    limitation:  "routing a call between the calling and called

21    party ..."

22          The Court construed this to mean "transmitting a

23    voice or data transmission between a party initiating a

24    voice or data transmission and a party receiving a voice or

25    data transmission."

1            Dr. Spafford, Dr. Tygar say that the accused

2    products do not transmit this data.  Dr. McDaniel, of

3    course, disagrees because the figures I have just showed

4    indicate that the data is being transferred -- transmitted

5    between one party through the accused products to the other

6    party.

7            What defendants are asking the Court to do is

8    ignore all of this evidence, ignore all of these factual

9    disputes, and grant summary judgment based on a single

10   statement.  Both Symantec and Trend Micro hinge their

11   motions on that one statement by Dr. McDaniel which was

12   given in the context of criticizing a prior art

13   demonstrative by Dr. Rubin, defendants' expert.

14           Dr. McDaniel said that private networks used

15   in that prior art demonstrative could not be within the

16   telephone network as construed by the Court.

17           Both defendants argue that this statement

18   conclusively proves that they did not infringe as a matter

19   of law but, again, how can that statement be sufficient

20   summary judgment evidence when there is a dispute about the

21   meaning and the scope of that statement.

22           Defendants want to enforce that statement in

23   context and claim that it proves noninfringement as a matter

24   of lawful.  Again, they are more than welcome to cross-examine

25   Dr. McDaniel on this statement regarding this prior art

1   demonstrative prepared by defendants' expert in support

2   of their expert's invalidity position and the rest of his

3   opinions, Dr. McDaniel's opinion at trial.  But this statement

4   is not the conclusive evidence of noninfringement that

5   defendants think it is.

6           I want to touch on the motion for clarification.

7   The standard applicable to the motion for clarification.  I

8   think there are two standards applicable to a motion for

9   clarification actually, Your Honor.

10          The first standard is the standard under a

11  motion for reconsideration.  That is what this argument is.

12  That is what their motion for clarification is.  And motions

13  for reargument made under Local Rule 7.1.5 like this one are

14  only granted if there has been an intervening change in the

15  law, there has been new evidence, there is a need to correct

16  a clear error of law and fact to present injustice.

17          In this case, no change of law, no evidence, no

18  clear error of law or fact.  Defendants simply don't like

19  the Court's construction.

20          All of these arguments that we're making -- that

21  the defendants are making that we're responding to in the

22  motion for clarification were teed up, if you will, before

23  the Court over a year ago.  But if the Court gets to the

24  merits of the actual construction, the Court will have to

25  apply a different standard:  whether or not defendants have

1    shown clear and unmistakable disavowal of claim scope.  And

2    they simply have not.

3              The prosecution history is inconsistent with

4    defendants' new construction, as is the specification.  The

5    patentee, during prosecution, disclaimed the gateway nodes

6    of Ji.  Our patent discusses virus screening without using

7    gateway nodes.

8              Defendants thinks this statement disclaims all

9    gateway nodes, but it was clear from the prosecution history

10   and the specification that the patentees only disclaimed

11   gateway nodes of the calling or called parties.

12             The Court asked a question of whether or not

13   this invention would work if the Court adopts defendants'

14   new proposed constructions.  This invention would not work

15   if the Court adopted the defendants' proposed construction.

16   That's why defendants' proposed construction doesn't make

17   any sense.

18             Defendants' proposed construction excludes all

19   gateway nodes, including any node that may or may not be on

20   the third party, such as the telephone network.  The

21   prosecution history and the specification make clear that

22   nodes, offices, switching offices, tandem offices, processors

23   all reside within the telephone network.

24             Under defendants' construction, those nodes

25   cannot be within the telephone network and there is nothing

1    left to do the virus screening.

2              Thank you very much, Your Honor.

3              THE COURT:  Thank you.  Any rebuttal?

4              MR. CHAIKOVSKY:  Very briefly, Your Honor.  One

5    in response.

6              Their expert stated or their expert said whether

7    he did it to overcome prior art or not.  Our systems are not

8    within that telephone network.  None of the demonstratives

9    that were just shown change the fact our systems are not in

10   that telephone network.

11             If you go to slide 49.

12             Also on the Ji issue, whether there is a

13   disclaimer or not.  The applicant argued that gateway nodes

14   and their respective networks are not included, and it must

15   be within the telephone network what is in green.

16             That is not where Trend or Symantec's servers

17   are located within that telephone network.  That is what the

18   applicant argued.

19             Besides the applicant arguing that, and getting

20   mischaracterized here by IV, we then have in slide 190, IV's

21   acknowledgment during their briefing as opposed to what we

22   hear standing here today.

23             IV said "the patentees sought to distinguish Ji

24   arguing that the gateway nodes in Ji were mutually exclusive

25   from the telephone network."

1          "... the applicants distinguished the claimed

2     invention from the prior art by excluding any gateway nodes

3     from within the telephone network.

4          That is in their opening claim construction

5     brief at page 31.

6          And then next slide, 191.

7          We heard some argument.  They argue that the

8     applicants would never have disclaimed all processors, i.e.,

9     all gateway nodes.

10         Well, all processors -- we had this discussion

11    a little bit.  All processors are not all gateway nodes.  A

12    gateway node may have a processor but a processor does not

13    make a gateway node.

14         We see McDaniel's transcript?

15         The remote processor referred to there in the

16    patent, is that a gateway node in your opinion?

17         No.

18         In your opinion, as you have applied the Court's

19    claim construction that contains a gateway node, are either

20    of those processors in Figure 2 (elements 80 and 90) gateway

21    nodes?

22         No, I don't think so.

23         So that is their own expert saying the

24    processors in the patent are not gateway nodes.

25         Go to the next slide.

1            So the next slide, IV again argues here their

2    data can be screened at the gateway nodes of a telephone

3    network if that gateway node is, for example, a tandem

4    office.  That is attorney argument.

5            What does their expert say?

6            Is an end office a gateway node?

7            No.

8            Central office?

9            No.

10            Tandem office?

11            No.

12            How about a switching office?

13            No, office is not a gateway node.

14    That is their expert.

15            So with that, Your Honor, whether you find a

16    disclaimer based on Ji or not, we don't infringe based on --

17    and I guess there is one other thing.

18            He mentioned routing, which I found kind of

19    interesting.  We're not trying to prove invalidity,

20    noninfringement.  As long as we show we're not within the

21    telephone network, summary judgment should be granted.  And

22    for the reasons we stated, whether it's because we're in a

23    private network and/or the disclaimer properly applied to

24    construe, summary judgment should be granted on behalf of

25    defendants.

1             THE COURT:  Okay.

2             MR. CHAIKOVSKY:  Thank you.

3             THE COURT:  Do defendants want to talk more

4    about summary judgment?

5             MR. FLAGEL:  Your Honor, in the interest of

6    time, based on my calculations we have 45 minutes left and

7    we want to be respectful of the Court's calendar.  I think

8    IV has about 51 minutes left.

9             What we would like to do is go to our Daubert

10   of Wagner because it also is dispositive on the damages

11   perspective.  You may recall we made a common motion for

12   summary judgment of no damages which is predicated on the

13   Wagner Daubert, and we would like to turn to that.

14            All of the other summary judgment issues we

15   would submit to the Court on the papers, including the slide

16   presentation.

17            THE COURT:  What is the plaintiffs' preference?

18            MS. TAYLOR:  Your Honor, we have some brief

19   remarks on some of the summary judgment motion.  We will

20   submit on '142 and '155, noninfringement.  But on the

21   Daubert motions, respectfully, we think our motions are case

22   dispositive with respect to their expert and so we would

23   like the chance at one point in the hearing to go first on

24   the Daubert issues.

25            THE COURT:  That's fine.  On the summary

 1   judgment, do you want to address some that they are not

 2   affirmatively addressing today?

 3              MS. TAYLOR:  I do.  Yes, I do just briefly want

 4   to address one issue.

 5              THE COURT:  Let's do that.  Then defendants want

 6   to use any of their time to rebut what they have heard on

 7   summary judgment, that's fine.  Then we've move on to

 8   Dauberts, and we'll talk about how to do that after we hear

 9   what you have to say.

10              MS. TAYLOR:  Thank you, Your Honor.  Briefly

11   on Symantec's summary judgment motion of no willfulness.

12              Symantec points to this Court's *Tarkus* case and

13   the *Bard* decision and argues that because it had some claim

14   construction positions that it thought were persuasive and

15   because it has what it thinks are reasonable defenses and

16   because there is a reexam pending that there should be an

17   objective determination at this stage of no willfulness.

18              To be sure, *Bard* holds that the objective prong

19   of *Seagate* will be decided by the Court as a matter of law,

20   but it does not hold that it should be decided now.  In

21   fact, *Bard* is very clear that in considering the objective

22   prong of *Seagate* the Judge made, when the defense is a

23   question of fact or a mixed question of fact and law, allow

24   the jury to determine the underlying facts relevant to the

25   defense in the first instance.  For example, the questions

1   of anticipation or obviousness.  And that is at page 1008 of

2   *Bard*.

3            In fact, the Federal Circuit in *Bard* remanded

4   for the trial court to make a legal determination based on

5   its review of the trial record.  *Bard* expressly contemplates

6   the trial court hearing the evidence at trial before making

7   the legal determination about the reasonableness of its

8   defense.

9            Here, Symantec claims it should be granted

10  summary judgment of no willfulness because it has claim

11  construction arguments that didn't prevail.

12           I'm going to focus on the '050 just briefly.

13           The Court respectfully can't determine that

14  Symantec has reasonable defenses based on its claim

15  constructions positions.  Those positions didn't prevail at

16  Markman.  There is no noninfringement of the '050 motion

17  pending before this court.

18           Instead, we heard this morning Symantec's

19  anticipation and obviousness motion with respect to the

20  Townshend reference, but that motion is replete, as the

21  Court has heard and as reflected in the papers, with factual

22  issues that must be resolved by the jury.

23           So per *Bard* and per another court that followed

24  that, the *Fujitsu v Belkin* court in California -- and I

25  would like to give you the cite of that decision -- the

1    appropriate thing to do is to remand or is to decide this

2    issue after a full trial on the record.

3            Let me give you the cite of the *Fujitsu v Belkin*

4    decision.  It's 2012 Westlaw 4497966.

5            And Judge Koh in that decision in a very similar

6    situation rejected the same argument Symantec is making here

7    and said defendants' anticipation and obviousness arguments

8    at this point turn on questions of fact for a jury to decide.

9    And in light of the *Bard* peripheral, the Court determines

10   it would be more appropriate to decide the legal issue of

11   willfulness with the benefit of the jury's factual finding

12   on anticipation and obviousness.

13           And we are in the same position here.

14           Let me just touch on the reexam briefly.  As the

15   Court is familiar and as the Federal Circuit said in *Hoechst*

16   *Celanese*, the grant of a reexam request is surely evidence

17   that the criterion for a reexamination has been met, but it

18   does not establish a likelihood of patent invalidity.  And I

19   suggest the reexam really is worth no weight.

20           Finally, turning to the subjective prong.  There

21   are multiple factual questions presented.  We know in this

22   case that there were discussions between the patentee and

23   Symantec.  We know that there was some review done of the

24   '050 patent at Symantec.  That is Exhibit 24 to our

25   opposition.  We don't know any more than that, Your Honor,

1    because Symantec is claiming privilege.

2              What we know is that following that, then

3    Symantec cited the '050 patent in no less than eight

4    prosecutions before the date of this lawsuit was filed;

5    and those facts, Your Honor, present a factual question that

6    should be left until after the trial to resolve.

7              THE COURT:  On the objective prong, I have the

8    discretion to do as the *Fujitsu* court did.

9              MS. TAYLOR:  Yes, Your Honor.

10             THE COURT:  Do I have to do that?

11             MS. TAYLOR:  I think here you must do that

12   because there are factual questions and in order to resolve

13   them, you have to see the evidence at trial.  There is a

14   mixed -- if you don't resolve their motion on summary

15   judgment, the best way that you can decide, determine

16   whether their motion is reasonable is to hear those facts,

17   that factual evidence at trial.

18             THE COURT:  Well, there may be -- let's just say

19   we may say there is a fact question as to whether the '050

20   is anticipated, but that is a different thing than to say

21   there is a fact question over whether the argument we heard

22   this morning is even reasonable.

