**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

INTELLECTUAL VENTURES I LLC,                  :
                                              :
    Plaintiff,                           :
                                              :
    v.                                   :    C.A. No. 10-1067-LPS
                                              :
CHECK POINT SOFTWARE                          :
TECHNOLOGIES LTD., CHECK POINT                :
SOFTWARE TECHNOLOGIES, INC.,                  :
MCAFEE, INC., SYMANTEC CORP.,                 :
TREND MICRO INCORPORATED, and                 :
TREND MICRO, INC. (USA),                      :    PUBLIC VERSION
                                              :    RELEASED APRIL 14, 2014
    Defendants.                          :
_____         :
                                              :
INTELLECTUAL VENTURES I LLC,                  :
                                              :
    Plaintiff,                           :
                                              :
    v.                                   :    C.A. No. 12-1581-LPS
                                              :
TREND MICRO INCORPORATED, and                 :
TREND MICROS, INC. (USA)                      :
                                              :
    Defendants.                          :

---

Joseph J. Farnan, III, Brian E. Farnan, FARNAN LLP, Wilmington, DE.

Parker C. Folse III, Brooke A.M. Taylor, Lindsey N. Godfrey, SUSMAN GODFREY L.L.P., Seattle, WA.

Weston O'Black, John P. Lahad, Richard W. Hess, SUSMAN GODFREY L.L.P., Houston, TX.

    Attorneys for Plaintiff Intellectual Ventures I LLC.


Jack B. Blumenfeld, Thomas C. Grimm, Karen Jacobs, Michael J. Flynn, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington DE.

    Attorneys for Defendants.

Yar R. Chaikovsky, D. Stuart Bartow, Michael F. Martin, McDERMOTT WILL & EMERY LLP, Menlo Park, CA.

David M. Beckwith, McDERMOTT WILL & EMERY LLP, Irvine, CA.

    Attorneys for Defendant Trend Micro Incorporated and Trend Micro, Inc. (USA).


Mark A. Flagel, Neil A. Rubin, Kathy Yu, LATHAM & WATKINS LLP, Los Angeles, CA.

Dean G. Dunlavey, LATHAM & WATKINS LLP, Costa Mesa, CA.

Michelle P. Woodhouse, LATHAM & WATKINS LLP, Menlo Park, CA.

Andrew J. Fossum, LATHAM & WATKINS LLP, Houston, TX.

Yury Kapgan, Suong Nguyen, QUINN EMANUEL URQUHART & SULLIVAN LLP, Los Angeles, CA.

    Attorneys for Defendant Symantec Corporation.

---

## MEMORANDUM OPINION

March 31, 2014
Wilmington, Delaware

**STARK, U.S. District Judge:**

Pending before the Court in this patent infringement action are the following motions:

1. Defendants' motion for leave to supplement the record to address recently developed facts regarding their motion for clarification of the Court's construction of "within the telephone network." (D.I. 498, C.A. No. 10-1067) (D.I. 63, C.A. No. 12-1581);

2. Defendants' motion for clarification of the Court's construction of "within the telephone network" (D.I. 437, C.A. No. 10-1067) (D.I. 10, C.A. No. 12-1581);

3. IV's motion to exclude three opinions of Symantec's damages expert W. Christopher Bakewell (D.I. 514, C.A. No. 10-1067);

4. Defendant Symantec Corporation's *Daubert* motion to exclude the testimony of Intellectual Ventures' Damages Expert, Michael Wagner (D.I. 511, C.A. No. 10-1067);

5. Trend Micro Incorporated and Trend Micro, Inc. (USA)'s *Daubert* motion to exclude the opinions and testimony of Plaintiff's damages expert (D.I. 73, C.A. No. 12-1581);

6. IV's motion to exclude Trend Micro's experts' opinions on one purported "non-infringing" alternative design" ("offshoring servers" – '050 patent) (D.I. 76, C.A. No. 12-1581);

7. IV's additional motion to exclude Trend Micro's experts' opinions on one purported "non-infringing" alternative design ("offshoring servers" – '610 patent) (D.I. 78, C.A. No. 12-1581);

1

8.     IV's motion to exclude Symantec's expert's opinions regarding an "indication of a characteristic" and related claim terms and "technically relevant" patents (D.I. 517, C.A. No. 10-1067);

9.     Symantec's Motion for Summary Judgment (D.I. 508, C.A. No. 10-1067);

10.    Trend Micro's motion for summary judgment (D.I. 71, C.A. No. 12-1581);

11.    IV's motion for partial summary judgment on eight Trend Micro affirmative defenses (D.I. 80, C.A. No. 12-1581);

12.    Defendants' motion for partial summary judgment on four Symantec affirmative defenses (D.I. 519, C.A. No. 10-1067);

13.    Symantec's motion for leave to amend answer, affirmative defenses, and counterclaims (D.I. 451, 10-1067);

14.    Trend Micro's motion for leave to amend answer, affirmative defenses, and counterclaims (D.I. 30, C.A. No. 12-1581); and

15.    Defendants' motion for sanctions for spoliation of evidence (D.I. 454, C.A. No. 10-1067) (D.I. 22, C.A. No. 12-1581).

## I.    BACKGROUND

Intellectual Ventures I LLC ("IV") brought suit against Check Point Software Technologies Ltd., Check Point Software Technologies, Inc., McAfee, Inc., Symantec Corporation ("Symantec"), and Trend Micro, Inc. (USA) ("Trend Micro" and, together with Symantec, "Defendants") alleging patent infringement of U.S. Patent Nos. 5,987,610 (the "'610 patent"), 6,073,142 (the "'142 patent"), 6,460,050 (the "'050 patent"), and 7,506,155 (the "'155 patent") on December 8, 2010. (D.I. 1, C.A. No. 10-1067) IV's action against Trend Micro was

severed on November 21, 2012 and was assigned C.A. No. 12-1581. (D.I. 1, C.A. No. 12-1581)

The two cases have been consolidated for pretrial purposes. (D.I. 1, C.A. No. 12-1581)

The Court issued a claim construction order on December 12, 2012. (D.I. 426)[1] Fact

discovery is complete, and no trial date has been set. The Court heard oral argument on the

pending motions on August 29, 2013 (D.I. 569) ("Tr.") and now resolves them.

## II.    LEGAL STANDARDS

### A.    *Daubert*

Federal Rule of Evidence 702 requires that expert testimony "help the trier of fact to

understand the evidence or to determine a fact in issue." Expert testimony is admissible only if

"the testimony is based on sufficient facts or data," "the testimony is the product of reliable

principles and methods," and "the expert has reliably applied the principles and methods to the

facts of the case." Fed. R. Evid. 702. There are three distinct requirements for proper expert

testimony: (1) the expert must be qualified; (2) the opinion must be reliable; and (3) the opinion

must relate back to the facts. *See Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000).

### B.    Summary Judgment

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, "[t]he court shall grant

summary judgment if the movant shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law." The moving party bears the burden of

demonstrating the absence of a genuine issue of material fact. *See Matsushita Elec. Indus. Co.,*

*Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). An assertion that a fact cannot be – or,

alternatively, is – genuinely disputed must be supported either by citing to "particular parts of

---

[1] Unless otherwise indicated, all D.I. numbers are in C.A. No. 10-1067.

3

materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B). If the moving party has carried its burden, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587 (internal quotation marks omitted). The Court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

To defeat a motion for summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586; *see also Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (stating party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted). However, the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment;" a factual dispute is genuine only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (stating entry of summary judgment is mandated "against a party who fails to

4

make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial"). Thus, the "mere existence of a scintilla of evidence" in support of the nonmoving party's position is insufficient to defeat a motion for summary judgment; there must be "evidence on which the jury could reasonably find" for the nonmoving party. *Anderson*, 477 U.S. at 252.

### C.    Motions for Clarification or Reconsideration

Pursuant to Local Rule 7.1.5, a motion for reconsideration should be granted only "sparingly." The decision to grant such a motion lies squarely within the discretion of the district court. *See Dentsply Int'l, Inc. v. Kerr Mfg. Co.*, 42 F. Supp. 2d 385, 419 (D. Del.1999); *Brambles USA, Inc. v. Blocker*, 735 F. Supp. 1239, 1241 (D. Del. 1990). These types of motions are granted only if the court has patently misunderstood a party, made a decision outside the adversarial issues presented by the parties, or made an error not of reasoning but of apprehension. *See Schering Corp. v. Amgen, Inc.*, 25 F. Supp. 2d 293, 295 (D. Del.1998); *Brambles*, 735 F. Supp. at 1241. "A motion for reconsideration is not properly grounded on a request that a court rethink a decision already made." *Smith v. Meyers*, 2009 WL 5195928, at * 1 (D. Del. Dec. 30, 2009). It is not an opportunity to "accomplish repetition of arguments that were or should have been presented to the court previously." *Karr v. Castle*, 768 F. Supp. 1087, 1093 (D. Del. 1991).

A party may seek reconsideration only if it can show at least one of the following: (i) there has been an intervening change in controlling law; (ii) the availability of new evidence not available when the court made its decision; or (iii) there is a need to correct a clear error of law or fact to prevent manifest injustice. *See Max's Seafood Café ex rel. LouAnn, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999). However, in no instance should reconsideration be

5

granted if it would not result in amendment of an order. *See Schering Corp.*, 25 F. Supp. 2d at
295.

### D.    Motions to Amend

Pursuant to Federal Rule of Civil Procedure 15, courts generally grant motions to amend

absent a showing of undue delay, bad faith, or dilatory motive on the part of the movant, undue

prejudice to the opposing party, or futility of the amendment. *See Dole v. Arco Chem. Co.*, 921

F.2d 484, 487 (3d Cir. 1990).  When a request for leave to amend arises after the deadline for

such amendments under the governing scheduling order, the movant must also satisfy Federal

Rule of Civil Procedure 16(b)(4), which provides "[a] schedule may be modified only for good

cause and with the judge's consent." Good cause is present when the schedule cannot be met

despite the moving party's diligence. *See Leader Techs., Inc. v. Facebook, Inc.*, 2010 WL

2545959, at *3 (D. Del. June 24, 2010).