23             MS. TAYLOR:  That's correct, Your Honor.  You

24   yourself in the *Tarkus* decision entered a summary judgment

25   opinion finding that a noninfringement argument that Adobe

```
 1    made was reasonable even though you didn't grant that
 2    summary judgment motion.  And there were arguments there
 3    about the constructions that you felt were reasonable.
 4              Here, we have an intense factual dispute about
 5    the evidence.  So you certainly have the discretion to do it
 6    if you find that there are no factual issues.
 7              THE COURT:  Okay.  Is there anything else you
 8    want to say on summary judgment?
 9              MS. TAYLOR:  Not on Symantec's motion for
10    summary judgment.  No, Your Honor.
11              THE COURT:  Okay.  I guess we'll stay on that
12    one.  Did Symantec want to respond?
13              MR. DUNLAVEY:  Yes, Your Honor.  I have some
14    slides.
15              THE COURT:  They're probably in the book; right?
16              MR. DUNLAVEY:  Yes.
17              THE COURT:  I don't mind looking in the book.
18              MR. DUNLAVEY:  Okay.  It's slide 70, Your Honor.
19              THE COURT:  I got it.
20              MR. DUNLAVEY:  And just to remind you because
21    there have been a lot of lawyers, I'm Dean Dunlavey on
22    behalf of Symantec in this instance.
23              THE COURT:  Thank you.
24              MR. DUNLAVEY:  So the burden here is a different
25    burden than we've been talking about for much of the morning
```

1    and then the carryover this afternoon.  And that is it's

2    Intellectual Ventures burden, and it has a burden of

3    presenting clear and convincing evidence of two things:

4    the objective prong of unreasonableness and the subjective

5    prong.  And I'm just going to focus on the objective prong

6    here.

7            The Court has, in the past, said that it could

8    reach a decision without waiting to hear the evidence at

9    trial.  In this case, the Court this morning agreed at least

10   with Mr. Flagel to the extent of saying I agree you have a

11   strong invalidity argument concerning the '050 patent.

12           That is enough at this juncture for the Court to

13   say Symantec is entitled to summary judgment of no willful

14   infringement because IV cannot meet the objective prong.

15           And something that was not touched on by Ms.

16   Taylor but I want to focus on is the Patent and Trademark

17   Office has done a reexam in this case.  It is not just, it

18   just granted a reexam, it has rejected every asserted claim

19   of the '050 patent.  That's the current status of that

20   examination.

21           Now, we cited in our opening brief the *Tesco*

22   case from the Southern District of Texas (2012), which held

23   that the results of a reexamination finding invalidity

24   suffices to establish that plaintiff cannot meet the

25   willfulness requirements.

1            The response came back.  In footnote 9 in page

2    37 of their opposition brief, they totally mischaracterized

3    or misread that case.  And I would like to now just present

4    the fact that in the *Tesco* case, the District Court found

5    it dispositive that the PTO in the reexam had granted an

6    initial rejection and said that, "The reexamination proceedings

7    are sufficient evidence that the objective prong is not met

8    so as to make summary judgment appropriate on all the claims

9    that were rejected in reexamination."  Saying as a matter of

10    law, the plaintiff can't show, by clear and convincing

11    evidence, that there is an objectively high likelihood of

12    infringement of a valid patent.

13            The Court went even further and said, it doesn't

14    matter if later on the reexamination decides to affirm the

15    claims and allows them to reissue because, "Even if the

16    claims are eventually restored, the fact that the examiners

17    rejected the claims demonstrate that a major issue exists as

18    to whether they are valid."

19            Next slide, please.

20            Intellectual Ventures pins its hopes on this

21    2003 e-mail which identified the '050 patent.  And I think

22    it's very important to recognize that this was sent in 2003,

23    five years before the release of the Symantec product that

24    is accused of infringing the '050 patent.

25            And Ms. Taylor said, well, you don't have any

1    evidence as to what was done by Symantec in 2003.

2         Well, logically, since they're only accusing

3    a product that was introduced in 2008 and thereafter of

4    infringement, what do you think would have happened if

5    someone had actually looked at this in 2003?  Certainly, IV

6    hasn't argued that any kind of examination at that time

7    would have disclosed any concerns about infringement at all.

8         The rest of this is briefed in our papers.  We

9    have limited time.  Let me just take a quick trip through

10   here.

11        THE COURT:  Let's just touch briefly on I hear

12   what you are saying about the '050.  How does that extend to

13   the other patents you are willfully accused of infringing?

14        MR. DUNLAVEY:  Yes, Your Honor.  There are

15   only two other patents that were alleged to have willfully

16   infringed:  the '610 and the '142.  And you have heard

17   arguments this morning and this afternoon on both of them.

18        With regard to the '142 patent, that is the one

19   from Park City Group, you have heard from Mr. Chaikovsky.

20   Clearly, the defense has been there are all kinds of factual

21   issues.  There are all kinds of factual issues so you should

22   not find by clear and convincing evidence that this patent

23   is invalid.

24        When that is the defense of the defendant, summary

25   judgment should not be granted quite yet or shouldn't be

1    granted because there are some pending factual issues, I

2    submit to you that you will never be able, as a plaintiff, to

3    overcome, to satisfy the objective prong.

4            And the same thing with regard to the '610

5    patent.  You have heard argument that that is not infringed.

6    Why?  Because Intellectual Ventures's own expert witness

7    has conceded that the networks accused of infringement are

8    not within the telephone network as specified by the Court

9    and their patent.

10           So we have a number of invalidity and

11   noninfringement arguments, but just the ones that you have

12   heard today, Your Honor, establish sufficient grounds to be

13   challenging the validity of the patents and the infringement

14   of the patents by the defendants, by Symantec.  Accordingly,

15   summary judgment of no willful infringement should be issued.

16           THE COURT:  You are not the moving party, but is

17   there anything else you want to say on this motion?

18           MS. TAYLOR:  I think we should move on to the

19   other motions with the remaining time we have.

20           THE COURT:  Was there anything else you wanted

21   to touch on, plaintiffs, on summary judgment?

22           MS. TAYLOR:  No.

23           THE COURT:  No.  Okay.  Well, then we'll move

24   on to Daubert motions.  Plaintiffs, do you want to pick one

25   to go first or do you want to see what defendants want to

1    argue?

2              MR. FOLSE:  Thank you, Your Honor.  Parker Folse

3    for the plaintiffs.

4              The motion that I want to discuss is the motion

5    to strike certain of the opinions proffered by Professor

6    Spafford.

7              THE COURT:  Okay.

8              MR. FOLSE:  I don't know if it's Spaf-ford or

9    Spa-fford (phonetic).

10             MR. FLAGEL:  Spaf-ford (phonetic).

11             MR. FOLSE:  Spaf-ford.

12             THE COURT:  It's probably not dispositive.

13             MR. FOLSE:  I hope not.

14             In this motion, we're actually asking the

15   Court to strike two sets of opinions offered by Professor

16   Spafford.  The first consists of his opinion that Symantec's

17   accused products don't infringe the claims of the '050

18   patent because Symantec's servers do not output to the

19   clients any indication of the characteristic of the message.

20   That is his position.

21             He reaches that conclusion by interpreting the

22   claim terms in a way that conflicts with the Court's Markman

23   order.  There is no disagreement about what the accused

24   products do, the way they work for those purposes.  There

25   is no disagreement that an expert witness legally is not

1    permitted at trial to reargue claim construction or to take

2    positions that are inconsistent with the Court's construction.

3        We cited two cases from this court for that

4    proposition on page 10 of our opening brief.  The *Power*

5    *Integrations* case and the *LP Matthews* case.  And there is

6    no disagreement about that in the defendants brief.

7        What the parties do seem to dispute is what

8    Professor Spafford is opining and what the Court decided

9    in the Markman order.  Despite Symantec's efforts to muddy

10   the waters, Professor Spafford's statements are quite clear.

11   The relevant parts of his report are in Exhibit 2 to his

12   opening brief, and I want to read a few of them.

13       The first one which we have on the slide is

14   paragraph 246 of his report where he sets out his view of

15   the Court's Markman order, and he states:

16       "Thus, it is clear that the 'indication'

17   provided by the server, which is claimed by the '050 patent,

18   is a determinative indication such as the 'presence or

19   absence' of a characteristic or, 'whether or not' the

20   message contains the characteristic."

21       And then he repeats the statement in slightly

22   different form in paragraph 249, which we have on this next

23   slide.  And he said:

24       "In each of the court's definitions, the

25   descriptor is clearly determinative:  whether the message is

1    spam, virus, junk, e-mail, copyrighted, classified, or the

2    presence or absence of a characteristic.  It is an either/or

3    determination, and does not include the 'likelihood' of a

4    file having a characteristic."

5            Based on that interpretation of the Court's

6    order, he then opines that Symantec's products don't

7    infringe.  He says the Symantec servers send the client

8    software a variety of data in response to client queries,

9    including a reputation score that is an indicator of the

10   likelihood of a file having a given characteristic.

11           And I will quote from paragraph 247 of his

12   report:

13           "The data sent by the server is not determinative

14   and must be interpreted by the client system, based on local

15   settings, to make the ultimate determination of whether a

16   file may contain a virus or not."

17           And it is clear in his repeated use of the word

18   "determinative" in these passages that I'm reading is what

19   he is talking about is a flat true/false, either/or.  It is

20   this or it is not that.

21           In his deposition, he again confirmed his view

22   that the indication provided by the server cannot infringe

23   if those are indicators of likelihood or probability.  That

24   is his testimony.  And it's clear from what we see in his

25   report.

1        So necessarily he intends to take the position

2   at trial that under the Court's Markman order, what the

3   server must supply is a determinative either or yes-or-no

4   answer, and he opines that because the Symantec products,

5   the final answer is determined by the client based on how

6   the client chooses to set what kind of reputation score it

7   will deem acceptable or unacceptable, then -- and which is

8   basically in some way determining how much risk the user

9   is willing to accept -- then the Symantec system doesn't

10  infringe.

11       We believe this is plainly in conflict with

12  the Court's claim construction.  To avoid that conclusion,

13  Symantec attempts to rewrite both what happened at the

14  hearing and what the Court decided.

15       Their view and Professor Spafford's view is that

16  regardless of what happens in the server's analysis of the

17  data that it has, that this Court required that the

18  indications sent to the client must be a true/false result.

19  An either/or, it is or it isn't, final determination.

20       Their view is that the Court merely rejected

21  any requirement that the process algorithms within the

22  server leading to that indication be a true/false test.

23       The entire thrust of their Markman argument was

24  that indications must be true/false answers.  That is the

25  position they took before the Court.

1          If the indication must be the result of a

2     true/false test, then the answer must be true or false.

3          Mr. Winters clarified this at the hearing where

4     he says he may have left a misimpression that he wanted to

5     clear up.  "The central point of this patent, the claims in

6     our construction is that it's the output of the test that

7     is the true/false.  So it's the output, the end of this

8     method is true or false.  You can test for any number of

9     characteristics.  Right?  Have I seen this with X number of

10    frequency?  Is this present?  But it is the output of the

11    analysis that represents the true/false test.  Apparently, I

12    may have left a misimpression.  And if so, I want to correct

13    that here."

14          So just to pause right there.  This is the

15    position that Professor Spafford is taking as to what the

16    Court intended to do by its claim construction.  And based

17    upon that, he says that the Symantec system doesn't infringe

18    because what it provides is a measure of likelihood or

19    probability of -- one of their fact witness calls it a

20    hygiene score.  They also refer to it as a reputation score.

21    And it is determinative depending on how the client chooses

22    to set, what score it will deem to be the cutoff.

23          The Court gave me a chance to get up after

24    Mr. Winters spoke, which I did, because he was attempting

25    to clarify something that perhaps I had misunderstood.

1            I said:  "... even with that clarification that

2    Mr. Winters made, there is still an attempt to introduce an

3    element of certainty or not into the patent which is just

4    not present either in the specification or in the claim

5    language itself.  There is a determination being made but it

6    can be a probabilistic determination, not a black-or-white

7    one.  Thank you."

8            Our view was that Symantec was trying to engraft

9    a new limitation into the terms of the patent that you

10   can't find in the language and is not supported by the

11   intrinsic evidence.  We believe the Court agreed with that

12   view.

13           Our position was that the indications supplied by

14   the server could consist of a likelihood or a probability; and

15   we believe the Court agreed with that view.