## III.    DISCUSSION

### A.    Defendants' Motion for Leave to Supplement Record

In connection with their pending motion for clarification of the Court's construction of

the claim term "within the telephone network," Defendants ask the Court to take into account

recent statements made by Dr. McDaniel which purportedly contradict IV's arguments that

switching offices and processors are gateway nodes.  (D.I. 498 Ex. C at 651-53)  IV argues that

Defendants take Dr. McDaniel's statements out of context.  (D.I. 503 Ex. B at 268-71)  The

Court agrees with IV that Dr. McDaniel's statements are related to his interpretation of the

Court's claim construction (D.I. 503 Ex. B at 268); however, the Court concludes that his

statements are relevant to Defendant's motion for clarification and will, therefore, take them

6

under consideration. Accordingly, the Court will grant Defendants' motion.[2]

## B.   Defendants' Motion for Clarification of Claim Construction

Defendants seek clarification (D.I. 437, C.A. No. 10-1067) of the "within the telephone

network" term which the Court construed to mean "in the voice or data network connecting the

calling party and the called party, exclusive of the networks and gateway nodes of the called

party and calling party." (D.I. 425 at 24)  In essence, Defendants wish to know whether the

telephone network of the Court's construction excludes any and all gateway nodes, or only

excludes gateway nodes of the called and calling parties.

The Court agrees with IV that Defendants' motion is properly viewed as a motion for

reconsideration.[3]  The heart of Defendants' motion is whether the patentee disclaimed all

gateway nodes, or gateway nodes of the calling or called party.  Despite Defendants' assertions

otherwise, this issue was squarely before the Court during claim construction.  IV's opening

claim construction brief allocates a majority of its analysis on the "within the telephone network"

term to U.S. Patent No. 5,623,600 ("Ji").  In discussing Ji, IV stated that "[t]he 'gateway nodes'

of the Ji patent are part of a party's network," and that "the patentees expressly indicated during

prosecution of the '610 patent that 'gateway nodes' are not part of the claimed telephone

network." (D.I. 223 at 30-31)  IV concluded its analysis by arguing that the term "should be

construed to exclude *any* nodes or computers located at the networks of the calling or called

party." (*Id.*) (emphasis added)  The scope of patentees' disclaimer in light of Ji was briefed for

---

[2] This analysis similarly applies to D.I. 63, C.A. No. 12-1581.

[3] IV submitted a letter to the Court requesting that the Court strike Defendants' reply brief
pursuant to Local Rule 7.1.5(a).  (D.I. 462)  The Court agrees that Defendants' motion is one for
reconsideration and, accordingly, will strike Defendants' reply brief.

7

the Court, and the Court's claim construction opinion resolved the parties' dispute. Thus, Defendants' motion is one for reconsideration.

Defendants have failed to meet the standard for reconsideration. Defendants do not present any change in controlling law, nor do they present any new arguments or evidence not previously before the Court. Nor does the Court believe there is a need here to correct clear error of law or fact. The Court disagrees with Defendants' contention that the patentees clearly and unambiguously disavowed any and all gateway nodes when distinguishing the invention over prior art. Thus, the Court will deny Defendants' motion.[4]

## C.    IV's Motion to Exclude Three Symantec Damages Opinions

IV requests that the Court exclude three opinions proffered by Symantec's valuation, licencing, and damages expert, W. Christopher Bakewell, as unreliable, unsupported, and unhelpful. (D.I. 514, C.A. No. 10-1067)  IV seeks to exclude Mr. Bakewell's opinion related to: (1) the "walk prices" spreadsheet for lack of factual basis; (2) his survey-based opinions as unreliable; and (3) alternative design opinions for lack of factual support.  For the following reasons the Court will deny the motion.

### 1.    "Walk Prices" Spreadsheet

The disputed spreadsheet ("IV-58"), entitled "Selected List of Unelected Deals for Intel - Security Patents (As of 12/06/2010)," contains the "walk price" for different groups of patents. (D.I. 515 Ex. 2)  The "walk price" indicates the price "below which [IV] wouldn't go" (D.I. 532 Ex. G at 200), considering a number of factors in evaluating the patent group (*id.* Ex. B at 125-26). Mr. Bakewell considered IV-58, among other data, in providing his damages

---

[4] The Court will also deny D.I. 10, 12-1581.

assessment. It is undisputed that IV created and produced the disputed spreadsheet. (D.I. 532 Ex. C at 32)

The Court concludes that Mr. Bakewell's reliance on IV-58 and his resulting opinions are admissible. IV-58 is IV's own document, upon which its experts rely. Thus, IV-58 is the type of data "reasonably relied upon by experts" in the field, and Mr. Bakewell's reliance on IV's internal document is appropriate. *See In re TMI Litig.*, 193 F.3d 613, 697 (3d Cir. 1999); *In re Flonase Antitrust Litig.*, 884 F. Supp. 2d 184, 192-93 (E.D. Pa. 2012) (permitting expert to rely upon defendant's internal documents and stating that challenges to testimony are suited for cross examination). Mr. Blackwell's reliance on IV-58 is not so unreasonable as to make his opinion inadmissible.

The Court is not persuaded by IV's remaining challenges to this portion of Mr. Bakewell's testimony. IV-58 is specifically designated for Intel (D.I. 515 Ex. 2), but whether or not Intel actually received and/or rejected any walk price is not sufficient grounds to exclude Mr. Bakewell's testimony. IV's objections that IV-58 does not provide walk prices, or that IV does not use walk prices, appear to be contradicted by the face of the document. (*Id.*)

### 2. Survey-Based Opinions

The survey data to which IV objects includes open-ended comments provided by consumers in response to their satisfaction with products. (D.I. 532 Ex. A at ¶ 241) IV's objections go to the weight of the evidence and can be explored through cross examination and the presentation of competing evidence. Mr. Bakewell rebuts IV's expert's position that the infringing features are important to consumers, based in part on his consideration of consumer feedback. Importantly, Mr. Bakewell recognizes that the survey data on which he relied results

9

from open-ended questions, and he explains that he searched for relevant terms provided by Dr.

Eugene Spafford, Symantec's noninfringement expert. (D.I. 532 Ex. A at ¶ 241) Mr. Bakewell's

opinions do not solely consider the survey data. He also considered statements from Symantec's

Marketing Director of Consumer Products (*id.* at ¶¶ 293-94), whether a feature is optional (*id.* at

¶ 416), that consumers might not install infringing features (*id.* at ¶ 417), that only some products

contain infringing features (*id.* at ¶ 418), and the impact of a feature and whether or not a product

would function the same without it (*id.* at ¶ 469). The Court concludes that any objections to the

type or data considered or the thoroughness of the analysis go to the weight of the evidence, not

its admissibility.

### 3.   Non-infringing Alternative Designs

IV objects to Mr. Bakewell's opinions on the non-infringing alternative designs for the

'050 and '610 patents, specifically the feasibility of moving servers outside of the United States.

These objections are substantially the same as those asserted against the experts of Symantec's

co-defendant Trend Micro, Drs. Leonard, Prakash, and Tygar. (D.I. 76, C.A. No. 12-1581)

The Court concludes that IV's objections may be properly addressed during cross

examination and through the presentation of competing evidence. Mr. Bakewell may rely upon

statements made by Dr. Spafford, specifically Dr. Spafford's statement that "it is [his] opinion

that the reputation servers could be moved to a location outside the United States with virtually

no impact on performance." (D.I. 532 Ex. N at ¶ 399) Dr. Spafford elaborates on his opinion

that Canada would be the best alternative location due to the lack of commercial impact of such a

move, the minimal cost differences, the indistinguishable capacities, and the fact that

transmission times would be substantially the same. (*Id.* at ¶ 400) IV has not sought to exclude

10

Dr. Spafford's opinion, and Mr. Bakewell may rely upon another expert's opinions so long as they are of the type reasonably relied upon by experts in the field. *See* Fed. R. Evid. 703. In addition to Dr. Spafford, Mr. Bakewell relies on interviews of Symantec employees. Both parties' experts rely on such "unsworn" statements, and the Court concludes that Mr. Bakewell may rely on these statements in forming his opinion.

### D.    Symantec's Motion to Exclude IV's Damages Expert Michael Wagner

Symantec moves to exclude IV's damages expert, Michael Wagner, because his opinions are unreliable, speculative, and contrary to the law. (D.I. 511, C.A. No. 10-1067)  For the reasons discussed, the Court will deny the motion.

#### 1.    '050 Patent

IV purchased the '050 patent, along with two foreign patent applications, for $750,000. (D.I. 513 Ex. A at ¶ 196)  Mr. Wagner ignores this price and bases his analysis instead on a licensing agreement between Trend Micro and Blue Coat Systems, Inc. ("the OEM Agreement"). Mr. Wagner concluded that the actual sale prices of the patents were irrelevant in his analysis. The Court does not find this conclusion to be unreliable, speculative, or contrary to law.

Several factors cause the Court to reach this conclusion. First, parties in a hypothetical negotiation are presumed to have perfect knowledge of all facts and circumstances, some of which were unknown during the actual patent negotiations and acquisition. *See Mobil Oil Corp. v. Amoco Chemicals Corp.*, 915 F.Supp. 1333, 1353 (D. Del. 1994). Second, when IV purchased the patents in suit, several accused products were not even in existence. (D.I. 538 at 19)  Third, licensing patents as an investment versus licensing the patent for use are distinct transactions. Fourth, IV incurred significant expense in licensing the patents subsequent to the acquisition, a

11

cost that may not have been factored into the actual sale of the patents. (*Id.* at 20)

Symantec also argues that the OEM Agreement is not probative of the value of the patents-in-suit, in part because it is not a patent license. In Symantech's view, Mr. Wagner's reliance on the OEM Agreement renders his opinion unreliable. The Court disagrees. The OEM Agreement is probative to the '050 patent, particularly in light of the statement of Symantec's expert, Dr. Patrick D. McDaniel, that the OEM Agreement involves "one of the specific Trend Micro technologies accused of infringing the '050 Patent," providing a clear link to the patent. (D.I. 539 Ex. E at ¶ 215) *See generally ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 870 (Fed. Cir. 2010) (remanding with instructions not to consider unrelated licenses without clear link to invention). Indeed, the OEM Agreement states that the Trend Product "is the cloud based equivalent of VSAPI." (*Id.* Ex. D at TMIVA0045759)

The Court is unpersuaded by Symantec's complaint that it was not able to take discovery into the OEM Agreement. Symantec identifies no basis for imposing an obligation on IV to disclose Mr. Wagner's reliance on the agreement prior to the deadline for exchange of expert reports. Symantec's remaining objections to Mr. Wagner's reliance on the OEM Agreement – that it involves additional technology or provisions and includes non-accused features – also do not provide a basis for exclusion of his testimony.