16           Symantec made clear what it was seeking; and the

17   Court rejected it.

18           Now they're playing semantic games trying to

19   argue that although the Court argued their argument, the

20   same one Professor Spafford is trying to use in his

21   noninfringement position, that the indication still has to

22   be the result of a true/false test.  It still requires, as

23   he puts it, a deterministic result, a true/false result.  It

24   is this, it is not this.  And that is at odds with the

25   Court's order.

1          Let's take a look at this slide.  Let's go back
2    one.
3          I'm sorry.  Let's go to the next one.  You are
4    right.
5          What is "the result of a true/false test"?  That
6    was their proposed construction.
7          Where you see the word "indication," they say
8    it is the result -- it must be the result of the true/false
9    test.
10         Well, the result of the true/false test is true
11   or false.  They can't come back and say that somehow is not
12   clear to the Court or clear to us.  It was clearly stated
13   by Mr. Winters.  It appeared in the plain words of their
14   proposed construction.  It was plainly rejected by the
15   Court.
16         And yet we have Professor Spafford coming in
17   saying that, "The 'indication' provided by the server -- in
18   this patent -- is a determinative indication such as 'the
19   presence or absence' of a characteristic or 'whether or not'
20   the message contains the characteristic ... It is an
21   'either-or' determination and does not include a likelihood
22   ..."
23         We believe it is quite clear that if Professor
24   Spafford were able to testify at trial to these opinions
25   that he would be putting himself in direct conflict with the

1    Court's claim construction and risking jury confusion.   On

2    that ground, these opinions should be stricken.

3              The second aspect of his opinions as to which

4    we object are his conclusory statements that 20 patents

5    licensed by Symantec are "technically relevant" to the '050

6    patent -- I managed to wake up with a cold this morning,

7    Your Honor -- and that six patents are technically relevant

8    to the '142 patent, and that six other patents are technically

9    relevant to the '155 patent.

10             He provides these opinions so that Symantec's

11   damages expert, Mr. Bakewell, will have some basis for

12   relying on those license agreements for purposes of his

13   damages analysis.

14             Nowhere in his report does Professor Spafford

15   define what he means by technically relevant.   In his

16   deposition, he said it meant that the patent relate in

17   some way to the nature of the patents in suit, which is

18   completely unhelpful.

19             In Mr. Bakewell's deposition, we quote both of

20   these at page 16 of our brief, he gave a different

21   definition of what he understood Professor Spafford to mean

22   by "technically relevant" which is whether the patents

23   licensed by Symantec related in some undefined way to the

24   accused products rather than to the patents in suit.   So

25   even their two experts don't seem to agree on what Professor

1    Spafford meant by the term "technically relevant."

2              But putting to one side that lack of clarity,

3    Professor Spafford gave no explanation in this report about

4    why the patents were "technically relevant."  He simply gave

5    broad one sentence summaries which you might charitably

6    call a field of invention to which batches of these patents

7    he said were technically relevant, might follow or could be

8    characterized.  That's it.  It was one page out of his

9    expert report dealing with approximately 30 patents that

10   Symantec licensed that he said were technically relevant.

11             Based on that, and that alone, you have

12   Mr. Bakewell saying I can now look at all these licenses

13   that Symantec took to all these patents and they become

14   relevant to the damages analysis.

15             It is not the responsibility of an opposing

16   party to pull out of an expert the explanation for his

17   opinion as if pulling teeth.  It is the responsibility of

18   the expert under the law that the Court must follow in its

19   gatekeeper role to provide intelligible, reliable grounds

20   for his opinion.

21             In this context in particular, the Federal

22   Circuit made clear in *ResQNet* and *Lucent v Gateway* that an

23   expert may not rely on other licenses to patents that are

24   not in suit to determine a reasonable royalty without some

25   particularized analysis.  And that analysis should include

1    discussion of the similarity between the technology covered

2    by the previous license agreements and the technology

3    covered by the patents in suit.  There must be a showing of

4    comparability at some level in order for the terms of the

5    license of other patents to be meaningful in determining

6    reasonable royalty, to have some reliable foundation.

7           And I'm sure there are plenty of situations

8    where it's hard to draw the line:  How far is enough?  How

9    much comparability is enough?  But in this case, we're

10   nowhere close to such a lumping because Professor Spafford

11   provides no explanation at all.  He picks these patents,

12   he slaps a label on them which could be called field of

13   invention or field of technology and said I find them to be

14   technically relevant and that's it.

15          THE COURT:  Well, you don't question his

16   qualifications.

17          MR. FOLSE:  No.

18          THE COURT:  Why isn't that at least enough and

19   then everything else is fair game for cross-examination?

20          MR. FOLSE:  Because we don't know what to

21   cross-examine him about.  I don't think it is appropriate.

22   Even if you just look at the description of what an expert

23   report should include, Federal Rule 26 requires the expert

24   not to simply just list his opinions.  He could just say in

25   my opinion, the '050 patent is invalid, period.  On to the

1    next subject.

2            Would that be a satisfactory expert report?  Would

3    that be satisfactory expert disclosure and description of the

4    grounds for his opinion in a manner that would withstand an

5    analysis under Daubert?  I don't think it would be.

6            Yet that is all he has done here.  He has

7    provided this what looks to him to be a throwaway opinion at

8    the tail end of his report and yet it becomes the foundation

9    for another expert's use.  That other expert, Mr. Bakewell,

10   has no technical expertise that would allow him to make a

11   determination that these other licenses are comparable.  He

12   is relying entirely on a thoroughly unexplained opinion by

13   Professor Spafford that they're irrelevant.  It doesn't say

14   how they're irrelevant or why they're irrelevant.

15           THE COURT:  There is a suggestion you all have

16   done something similar.  That your expert has found other

17   licenses, I guess, and not explained why they're related to

18   with any greater degree.

19           MR. FOLSE:  They have said that.  In an effort

20   to say he went far beyond what Professor Spafford did, we

21   put together a table which laid out the analysis he went to

22   which was much more descriptive, has much more substance to

23   it than what Professor Spafford was arguing.  I really do

24   not think that they are comparable in the way they approach

25   their analysis of other patents.

1            THE COURT:  Is there anything else?

2            MR. FOLSE:  That's it.

3            THE COURT:  All right.  We'll hear a response.

4            MR. FLAGEL:  Thank you, Your Honor.  Could I

5    have slide 6?

6            Could I have this turned on?

7            (Elmo settings adjusted.)

8            MR. FLAGEL:  Your Honor, while I disagree

9    with virtually everything that Mr. Folse said about the

10   "indication of characteristic" point with respect to

11   Dr. Spafford, one thing I will say, I think we saw not one,

12   not two, but three exclamation points on invalidity in light

13   of Townshend.  I'll explain why and I'll make it relevant

14   very quickly.

15           Dr. Spafford applied your construction.  We know

16   we had claim construction and we know what the Court decided.

17   Here it is on slide 146.

18           What is an indication of a characteristic?  It's

19   a descriptor of the content.

20           What does it mean to identify the existence or

21   absence?  It means to identify whether or not the message is

22   of a certain type or classification.

23           What does indicating the presence or absence of

24   a characteristic mean?  It means indicating the presence or

25   absence of a characteristic.

```
 1              What Dr. Spafford had stated is IV points to a
 2   reputation score from minus 127 to plus 127.  It gets
 3   construed by the client as one factor in a lot of factors to
 4   determine whether or not an e-mail is malicious or not.  It
 5   doesn't itself tell anything other than, for example, the
 6   score of 25 that we talked about being higher than the score
 7   of 1 or higher than the score of minus 25.  It's one
 8   ingredient.
 9              All Dr. Spafford is saying is in light of this
10   construction, what they have pointed to as their infringing
11   detailing your system, that doesn't cut it.  It's not about
12   claim construction, it's about pure application of the
13   actual construction that the Court reached.
14              Could I have the next slide, please.
15              Again, just to repeat.  It's 100 percent
16   consistent but it also demonstrates.  This argument,
17   contrast it with the count because I want to go back to it.
18   This absolutely demonstrates that the count alone in Figure
19   3, before even getting to Figure 4, which we already have
20   shown is anticipating, Figure 3 itself, because the Townshend
21   count is determinative.
22              The Townshend count of 25, with a predetermined
23   threshold of 10, tells everyone in the system this is false.
24   The Townshend count of 1 tells everyone in the system this
25   isn't bulk.  It indicates the presence or absence of a
```

1    characteristic, just like the '050 says itself in claim 8,

2    in claim 14 and in column 6.

3            But the Symantec score isn't.  It's just one

4    factor.  It's a number that is a factor.

5            Then the final argument I will make, because I

6    want to preserve time for Wagner, is that certainly if we

7    lose anticipation and if IV is permitted to argue that the

8    count isn't an indication of the characteristic, that the

9    Townshend number doesn't indicate anything, then certainly

10   Dr. Spafford should be permitted and not precluded from

11   arguing that the score, which tells you even less than the

12   count, qualifies.

13           THE COURT:  All right.  How do you square what

14   Dr. Spafford has opined with the explanation we gave in our

15   opinion not just what the claim construction order says and

16   what the constructions were but our description as to how we

17   reached the conclusion?

18           MR. FLAGEL:  I do not think they're in conflict,

19   Your Honor.  I really don't.  I think that he acknowledges

20   that we made an argument and that argument was defeated, and

21   he looks at -- can I go back one slide, please?

22           His opinion is specifically based on what the

23   Court said.  And he is opining that, okay, I have to decide:

24   Is the number 25 that is retrieved in the Symantec system or

25   the number 1, is that a descriptor of the content?  Does it

1    indicate the presence or the absence of a characteristic?

2    And in light of this Court's construction, his answer is

3    no, because it doesn't tell you anything, the way the

4    Symantec system works.

5                THE COURT:  We wrote, at page 11 of the opinion,

6    the claim construction opinion:  "The parties dispute whether

7    these limitations must be the result of the true/false test

8    or whether they may instead be the result of something else,

9    such as probability, likelihood, or related scores."  We

10   said that, right?

11               MR. FLAGEL:  (Nodding head.)

12               THE COURT:  Yes?  I'm sorry.  For the record,

13   yes or no.

14               MR. FLAGEL:  Sure.  I have no reason to doubt

15   you're correctly reading, Your Honor.

16               THE COURT:  So did we answer that question in

17   the opinion?

18               MR. FLAGEL:  Yes, with a caveat.  Sure.

19   Whatever it is, if it's a number, if it's an indication of a

20   likelihood of probabilistic characteristic, then also -- and

21   it's a number and it satisfies these claim constructions,

22   then it qualifies.  I agree with that.  Absolutely.  That is

23   why a count from Townshend is 100 percent anticipatory.

24               But there is still an argument that the score in

25   Symantec's system is not, because what does that tell you?

1    All that tells us is that 25 has a higher reputation than 1.

2    What characteristic does it tell you is more likely than

3    not?

4                    What Dr. Spafford is saying is that what happens

5    in the Symantec system is that you look at the score, you do

6    a bunch of heuristic tests, you look at other knowledge that

7    you have, and you make a collective determination of whether

8    this file should be treated as malicious or not.

9                    All the Symantec scores in that context is one

10   input.  That is the sum and substance to the testimony.

11                   THE COURT:  If Dr. Spafford wants to opine that

12   when the result is the result of a probability or likelihood

13   or related score, that that is not within the scope of the

14   patent, you would agree I should not let him give that

15   opinion?

16                   MR. FLAGEL:  In a vacuum, sure.  In a vacuum, I

17   would agree with that, Your Honor.  In a specific instance,

18   I think that the experts, if this goes to trial, would

19   have to be allowed to look at a particular thing that is

20   being argued to be a probability, likelihood or score that

21   satisfies this Court's claim construction and say here is

22   why it does or here is why it doesn't.  But as you articulated

23   your question, I agree, Your Honor.

24                   THE COURT:  So he is going to agree, he is going

25   to understand he has to agree that probabilities and

1    likelihoods are within the scope of the patent.  He just

2    wants to opine that that is not what you are doing.

3               MR. FLAGEL:  Right.  Probabilities and

4    likelihoods that satisfy these claim constructions certainly

5    can qualify.  The count of Townshend absolutely does.  The

6    score of Symantec system does not because it simply is, as I

7    said, one among many factors.

8               THE COURT:  Did you want to touch on the other

9    opinions that they're seeking to exclude?

10              MR. FLAGEL:  Only to say just one comment, only

11   to say that lots of words doesn't mean lots of substance.

12              THE COURT:  You do have an argument that these

13   very few words are any substance at all?