### 2. '610 Patent

IV purchased the '610 patent, along with another patent and five applications, for $770,000. (D.I. 513 Ex. A at ¶ 396) Like the '050 purchase price, Mr. Wagner does not factor the $770,000 purchase price in his analysis. Mr. Wagner opines that a reasonable royalty of $6,560,088 is appropriate. (*Id.* Ex. C at ¶ 15) For the reasons already stated with respect to the

12

'050 patent, the Court likewise will not exclude Mr. Wagner's opinion for failing to consider the '610 patent's purchase price.

Symantec also argues that Mr. Wagner committed a fatal error by applying the Entire Market Value Rule ("EMVR") even though he admitted that the technology allegedly protected by the '610 patent is not the sole basis for customer demand. The Entire Market Value Rule is applicable when a patented feature is the sole basis for demand. *See Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1336 (Fed. Cir. 2009). Here, IV argues that the EMVR applies because the '610 patent is the essence of "security-as-a-service" products. (D.I. 539 Ex. E at ¶ 52) The Court agrees that this is a permissible opinion under the circumstances here.

Dr. McDaniel states that "[w]ithout the invention of the '610 Patent, security providers . . . would be limited to traditional screening at the customer's computer or . . . network, which do not fall into the security-as-a-service or fully-hosted category of products." (*Id.*) According to Dr. McDaniel, Symantec's '610-accused products enable malware detection and antivirus scanning to take place in the Cloud. (*Id.* Ex. G at ¶ 445-48, 466) Mr. Wagner states that he relied on Dr. McDaniel's statements that the '610 Patent drives demand for the accused Trend Micro products. (*Id.* Ex. F at 191) Accordingly, it was not inappropriate for Mr. Wagner to employ the EMVR analysis in conducting his analysis.

The Court also concludes that Mr. Wagner properly considered three other settlement agreements. Mr. Wagner analyzed licenses for United States Patent No. 5,623,600 (the "'600 Patent") in providing a royalty rate. He opines that the '600 Patent technology is similar to the technology of the '610 Patent. (D.I. 539 Ex. G at ¶ 337) Dr. McDaniel also concludes that the two patents are "comparable in the sense that they both contemplate virus screening at a

13

particular location . . . [and] disclose technology fundamental to their respective implementations." (*Id.* Ex. E at ¶¶ 216-17)

The Court is persuaded that Symantec's objections go to the weight of Mr. Wagner's testimony, not its admissibility, and will therefore deny the motion.

### 3. '142 Patent

IV purchased the '142 patent for $200,000 from Park City Group ("Park"). (D.I. 513 Ex. A at ¶ 510) As with the patents-in-suit discussed above, Mr. Wagner opines that the purchase price of the '142 patent is irrelevant, and states that a royalty of $14,701,916 is appropriate. (*Id.* Ex. C at ¶ 15) Symantec argues that the fact that Park was willing to sell its patents for $200,000 "cannot be reconciled with" Mr. Wagner's assertion that Park "would have insisted [on] $14.7 million to license its patent." (D.I. 512 at 17) This inconsistency, Symantec argues, warrants exclusion of Mr. Wagner's opinion.

However, as IV points out, the circumstances surrounding the Symantec-Park negotiation were not the same as those of a hypothetical negotiation. At the very least, nothing in the record shows that the parties to the Symantec-Park agreement assumed that the patent was valid and infringed – key assumptions upon which the hypothetical negotiation is predicated. *See Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1325 (Fed. Cir. 2009) ("The hypothetical negotiation also assumes that the asserted patent claims are valid and infringed."). Whether the differences between the hypothetical negotiation and the Symantec-Park agreement render the agreement particularly probative for the purposes of an accurate damages calculation is a factual dispute that can be adequately addressed through cross-examination and presentation of competing evidence.

14

Thus for essentially the same reasons discussed with respect to the '050 and '610 patents,

the Court will not exclude Mr. Wagner's opinion for failing to consider the '142 patent's

purchase price.

Symantec also objects to Mr. Wagner's reliance on two statements made by Huron

Consulting Group concerning the value of patents that Symantec acquired when it purchased

Brightmail Incorporated in 2004:

> 16. [An] average pre-tax royalty rate [which] was
> estimated to be 1.5% and was based on
> consideration of technology licensing programs,
> including IMB's active patent licensing program.

> 17. Symantec management indicated that patent
> royalties in similar areas average approximately
> 1.0% to 2.0% of revenues.

(D.I. 512 at 17) Symantec contends that the Court cannot allow Mr. Wagner to rely on these

statements because he does not tie them to the facts of this case. (*Id.*) IV's technical expert, Dr.

McDaniel, opined that the Huron-valued patents are comparable and related to the '142 patent.

(D.I. 539 Ex. E at ¶ 221) Whether the Huron-valued patents are comparable to the '142 patent is

a fact question that goes to the weight of Mr. Wagner's analysis, not its admissibility.

Accordingly, again, the Court will deny Symantec's request to exclude Mr. Wagner's expert

opinion with respect to the '142 patent.

#### 4.    '155 Patent

IV purchased the '155 patent, in addition to another patent and pending application, for

$285,000. (D.I. 513 Ex. A at ¶ 578) Mr. Wagner does not consider this purchase price in

calculating his reasonable royalty of $1,000,000 for infringement of the '155 patent. (*Id.* at

¶ 628) For the reasons discussed in connection with the other patents-in-suit above, the Court is not persuaded that Mr. Wagner's exclusion of the purchase price from his analysis warrants excluding his testimony.

Symantec also argues that Mr. Wagner improperly relies upon settlement agreements that are unrelated to the patent. However, Mr. Wagner has opined that the patents involved in those negotiations were comparable to the '155 patent. For substantially the same reasons discussed above, the Court will not exclude Mr. Wagner's expert opinion with respect to the '155 patent.

### E. Trend Micro's Motion to Exclude IV's Damages Expert Michael Wagner

Like Symantec, Trend Micro also moves to exclude Mr. Wagner's damages opinion. (D.I. 73, C.A. No. 12-1581) Mr. Wagner opines that the following are reasonable royalties for infringement of the patents asserted against Trend Micro: $119.07 million for the '050 patent, $6.33 million for the '142 patent, and $594,660 for the '610 patent. (D.I. 82 Ex. 41 at ¶ 167) For substantially the same reasons as discussed above in connection with Symantec's motion to exclude Mr. Wagner, the Court will deny Trend Micro's similar motion as well.

#### 1. '050 patent

With respect to the '050 patent, Trend Micro argues that its bundling license agreement with Blue Coat (the "OEM Agreement") is not probative of the patents-in-suit and is not comparable because it is not a patent license, so Mr. Wagner's reliance on the agreement renders his opinion unreliable. For substantially the same reasons as discussed above in connection with Symantec's similar argument, the Court will not exclude Mr. Wagner's opinion with respect to the '050 patent.

16

### 2.     '142 Patent

Trend  Micro argues that Mr. Wagner's opinion is unreliable because it is based on a

third-party presentation that is irrelevant to Trend  Micro, Park City Group, or the '142 patent.

Trend  Micro's arguments with respect to the '142 patent are essentially a duplicate of

Symantec's arguments with respect to Mr. Wagner's analysis of the same patent.  For the reasons

discussed with respect to Symantec's motion, the Court will deny Trend Micro's request to

exclude Mr. Wagner's expert opinion with respect to the '142 patent.

### 3.     '610 Patent

Trend Micro argues that Mr. Wagner's opinion with respect to the '610 patent is

unreliable because it relies on a settlement agreement that is unrelated to the '610 patent.  IV

responds that Mr. Wagner properly relied upon three licenses to the '600 patent.  Mr. Wagner

relied on Dr. McDaniel's conclusion that the '600 patent was comparable to the '610 patent (D.I.

99 Ex. A at ¶ 340), as well as his own analysis in drawing the same conclusion (*id.* at ¶ 341).

Mr. Wagner dedicated almost twenty pages of his report to a detailed analysis of the '600 patent

licenses.  (*Id.* at ¶¶ 342-88)  For essentially the same reasons discussed with respect to

Symantec's motion, the Court will deny Trend  Micro's request to exclude Mr. Wagner's expert

opinion with respect to the '610 patent.

### 4.     ███████████████

Trend  Micro argues that Mr. Wagner's reliance on the ██████████████████ as a

reasonableness check is inadmissible as unfairly prejudicial.  According to Trend  Micro, it is

improper for IV to use the ████████████████████ to establish that Mr. Wagner's

$126 million royalty is reasonable.  *See Uniloc*, 632 F.3d at 1320.  Next, Trend  Micro argues

██████████████████████████████████████████████████████████

████████████████████████████████████████ Trend Micro also contends that

it has not had the opportunity to conduct discovery █████████████████████████

nor has it conducted discovery on the ███████████████████████████████████

██████████████████████████ Finally, Trend Micro contends that because only three of

the four patents-in-suit are asserted against it ████████████████, is not probative. Similarly,

Trend Micro argues that it would have sought individual licenses for each of the three patents,

and would not have sought a ██████████████████

      IV responds that Trend Micro's objection to Mr. Wagner's reliance on the ████████████

██████████████████ is a motion in limine in disguise, and on this basis the Court should reject

Trend Micro's arguments

      Mr. Wagner's reliance on the ████████████████████████████ may be addressed by

Trend Micro through cross-examination and presentation of competing evidence.  There is

sufficient basis for Mr. Wagner's reliance on it to be reasonable.  ████████████████████████

█████████████████████████████████████████████████████████████

███████████████████████████████████████████████ █ ███████████████

██████████████████  Mr. Wagner attributed ██████████████████████████████████████

████████████████████ █  The Court cannot conclude that Mr. Wagner's comprehensive

analysis and opinion related to ███████████████████████████ are so unreliable as to be

inadmissible.  Thus, the Court will deny Trend Micro's motion.