14              MR. FLAGEL:  I think on their face they are.

15              THE COURT:  On their face.

16              MR. FLAGEL:  Yes.

17              THE COURT:  All right.  Thank you.  Any reply?

18              MR. FOLSE:  Very quickly, Your Honor.

19              Both the Townshend count and the reputation

20   score in the Symantec system are numbers.  That is pretty

21   much where the similarity ends.  The count is simply what

22   that says it is.  It's a determination of the number of

23   e-mails, identical e-mails received.  It tells you whether

24   the e-mails were sent in bulk or not and that is it.

25              I'm not going to rehearse the rest of the

1    argument about why this patent goes far beyond it.  But the

2    reputation score, which counsel has attempted to minimize

3    the significance of, is the result of a number of different

4    inputs of data within Symantec's server system that is

5    configured through an algorithm to provide an indicator of

6    the extent of maliciousness based on a number of different

7    markers.  And in Mr. Lahad's argument, he put up the

8    testimony from Mr. Egan at Symantec which said that.  It is

9    an indication of the maliciousness of the file.  That is

10   what the score tells you.

11           All the client can do, if it chooses, is to

12   change the cutoff point between something that is malicious

13   and is going to be deemed not malicious.  But that

14   reputation score, that hygiene score is precisely an

15   indication of the likelihood that the file is malicious.

16           Thank you.

17           THE COURT:  All right.  Plaintiffs, why don't

18   you tell us what you want to argue next.

19           MR. HESS:  Your Honor, Rick Hess for IV for

20   Intellectual Ventures.

21           We would like to take up two similar but

22   slightly different motions addressing the Daubert standard

23   and whether or not Trend's experts meet that standard on

24   both the '050 patent first and then the '610.  And I think I

25   can be pretty brief on both.  So if it makes sense, I'll go

1    through both the '050 and then right to the '610.

2              THE COURT:  Is this the noninfringing

3    alternative?

4              MR. HESS:  This is the noninfringing

5    alternative.

6              THE COURT:  Yes, handle both of them at the same

7    time.

8              MR. HESS:  Trend's experts have opined that Trend

9    had an available and acceptable noninfringing alternative to

10   practicing the '050 patent by moving a very particular and

11   limited set of data servers outside the United States at the

12   time of the hypothetical negotiation.

13             The problem with Trend's proposed noninfringing

14   alternative is that it does not avoid infringing the '050.

15   In two ways, Trend customers would still be infringing the

16   '050 patent even if Trend implemented this purportedly

17   noninfringing alternative design.

18             The first is through a device called local

19   Smart Scan servers.  This is a device that Trend sells to

20   its enterprise customers that gets installed at Trend's

21   customers premises and it acts as the second tier in the

22   '050 scheme.

23             There is no proposal from Trend to do away with

24   the local Smart Scan servers.  It would still exist in the

25   event this noninfringing alternative would be implemented,

1    so Trend would continue to infringe.  There is no dispute

2    that local Smart Scan servers infringe the '050 patent.

3    This is in our expert report.

4           The second way Trend customers would continue

5    to infringe the '050 patent is because Trend customers,

6    both enterprise and the consumers, would still be using what

7    are distributed cache servers or as Trend calls them edge

8    servers.  More people know them, are familiar with them by

9    the name Akamai servers, but there are other companies other

10   than Akamai that perform this service.

11          By definition and by design, these edge servers

12   or distributed cache servers must be located as closely as

13   possible to customers in order to fulfill their purpose.

14   Trend spends millions of dollars a year using Akamai's

15   distributed cache servers and those servers are located near

16   the customer.  Those servers would still be used in the

17   event Trend decided to implement its proposed noninfringing

18   alternative.

19          Trend has not decided that it could move all

20   Akamai servers outside the United States, and its experts

21   have not opined that Trend could only use edge servers

22   located outside the United States.  The only way Trend could

23   do that is if Trend decided not to have customers within the

24   United States.

25          Now, the case law is clear that in order to be a

1    noninfringing alternative, like the name suggest, the

2    alternative must be noninfringing.  These are the cases that

3    we cite in our brief:  *Grain Processing*, *DSU Medical*, and

4    *Spectralytics*.

5           Trend's response to each of these points is a

6    little unusual.  Trend says it does not need to account for

7    the continued infringement through local Smart Scan servers

8    because at the time of the hypothetical negotiation, local

9    Smart Scan servers had not yet been deployed even though it

10   is undisputed that those local Smart Scan servers would be

11   deployed in a manner of months or years.

12          So it is undisputed that Trend infringes the

13   '050 patent through the use of local Smart Scan servers

14   versus through the damages period but Dr. Leonard, their

15   damages expert, never accounts for this infringement.  He

16   just wishes it away.

17          In his deposition, Dr. Leonard testified that

18   the only way to solve infringement of the '050 patent local

19   Smart Scan servers is not to have them, yet he had done no

20   analysis on the effect to Trend's customers or its products

21   or its services or whether or not that could be done.

22          When we moved to exclude Dr. Leonard's testimony

23   related to his noninfringing alternative, Trend's response

24   changed a little bit.  They said they don't need to account

25   for the local Smart Scan servers because they did not yet

1    exist at the time of the hypothetical negotiation.  What

2    Trend is essentially arguing for is that they should be

3    permitted to have a royalty-free use of a patent that that

4    they indisputably infringe.  We don't think that is the law.

5         On the second way that Trend continues to infringe

6    under its proposed '050 noninfringement alternative, Trend

7    now says that its expert has opined that they could use only

8    noninfringing -- could only use distributed cache servers

9    located outside the United States.

10        As we explain in more detail in our brief, this

11   is an astonishing re-imagination of what Dr. Leonard and Dr.

12   Prakash said in their report, and Dr. Leonard specifically

13   disavows this particular scheme in his deposition.  He says he

14   hasn't considered it.  He doesn't know of anyone who has.

15        Moreover, Trend's damages expert was very

16   clear in his deposition that the proposed noninfringing

17   alternative on the '050 patent only involved moving at most

18   six physical servers to Canada.

19        It is clear from Trend's answering brief to our

20   Daubert motion that they no longer rely on his testimony.

21   Because in their answering brief, they say that it would be

22   at least 20 at least with the '610 patent, and it would have

23   to be thousands in the case of '050 patent.

24        If a proposed alternative design infringes the

25   '050 patent it's not available, it's not acceptable, and it

1    is not a noninfringing alternative.  It would waste the

2    jury's time, and it would be useless to the trier of fact to

3    hear testimony of that value.  For that reason, the Court

4    should exclude Trend's expert opinions on the '050 proposed

5    noninfringing alternative.

6            Now, to turn to the '610 noninfringing

7    alternative, this one is a little different.  The opinions

8    offered by Trend's experts here; and some of them are the

9    same experts as in the '050 with the addition of one more

10   technical expert, Dr. Tygar; the opinions offered by these

11   Trend experts are unreliable and they contradict each other.

12           Dr. Tygar's opinions on the availability of

13   this proposed design-around are so deficient they aren't

14   even conclusory.  Dr. Tygar never even opines that Trend

15   had an acceptable alternative.  Thus, the opinions are

16   unreliable.  They're unhelpful to the trier of fact.

17           It's important to know that for the '610

18   alternative design that the defendants' products that

19   infringe the '610 are totally different from the products

20   that infringe the '050.  The '610 infringing products are

21   generally host e-mail services and other in-the-cloud

22   products, and they infringe the '610 patent when the virus

23   screening takes place within the secured network.

24           In Dr. Leonard's deposition however,

25   Dr. Leonard, who is Trend's damages expert, conflated the

1    alternative designs for both the '610 and the '050 patent

2    and didn't appear to know that the infringing products for

3    each patent used different virus detection methods and

4    different networks of servers.  This is important because

5    it's Dr. Leonard who opines Trend's damages should be

6    limited to the cost of a noninfringing alternative, but Dr.

7    Leonard doesn't know what that cost is because he doesn't

8    understand what implementing that proposed alternative would

9    entail.  He says repeatedly at most, both patents avoids

10   infringement by moving six servers.

11           Dr. Tygar, who is the technical expert on whom

12   he is relying, contradicted this in his deposition.  Dr.

13   Tygar said he doesn't know how many servers it would take

14   but no more than 300, and there is a big difference between

15   six and 300.

16           In order to demonstrate that Trend could have

17   employed an alternative design rather than infringe the '610

18   patent, Trend has to show by sound economic proof and by

19   grounded facts that the alternative was both available and

20   acceptable.

21           As I alluded to earlier for the '610 patent,

22   none of Trend's experts actually say this.  The closest that

23   Trend's technical expert, Dr. Tygar on the '610, says, the

24   closest he comes to saying this, is if Trend could locate

25   all of its infringing service outside the United States,

1    then Trend would not be infringing.

2            That, Your Honor, is a tautology.  It is not

3    the standard for having a noninfringing alternative.  He

4    is just stating a fact if they were able to do one element

5    of the claim outside the United States, they wouldn't be

6    infringing.  He doesn't actually say that they could do it.

7            At his deposition, he maintained that opinion.

8    He did not expand on it and say Trend actually had an

9    acceptable and available noninfringing alternative.

10           THE COURT:  You said tautology from which I

11   infer that you mean it is true.  So if the record did show

12   that they could move their servers, all of them, offshore,

13   that would create a noninfringing alternative under the '610

14   patent?

15           MR. HESS:  If they could move all of their --

16   all the virus scanning servers outside the United States,

17   then they would be able to go to a jury and argue that they

18   had a noninfringing alternative.  There are still many

19   issues whether this is available or acceptable, whether the

20   customers would use it.

21           THE COURT:  But it would be noninfringing.

22           MR. HESS:  It would not practice one step of the

23   patent.  That's right, Your Honor.

24           THE COURT:  Okay.

25           MR. HESS:  It is not an oversight that Dr. Tygar

1    refused to go ahead and say Trend had an acceptable and

2    available noninfringing alternative.  That is because Trend

3    doesn't.  They cannot make this change.  It would require

4    moving a large number of servers, the number of which they

5    don't know, to a foreign country; and they have done no

6    analysis of the impacted service from a customer retention

7    issue that is created.

8            In Trend's answering brief on this point, they

9    tried to excuse the lack of analysis that their experts

10    don't provide by saying that this proposed alternative is so

11    simple it requires no elaboration.  Incidentally, it's the

12    same argument that Symantec makes, and we point out the lack

13    of analysis for Mr. Bakewell's and Dr. Spafford's proposed

14    noninfringing alternative design.

15            But as with Symantec's alternative designs, if

16    it's so simple, then it's unclear why Trend needs three

17    experts to provide their unsupported conclusions and

18    opinions about the proposed alternative anyway.

19            Trend's principal '610 patent alternative design

20    that is available and acceptable simply can't be found.

21    And none of Trend's experts can provide any details on the

22    alternative design without contradicting themselves on the

23    number of servers that would be relocated.  We believe those

24    opinions should be excluded for those reasons.

25            THE COURT:  I know there is overlap, but in your

1   view, could the Court reach a different conclusion with

2   respect to the '050 and the '610?

3              MR. HESS:  I don't think so.  I think in both

4   cases, the opinions are so deficient and contradicted by the

5   expert's own testimony, it would be difficult to find that

6   Trend can present one of these opinions to the jury and not

7   the other.  I think that is actually the strategy from

8   Trend's expert to try to conflate the two when actually the

9   requirements are very different for both.

10             THE COURT:  Okay.  Thank you.  We'll hear from

11  the defendant.

12             MR. BARTOW:  Good afternoon, Your Honor.

13             THE COURT:  Good morning.

14             MR. BARTOW:  Stuart Bartow from McDermott Will

15  and Emery on behalf of Trend Micro.  I'll try to be brief,

16  Your Honor.

17             We'll start with the summary slide but since

18  this is all covered in the briefing, I think the sides have

19  had their say at this point for the most part.

20             I think Trend's alternative designs as

21  propounded by their experts are based on uncontested real

22  world facts, including what we have already seen in this

23  case, the move of another former defendant's systems outside

24  of the United States.  And Your Honor was quite right when

25  you observed that the case law is that if all the steps of a

1  patented method are not performed in the United States,

2  there can be no infringement.  And that is the *NTP v*

3  *Research in Motion* case.

4  We also rely on the opinions of indisputably

5  qualified experts.  IV doesn't challenge the qualifications

6  of the expert at all; and they don't seem to be challenging

7  the methodology of the experts, as far as IV is concerned,

8  as far as I can tell, and they don't quarrel with that.

9  What they really quarrel with is the objective

10  conclusions that they reach.  They don't like the conclusions.

11  So we think that this notion really is essentially based on

12  the attorney argument.