**F.    IV's Motion to Exclude Trend Micro's Expert's
        Opinions on "Non-Infringing" Alternative Design – '050 Patent**

IV moves to exclude opinions by Trend Micro's experts, Drs. Atul Prakash and Gregory

Leonard, on the grounds that certain "non-infringing" alternatives about which these experts

opine would actually still infringe the '050 patent. (D.I. 76, C.A. No. 12-1581)  IV further argues

that both experts' opinions are unreliable and unhelpful because they do not rely on sufficient

facts.

Dr. Prakash opines that Trend Micro could have transferred its servers outside of the

United States and thereby avoided infringement. (D.I. 77 Ex. 1 at ¶¶ 179-84)  Dr. Leonard relies

upon Dr. Prakash's opinion in rendering his own opinion that a reasonable royalty of $90,000 is

commensurate with the cost of moving servers outside of the United States.  (*Id.* Ex. 2 at ¶ 7)  IV

counters that transferring certain servers outside the United States would not avoid infringement

because local servers and cache servers would necessarily still be located in the United States.

(*Id.* Ex. 3 at ¶ 88; *id.* Ex. 4 at ¶¶ 20-25)  IV further argues that because Trend Micro's experts do

not provide a non-infringing alternative, these experts' testimony should be excluded.

*Daubert* does not require that a party who proffers expert testimony carry the burden of

proving to the Court that the expert's assessment of the situation is correct.  As long as an

expert's scientific testimony rests upon good grounds, based on what is known, it should be

tested by the adversarial process – competing expert testimony and active cross-examination –

rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or

satisfactorily weigh its inadequacies. *See United States v. Mitchell*, 365 F.3d 215, 244 (3d Cir.

2004).  Accordingly, IV's position that Drs. Leonard's and Prakash's testimony should be

19

excluded because it is incorrect is contrary to Third Circuit law. Whether the proffered alternative is, in fact, non-infringing or is viable are factual questions that may be resolved by a jury.

IV next contends that Dr. Leonard's opinion that deactivating the Local Smart Scan Servers would avoid infringement is both untimely and ipse dixit. (D.I. 77 at 9-13) IV argues that Dr. Leonard performed no analysis, and did not perform any calculations based on revenue earned from Local Smart Scan Servers. (*Id.*) Thus, IV argues that Dr. Leonard's opinion lacks the required "sound economic proof." *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341, 1350 (Fed. Cir. 1999); *see also DSU Med. Corp. v. JMS CO., Ltd.*, 471 F.3d 1293, 1309 (Fed. Cir. 2006). Similarly, IV argues that Dr. Prakash's opinions are inadmissible for failure to rely on sufficient facts.

However, Trend Micro's experts' opinions are supported by the factual representations that: (1) Check Point and its vendors were able to implement offshore servers with minimal cost, time, and effort (D.I. 94 Ex. 55 at ¶ 4 (Check Point's licensed servers located in Germany and the United States in 2012)); *id.* at ¶¶ 6, 7, 13; D.I. 95 Ex. 69 at ¶¶ 4-6); (2) offshoring servers was a viable option for Trend Micro in 2007, as demonstrated by Trend Micro's offshore servers located in Taiwan at the time; (3) Trend Micro's Vice President of Product Development, Robert Liu, testified about Akamai edge cache servers, which were "pre-deployed" globally, and could serve Trend Micro customers (D.I. 94 Ex. 63 at 34); and (4) a conversation with Simon Ko, a Trend Micro employee (D.I. 90 at 15-16). Dr. Prakash also opined that based on his personal experience, because Trend Micro is a global company, Trend Micro would have been able to perform the simple task of moving servers offshore. IV's contentions raise fact issues that do not

20

warrant exclusion of Trend Micro's experts' opinions.

Further, Trend Micro focuses on the date that Local Smart Scan Servers became available, in June 2009, which was after the date of the hypothetical negotiation. As Local Smart Scan Servers were not available at the time of the hypothetical negotiation, Trend Micro contends that they are irrelevant. (D.I. 90 at 5) Whether damages related to Local Smart Scan Servers must be included in the hypothetical negotiation analysis is another fact dispute; even if Dr. Leonard decided not to factor those damages into his analysis, these are issues that go to the weight of his testimony, not its admissibility.

Finally, IV argues that even if the Court concludes that Dr. Leonard's opinions are otherwise admissible, the Court should still exclude them because there is no evidence that the "offshoring" alternative was a viable option available to Trend Micro in 2007 or that offshoring servers provides an equivalent service. *See Kaufman Co., Inc. v. Lantech, Inc.*, 926 F.2d 1136, 1142-43 (Fed. Cir. 1991) ("A product lacking the advantages of that patent . . . can hardly be termed a substitute acceptable to the customer who wants those advantages."). Both Drs. Leonard and Prakash rely on Mr. Ko for the proposition that Trend Micro could have implemented such changes in 2007. IV argues that Mr. Ko never stated that the offshoring alternative was available to Trend Micro in 2007. This dispute over the interpretation of Mr. Ko's testimony is again a factual issue that goes to the weight of the experts' testimony, not its admissibility.

IV has failed to show that Drs. Leonard and Prakash's testimony is based either on insufficient facts, unreliable methodology, or an improper application of those facts to the methodology. Accordingly, the Court will deny IV's motion.

21

### G.   IV's Motion to Exclude Trend Micro's Expert's
###      Opinions on "Non-Infringing" Alternative Design – '610 Patent

IV seeks to preclude the opinion of Trend Micro's expert, Dr. J.D. Tygar, for being

speculative. (D.I. 76, C.A. No. 12-1581)  IV also seeks to preclude Dr. Leonard's opinion related

to the cost of moving servers offshore, based on his reliance on Dr. Tygar's opinion.

Dr. Tygar's opinion with respect to a non-infringing alternative to the '610 patent is as

follows:

> I understand that Dr. Prakash has analyzed the possibility of
> moving a portion of the Trend Micro servers accused of infringing
> the '050 patent outside of the United States. I rely on Dr.
> Prakash's analysis regarding such a move. However, I note that,
> with respect to the products accused of infringing the '610 patent,
> should the servers that perform all or part of the step of detecting
> viruses be moved outside of the United States, then they would not
> be performing all of the steps of the asserted Claim 7 within the
> United States. It is my understanding that, accordingly, such a
> system architecture would not infringe the '610 patent.

(D.I. 79 Ex. 2 at ¶ 184)  IV argues that because Dr. Tygar fails to opine that Trend Micro would

be capable of implementing this purportedly non-infringing alternative, the Court must exclude

his opinion. *See LaserDynamics, Inc. v. Quanta Comp., Inc.*, 2011 WL 197869 (E.D. Tex. Jan.

20, 2011) (excluding speculative expert opinion for failure to state that accused infringer would

be capable of implementation). Even if Dr. Tygar had stated such opinion, IV argues that his

reliance on Dr. Prakash's analysis is improper in relation to the '610 patent.

The Court finds that Dr. Tygar's opinion is not inappropriately speculative.  Dr. Tygar

simply relies on Dr. Prakash's opinion for the proposition that it would have been possible for

Trend Micro to offshore its infringing servers. Based on Dr. Prakash's opinion, Dr. Tygar opines

that Trend Micro could have avoided infringing the '610 patent by off-shoring those same

22

servers. (*See* D.I. 79 Ex. 2 at ¶ 184) Dr. Tygar does not opine that Trend Micro could have

moved its servers off-shore; just that, if the servers were moved offshore, Trend Micro would no

longer infringe the '610 patent. Although Dr. Prakash only considered the '050 patent when he

offered offshoring as a non-infringing alternative, Dr. Leonard explains that, in offering his

opinion, Dr. Prakash was not talking about the '050 patent specifically. He is instead talking

about a specific action Trend Micro could take that would avoid the infringement of that patent,

but also, as it turns out, would avoid infringement of the '610 patent as well. (*See* D.I. 91 at 15)

A reasonable jury could find a sufficient nexus between Dr. Prakash's analysis of the '050 patent

and Dr. Tygar's or Dr. Leonard's opinions with respect to the '610 patent.

IV additionally argues that because Trend Micro's infringing product at times uses more

than 200 servers, Drs. Tygar and Leonard's opinions that merely moving six servers outside the

United States was a viable non-infringing alternative is an unreliable opinion. (*See* D.I. 79 at 8)

However, Dr. Tygar was aware that Trend Micro's infringing product uses hundreds of servers.

(*See id.*) Dr. Leonard relied on Dr. Tygar's opinion in forming his own damages opinion. Drs.

Tygar and Leonard's opinions were not based on insufficient facts and did not employ unreliable

methodology. IV's concerns raise fact questions that can be explored at trial. Accordingly, the

Court will not exclude either Dr. Tygar's or Dr. Leonard's expert testimony.

### H.   IV's Motion to Exclude Symantec's Experts' Opinions Regarding Infringement

IV moves to strike two opinions of Dr. Eugene Spafford, Symantec's infringement expert,

as unreliable. (D.I. 157) The two opinions relate to the claim term "an indication of the

characteristic" and the comparability of "technically relevant" patents.

23

### 1.   "Indication of a Characteristic"

IV objects to Dr. Spafford's opinion that excludes the possibility of a probability or likelihood of a characteristic. (D.I. 518 Ex. 2 at ¶ 249; *id.* Ex. 3 at 179-80)  IV argues that Dr. Spafford's opinion – that an indication of a characteristic requires that a message have either a malicious or a not malicious identity – is in direct conflict with the Court's broader interpretation of the claims.  Symantec responds that Dr. Spafford's opinion is harmonious with the Court's construction.