13  I heard a lot of argument from Mr. Hess.  What I

14  didn't see are underlying expert opinions.  I didn't hear or

15  see expert testimony on technical issues about any potential

16  questions that would arise.  And I think to a large extent,

17  we see a mischaracterization of the record, but Mr. Hess did

18  observe there are three types of servers that we want to

19  talk about here.  And I'll go through this very briefly.

20  Local Smart Scan servers, global Smart Scan

21  servers, and Akamai "Edge" servers.

22  Local Smart Scan servers, I think the law is

23  relatively clear.  They're irrelevant.  They're simply

24  irrelevant.  They were not available on the market or even

25  conceived or in development at the time of the hypothetical

1    negotiation.

2           Trend's experts opined at the time of the

3    hypothetical negotiation for both the '050 and the -- or at

4    least for the '050 patent and the '610 patent actually go

5    back to that time.  The servers could have been located

6    outside of the United States.

7           In fact, this is Mr. Wagner's testimony.  Mr.

8    Wagner confirmed this.  He agreed with the principal.  So

9    looking at 2006, and there is a dispute about potentially

10   when the hypothetical negotiation took place in late 2006,

11   early 2007.  But,

12          If only global Smart Scan servers were available

13   at that point in time, those are the only servers that Trend

14   Micro would have to move, right?

15          And he agreed with that.

16          As I mentioned, Check Point and its vendors

17   Commtouch and Mailshell moved their accused software

18   services overseas.  And there are declarations from all

19   three parties, at least from Commtouch and Mailshell.  There

20   is deposition testimony from Check Point to this point.

21          Minimal costs, no performance degradation.

22          Trend's servers for certain of the accused

23   software previously were located in Taiwan, and there is no

24   question that U.S. based servers provided certain services

25   to customers around the world.

1          THE COURT:  What is in the record on your

2     servers being in Taiwan?

3          MR. BARTOW:  Well, there is an expert relied on

4     testimony from a conversation that he had with our Director

5     of Core Technologies.  So forgive me, Your Honor.  Maybe I

6     misspoke but certainly that Director of Core Technologies we

7     are happy to have come to trial and he can testify to the

8     same thing.

9          THE COURT:  Is there something in my record

10    right now other than attorney argument that you do have or

11    did have servers in Taiwan?

12         MR. BARTOW:  That's the only thing I can think

13    of off the top of my head, Your Honor.  Well, it's in the

14    expert's testimony as well.  So to that extent it is in the

15    record.

16         With respect to the edge servers, Dr. Atul

17    Prakash, one of Trend's experts, opined, first of all, that

18    locating all servers running the accused software in Canada

19    would have been technically feasible without any significant

20    impact on performance.

21         Dr. Prakash mentioned Akamai in his report in

22    two ways, these captions.  First of all, he said there would

23    be a cost associated with the Akamai content distribution

24    regardless of where their servers are located.  That is one

25    piece of his report.

1          But he also noted in his report the incremental

2     cost, meaning costs higher in Canada, of locating the Akamai

3     servers in Canada would be $30,000.  So there is a $30,000

4     incremental cost associated with that.

5          So contrary to what IV says in their brief,

6     Trend's design would only use edge servers outside of the

7     United States which, as we mentioned under *NTP*, wouldn't

8     infringe as a matter of law.

9          I have just kind of summarized for you what

10    the experts said.  This is some of the evidence that they

11    rely on.  They rely on the Check Point move, documents and

12    testimony produced in this case.  As I mentioned, a

13    conversation with Simon Ko, who is Trend's Director of Core

14    Technologies.  And both of the experts have a significant

15    amount of experience.

16         Dr. McDaniel, IV's expert.  And I won't spend

17    much time on this, but this is basically his technical

18    infeasibility opinion in response.  It just says he

19    disagrees, and he disagrees because essentially Phoenix is

20    farther from anywhere in Canada than say Atlanta and moving

21    data back and forth could take four times as long.  And,

22         In fact, Dr. McDaniel then acknowledges that

23    he didn't recall where Trend Micro's data centers were.  He

24    cites to some network statistics that he claims to have

25    relied on but he didn't include them in his report.  He was

1    asked whether he performed calculations?  First he said he

2    did.  Then he said he couldn't recall whether he had notes.

3    And then he testified somebody else did the calculations.

4    To date, we haven't gotten any notes of these calculations.

5              That I think is the real reason why they filed

6    this motion and want to try to exclude these opinions,

7    because they really don't have any significant counters

8    to it.

9              So here are just some of the examples, I think

10   throughout IV's brief and reply brief as well, where they

11   make unsupported statements that are not supported by their

12   technical experts or economic opinion and are in fact just

13   flat out contradicted.  The notion that Trend's experts

14   don't breath a word about Akamai.

15             You can take a look for yourself.  Certainly

16   they do.

17             And then there is this with respect to the '610

18   patent, and I think I can be very brief.  I think there is a

19   misunderstanding here about what the testimony was.

20             Dr. Tygar did not testify that hundreds of

21   accused servers would need to be relocated for the '610.

22   There were only 21 servers on the document he was looking at

23   at the time he testified.  And wouldn't you know, sales for

24   that product, for the first time since 2007 or so, or 2006,

25   are about a third of what they are today.

 1              So we believe there is no legal or factual basis

 2    for excluding these alternative designs.

 3              THE COURT:  On the '610, Dr. Tygar doesn't

 4    really say much or doesn't make it clear what he is relying

 5    on.  Can you help me out on that?

 6              MR. BARTOW:  Well, I think he is relying in the

 7    first instance on Dr. Prakash, on his report anyway.

 8              THE COURT:  Does Dr. Prakash talk about the '610

 9    patent?

10              MR. BARTOW:  He does not, but he talks about the

11    concept of locating a server in Canada as opposed to the

12    United States at first conception of the product.  And based

13    on his experience, he had certainly no reason to disagree

14    with that.  He in fact agreed.

15              THE COURT:  So Dr. Tygar brings to bear his

16    experience.  Add that to what Dr. Prakash opined about the

17    '050, and that lead to the conclusion on the '610?

18              MR. BARTOW:  I believe that is correct.

19              THE COURT:  Okay.  Is there anything else?

20              MR. BARTOW:  No, Your Honor.  Thank you.

21              THE COURT:  All right.  Is there anything else

22    from plaintiffs on this?

23              MR. HESS:  Just one small point, Your Honor.

24    This is all addressed more fully in our brief.  But the

25    notion that Trend's experts ever opined that they could only

1    use or they could successfully only use Akamai servers

2    located outside the United States simply isn't true.

3              I put this question squarely to Dr. Leonard at

4    his deposition.  I asked him, assume for a minute that Trend

5    implements this '050 design-around and decides to stop using

6    Akamai cache servers that are located in the United States.

7              He says:  Okay.

8              I said:  Did you or anyone you are working

9    with determine whether this implementation would decrease

10   performance of the servers accused of infringing the '050?

11             He begs off.  He says that is a technical

12   question.

13             I said:  Did Dr. Prakash do that work?

14             He said:  I don't know.

15             I asked him:  Did anyone who you talked to do

16   that work?

17             He says he doesn't know.

18             This is his transcript, page 124, line 22,

19   through 125.

20             They are attempting to rescue their

21   noninfringing alternative by forming a new opinion in the

22   briefs; and that is simply not fair.

23             Thank you.

24             THE COURT:  All right.

25             MR. BARTOW:  May I have one brief second to

1  respond?

2              THE COURT:  Sure.

3              MR. BARTOW:  I'll just point out as I believe

4  Mr. Hess pointed out, Dr. Leonard is the damages expert, not

5  a technical expert, and he wasn't opining on the technical

6  feasibility of such a design-around.

7              THE COURT:  Mr. Hess, is there anything you want

8  to say in response to that?

9              MR. HESS:  No, I will stand on the papers.

10              THE COURT:  Do plaintiffs want to choose where

11  to go after that?

12              MR. FLAGEL:  Your Honor, that was Trend's

13  response.

14              THE COURT:  Oh, I'm sorry.  All right.  Thank

15  you.  Plaintiffs, what do you want to argue?

16              MR. HESS:  I think a natural place to transition

17  would be the motion to exclude the Symantec opinions, one of

18  which is the same type of non-infringing design-around.

19              THE COURT:  Okay.

20              MR. HESS:  There is more to it, though.

21              Your Honor, Intellectual Ventures has asked the

22  Court to exclude three very specific opinions identified in

23  report provided by Symantec's expert, Mr. Bakewell, because

24  those opinions aren't based on real facts in the record and

25  they're otherwise unhelpful to the trier of fact.

1           The Court should exclude Mr. Bakewell's opinions

2    about a fictional Intel transaction.  This is the opinion

3    that Mr. Bakewell arrives at based on what has been called a

4    walk price of spreadsheet where Mr. Bakewell constructs what

5    he called a real world market transition but is in fact a

6    hypothetical transaction for which no support exists.

7           The second opinion is Mr. Bakewell's attempt to

8    drawn conclusions from Symantec's survey data using an

9    unreliable methodology and applying the data that have

10   nothing to do with the patents in suit.  And,

11          The third opinion we asked the Court to exclude

12   from Symantec's experts is the one offered by the Trend

13   noninfringing design alternative that would purport to move

14   portions of Symantec's infringing architecture outside the

15   country.

16          It may useful to fit Mr. Bakewell's opinions

17   into the larger context of Symantec's damages case.  So, of

18   course, we start with the plain claim language of the patent

19   damages statute that requires the court to set the damages

20   adequate to compensate for the infringement but in no event

21   less than a reasonable royalty for the use made of the

22   invention by the infringer.

23          Now, instead of using the use that Symantec

24   made of the invention, Mr. Bakewell considers a variety of

25   other metrics that have nothing to do with Symantec or

1   Symantec's use.  Instead, Mr. Bakewell bases his calculation

2   on things like the amount that Intellectual Ventures paid to

3   acquire the patent, an analysis of Intellectual Ventures'

4   return on investment.  And as you heard a minute ago from

5   Mr. Folse, a set of allegedly comparable Symantec lump sum

6   litigation licenses that do not involve patents and have not

7   been adequately compared to the hypothetical negotiation.

8              THE COURT:  Let me tell you plaintiffs have ten

9   minutes left altogether.

10             MS. TAYLOR:  Thank you very much, Your Honor.

11             Now, let's go to the first walk prices.

12             Now, this is another opinion that, as I noted,

13   is not based on Symantec's use of the patents in suit, and

14   it's completely divorced from the facts of the case.

15             Out of the 900-or-so Excel spreadsheets that

16   Intellectual Ventures produced in this case, Mr. Bakewell

17   seizes on one of them, which is called IV 58, and he bases

18   his damages in part on this spreadsheet.

19             The first page is called a summary of the actual

20   Excel spreadsheet.  There is the first page on the screen.

21   But Mr. Bakewell doesn't base opinion on this page.  Instead,

22   he pulls out from the subsequent pages four cells on four rows

23   buried on a worksheet of supporting information.

24             Mr. Bakewell claims by taking these four cells

25   on four rows and using the numbers found on these cells that

1    Intellectual Ventures offered to license just the

2    patent-in-suit to Intel on a particular date in 2010.  He

3    does this even though there is no evidence of that offer.

4    There is no e-mail, there is no draft contract or testimony

5    to support it.

6              Mr. Bakewell claims numbers on the spreadsheet

7    represent offer prices that Intel actually received from

8    Intellectual Ventures and, more startlingly, that Intel

9    rejected.  But there is no evidence of that either.

10             At his deposition, Dr. Bakewell appeared to walk

11   backwards a little from his opinion and asserted that, well,

12   even if there is no offer and no rejection of this offer,

13   then this at least is relevant what Intellectual Ventures

14   was thinking at the time that this spreadsheet was created.

15             But that is not true neither.  Neither Symantec,

16   nor Mr. Bakewell know who created the spreadsheet or why.

17   They listed no deposition testimony about what this is or

18   what it means.  And they note they have no information about

19   whether anyone with authority at Intellectual Ventures ever

20   approved offering -- offered the four patents-in-suit to

21   Intel at these prices at the time that Dr. Bakewell claims.

22             Under both the Third Circuit law and under

23   Daubert, the experts are required to connect his expert

24   opinions to the facts of the case.  There isn't a foundational

25   requirement here that Mr. Bakewell has not and cannot meet.