The Court does not agree with Symantec's reinterpretation of the Court's claim construction.  In its Markman opinion, the Court explained that "[t]he parties dispute whether these limitations must be the result of a true/false test or whether they may, instead, be the result of something else, such as probability, likelihood, or related scores."[5]  (D.I. 425 at 11)  The Court further "discern[ed] nothing in the claims or the specification suggesting that the use of true/false tests is a defining feature of the claimed invention" and adopted IV's proposed construction. (*Id.* at 12)  Dr. Spafford's opinion contradicts the Court's construction, and, accordingly, the Court will strike the challenged portions of his opinion. *See Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 763 F. Supp. 2d 671, 695 (D. Del. 2010) ("Parties, their experts, and their attorneys are not permitted at trial to reargue claim construction or to take positions that are inconsistent with the Court's construction.").

### 2.   "Technically Relevant"

IV moves to exclude Dr. Spafford's opinions related to patents "technically relevant" to

---

[5] During the *Markman* hearing, counsel for Symantec clarified that the dispute related to "the output of the process." (D.I. 340 at 72 ("it's the output of the test that is true/false.  So it's the output, the end of this method is true or false."))

the '150, '142, and '155 patents. (D.I. 518 Ex. 2 at ¶¶ 409, 411, 412)  The dispute here is

whether Dr. Spafford's general identification of comparable features is sufficient to establish

comparability.

The Court concludes that Dr. Spafford's comparability analysis survives IV's *Daubert*

challenge.  For each of the three patents in question, Dr. Spafford identifies specific comparable

features embodied by the "technically relevant" patents.  For instance, some of the patents relate

to "identifying information about remote data in a distributed environment," "validating

registration information transmitted by users to a remote entity in a distributed environment,"

"us[ing] content indicators," "identifying indicators in a distributed environment," "us[ing] file

signatures and communications with a central system in a distributed environment," "data

management in a distributed environment," "data queries," "applying filtering and detection

rules," "filtering specific types of information," "spam filters," "conversion of certain portions of

program for rights management," "analysis and conversion of information in a database," and

"detection, removal, and replacement of potentially inappropriate content." (D.I. 518 Ex. 2 at

¶¶ 409, 411, 412)  Although Dr. Spafford does not elaborate on the features, he testified that "he

looked to see if there were features that had some similarity such that the patent listed could

provide insight and/or potential use in addressing part of the patent in suit." (*Id.* Ex. 3 at 223)[6]

The Court concludes that Dr. Spafford has identified sufficient comparability between the

patents, and the strength of his analysis can be addressed through cross examination and

---

[6] The specific features identified as comparable to the asserted patent go beyond the comparisons
at issue in *LaserDynamics*, 694 F.3d at 79 ("loose or vague comparability"), *ResQNet.com, Inc.
v. Lansa, Inc.*, 594 F.3d 860, 870 (Fed. Cir. 2010) ("[no] discernible link to the claimed
technology"), and *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1328 (Fed. Cir. 2010)
(generally comparing agreement as "PC-related patents").

presentation of competing evidence. Thus, the Court will deny this portion of IV's motion.

### I.    Defendants' Motions for Summary Judgment

Symantec and Trend move for summary judgment on substantially similar grounds. (*See* D.I. 508; D.I. 71 C.A. No. 10-1581) The Court will address the motions collectively below.

### 1.    '050 Patent Validity

Townshend[7] and the '050 patent both generally relate to categorizing email as junk or spam. Defendants contend that Townshend anticipates the '050 patent.[8] Defendants argue that Townshend provides an architecture identical to that of the '050 patent for detecting and labeling emails as bulk (or spam). In Townshend, a computer communicates with an Email Server, while in the '050 patent the computer communicates with a First Tier System. (Townshend col. 5 ll. 2-4; '050 patent col. 3 ll. 35-37) The Email Server and First Tier System then communicate to a central server, known as the Central Server, and the Second Tier System, respectively. (Townshend Fig. 1; '058 patent Fig. 2) Alternatively, Defendants contend that the '050 patent is invalid as obvious in light of Townshend.

IV argues that Defendants ignore the factual disputes among the parties, particularly whether Townshend discloses the second and third steps of the asserted claims. Further, IV

---

[7] U.S. Patent No. 6,829,635 ("Townshend") is found in the record at D.I. 118 Ex. 3, C.A. No. 12-1581.

[8] On September 12, 2012, Symantec filed an *inter partes* reexamination with the PTO. The reexamination is ongoing; currently the PTO has rejected the claims of the '050 patent as anticipated by Townshend. (D.I. 118 Ex. 6 at 16 C.A. No. 12-1581) IV contends that the reexamination proceedings are irrelevant. The Court notes that because the reexamination is ongoing, it provides minimal, if any, probative value for the Court's analysis. *See generally Volterra Semiconductor Corp. v. Primarion, Inc.*, 796 F. Supp. 2d 1025, 1042 (N.D. Cal. 2011) ("As these [PTO] opinions are only preliminary, however, they have no probative value on [questions of validity].").

26

argues that whether Townshend's "count" or "bulk email signature" satisfy the court's construction is a material dispute of fact.

The Court concludes that genuine disputes of material fact preclude summary judgment. For example, with respect to the second step of the '050 patent,[9] which requires comparing the received identifiers with other content identifiers already collected to determine the characteristic of the file, IV argues that Defendants' do not account for a critical element of step 2: analyzing the characteristic of the file or identifier. IV has support for this view in the opinion of its expert,

---

[9] The second steps of the '050 patent claims require:

> determining, on the processing system, whether each received content identifier matches a characteristic of other identifiers (claim 9)
>
> comparing, on the second computer, the digital content identifier to a characteristic database of digital content identifiers received from said plurality of first computers to determine whether the message has a characteristic (claim 16)
>
> characterizing the files on the server system based on said digital content identifiers received relative to other digital content identifiers collected in the database (claim 22)

('050 patent col. 8 ll. 20-22, 51-55, col. 9 ll. 20-24) In essence, this step requires comparing the received identifiers with other content identifiers already collected to determine the characteristic of the file.

The Court construed the relevant claim language, "determining on the processing system, whether each received content identifier matches a characteristic of other identifiers," to mean "determining, on the processing system, whether each received content identifier has the same characteristic as other content identifiers." (D.I. 425 at 6) The Court construed "characterizing the files on the server system based on said digital content identifiers received relative to other digital content identifiers collected in the database" to mean "classifying the files on the server system by comparing their digital content identifiers to other digital identifiers collected in the database." (*Id.* at 13)

27

Dr. McDaniel, who states: "Townshend discloses a system that generates counts of message signatures" and "nothing more." (D.I. 97 C.A. No. 12-1581 Ex. 1 at ¶¶ 89, 93) He continues: "In other words, the 'count' is not 'a descriptor of the content (e.g., spam, virus, junk, email, copyrighted),' the 'count' does not 'identify whether or not the message is of a certain type or classification,' and the 'count' does not perform any 'indicating the presence or absence of a characteristic (e.g., spam, virus, copyright, bulk email),' as required by the Court's construction." (*Id.* at ¶ 89)

IV further contends that Townshend's Figure 4 does not support Defendants' position. Townshend's specification states that any bulk signature elements are compared and analyzed at the Listening Email Server, not at the Central Server. (Townshend Fig. 1; *id.* at col. 9 ll. 42-50 ("When a listening electronic mail server receives a bulk signature element from a central server, the listening e-mail server then compares the bulk signature element to signature elements generated for an electronic mail message. If at least one signature element of a received electronic mail message matches a bulk signature element that was received within a threshold period of time, then the electronic mail message is marked as bulk electronic mail.") (emphasis added)) Dr. McDaniel opined that this process performed by Townshend does not anticipate the '050 patent because the Central Server "does not receive the request from the first systems, perform the determining step or provide the outputting step . . . it doesn't do the receiving step, the comparing step or the responding step . . . it does not perform the collection, the characterization or transmission." (D.I. 97 Ex. 2 at 115-16; *see also id.* Ex. 3 at 185-86 (Dr. Prakash stating that if determination of file characterization is "happening on the client side" and not the central server, then output response would not fall within meaning of court's

28

construction))

A reasonable jury could agree with Dr. McDaniel's view of Townshend,[10] and thereby find that Defendants have failed to demonstrate, by clear and convincing evidence, that the '050 patent is invalid due to anticipation or obviousness.[11] Accordingly, summary judgment of invalidity is not warranted. *See generally Tarkus Imaging, Inc. v. Adobe Sys.*, Inc., 2012 WL 2175788, at *1 (D. Del. June 14, 2012).[12]

### 2. '142 Patent Validity

Park City Group, Inc. ("PCG") is the original assignee of the '142 patent. It is undisputed that PCG, a Utah based company, entered into a transaction with The Boots Company PLC ("Boots"), a UK based company, more than one year before the filing date of the '142 patent. Pursuant to 35 U.S.C. § 102(b), a patent is invalid if "the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country more than one year prior to the date of the application for patent in the United States." The parties

---

[10] To the extent that Dr. McDaniel's statements are not entirely consistent (*see, e.g.*, D.I. 118 C.A. No. 12-1581 Ex. 80 at 124-25), they raise credibility issues that are to be resolved at trial. *See generally Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

[11] With respect to obviousness, Defendants rely on Dr. Rubin, who opines that only "trivial" modifications to Townshend would result in the '050 patent. (D.I. 118, Ex. 81-B at 53) This is not Dr. McDaniel's opinion. Instead, Dr. McDaniel states that the '050 patent "represents a significant advancement over conventional malware screening methodologies." (D.I. 537 Ex. 4 at ¶ 64) Moreover, Dr. McDaniel discusses, at some length, various secondary considerations to support his opinion that the '050 patent is not obvious. (*Id.* Ex. 1 at ¶¶ 119-27) Again, the record demonstrates genuine disputes of material fact, precluding summary judgment.