1    These opinions should be excluded.

2              Now, the second area we ask the Court to

3    exclude Mr. Bakewell's testimony on concerns his reliance on

4    Symantec's survey data.  This is more explored more fully in

5    our brief.  In the interest of making sure we have more time

6    left, I'll refer the Court to that, but it's worth noting

7    that the point of Mr. Bakewell's opinion is he wants to tell

8    the jury only .22 percent of Symantec customers commented on

9    a term relating to the '050 patent.  Therefore, the

10   customers didn't care about the patent.

11             That number is incredibly low.  That is because

12   the denominator is so incredibly high, and misleadingly so.

13   The denominator for that .22 percent involves tens of

14   thousands of customers, many of whom never even used

15   infringing products and therefore would not comment on the

16   allegedly accused features.

17             Then, finally, Your Honor, we ask that the

18   Court exclude all of Symantec's expert opinions on the

19   noninfringing design-around that would involve moving the

20   servers overseas for many of the same reasons that we

21   demonstrated that Trend failed as well to support those

22   opinions with sound economic principles or grounded in the

23   facts of the case.  And,

24             With that, Your Honor, I will rest on our papers

25   and reserve the rest of our time.

1            THE COURT:  Okay.  Fine.

2            MR. DUNLAVEY:  Slide 132, please.

3            Your Honor, just so I'm clear on the time

4    because I'm also going to be arguing the Daubert motion

5    concerning Mr. Wagner.  I have my time left as 21 minutes

6    and their time left as five minutes?  Is that yours?

7            THE COURT:  I have it at six.  But, yes, I have

8    you at 21 or at least when you stood up you were at 21.

9            MR. DUNLAVEY:  I'll stop filibustering.

10           Let me go to the last of the objections that

11   were raised by Mr. Hess first.  That is, the noninfringing

12   alternative for Symantec for the '050 and '610 patents.

13           Mr. Bakewell noted that Symantec could easily

14   avoid Intellectual Ventures' infringement claims by placing

15   the relevant servers in Canada.

16           There has been absolutely nothing from

17   Intellectual Ventures claiming that moving servers to Canada

18   would not avoid infringement of their patents.  And when you

19   asked Mr. Hess, he had to candidly admit that, yes, that is

20   true.

21           In connection with the Trend Micro noninfringing

22   alternatives, Mr. Hess focused on the local Smart Scan

23   servers that are used by that company.

24           Symantec doesn't use those type of servers.  The

25   reputation servers that are accused of infringing the '050

1    patent are located in Tucson, Arizona.  It's very close

2    to the U.S. and Mexico border.  The alternative that we

3    proposed that would be easily implemented and that would

4    have been chosen at the time of the hypothetical negotiation,

5    had there been an expression raised about infringement

6    of these patents, would be to place those servers not in

7    Arizona but just across the border in Canada where there

8    is electricity, where there are talented engineers, where

9    there are Internet connections, and where there would be no

10   infringement.

11           Now, Intellectual Ventures' own expert said that

12   if there is a design-around that can be implemented at low

13   cost, the reasonable royalty will never be above that cost.

14   Yet they wouldn't say that my client has to pay $195 million

15   because it located servers somewhere just within the

16   U.S./Mexico border instead of placing them just outside the

17   U.S./Canadian border.

18           I submit to you that is simply ludicrous.  The

19   analysis Mr. Bakewell did was to talk to engineers and say,

20   hey, if you were faced with this proposition, instead of

21   starting the operation by putting the servers in Tucson,

22   could you have put them in Canada?  And they said, of course

23   we would have, and it wouldn't cost us anything to do that.

24   No price differential whatever.

25           Now, during his deposition, Mr. Bakewell was

1  asked the question, and he referred to a paragraph in his

2  expert report in which he was referencing a different

3  design-around.  That is what IV has now seized upon and

4  said, oh, there is this disparity between what he said in

5  his expert report, zero, and what he said at his deposition,

6  $700,000.  So Symantec should be precluded from introducing

7  any evidence about the noninfringing alternative that costs

8  less than $195 million.  And I submit to you that that is

9  simply not a reasonable proposition.

10          THE COURT:  So the zero noninfringing

11  alternative was a different one that he was opining to than

12  the $72,000 noninfringing alternative?

13          MR. DUNLAVEY:  Absolutely.  As we pointed out

14  in the opposition brief, and you can see by looking at

15  paragraph 290 of his expert report which he was referring

16  to, specifically referenced in the deposition, talked about

17  the snippet that was picked up and provided to the Court.

18          Okay.  So let me go back to the customer

19  surveys.

20          Intellectual Ventures wants to convince a

21  jury that somehow these patented features are incredibly

22  in demand, and that is why these ridiculous reasonable

23  royalty figures are justified.  Because these features are

24  absolutely essential to getting safe product sales.

25          So Mr. Bakewell went through survey data, data

1    which Intellectual Ventures has, by the way, to see, well,

2    if these features are so much in demand, how frequently

3    are they discussed by customers?  And the answer is they're

4    discussed almost never.  That is all that this survey

5    analysis reveals.  That is, I submit, relevant, should we

6    get to damages, that Mr. Wagner's opinions are not reasonable.

7                Okay.  Last --

8                THE COURT:  You are defending Mr. Bakewell's

9    opinions, correct?

10               MR. DUNLAVEY:  Correct, because I think Mr.

11   Wagner will ultimately be excluded from testifying.  But

12   I am saying that if Mr. Wagner is permitted to testify,

13   Mr. Bakewell's rebuttal to that is certainly justified by

14   citing to the customer surveys of Symantec.

15               THE COURT:  And what else does he rely on in

16   saying these features, opining that these features are not

17   important?

18               MR. DUNLAVEY:  Well, his report was 200 pages

19   long, Your Honor.  He spoke with technical experts.  He

20   spoke with the folks within the company.  And there were --

21   there are a lot of things that go into antivirus and

22   anti-spam.

23               THE COURT:  It looked to us he was not actually

24   very specific about what other evidence he had relied on.

25   But I guess your response to that is we have to see what is

1    in the report.

2            MR. DUNLAVEY:  That is correct.

3            THE COURT:  All right.

4            MR. DUNLAVEY:  Okay.  Then, lastly, the comment

5    about his reliance upon the Intellectual Ventures document.

6    Maybe Mr. Hess would like to candidly tell the Court where

7    that document came from.  It came from the records of a

8    licensing executive at Intellectual Ventures.

9            They say that we haven't developed a record on

10   that.  And they say that this licensing executive testified

11   that IV never calculates walk prices.  It doesn't use that.

12           But there was testimony from other people that

13   IV does, in fact, calculate walk prices.  That walk prices

14   represent the price that Intellectual Ventures would like

15   to get for its patent in its licensing negotiations with

16   companies.

17           Now, Mr. Bakewell's reliance on this document

18   is -- actually, it's not a centerpiece of his report but

19   clearly when Intellectual Ventures has got a document which

20   says, selected lists of unelected deals for Intel - security

21   patents.  And it has a column that says IV walk price.

22           The representation to you that you should not

23   allow Mr. Bakewell to rely upon this is because Intellectual

24   Ventures doesn't calculate walk prices and it doesn't, and

25   it didn't have an analysis for its negotiations with Intel,

1    I think simply rings -- well, it doesn't ring true.

2              That is what I have to say about their Daubert

3    motion.  And I will also, as you know, be presenting on the

4    Wagner Daubert.

5              THE COURT:  We'll probably have you back shortly.

6              Mr. Hess, did you want to use any of your time

7    to respond?

8              MS. TAYLOR:  Your Honor, maybe just one minute.

9              THE COURT:  Okay.

10             MS. TAYLOR:  And I will use the time that it

11   takes to get to the podium.

12             THE COURT:  That's fine.

13             MS. TAYLOR:  The Federal Circuit has cautioned

14   courts that when they are evaluating proposed noninfringing

15   design, that those designs must be grounded in sound

16   economic reasoning and factual predicates.

17             The standards are even higher in a case like

18   this case, that noninfringing alternative design has not

19   been available or implemented during the period of the

20   hypothetical negotiations.

21             In that case, the *Spectralytics* case, a

22   fact-finder must proceed with caution in assessing proof

23   of availability of substitutes not actually sold during the

24   period of infringement.

25             Neither Symantec nor Trend have implemented this

1    proposed alternative design they say is so easy to do.  We

2    submit there is a reason for that.

3              Just on the last point on Mr. Bakewell's surveys,

4    I think Your Honor got it right.  The only quantifiable

5    evidence that Mr. Bakewell presented of consumer interest in

6    these, in the features of the infringing products was this

7    survey evidence.  There is nothing else quantitative that

8    Mr. Bakewell offers.

9              Thank you.

10             THE COURT:  Okay.  Why don't we hear the

11   defendants' Daubert motion.

12             MR. DUNLAVEY:  Let me make one last comment.

13   And that is if my client had to change its operations every

14   time a plaintiff asserted a patent infringement case in

15   order to have a noninfringing alternative defense, my client

16   would spent a great deal of time unnecessarily.

17             Okay.  If we can go to slide 100, please.

18             Mr. Wagner's work in this case, Your Honor, is

19   a textbook example of what an expert witness cannot do and

20   still testify at trial.

21             In all four of the patents analyzed in this

22   case, he made such fundamental mistakes that they are way

23   beyond the threshold that we need to satisfy in order to

24   have them excluded under Daubert.  They are totally

25   unprincipled and unreliable.

1          Let me start with the '050 patent.

2          His entire analysis is based upon an agreement

3     that was not a patent license.  It doesn't involve

4     Intellectual Ventures, it doesn't involve Symantec, and it

5     doesn't involve the '050 patent.  It is a software supply

6     agreement from Trend Micro to another company, Blue Coat,

7     in which Trend Micro was to supply object code, support

8     services, antivirus patterns, antivirus pattern updates.

9     It doesn't mention the '050 patent at all.  It mentioned a

10    Trend Micro patent that will have to be marked on any kind

11    of documentation.  So people's complaint about this expert

12    comparing apples and oranges, here is a case where there

13    is an apple compared to an elephant.  It just has no

14    relationship whatsoever.

15         Now, Intellectual Ventures says, with a straight

16    face, that the OEM agreement covers the precise infringing

17    technology embodied in the '050 patent.  That it is narrowly

18    focused on the technology embodied in the '050 patent.  That

19    it isolates the technology comparable to the '050 patent.

20         Yet just looking at the document and reading

21    it and looking at the questioning of Mr. Wagner that has

22    been provided to the Court, you can see that that is simply

23    totally untrue.  This OEM agreement has nothing to do with

24    the '050 patent and it's not comparable to it.

25         In addition, Intellectual Ventures doesn't even

1    have the conviction of its own analysis.  Mr. Wagner

2    conceded that the OEM agreement covered the noninfringing

3    Trend Micro product.  V-S-API (phonetic) or V-SA-PI

4    (phonetic) I guess is how they described it, and that it

5    covered the patented technology of the Trend Micro patent.

6            It also provides if Trend Micro supplies

7    the software for a different product, the iCRC product,

8    that Blue Coat will pay for that product as well.  The

9    iCRC product is the one accused of infringement, and yet

10   the identical fee is charged for the source code for

11   the noninfringing alternative -- I'm sorry -- for the

12   noninfringing product as for the allegedly infringing

13   product.

14           So if you think about that, what is the premium

15   that is being paid for the infringing technology that wasn't

16   in the VSAPI product?  It's zero.

17           So by way of analogy, Your Honor.  If I go into

18   McDonald's and I order a hamburger.  It comes with a bun, a

19   patty, some lettuce, some unions, and if I want to go and

20   get a tomato slice, they'll put it on there for free.

21           What they are trying to do is they're trying to

22   say that the tomato slice, the value of the tomato slice can

23   be based upon the price that I paid for a hamburger even

24   though the price for a hamburger with a tomato is the same

25   as the price for a hamburger without the tomato.

1          His analysis is simply -- I'm being told to move

2     on.  Anyway, his analysis is simply -- on principle I think

3     is too kind of a word.  If you look at it internally, it

4     causes you to conclude that logically the patent is worth

5     zero.  This absurd methodology has lead to an absurd result.

6          The purchase price of this patent was less

7     than $750,000, and yet he is now trying to turn it into a

8     reasonable royalty, non-exclusive patent license that

9     exceeds $310 million just for the period that ended at the

10    end of last year.

11         And, you know, the entire basis for it is by

12    saying the OEM agreement is not an OEM agreement.  It's a

13    patent license for the '050 patent.  And that is something

14    that is just not permitted.