[12] Dr. McDaniel identifies other reasons why Townshend does not invalidate the '050 patent, and IV argues that there are additional genuine disputes of material fact precluding summary judgment for Defendants. Given the procedural context, the Court need not address each of these remaining arguments.

disagree as to whether the licensing agreement between PCG and Boots, originating in the United States but culminating in the United Kingdom, comes within the meaning of "on sale in this country."

The Federal Circuit has not directly addressed the meaning of "in this country." However, even accepting, arguendo, Defendants' legal interpretation, the Court concludes that Defendants have not shown that a reasonable juror would have to find, on the present record, clear and convincing evidence that the September 1995 Letter Agreement and End User License Agreement ("EULA") constitutes an offer for sale "in the United States."

The Letter Agreement between PCG and Boots was signed in England on October 18, 1995. (D.I. 97 C.A. No. 12-1581 Ex. 6) This agreement was subject to PCG and Boots' EULA. (*Id.* Ex. 7) It is undisputed that the EULA and Letter Agreement permit Boots to use the Gatekeeper product only outside of the United States, and expressly provide that "[Gatekeeper] is licensed, not sold." (D.I. 537 Ex. 6 at PARKCITY_0006259 ("Geographic Scope. Your license and our agreements are valid only in the United Kingdom, the Republic of Ireland and the Channel Islands."); D.I. 97 C.A. No. 12-1581 Ex. 7 at PARKCITY_0006258)) The EULA further restricted Boots' use of Gatekeeper, including by prohibiting any assignment, license, transfer, or use of the product; provided a strict confidentiality clause; and provided that English law controlled the agreement. (D.I. 537 Ex. 6 at PARKCITY_0006259-64) The parties also entered into a maintenance agreement whereby PCG would make "on-site visits," outside of the United States, to "support the implementation of the Software." (D.I. 537 Ex. 7 at PARKCITY0006248) All three agreements were executed in the United Kingdom. (Id. Exs. 5-7)

30

Symantec and Trend Micro's reference to certain "prefatory activities" fails to show that

no reasonable jury could find in favor of IV.[13] Symantec and Trend Micro rely on the following

evidence: (1) the letter agreement was faxed from Utah to the UK (D.I. 537 Ex. 5); (2) PCG and

Boots met in Utah as part of the evolution of the deal (D.I. 510 Ex. T at 83-84); (3) most of

PCG's sales force is located in Utah (*id.* Ex. V at 2-22); and (4) PCG source code was held in

escrow in San Diego (*id.* Ex. F at PARKCITY_0006266-77). None of this evidence, individually

or collectively, demonstrates that Defendants are entitled to summary judgment. For example,

Boots and PCG had a preexisting commercial relationship calling for PCG to visit Boots in the

United States. (D.I. 509 at 23 (citing PARKCITY_0006422-23, 7307-14)) When PCG and

Boots discussed Gatekeeper, the followup meetings occurred in the UK. The escrow agreement

was executed in the UK, and contains a series of events that must occur before Boots could

obtain a secondary copy of the source code. Whether or not all of this activity is substantial

enough to trigger the on-sale bar requires a fact-intensive inquiry. *See, e.g., B.F. Goodrich*, 825

F. Supp. at 72 (denying summary judgment and noting that telephone communication and

preparation of proposals was insufficient to satisfy the on-sale provision); *Abraxis, Inc. v.

Cepheid*, 2012 WL 3255602, at *6 (denying summary judgment due to insufficient facts to meet

clear and convincing standard). Thus, the Court will deny summary judgment.

### 3.    '142 Patent Infringement

Defendants argue that the accused products do not infringe any of the asserted claims of

---

[13] Assuming, arguendo, the "prefatory test" is applicable, summary judgment must be denied, for
the reasons explained in the text.

the '142 patent.[14]  In particular, Defendants argue that the accused products fail to satisfy the

requirements of a destination post office and to combine a distribution list with rule history for

delivery to a post office.

### a.    Destination Post Office[15]

Defendants first argue that IV's contention that the "quarantine" feature in the accused

products meets the "destination post office" requirement of the '142 patent fails. Defendants

argue that the code Dr. McDaniel identifies as performing the infringing feature does not satisfy

all the limitations of the claims, and further that "quarantine" does not constitute a "post office"[16]

because quarantines are not "agents."

IV responds by relying on Dr. McDaniel's opinion. Dr. McDaniel opines that "SMEX

and SMLD receive and scan emails as they pass through the email server and quarantine

messages, if needed . . . [t]his involves receiving, storing, and distributing email." (D.I. 97 Ex.

17 at ¶ 19; *see also id.* Ex. 5 at ¶¶ 128-45)  Dr. McDaniel's testimony raises a genuine dispute of

material fact. This is confirmed by Dr. Tygar's statement that Dr. McDaniel's screenshots of the

accused products create a "reasonable inference" that an "administrator can deliver e-mails from

the quarantine directory" as well as receive and store the quarantined message. (D.I. 97 Ex. 18 at

196-97)

---

[14] The asserted claims are claims 1, 7, 17, 18, 21, 22, 24, 25, and 26.

[15] Claims 1, 7, 17, 21, 22, 24, and 26.

[16] The parties agreed that "post office" means "an agent for receiving, storing, and distributing
email messages or data objects." (D.I. 214-1 at 1)

32

### b.   Combining Email Message with New Distribution List and Rule History[17]

Defendants argue that Dr. McDaniel's opinion that the distribution list is the "name of the quarantine," which is also the post office, is illogical.[18] Defendants add that Dr. McDaniel fails to state that the accused products deliver a distribution list to a post office, and instead merely states that a message is directed to the post office.

Dr. McDaniel explains how the accused products combine emails with "rule history" by adding X-headers to emails with Rule IDs. (D.I. 97 Ex. 5 at ¶ 132-43) He also states that the accused products combine emails with a new distribution list; indeed, he states that a new distribution list is "necessarily" present when sending a message to a place to which it was not previously addressed. (*Id.* Ex. 2 at 379) Dr. McDaniel refutes Dr. Tygar's opinion that the accused products do not combine the rule history and distribution lists with emails. (*Id.* Ex. 17 at ¶¶ 25-29 (noting that Dr. Tygar essentially pursues construction related to "wrapped message" rejected by Court)) Dr. McDaniel provides a screenshot of the accused products inserting "X-headers denoting that the message is being quarantined" to be delivered to quarantine. (*Id.* at ¶¶ 28-29) As the X-header becomes part of the email message, Dr. McDaniel states that the e-mail and distribution list are combined for delivery.

The Court concludes there are genuine disputes of material fact, at least as between the opinions of Dr. McDaniel and Dr. Tygar. Accordingly, the Court will deny Defendants' motion

---

[17] Claims 1, 7, 17, 21, 22, 24, and 26

[18] The Court has construed the relevant term to mean "combining the e-mail message [or data object], a new distribution list, and a rule history, for delivery together, where a rule history identifies each of the [at least one] business rule(s) whose antecedent condition was satisfied by the e-mail message [or data object]." (D.I. 425 at 16)

for summary judgment with respect to non-infringement of the '142 patent.

### c.   ScanMail does not receive messages or data objects from a sender[19]

Defendants also argue that ScanMail for Microsoft Exchange ("SMEX") and ScanMail

for Lotus Domino ("SMLD") do not infringe the '142 patent because they do not "receive[] an

email message directly from a sender," as required by the claims 1, 7, and 24. (D.I. 72 C.A. No.

12-1581 at 33) Instead, Defendants suggest that SMEX and SMLD scan messages that are

received by another software program running on the same machine. (*Id.* at 33) All that is

passed to SMEX is a pointer that directs the SMEX to the received messages. (*Id.*)

Claims 1 and 7 of the '142 patent require "a receipt mechanism that receives an e-mail

from a sender." Similarly, claim 24 of the '142 patent requires a post office comprising "a

receipt mechanism that receives a data object from a sender." The parties have stipulated that

"receipt mechanism" means "a mechanism for receiving." (D.I. 214 Ex. A at 2)

IV contends that Trend is attempting to import a non-existent limitation into the claims.

According to IV, claims 1, 7, and 24 do not require that a message be sent directly from a sender.

(D.I. 96 C.A. No. 12-1581 at 31-32) Further, IV argues that even if only pointers are passed onto

the ScanMail products, ScanMail still receives the products for purposes of the '142 patent.

The Court concludes that there is a material factual dispute with respect to whether the

ScanMail products infringe the '142 patent. Accordingly, the Court will deny Defendants'

motion for summary judgment with respect to non-infringement of the '142 patent.

---

[19] Claims 1, 7, and 24.

### 4.  '610 Patent Infringement

Defendants argue that IV has not shown that the accused products detect viruses "within the telephone network" because the accused products only detect viruses using private networks.[20] Defendants argue that because all servers used by the accused products use private networks with IP addresses beginning with "10," they cannot infringe the '610 patent. Defendants rely on Dr. McDaniel's statement that private IP addresses beginning in 10, "by definition, cannot be accessed from the public Internet. In other words, no [ISP] will route to private networks using the address ranges of 192.168.x.x. or 10.x.x.x, and these private networks can never be 'within the telephone network.'" (D.I. 97 Ex. 1 C.A. No. 12-1581 at ¶ 44)  Dr. McDaniel attempted to distance himself from this statement in his supplement report, arguing that Defendants took his statements "out of context." (D.I. 82 Ex. 33 C.A. No. 12-1581 at ¶ 3) Defendants argue that Dr. McDaniel's disavowal cannot create a genuine issue of material fact and summary judgment is appropriate.