15         With regard to the '610 patent.  The

16    fundamental, most fundamental mistake that Mr. Wagner made

17    is he applied the entire market value rule even though he

18    admitted that the patented technology was not the sole basis

19    for customer demand.

20         Now, in light of the time, I will say if you

21    look at the cases that were cited by Intellectual Ventures,

22    their own cases agree that it must be the --  the patented

23    feature must be the basis for customer demand.  And then

24    they try to pick out some language subsequent to a statement

25    of that principle that would suggest that maybe it's not

1    quite as strict as it is supposed to be.

2              I would ask the Court if you have any question

3    about it, read all the cases.  Look at the *AVM* decision from

4    Judge Andrews from earlier this year which says that the

5    patented feature alone must cause customers to purchase the

6    accused products.

7              The second fundamental mistake that he made

8    was in utilizing settlement agreements as a comp for patent

9    licenses.

10             Now, even when you have a settlement agreement

11   that covers the patent in suit, the Supreme Court has said

12   that you cannot use that as a standard to measure the value

13   of the improvements patented.

14             They cite to one case, *ResQNet*, which by a

15   2-to-1 decision, and in the very limited circumstances

16   there, the court said on remand, we're going to allow the

17   District Court to consider the settlement agreement

18   concerning the patent-in-suit that was not considered

19   earlier.

20             Now, right after that, in the *Laser Dynamics* case,

21   the Federal Circuit cautioned once again, look, that was an

22   extremely narrow circumstance.  That was a circumstance in

23   which the only evidence, the closest license agreement was

24   that settlement agreement and it was to be used for a very

25   narrow purpose.

1          I'm sure the Court will understand that parties

2     decide to settle cases for all kinds of reasons; and, you

3     know, in this lawsuit it would be impossible to investigate

4     why 20 other companies may have settled lawsuits involving

5     other patents.

6               All right.  Given my limited --

7               THE COURT:  You have about five minutes left.

8               MR. DUNLAVEY:  Let me move to the '142 patent,

9     Your Honor.

10              This court and others have recognized that an

11    expert's opinion that ignores the facts of the case is not a

12    proper analysis.  In this case, Mr. Wagner, particularly

13    with regard to the '142 patent, not only ignored the facts

14    of the case, he contradicted the facts of the case.

15              The '142 patent is somewhat different than the

16    others because the hypothetical negotiation date is a date

17    at which the patent was owned not by Intellectual Ventures

18    but was owned by Park City Group.

19              Park City Group demonstrated its willingness to

20    sell the '142 patent for $200,000 when it sold that patent

21    for $200,000, and yet what Intellectual Ventures' argument

22    is, is these two parties entered into a hypothetical

23    negotiation and Symantec wanted to pay $200,000 to purchase

24    the license.

25              Now, Symantec would have entered into the

1    negotiation and have paid a running royalty that would have

2    worked out to $14.7 million over the course of the next six

3    years.  And I submit to you that that analysis does not fit

4    the facts of the case and must be excluded for that reason.

5            An expert can't rewrite contracts.  An expert

6    can't rewrite licenses or ignore sales.  If Mr. Bakewell,

7    for example, had said here was a license negotiated between

8    two parties but that doesn't coincide what I think should be

9    the negotiated royalty rate, I'm just going to ignore it.

10   Of course, there would be a motion to exclude it that.

11           Here, there was a demonstrated sale.  A sale of

12   all of the rights of the patents, not just the rights to

13   license it.  And that sale was for $200,000.

14           The last comment is there are two sentences in

15   an internal document that date back to 2004 in which a

16   company called Huron noted that IBM had a technology

17   licensing program in which it tried to license its patents

18   for one percent per patent.  And the Symantec management had

19   indicated that the patent royalties in similar areas were on

20   average approximately one to two percent of revenues.

21           Intellectual Ventures wants to take those two

22   general statements, which are not supported by any kind of

23   documentation, which describe general royalty rates and

24   don't tie them to the technology that is claimed to be

25   covered by the '142 patent and say that because they're in

1     a Symantec document, Mr. Wagner didn't have to do anything

2     else.  That that is sufficient for his analysis.

3               As a consequence, even though the patent was

4     purchased for $200,000, Symantec really would have agreed

5     to pay $14.7 million of running royalties through the end

6     of 2012.  And as we stated in our brief, that simply is

7     unprincipled so, therefore, Mr. Wagner's opinions should be

8     excluded.

9               And as a consequence -- may I ask how much time

10    do I have left?

11              THE COURT:  One minute.

12              MR. DUNLAVEY:  All right.  So I won't cover the

13    '155.  It's in our papers.

14              But when a damages expert for the plaintiff

15    presents a totally unprincipled methodology, his opinions

16    are to be excluded and we, Symantec, are entitled to summary

17    judgment of no damages at this point in time because that

18    is exactly what Mr. Wagner's work was.

19              THE COURT:  Okay.  Thank you.  I'll give you a

20    brief chance on rebuttal.  First, we'll hear from the

21    plaintiffs.

22              MR. HESS:  Your Honor, I think I have five

23    minutes left.

24              THE COURT:  You do.

25              MR. HESS:  Which feels like a luxury at this

1    point.  I'll take my time.

2              THE COURT:  You are the rich one at this point.

3              MR. HESS:  I will see if I can address all of

4    Mr. Dunlavey's, but obviously there is more full briefing in

5    the record.

6              On the Blue Coat agreement, the Blue Coat

7    agreement is the most relevant agreement on the record.  It

8    licenses what is called iCRC.  ICRC is the infringing

9    antivirus engine that Trend uses in its infringing software.

10   There cannot be a more closely tied technology license than

11   one that is actually accused of infringing, and that is why

12   Mr. Wagner uses it.

13             Both Trend and Symantec argue that the Blue

14   Coat license did not license the iCRC technology.  They say

15   it licensed something called VSAPI.  This is word play

16   because the Blue Coat agreement both VSAPI and iCRC, just at

17   different times.

18             Under the Blue Coat agreement, Blue Coat could

19   but apparently did not license VSAPI, the legacy engine,

20   until the end of December 2010.  After December of 2010,

21   then Blue Coat could license the new infringing iCRC engine,

22   and that is exactly what Blue Coat did.  100 percent of the

23   royalty paid by Blue Coat to Trend under the Blue Coat

24   agreement were paid after December 31, 2010.

25             So when Mr. Dunlavey said what is the premium

1    one would be willing to pay given the royalty is the same

2    between the VSAPI period and iCRC period, it's not zero,

3    it's 100 percent.  Every single dollar that Blue Coat paid

4    to Trend were paid for the infringement license.  No dollars

5    for bid for the noninfringing engine.

6           Mr. Dunlavey also said based on the amount of

7    money that Intellectual Ventures paid for the patents many,

8    many years ago, this results in absurd methodology and

9    absurd results because the damages opinions are so high.

10          The amount that Intellectual Ventures paid for

11   the '050 patent is not related to the infringer's use of

12   that patent.  Again, Symantec is attempting to ignore the

13   plain language of the patent damages statute.  You have to

14   look at the use made of the patented invention, and Trend

15   and Symantec used that patent extensively.  That is why they

16   would owe quite a bit more than Intellectual Ventures which

17   doesn't make any products that infringing the '050 patent.

18          THE COURT:  How did you square that with the

19   concept of a hypothetical negotiation?  Who would possibly

20   pay hundreds of millions of dollars for something that we

21   know a willing seller would sell for hundreds of thousands

22   of dollars?

23          MR. HESS:  Mr. Wagner addressed this extensively

24   in his report, and he points out when Intellectual Ventures

25   buys the patent, it has a lot more information than, for

1    instance, the seller of the '142.  The seller of the '142

2    patent didn't know the extent of use.  And if you don't know

3    the extent of use, then you can't extract the large price

4    that would be required given the high amount of use by both

5    Trend and Symantec.

6             Mr. Dunlavey also argues Mr. Wagner properly

7    relies on the Huron Consulting valuation.  This valuation

8    was commissioned by Symantec.  Symantec relied on it, and it

9    looked at three patents, all three of which are closely tied

10   to the patent-in-suit.  They're anti-spam patents and

11   patents on a rule based processor.  That is precisely what

12   the '142 patent does.

13            Then Mr. Wagner uses the comments from Symantec

14   executives saying a one-to-two royalty rate was appropriate.

15   He ends up with a concluded two percent royalty rate after

16   analyzing the Huron Consulting document.

17            On the '610 patent, we addressed this

18   extensively in our brief, but the notion that you can only

19   use the entire market value rule under the circumstances

20   described by Mr. Dunlavey is not correct.  We cite extensive

21   cases in our brief, including the en banc Federal Circuit

22   decision last year in *Marine Polymers* where the entire

23   court, affirmed by an equally divided vote, the District

24   Court's decision that substantial evidence supported a

25   jury's damage award when the infringing feature was only

1    critical to the core function of the accused product.

2            Symantec's reply brief never addresses *Marine*

3    *Polymer* which postdates all the cases they rely on.  Our

4    answering brief cites three cases that have not been

5    overruled and also permit a damage award where the patented

6    feature satisfies some standard other than being the sole

7    and only driver of consumer demand.

8            I think I have addressed the point on the Park

9    City Group sale, so if I have any time left I will reserve.

10           THE COURT:  Okay.  You have about a minute.

11           Is there any quick rebuttal?

12           MR. CHAIKOVSKY:  Your Honor, I may need 30

13   seconds.  Largely everything that has been said on behalf of

14   Symantec applies to Trend.

15           THE COURT:  You will have it.

16           MR. CHAIKOVSKY:  Thanks.

17           MR. DUNLAVEY:  Intellectual Ventures did not

18   say anything in its opposition brief concerning the fact

19   that there is no price premium between the iCRC product and

20   the VSAPI product.  Therefore, the argument should not be

21   considered by the Court.

22           But if the Court is going to consider it, I

23   would say this.  And that is, first, with regard to the

24   timing of the purchases, I asked -- I'm sorry.  Mr. Wagner

25   was asked in his deposition:  Is your opinion on the '050

1    patent based at all in terms of the timing of the purchases

2    by Blue Coat of the Trend Micro product?

3             He said not at all.  It wouldn't matter to me if

4    there wasn't a single dollar sale of that product.  The fact

5    is that what is in the term sheets.  What is in the term

6    sheets are that there was no price premium whatsoever.

7             I would also note that in their opposition brief

8    on page 9, footnote 5, Intellectual Ventures complains about

9    the fact that Trend Micro produced this sales data and it

10   said:  IVI objects to this selective and late produced

11   information, seeks to exclude it and will also move in

12   limine to bar defendants use of this information.

13            Now he wants to mislead the Court by misusing

14   the information and not giving us an opportunity to present

15   the testimony of his own expert that what he just said was

16   relevant didn't matter at all to him.

17            THE COURT:  Thank you.  Mr. Chaikovsky.

18            MR. CHAIKOVSKY:  Very briefly, Your Honor.  I

19   think I will only comment on the Blue Coat agreement, on the

20   '050 patent.

21            It wasn't pointed out, beyond what Mr. Dunlavey

22   said, that there was no additional fees for iCRC versus

23   VSAPI in that license, so there is no ability for Mr. Wagner

24   to be able to distinguish, in addition to having all this

25   other technology, trademark, et cetera, license.  It doesn't

1    relate to the '050 at all.  There is iCRC which is accused,

2    but iCRC is an add on to VSAPI.  It has the VSAPI engine

3    underneath it.  All it has is cloud-based functionality.

4              In fact, if we go to slide 127.  Mr. Wagner

5    admitted that it covers noninfringing technology.

6              "Question:  Okay.  And you understand that the

7    iCRC product is basically the same as VSAPI except that the

8    iCRC has some cloud-based functionality?

9              "Answer:  Well, cloud-based and other

10   second-tier server capability, yes.

11             "Question:  Are there any other differences that

12   you are aware of between the VSAPI and the iCRC product as

13   it relates to either this case or the '050 patent?

14             "Answer:  No."

15             And VSAPI was licensed.  Under this agreement,

16   he would like to put in front of the jury and say, hey, now

17   we can all pay in the aggregate $300 million when that

18   license was a license that garnered $77,000 from Blue Coat.