IV argues that the foundation of Defendants' motion – that because the accused products are connected through a private network, they cannot receive data from the public Internet – is false. Additionally, notwithstanding Dr. McDaniel's statement that private networks can never be within the telephone network, Dr. McDaniel further opines that the accused products meet the "within the telephone network" limitation by screening for viruses in the cloud, and thus outside the calling or called party's networks. (D.I. 96 at 34-35) (citing McDaniel Inf. Report (Trend Micro) at ¶ 82) Finally, IV argues that there are issues of fact related to the "routing a call

---

[20] The Court construed the relevant claim language to mean "in the voice or data network connecting the calling party and called party, exclusive of the networks and gateway nodes of the called or calling party." (D.I. 425 at 24)

between a calling party and a called party of the telephone network."[21]

The Court agrees with IV that the record demonstrates genuine disputes of material fact, rendering summary judgment inappropriate. (*Compare, e.g., id.* at 37 (citing McDaniel Inf. Report (Trend) at ¶ 80), *with* D.I. 97 Ex. 21 at ¶¶ 91-92 (Dr. Tygar's opposing opinion))

### 5. '155 Patent Infringement[22]

Symantec argues that IV's infringement contentions rely on an incorrect assumption that when emails are stored in quarantine, the email is stored with deactivated hyperlinks. Symantec contends that because the accused products never store emails with deactivated hyperlinks, that summary judgment is appropriate. (D.I. 510 Ex. NN at ¶¶ 3-4)  Indeed, Dr. McDaniel stated that he was not aware of any evidence that the accused products stored messages with deactivated hyperlinks. (Id. Ex. JJ at 643-44)

However, aspects of Dr. McDaniel's opinion reveal a material factual dispute between the parties. Dr. McDaniel opines that, contrary to Symantec's assertions, the accused products do, in fact, deactivate hyperlinks. He provides a screenshot of the accused Symantec product which, he believes, show that the link is suppressed. (D.I. 537 Ex. 4 at 208-09) He opines that this is evidence that the accused products infringe both claims 2 and 3. (*Id.* at ¶¶ 212-13) Further, he explains that, for example, "[i]n Email Security.cloud, the hypertext link is converted to non-executable text." (*Id.* at ¶ 213)

---

[21] The Court construed this language to mean "transmitting a voice or data transmission between a party initiating a voice or data transmission and a party receiving a voice or data transmission." (D.I. 425 at 22)

[22] IV alleges infringement only by Symantec with respect to claims 2 and 3 of the '155 patent.

36

The Court agrees with IV that the record shows at least these material disputes of fact, rendering summary judgment of non-infringement inappropriate.

### 6.    Willful Infringement [23]

Symantec contends that IV cannot establish "by clear and convincing evidence that [Symantec] acted despite an objectively high likelihood that its actions constituted infringement of a valid patent." *In re Seagate Tech., LLC*, 497 F.3d 1360, 1371 (Fed. Cir. 2007). Under Seagate's "objective standard, both legitimate defenses to infringement claims and credible invalidity arguments demonstrate the lack of an objectively high likelihood that a party took actions constituting infringement of a valid patent." *Black & Decker, Inc. v. Robert Bosch Tool Corp.*, 260 F. App'x 284, 291 (Fed. Cir. 2008).

The Court agrees with Symantec that IV cannot meet the objective prong of *Seagate* and will, therefore, grant this motion. Symantec has offered reasonable claim construction positions, legitimate defenses to infringement, and credible invalidity arguments. Moreover, the PTO has rejected all of the asserted claims of the '050 patent through reexamination proceedings. (D.I. 509 at 39 citing 12/11/12 Office Action in '050 Reexamination at 4 (App. at 428)) All these factors support a finding of no willful infringement.

IV has failed to provide any meaningful evidence to support its assertion of willful infringement. At most, IV alleges that Symantec cannot win its non-infringement and invalidity defenses. However, Symantec simply needs to make "legitimate" and "credible" showings of non-infringement and invalidity to defeat IV's claim for willful infringement. *See Black & Decker, Inc.*, 260 F. App'x at 291. The Court finds that Symantec has made such showings.

---

[23] IV does not allege that Trend Micro willfully infringed. (D.I. 96 at 38)

37

Because no material factual disputes exist as to whether Symantec willfully infringed the patents-in-suit, the Court will grant Symantec's motion for summary judgment on the issue of willfulness.

### 7. Damages

Defendants argue that the Court must grant its motion of no damages because IV's damages case rests entirely on the testimony and opinion of Mr. Wagner. As the Court will be denying Defendants' motion to exclude Mr. Wagner's testimony, it follows that the Court will likewise deny Defendants' motion for summary judgment of no damages.

### J.   IV's Motion for Partial Summary Judgment on Trend Micro Affirmative Defenses

IV argues that there is no evidence to support Trend Micro's affirmative defenses of laches, equitable estoppel, waiver, standing, patent exhaustion, "failure to join," implied license, and intervening rights. (D.I. 80, C.A. No. 12-1581) Trend Micro does not oppose granting summary judgment of laches with respect to the '610 patent, equitable estoppel, and waiver (D.I. 92 at 1 n.1, C.A. No. 12-1581), but insists that genuine issues of fact remain with respect to the remaining defenses. For the reasons discussed below, the Court will grant IV's motion.

### 1. Laches

Trend Micro has failed to raise triable issues of fact as to the unreasonable delay requirement of laches. *See A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1032-33 (Fed. Cir. 1992). Drawing all inferences in favor of Trend Micro, there is no evidence in the record suggesting that IV had constructive or actual knowledge of Trend Micro's allegedly infringing activities more than six years before the filing date of the suit. In November 2005, a

representative of the inventors of the '050 patent sent an email to IV in search of "a firm to enforce the patent." (D.I. 95 Ex. 77, C.A. No. 12-1581) The email stated that the '050 patent had an "indispensable utility in anti-spam systems," and that "large ISPs that provide anti-spam systems . . . have been using our invention without permission." (*Id.*) Although this email suggests broadly that the '050 patent could be asserted against certain large ISPs that provide anti-spam systems, there is no support in the record for a conclusion that IV or the inventors were aware of Trend Micro. Similarly, Trend Micro's reliance on a ████████████████, which states that ████████████████████████████████████████████████████ ████████ falls short; there is no reference to Trend Micro or its allegedly infringing activities. ████ █████████████ )

    Even assuming the above evidence put IV on notice of Trend Micro's allegedly infringing activities, the presumption of laches would not arise because November 2005 is not more than six years prior to the filing of the instant lawsuit, in December 2010. Trend Micro does little more than state that "[s]horter periods of time have been found to constitute laches depending on the facts and circumstances," but fails to cite to any facts or circumstances in this case suggesting that the five-year delay was unreasonable.

    Thus, the Court finds that Trend Micro fails to raise triable issues as to IV's purported unreasonable delay and, will, therefore grant IV's motion as to laches.[24]

### 2. Standing/"Failure to Join"

    The Court concludes that IV has established standing and will, therefore, grant IV

---

[24] The motion is relevant only as to the '050 patent. Trend Micro does not oppose summary judgment with respect to the '610 patent, and IV does not seek summary judgment with respect to the '142 patent.

summary motion with respect to this defense. IV has produced the assignment history of the patents-in-suit, satisfying its burden of establishing through "a written instrument" "the transfer of proprietary rights in the patents." *Speedplay, Inc. v. Bebop, Inc.*, 211 F.3d 1245, 1250 (Fed. Cir. 2000). Trend Micro does not contest this evidence and, therefore, no material dispute exists as to IV's ownership over the patents-in-suit.

### 3.  Implied License and Exhaustion

The doctrine of patent exhaustion holds that an initial authorized and unconditional sale of a patented article terminates all patent rights to that article, thereby limiting a patentee's exclusionary power in the underlying patent. *See Quanta Comp., Inc. v. LG Elecs., Inc.*, 553 U.S. 617, 625 (2008). The doctrine applies when the "only reasonable and intended use" for a product sold is "to practice the patent." *Id.* at 631.

Trend Micro states that "[i]t appears that most or all of the functionality IV accuses is provided by the Microsoft Exchange and Lotus Dominos products sold by Microsoft Corporation . . . and IBM." (D.I. 92 at 9) As an initial matter, Trend Micro only asserts that Microsoft Exchange is licensed or barred by exhaustion. (*Id.* at 11) The Court will grant summary judgment to IV with respect to Lotus Dominos, as that portion of the motion is essentially unopposed. The Court will also grant summary judgment to IV with respect to Microsoft Exchange because Trend Micro fails to point to any evidence in support of how Microsoft Exchange satisfies the elements of the '142 patent. Specifically, there is no evidence to show how Microsoft Exchange satisfies the following elements: (1) "a database of business rules;" (2) "a rule engine;" or (3) "a distribution mechanism." As there is no evidence to support a finding that Microsoft Exchange embodies three required elements of claim 1 of the '142 patent,

40

the Court concludes that the sale of Microsoft Exchange does not trigger exhaustion, because it does not embody the patented invention. See *Quanta*, 553 U.S. at 631.

Trend Micro fails to cite to any additional evidence in support of the distinct defense of implied license. Hence, the Court will grant IV's motion for summary judgment with respect to Trend Micro's implied license defense.

### 4. Intervening Rights

Pursuant to 35 U.S.C. § 307(b), "after a patent emerges from reexamination, the statute makes available absolute and equitable intervening rights . . . but only with respect to 'amended or new' claims in the reexamined patent." *Marine Polymer Techs., Inc. v. HemCon, Inc.*, 672 F.3d 1350, 1362 (Fed. Cir. 2012). Trend Micro's defense fails on two grounds: reexamination of the '050 patent is ongoing and none of the asserted claims are new or have been amended. Thus, Trend Micro has no intervening rights to reserve, and the Court will grant IV summary judgment.

### K. Symantec's Motion for Leave to Amend Answer, Affirmative Defenses, and Counterclaims

Symantec seeks to amend its answer to include the additional affirmative defense that the patents-in-suit are unenforceable due to newly discovered conduct of IV. (D.I. 451, C.A. No. 10-1067) Although Symantec's request was filed after the May 25, 2012 deadline to amend pleadings had passed, Symantec contends that it satisfies the good cause requirement for amendment due to the purportedly recent discovery (through document production and witness depositions) revealing IV's conduct. Symantec further contends that leave to amend is appropriate because IV will not be prejudiced, nor will amendment necessitate any additional discovery.

41

IV opposes granting Symantec leave to amend, arguing that Symantec cannot meet its burden to show good cause because Symantec was not diligent in bringing its new defense. More importantly, IV argues that this additional defense will alter the nature and focus of the case from patent infringement to antitrust, severely prejudicing IV. IV additionally contends that if Symantec had timely filed its defense, IV would have approached and prepared for this case in a different manner.