19             There is no evidence of what Blue Coat -- they

20   can provide no evidence of what Blue Coat paid, just when

21   they paid.  They can't provide evidence whether it was from

22   VSAPI or iCRC or it was '050 related technology of iCRC that

23   Blue Coat was paying for.  There is no technical evidence

24   for Mr. Wagner to rely upon.  This must be excluded because

25   it's unreliable and unprincipled.

```
 1              In fact, the agreement only calls for up to
 2   50,000 users.  They would like to apply it now to millions
 3   of users.  Where is that extrapolation coming from?
 4              One more thing on slide 126.  And you commented
 5   on this yourself, Your Honor.
 6              In April 2006, they paid $750,000 for the
 7   portfolio -- portfolio which included the '050.
 8              In the hypothetical negotiation, using
 9   Mr. Wagner's date.  September 2006 is his hypothetical
10   negotiation.  So five months later, they would like the jury
11   to hear that Trend, by itself, would willingly agree to pay
12   license fees that would total $120 million for five months
13   of their ownership.
14              They have turned that thing into a diamond, as
15   we will hear from their CEO, and 160 times the purchase
16   price.  I don't know what they did to it but obviously if we
17   sat across the table who from someone who bought a patent
18   portfolio for $750,000.  I don't think it's principle to
19   say we would pay $120 million.  Thank you, Your Honor.
20              THE COURT:  Mr. Hess, you have a chance to
21   respond, if you wish.
22              MR. HESS:  Thank you.  I will only address one
23   point.  And Mr. Dunlavey is such a good attorney he waited
24   until he was done to mention the waiver point.  I'm glad I
25   kept one more minute to address it.
```

1          Both Trend and Symantec argue that Intellectual

2     Ventures did not respond to the point that the VSAPI and

3     iCRC engine licensed in the Blue Coat agreement had the same

4     royalty rate attached.

5          This argument we did not address it is false.  I

6     addressed it in its briefing and, more importantly,

7     Mr. Wagner addressed it repeatedly in his reply report and

8     his testimony.  It's on page 2 of our answering brief to

9     the Trend motion to exclude.  And we develop again on page 4

10    of our Trend answering brief.

11         And then Mr. Wagner addressed this report in his

12    reply brief, paragraph 103 on page 38, and then he addressed

13    the same point on both pages of his deposition, page 154,

14    when the Trend attorney deposed him, and page 336 and 337

15    when the Symantec attorney deposed him.  This is not waived.

16         Thank you for your time.

17         THE COURT:  Okay.  Thank you.

18         There is one more motion that you didn't touch

19    on that I am curious to hear a tiny bit on, so I'll give

20    each side a few minutes, if you wish, and I would appreciate

21    if you would address it.  It's the motion for partial

22    summary judgment by the plaintiff against Trend Micro on

23    eight of these affirmative defenses.

24         Actually, let me hear from the defendants

25    first, because my question really is whether defendants are

1    opposing this motion because it's a little hard to tell from

2    the briefing.

3              MR. FLAGEL:  For Symantec, Your Honor, I don't

4    think we filed any opposition.

5              THE COURT:  No, I think you have exactly "not

6    opposed."  Thank you.

7              MR. BARTOW:  Thank you, Your Honor.  And my

8    apologies if there is any anything that is not clear about

9    our response.

10             I think as to standing, I think I can clarify.

11   We are not raising a factual issue as to standing at this

12   point, simply noting the fact standing can be raised at any

13   time, as the Court is well aware.

14             So we think it is potentially premature for the

15   Court to enter partial summary judgment on that point, but

16   if Your Honor is so inclined, we won't --

17             THE COURT:  If we were going to trial right now,

18   there is nothing to try.

19             MR. BARTOW:  That's right.  We don t expect to

20   at this point, that's right.

21             With respect to the intervening rights argument,

22   we know that the '050 patent is in reexam right now.  That

23   reexam is not concluded.  There have been new claims

24   submitted, applied for, with the PTO.  They have not issued

25   at this point.  So there is no question that there are not,

1   as we stand here today, intervening rights; but neither has

2   IV suggested, and I don't think they would be permitted to

3   in any instance, but they haven't suggested they would try

4   to bring new claims into the case.  I don't think Your Honor

5   would permit that.

6            THE COURT:  Again, right now, if there is a

7   trial tomorrow, there are no intervening rights.

8            MR. BARTOW:  Correct.  With respect to implied

9   license and exhaustion, IV I believe represented in its

10  reply brief that its infringement read on Trend Micro

11  products is that the Trend Micro products themselves, and

12  not in conjunction or combination of any other products of

13  a third party, their contention is that they alone meet the

14  claims and as long as they're held to that, that is fine.

15           I think there was some, there is a lack of clarity

16  early on in the case about exactly what their contentions were

17  and whether or not they include combinations of products and

18  so forth.  So I think as long as they're held to that, then I

19  don't think we oppose that either.

20           I think where we do have actually a difference

21  of view is on laches.  And, in fact, I just -- well, if you

22  will indulge me.

23           THE COURT:  For a couple minutes.

24           MR. BARTOW:  Maybe two minutes.  Okay.  Thanks.

25           The law on laches is well established at six

1    years.  I don't think anyone is really disputing that.

2              I will point out to you the *Eastman Kodak v*

3    *Goodyear Tire & Rubber.*  Predecessor delay can be imputed to

4    successor in interest.

5              We prepared a timeline.  I will leave it at that.

6              But the thing I want to highlight here is I know

7    Ms. Taylor I think and/or Mr. Dunlavey in their arguments

8    earlier alluded to a November 2003 letter sent to Symantec

9    by the patentees attempting to sell or potentially license

10   the '050 patent, and my understanding is IV is arguing that

11   that triggered a duty on behalf of Symantec to investigate

12   the '050 patent.

13             So we think that there is factual evidence

14   upon which a fact-finder can conclude the six year laches

15   presumption has in fact been satisfied.  There is evidence

16   that suggests that all the way back in 2003-2004, let alone

17   2006 when IV buys the patent, that these guys are going

18   around telling people that, hey, we're going to license

19   anybody in the anti-spam business on the '050 patent.

20             So we think there are factual disputes and they

21   could find the presumption and, if not, that they otherwise

22   were unreasonable.

23             THE COURT:  Okay.  Thank you.

24             MR. BARTOW:  Thank you.

25             THE COURT:  I'll give the plaintiffs a few

1   minutes to respond, if you would.

2            MS. TAYLOR:  Thank you, Your Honor.  It doesn't

3   sound like I need to address standing or intervening rights.

4            THE COURT:  Only, what would you have me do?  Is

5   it a straightforward grant of summary judgment?

6            MS. TAYLOR:  Yes, I think summary judgment

7   should be granted on those issues.  The case has been around

8   for three years, and there is no factual issue that has been

9   raised.

10           Let me turn to laches because we have a starkly

11   different view of the facts and the law in this situation.

12           So Trend concedes, just for purposes of clarity,

13   that it will not argue laches as to the '610.

14           The Court should further grant Intellectual

15   Ventures motion for summary judgment on laches on the '050

16   patent for two independent reasons:

17           One, Trend does not dispute that IV did not

18   engage in extraneous or improper tactics and unrefuted

19   Federal Circuit law that means there can be no undue delay

20   even accepting Trend's incorrect constructive notice.

21           Second, Trend cannot show the requisite

22   evidentiary prejudice.  Let me lead first with the timing

23   consideration.

24           First, Trend's laches claim fails because it is

25   conceded that there were no extraneous or improper tactics.

1          Federal Circuit precedent in *Meyers* and in

2     *Rosemount* and in district cases following those Federal

3     Circuit cases are clear that a defendant asserting laches

4     must establish one of two things to establish undue delay:

5     either the presumption over six years or extraneous improper

6     tactics.  There is no allegation much extraneous or improper

7     tactics here.

8          Now let's talk about the timeline.

9          It is clear that the infringing product was not

10    released until the fall of 2006.  Thus, there cannot be the

11    start of the alleged delay cannot be imposed until the fall

12    of 2006.  The fall of 2006 is a starting point and suit was

13    filed at the end of 2010.  Then we're at even less than ten

14    years.

15         If you take a constructive notice theory which

16    Trend's brief doesn't set out the legal standard for

17    constructive notice, but the Federal Circuit's *Wandless*

18    decision hold the period of delays begins at the time the

19    patentee had actual or constructive knowledge of the

20    defendant's potentially infringing activities.

21         How could the patentee have had knowledge of

22    Trend's potentially infringing activities when the product

23    was not released until the fall of 2006 and no product

24    before it had the accused features.

25         Further, it would be Trend's purpose to show

1   their open and notorious activities such as sales and

2   marketing activities that would put a patentee on notice.

3   Instead, Trend tries to shift the burden to IV saying that

4   IV was looking and the patentee was looking around for

5   someone to potentially look at the patent.

6          That doesn't establish constructive notice.

7   Constructive notice is established by the accused

8   infringer's activities.  And so here we've got a clock that

9   goes back to 2006 at the earliest or even under their

10  constructive notice period in their brief, they cite to

11  2005 which would be less than six years.

12         So when we have a heard of less than six years,

13  Your Honor, the Federal Circuit has held you have got to

14  have the extraneous and improper tactics.

15         Trend doesn't make that showing.  They haven't

16  attempted to make that showing, and they couldn't since

17  there was no pre-suit contact between the patentee and

18  Trend.

19         Let me just move briefly.  The elements are

20  dependent.  So if they fall there, the laches claim is dead.

21         On the evidentiary prong, they also fail.  You

22  cannot, in order to create a claim of evidentiary prejudice

23  hope for a defense that you would have had and say there is

24  some piece of evidence that might have established it when

25  it's contradicted, which is exactly what has happened here.

1        Trend says, well, we might have had a public

2    use bar on the '050 if only we had had the allegedly

3    missing CD which it really hadn't been established that

4    it's missing; but that argument fails because all of the

5    testimony of the inventors who were deposed, plus documents

6    that were produced support there was no public use.  It was

7    kept confidential.  It was under the inventor's control.

8        Federal Circuit precedent is clear that there

9    could be no public use bar.  And I would cite you to the

10   *American Seeding* case.

11       So for both of those independent reasons, their

12   laches claim must fail.

13       Let me turn briefly to patent exhaustion and

14   implied license.  This argument was given very short shrift

15   in Trend's brief.  None of the legal standard were set

16   forth.

17       There was if IV had given a license to someone,

18   that license could exhaust.  There is no citation of any

19   license agreement for the Court to consider in the record or

20   for IV to consider.  So there is no exhaustion agreement

21   that could be considered or implied license agreement.

22       But as the *Quanta* case is clear, the question

23   is whether or not the supposedly licensed product practices

24   the patent, and that is the only thing that the supposedly

25   licensed product can do.

1           The accused products here are the Trend

2    products, Your Honor.  And with that, and without having

3    any license in the record to consider, I don't think there

4    is any genuine issue of material fact on either patent

5    exhaustion or implied license.

6           THE COURT:  And it's the Trend products alone

7    you are accusing?

8           MS. TAYLOR:  Yes, the claim limitations are met

9    by the Trend products.

10          THE COURT:  Okay.  Thank you.  Briefly, if you

11   wish.

12          MR. BARTOW:  Very briefly.  Yes, Your Honor.

13          I think we have an understanding now as least

14   as to the implied license and exhaustion defenses, and we'll

15   withdraw our opposition with counsel's representation.  That

16   is fine.

17          Just two comments very briefly on laches.

18          First of all, we're arguing the six year

19   presumption may apply.  And in that event, it shifts the

20   burden of production to the plaintiff.  So I don't think

21   it's true that if the presumption applied, we would in fact

22   need to affirmatively also show the conduct from.  So I

23   don't think that is right.

24          I'll just point out as to the infringing product

25   argument, and I don't want to oversell the Court's recent

1    *St. Clair* opinion but I think it did recognize potentially

2    and, in that opinion, the mindset of the patentee is

3    relevant.

4                Yes, as we stand here today, the accused

5    products they're accusing right here right now did not come

6    on the market until 2007-2008, around that time frame, but

7    earlier there is certainly evidence, and as pointed to by IV

8    in its briefing particularly with respect to Symantec, that,

9    in fact, the patentees were going to or did have more than a

10   mere suspicion.  And that is a Delaware case that uses that

11   language, that the entire anti-spam industry was infringing.

12               Thank you.

13               THE COURT:  Thank you.  We covered a lot of

14   ground.  I appreciate the very thorough and helpful

15   arguments.  We'll take the motions under advisement, and

16   we'll be in recess.

17               (Hearing ends at 2:56 p.m.)

18

19       I hereby certify the foregoing is a true and accurate
     transcript from my stenographic notes in the proceeding.

20

21                          /s/ Brian P. Gaffigan
                            Official Court Reporter
22                            U.S. District Court

23

24

25