Pursuant to Federal Rule of Civil Procedure 16(b)(4), "[a] schedule may be modified only for good cause and with the judge's consent." Good cause is present when the schedule cannot be met despite the moving party's diligence. *See Leader Techs., Inc. v. Facebook, Inc.*, 2010 WL 2545959, at *3 (D. Del. June 24, 2010). Pursuant to Federal Rule of Civil Procedure 15, courts generally grant motions to amend absent a showing of undue delay, bad faith, or dilatory motive on the part of the movant, undue prejudice to the opposing party, or futility of the amendment. *See Dole v. Arco Chem. Co.*, 921 F.2d 484, 487 (3d Cir. 1990).

Here, the Court agrees with IV that Symantec has failed to demonstrate good cause for failing to add its antitrust defense prior to the scheduling order's May 25, 2012 pleading deadline. Symantec was on notice of IV's general business model by the end of 2009. In October 2009, Sanjay Prasad, an IV employee, and Joseph Fitzgerald, Symantec's General Counsel, were in contact regarding IV's capabilities and business. (D.I. 464 Ex. A) Mr. Prasad provided Mr. Fitzgerald with an overview document of IV's business, which described IV's activities as including monetization of acquisition portfolios. (*Id.* at IV-SEC-00022197) The document also stated that IV licenses a portfolio of more than 20,000 patents to its customers, including in fields such as software, ecommerce, electronics, and biomechanics. (*Id.* at

42

IV-SEC-00022201-02)  Symantec later deposed Mr. Prasad, and Mr. Prasad confirmed that he had discussed the possibility of "a broad license to the portfolio" or "a license for some – the entire set or some subset of existing patents in the portfolio" with Symantec.  (*Id.* Ex. C at 139)

More than knowing the structure of IV's business model, Symantec was on notice by at least April 2011 that IV's portfolios included the patents-in-suit.  (D.I. 63 at 1 ("patent portfolio licenses that included the four patents-in-suit"))  Even if Symantec had overlooked this statement, Symantec was in possession of IV's licensing agreements by January 27, 2012, and by April 2012 Symantec had a spreadsheet containing a list of every IV licensee and the IP assets licensed.  (*Id.* Exs. E & F)  Symantec was also on notice, by at least January 2012, of IV's ███ ███████████████████████████████ Thus, Symantec was in possession of sufficient information to include the proposed added claim by at least April 2012.

In addition to the above facts, Symantec's proposed antitrust claims rely on documents produced to it by early 2012.  For instance, Symantec quotes an email from Nathan Myhrvold, IV's co-founder, which states that infringers need to be "taken out to the woodshed."  (D.I. 452 at 10 (quoting D.I. 453 Ex. BB))  This email was produced in February 2012.  (D.I. 464 Ex. J) Symantec also quotes from a 2006 article that IV's business is "to hold entire industries hostage with high licensing fees."  (D.I. 452 at 10 (quoting D.I. 453 Ex. P))  Indeed, IV's business strategy and impact on the patent system were well known prior to the May 25, 2012 deadline.  In 2011, *This American Life* (a radio show) produced an episode highlighting the rise of "patent trolls," including a lengthy discussion of IV.  (D.I. 464 Ex. L)  The episode references "articles talk[ing] about how IV has amassed one of the largest patent portfolios in existence.  How it's going around to technology companies demanding money to license these patents."  (*Id.* at

43

IV-SEC-00086821) These articles include those found in "an influential blog in Silicon Valley called TechDirt," articles from *IPWatchdog*, and the *Wall Street Journal.* (*Id.*)

In this light, it is not plausible that Symantec could not have gathered sufficient facts and evidence to support its antitrust claims prior to the pleading amendment deadline.[25] Thus, the Court concludes that Symantec could and should have brought its affirmative defense prior to the May 25, 2012 deadline and will deny Symantec's motion for leave for failure of establishing good cause.

### L. Trend Micro's Motion for Leave to Amend Answer, Affirmative Defenses, and Counterclaims

For substantially the same reasons as discussed with respect to Symantec's motion for leave, the Court will deny Trend Micro's motion as well. (D.I. 30, C.A. No. 12-1581)

### M. Defendants' Motion for Sanctions for Spoliation

Defendants argue that sanctions should be imposed because IV failed to fulfill its duty to preserve the database created by the inventors of the '050 patent, Messrs. Mark Pace and Brooks Talley, and no such database has been produced. (D.I. 454, C.A. No. 10-1067) (D.I. 22, 12-1581) Defendants contend that they have been prejudiced by the "disappearance" of this material evidence because it is the best evidence to establish that the patent is invalid as obvious. In order to remedy this prejudice, Defendants request that the Court: (1) preclude IV from asserting a

---

[25] Symantec did not need to wait to confirm these facts through subsequent depositions; the depositions fail to reveal any new information that was unknowable to Symantec. (*See, e.g.,* ███ (deposition of Richard Harris, IV licensing executive, ███ *id.* ███ (deposition of Ryan Clark, ███ (same); *id.* ███ (deposition of Edward Jung, co-founder of IV, ███ ███); *id.* Ex. X (deposition of Joseph Kosiara, IV director of finance, ███))

44

priority date earlier than October 1999; (2) "issue an instruction to the jury that IV had a duty to

preserve the database, that IV breached that duty, and that the jury may infer from this breach that

the database contained evidence adverse to IV with respect to public use;" and (3) "relieve

Defendants of any corroboration requirement with respect to their evidence of public use." (D.I.

455 at 1-2)

IV replies that sanctions would be inappropriate because IV did not destroy any evidence,

there is no evidence of any destruction, and IV had no duty to preserve 2006 documents for a

2010 lawsuit. IV contends that sanctions are unwarranted for the further reason that Defendants

have failed to present any evidence of bad faith.

"Spoliation occurs where: the evidence was in the party's control; the evidence is relevant

to the claims or defenses in the case; there has been actual suppression or withholding of

evidence; and, the duty to preserve the evidence was reasonably foreseeable to the party." *Bull v.*

*United Parcel Serv. Inc.*, 665 F.3d 68, 73 (3d Cir. 2012).[26] The Court will not draw unfavorable

inferences where there is support for a finding that documents were accidentally destroyed. *See*

*id.* at 79; *see also Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 334 (3d Cir. 1995).

Thus, "a finding of bad faith is pivotal to a spoliation determination." *Bull*, 665 F.3d at 79. If

the Court finds spoliation, it will determine an appropriate sanction considering "(1) the degree

of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by

the opposing party; and (3) whether there is a lesser sanction that will avoid substantial

unfairness to the opposing party and, where the offending party is seriously at fault, will serve to

---

[26] Spoliation is analyzed under regional circuit law. *See Hynix Semiconductor Inc. v. Rambus Inc.*, 645 F.3d 1336, 1345 (Fed. Cir. 2011).

45

deter such conduct by others in the future." *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 79 (3d Cir. 1994).

The Court concludes that Defendants' spoliation motion fails on several grounds. First, the record does not support a finding of bad faith. In May 2006, Harlan Dybdhal, on behalf of Messrs. Pace and Talley, sent a letter to Paul Nagy, IV's former outside patent counsel, including an affidavit, printouts, and a CD containing the pertinent database, all in connection with the sale of the '050 patent. (D.I. 456 Ex. I) Mr. Pace confirmed that he provided a copy of the database to Terranco, L.L.C., an IV entity. (D.I. 456 Ex. E at 111; *id.* Ex. G) However, IV's in-house attorney, Brian Platt, submitted a declaration stating that no IV attorneys became aware of the CD until September 2012. (D.I. 470 at ¶ 4) Upon then learning of the CD, according to Mr. Platt, IV "undertook an exhaustive search to determine whether we had ever received a CD." (D.I. 466 Ex. C at 71) As part of this search, IV contacted all of the IV employees involved in the patent acquisition transaction. One such employee, Don Merino, with whom Mr. Platt spoke, stated that he had no recollection of any CD.

Next, IV discovered that the CD had changed hands multiple times after Mr. Nagy first acquired it. Mr. Nagy, who worked at Berkeley Law and Technology Group, had transferred the documents to Meyertons, Hood, Kivlin, Kowert & Goetzel, P.C., who sent the documents to Sadler, Breen, Morasch & Colby, who transferred the documents to Perkins Coie, who sent the documents to Foley & Lardner. (D.I. 466 Ex. C at 74-75) IV requested that all of the attorneys who had been in contact with the file in this succession search for the CD. None of the attorneys or firms could locate the CD. IV also contacted Mr. Nagy to search his files, and IV searched its own files related to or proximate to the '050 records, but these efforts also failed to locate a CD.

(D.I. 466 Ex. C at 41-43, 53-54, 59, 104-05, 110-11) Finally, IV searched its electronic records, including email, to look for any reference to the CD. (*Id.* at 111) Mr. Platt testified that there were no "reference[s], in any form, in any place, on any IV system or resource, of a mention of the database, apart from . . . the letter from Mr. Dybdahl to Mr. Nagy." (*Id.* at 114-15) IV's conduct in attempting to locate the CD is inconsistent with a suggestion of bad faith misconduct and intentional destruction of evidence.

Second, Defendants have failed to produce sufficient evidence to establish that in 2006, litigation with respect to the '050 patent was either pending or reasonably foreseeable. Defendants appear to rely on little more than characterizations of IV's current business model. Yet in 2006, it appears that IV was focused on acquiring intellectual property, and in 2009 began developing its licensing program. IV did not assert any of its patents in litigation until December 2010, and the patents it asserted constituted only a small fraction of its portfolio. Furthermore, if IV received the database on a CD in May 2006, this was several months prior to the release of any infringing product – further undermining the foreseeability of litigation. (*See, e.g.*, D.I. 466 Ex. D at 146 (stating that Symantec employed accused products in 2009); *id.* at Exs. F & G (licensing technology in 2007))

Accordingly, the Court will deny Defendants' motions for sanctions.

## IV.     CONCLUSION

An appropriate order will follow.

47