IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| INTELLECTUAL VENTURES I LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 10-1067 (LPS) |
| | ) | |
| SYMANTEC CORPORATION, | ) | **TGFCEVGF //** |
| | ) | **RWDNKE XGTUKQP** |
| Defendant. | ) | |

## OPENING BRIEF IN SUPPORT OF SYMANTEC CORPORATION'S MOTION FOR PATENT INVALIDITY UNDER 35 U.S.C. § 101

OF COUNSEL:

LATHAM & WATKINS LLP

Dean G. Dunlavey
Joseph H. Lee
650 Town Center Drive, 20th Floor
Costa Mesa, CA 92626-1925
(714) 540-1235

Douglas E. Lumish
Jeffrey G. Homrig
Michelle P. Woodhouse
Brett Sandford
140 Scott Drive
Menlo Park, CA 94025-1008
(650) 328-4600

Neil A. Rubin
Kathy Yu
355 South Grand Avenue
Los Angeles, CA 90071-1560
(213) 485-1234

Robert J. Gajarsa
Michael J. Gerardi
555 11th St., NW
Washington, DC 20004-1304
(202) 637-2200

Original Filing Date:  March 13, 2015
Redacted Filing Date: March 19, 2015

MORRIS NICHOLS ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Thomas C. Grimm (#1098)
Karen Jacobs (#2881)
Michael J. Flynn (#5333)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
jblumenfeld@mnat.com
tgrimm@mnat.com
kjacobs@mnat.com
mflynn@mnat.com

*Attorneys for Defendant Symantec Corporation*

# TABLE OF CONTENTS

Page

I.      NATURE AND STAGE OF PROCEEDINGS .............................................................1

II.     SUMMARY OF ARGUMENT .................................................................................1

III.    STATEMENT OF FACTS .......................................................................................3

IV.     LEGAL STANDARD ..............................................................................................3

V.      Argument ..............................................................................................................5

        A.      The Asserted Claims Of The '142 Patent Are Invalid Under § 101 ......................6
                1.      The "Invention" Consists Of Controlling The Distribution Of
                        Messages Based Upon Their Content Or Intended Recipient ...................6
                2.      The '142 Patent Is Directed To An Abstract Idea...................................8
                3.      The Asserted Claims Add Nothing Inventive To The '142 Patent's
                        Abstract Idea .................................................................................12
        B.      The Asserted Claims Of The '050 Patent Are Invalid Under § 101 ....................15
                1.      The "Invention" Consists Of Using A Number To Uniquely
                        Identify Something And Determining Whether The Thing Has A
                        Characteristic Based On The Number ...................................................16
                2.      The '050 Patent Is Directed To An Abstract Idea..................................18
                3.      The Asserted Claims Add Nothing Inventive To The '050 Patent's
                        Abstract Idea .................................................................................20
        C.      The Asserted Claim Of The '610 Patent Is Invalid Under § 101 ........................23
                1.      The "Invention" Consists Of Screening Data At A Location Other
                        Than The Location Of Either The Sender Or The Intended
                        Recipient .......................................................................................23
                2.      The '610 Patent Is Directed To An Abstract Idea..................................25
                3.      The Asserted Claim Adds Nothing Inventive To The '610 Patent's
                        Abstract Idea .................................................................................27

VI.     CONCLUSION .....................................................................................................29

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Accenture Global Servs. v. Guidewire Software, Inc.*,
  728 F.3d 1336 (Fed. Cir. 2013)................................................................*passim*

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
  134 S. Ct. 2347 (2014) ...........................................................................*passim*

*Bancorp Servs. L.L.C. v. Sun Life Assurance Co. of Canada*,
  687 F.3d 1266 (Fed. Cir. 2012)................................................................ 5, 15, 22

*Bilski v. Kappos*,
  561 U.S. 593 (2010) ................................................................................*passim*

*buySAFE, Inc. v. Google, Inc.*,
  765 F.3d 1350 (Fed. Cir. 2014)................................................................*passim*

*Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*,
  776 F.3d 1343 (Fed. Cir. 2014).................................................................*passim*

*Cyberfone Sys. LLC v. CNN Interactive Grp., Inc.*,
  558 F. App'x 989 (Fed. Cir. 2014).......................................................... 11, 14, 26

*CyberSource Corp. v. Retail Decisions, Inc.*,
  654 F.3d 1366 (Fed. Cir. 2011)................................................................*passim*

*DDR Holdings, LLC v. Hotels.com, LP*,
  773 F.3d 1245 (Fed. Cir. 2014).................................................................3, 4

*Dealertrack, Inc. v. Huber*,
  674 F.3d 1315 (Fed. Cir. 2012).................................................................*passim*

*Digitech Image Techs., LLC v. Elecs. For Imaging, Inc.*,
  758 F.3d 1344 (Fed. Cir. 2014).................................................................14

*Fort Props., Inc. v. Am. Master Lease LLC*,
  671 F.3d 1317 (Fed. Cir. 2012).................................................................5

*In re Bilski*,
  545 F.3d 943 (Fed. Cir. 2008) (en banc), *aff'd on other grounds, Bilski*, 561
  U.S. 593 (2010)......................................................................................5

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
  132 S. Ct. 1289 (2012) ............................................................................*passim*

*Parker v. Flook,*
    437 US. 584 (1978) ............................................................................................. 2, 15, 22

*Planet Bingo, LLC v. VKGS LLC,*
    576 F. App'x 1005 (Fed. Cir. 2014) ..........................................................................28

*SmartGene, Inc. v. Advanced Biological Labs., SA,*
    555 F. App'x 950 (Fed. Cir. 2014) ....................................................................... 11, 21

*Ultramercial, Inc. v. Hulu, LLC,*
    772 F.3d 709 (Fed. Cir. 2014) ....................................................................... *passim*

## Rules and Statutes

35 U.S.C. § 101 ............................................................................................. *passim*

Fed. R. Civ. P. 50(b) ..........................................................................................3

Fed. R. Civ. P. 52(c) ........................................................................................1, 3

Defendant Symantec Corporation ("Symantec") respectfully submits this opening brief in support of its motion for judgment pursuant to Rule 52(c) that all patent claims asserted by Intellectual Ventures I LLC ("IV") at trial are invalid for failure to claim patent-eligible subject matter. *See* 35 U.S.C. § 101.

## I.      NATURE AND STAGE OF PROCEEDINGS

IV filed the instant lawsuit against Symantec on December 8, 2010, alleging infringement of four patents:  U.S. Patent Nos. 6,460,050 (the "'050 patent"), 6,973,142 (the "'142 patent"), 5,987,610 (the "'610 patent"), and 7,506,155 (the "'155 patent").  (D.I. 1.)  IV ultimately withdrew its infringement claims as to the '155 patent.  (D.I. 617.)

Prior to trial, the Court ordered that Symantec's claims of invalidity based on non-eligible subject matter under § 101 were not to be presented at trial, but instead were to be briefed and decided after the trial.  (*See, e.g.*, D.I. 615 at 4.)

A jury trial commenced on January 26, 2015, at which IV asserted claims 1, 7, 21, and 22 of the '142 patent; claims 9, 16, and 22 of the '050 patent; and claim 7 of the '610 patent.  On February 6, 2015, the jury returned a verdict, finding that Symantec had not infringed the '050 patent but had infringed the '142 and '610 patents, and that the patents were not invalid. (D.I. 676.)

Pursuant to the Court's letter of March 4, 2015, Symantec now files its opening brief in support of its motion for entry of judgment that the asserted claims of the patents-in-suit are invalid under § 101.  (D.I. 691 at 3.)

## II.     SUMMARY OF ARGUMENT

1.      A patent claim is invalid under § 101 if it (1) is directed to an abstract idea and (2) does not add an "inventive concept" sufficient to transform that abstract idea into a patent-eligible invention.  *See Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014);

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1293 (2012); *Bilski v.*

*Kappos*, 561 U.S. 593, 601–02 (2010).  Each claim IV asserted at trial is invalid under this two-

part test.

        2.      Each of the asserted patent claims is directed to an abstract idea.  The asserted

claims of the '142 patent are directed to the idea of controlling the distribution of messages based

upon their content or intended recipient—just as businesses routed mail internally in the pre-

Internet world.  The asserted claims of the '050 patent are directed to the idea of using a number

to uniquely identify something and determining whether the thing has a characteristic based on

the number—just as police departments have long used license plate numbers to determine

whether a car has been reported stolen.  And the asserted claim of the '610 patent is directed to

the idea of screening data at a location other than the location of either the sender or the intended

recipient—just as the government reviewed mail sent during wartime.  These abstract ideas are

"'part of the storehouse of knowledge of all men . . . free to all men and reserved exclusively to

none,'" and IV has no right to appropriate them.  *Bilski*, 561 U.S. at 602 (citation omitted).

        3.      The asserted claims do not provide an "inventive concept" that would prevent IV

from "monopoliz[ing] these tools" and "thwarting the primary object of the patent laws"—to

promote the useful arts and sciences.  *Alice*, 134 S. Ct. at 2354 (quoting *Mayo*, 132 S. Ct. at

1293).  The asserted claims do not recite any specialized hardware or programming, and do not

"purport to improve the functioning of the computer itself."  *Id.* at 2359.  Rather, the asserted

claims purport to extend their abstract ideas to the world of electronic communications by

invoking generic computer software, hardware, and networking concepts.  But the Supreme

Court has squarely rejected the argument that "generic computer implementation" can

"transform [an] abstract idea into a patent-eligible invention."  *Id.* at 2352; *see also Parker v.*

2

*Flook*, 437 US. 584, 593–95 (1978).  The computer and networking jargon contained within the asserted claims is nothing "more than a drafting effort designed to monopolize the [abstract idea] itself."  *Mayo*, 132 S. Ct. at 1297.

## III.   STATEMENT OF FACTS

For clarity, the relevant facts are set forth in the Argument sections as appropriate.

## IV.   LEGAL STANDARD

For the reasons stated in the parties' Joint Status Report of February 13, 2015 (D.I. 685 at 3–4), Symantec brings this motion pursuant to Fed. R. Civ. P. 52(c).[1]  Patent eligibility is a question of law for the Court to decide.  *See Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 711 (Fed. Cir. 2014).

The Supreme Court has adopted a two-step framework for determining whether patent claims meet the threshold of § 101.  *See Alice*, 134 S. Ct. at 2355.  First, the asserted claims cannot be directed to a patent-ineligible "abstract idea."  *Id.*  Abstract ideas are not eligible for patenting because they are basic tools in the "'storehouse of knowledge'" that are "'free to all . . . and reserved exclusively to none.'"  *Bilski*, 561 U.S. at 602 (citation omitted).  "'[M]onopolization of those tools through the grant of a patent might tend to impede innovation more than it would tend to promote it.'"  *Alice*, 134 S. Ct. at 2354 (alteration in original) (quoting *Mayo*, 132 S. Ct. at 1293).  In *Alice*, for instance, the claims were "drawn to the concept of intermediated settlement," which the Court found to be "'a fundamental economic practice long prevalent in our system of commerce.'"  *Id.* at 2356 (quoting *Bilski*, 561 U.S. at 611).

---

[1]   Symantec requests judgment as a matter of law under Rule 50(b) in the alternative.  *See DDR Holdings, LLC v. Hotels.com, LP*, 773 F.3d 1245, 1255–59 (Fed. Cir. 2014) (reviewing § 101 argument raised under Rule 50(b) *de novo*).  Regardless of the procedural vehicle, Symantec's motion raises a question of law for the Court to decide without deference to the jury's findings.

Second, if claims are directed to an "abstract idea," they nonetheless may be patent-eligible if they "contain[] an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application." *Id.* at 2357 (quoting *Mayo*, 132 S. Ct. at 1294, 1298). This "inventive concept" must be "sufficient to ensure that the patent in practice amounts to *significantly* more than a patent upon the [ineligible concept] itself." *Id.* at 2356 (quoting *Mayo*, 132 S. Ct. at 1294) (emphasis added). The claim itself must reflect the inventive concept. Even when the specification is "complex[]" and contains "detailed software implementation guidelines, the important inquiry for a § 101 analysis is to look at the claim." *Accenture Global Servs. v. Guidewire Software, Inc.*, 728 F.3d 1336, 1345 (Fed. Cir. 2013).

The Supreme Court has explained that (1) implementing an abstract idea using well-known computer components or functions, (2) limiting an abstract idea to a particular field of use, and (3) adding data-gathering steps or token post- or extra-solution activity to an abstract idea are not "inventive concepts" that can salvage a patent claim. *Alice*, 134 S. Ct. at 2357–59. For example, storing data in a database is "one of the most basic functions of a computer." *Id*. at 2359. The same is true with respect to the use of a computer to "obtain data," "track[] multiple transactions," "adjust account balances," and "issue automated instructions" "simultaneously." *Id.* "[A]ll of these computer functions," the Court recognized, "are 'well-understood, routine, conventional activit[ies]' previously known to the industry," that did not make the abstract concept of intermediated settlement patentable under § 101. *Id.* (alteration in original) (quoting *Mayo*, 132 S. Ct. at 1294). Similarly, claiming the implementation of a process on "a ubiquitous information-transmitting medium" such as the Internet or e-mail "is not a novel machine" and cannot "save a patent." *Ultramercial*, 772 F.3d at 716–17; *see also DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1258–59 (Fed. Cir. 2014).

4

While the "machine-or-transformation test" is no longer the "sole test" for eligibility, it remains a "useful clue" in determining whether a patent recites eligible subject matter under § 101. *Bilski*, 561 U.S. at 603; *Ultramercial*, 772 F.3d at 716. A claim passes this test if it is "tied to a particular machine or apparatus" or "transforms a particular article into a different state or thing." *In re Bilski*, 545 F.3d 943, 954 (Fed. Cir. 2008) (en banc), *aff'd on other grounds*, *Bilski*, 561 U.S. 593 (2010).

The Federal Circuit has repeatedly applied *Bilski* and *Alice* to invalidate claims that cover generic computer implementation of abstract ideas. *See, e.g.*, *Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*, 776 F.3d 1343, 1346–48 (Fed. Cir. 2014) (extracting data from documents such as checks using a scanner, recognizing certain information within the scanned data, and storing the recognized information); *Ultramercial*, 772 F.3d at 716–17 (providing digital content in exchange for viewing an advertisement); *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1351–52, 1354–55 (Fed. Cir. 2014) (guaranteeing Internet transactions); *Accenture*, 728 F.3d at 1345 (generating tasks in an insurance organization); *Bancorp Servs. L.L.C. v. Sun Life Assurance Co. of Canada*, 687 F.3d 1266, 1278 (Fed. Cir. 2012) (managing a stable value protected life insurance policy); *Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1333–34 (Fed. Cir. 2012) (providing an information clearinghouse to facilitate auto loans); *Fort Props., Inc. v. Am. Master Lease LLC*, 671 F.3d 1317, 1323 (Fed. Cir. 2012) (managing real estate investments for tax-deferred exchanges); *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1375 (Fed. Cir. 2011) (detecting fraudulent Internet credit card transactions).

## V.   ARGUMENT

Each of IV's asserted claims covers generic computer implementation of abstract ideas and each is invalid for claiming ineligible subject matter under § 101.

## A.    The Asserted Claims Of The '142 Patent Are Invalid Under § 101

The asserted claims of the '142 patent represent a classic case of merely "[s]tating an abstract idea while adding the words 'apply it with a computer.'" *Alice*, 134 S. Ct. at 2358.  The asserted claims, therefore, should be found invalid under § 101.

### 1.    The "Invention" Consists Of Controlling The Distribution Of Messages Based Upon Their Content Or Intended Recipient

The '142 patent is directed to systems and methods for controlling the distribution of electronic mail "by applying business rules to the messages as they are processed."  (PX 2 Abstract.)  The specification itself discloses that the "invention" consists of applying known methods of reviewing and routing paper documents within a company to email communications. It describes how companies "have elaborate methods to control the flow of memorandum, publications, notices, and other printed information within the organization," including "prohibit[ing] the distribution of memoranda to all employees in order to reduce photocopying costs," "filter[ing] documents that are to be sent to specific persons," and "prohibit[ing] distribution of certain types of documents, such as those containing . . . profane materials."  (*Id.* 1:15–34.)  "These various rules are typically . . . managed by the personnel, human resources, or other departments"—i.e., by human beings.  (*Id.*)  According to the specification, these well-known methods for controlling printed materials were not being employed by "[e]xisting e-mail protocols," which "are intended to operate by unabated delivery."  (*Id.* 1:65–67.)

The purported "invention" of the '142 patent allows a company to "define business rules that implement business communication policies for the handling of e-mail messages and other data objects by a data server."  (*Id.* 3:11–14.)  According to the named inventors, their goal was to provide organizations with the same level of control over e-mail communications the organizations already had over printed materials.  (Ex. A, Wood Dep. 99:3–15.)  One inventor

6

testified that he could not think of a "business rule," as described by the patent, "that could not be implemented or applied to a paper piece of mail."  (Ex. B, Geiger Dep. 272:5–21.)

The specification does not disclose any specific hardware, specialized programming, or algorithms that would permit a company to implement the asserted claim's solution to the purported "business problem[]."  (Ex. A, Wood Dep. 99:9-10.)  Instead, it provides a functional description of a message-monitoring service and emphasizes that such a service can be implemented with conventional computer and networking technology.  The disclosed system "provides support for *conventional* e-mail," (PX 2 3:25–26, 5:49); "operates on a *conventional* communications network," such as "the Internet," (*id.* 5:46–47); and "operate[s] in conjunction with *conventional* operating systems" on "*conventional* server-class computers," (*id.* 9:51–58) (all emphases added).

The four asserted claims set forth the solution to this business problem as a set of conventional computer-implemented steps or generic devices capable of implementing those steps.  For example, claim 22 recites the steps of an intermediary (1) "receiving" an e-mail message, (2) "deferring" delivery to the message's recipient by diverting it to an "administrator" for review, (3) "storing" the message pending review, (4) "automatically reviewing" the message according to a given "business rule" to determine what to do with the message, and (5) "automatically applying the action" to the message.  (PX 2 31:16–37.)  These final steps are performing tasks that alternatively can be performed by "a person designated to review gated messages," as the specification acknowledges.  (*Id.* 7:33–34.)  Asserted method claim 21 is similar and includes a step of "storing" business rules to be applied to messages, "selecting" messages to defer, and "delivering" non-selected messages to the intended recipient.  (*Id.* 30:50– 31:37.)

While asserted claims 1 and 7 are system claims, they are substantially similar to the asserted method claims and subject to the same § 101 analysis.  They are directed to a "post office" comprising components such as a "receipt mechanism," a "database," a "rule engine," a "distribution mechanism [/ engine]," and a "message store."  (*Id.* 27:1–31, 28:22–31.)  The specification describes these components as "functional modules for receiving, processing, and distributing e-mail messages," not specific devices.  (*Id.* 6:25–7:3.)  Nothing in the specification or the claims provides any definitive structure to these nebulous components.  Indeed, they are not even identified as being hardware or software.

### 2.     The '142 Patent Is Directed To An Abstract Idea

The concept of controlling the distribution of messages based upon their content or intended recipient is an abstract idea.  Like risk-hedging (*Bilski*) or intermediated settlement (*Alice*), this idea addresses a business problem that existed long before the advent of e-mail.  The '142 patent explicitly acknowledges that fact.  It states that "many organizations" applied the idea before the introduction of e-mail to "control the flow of . . . printed information within the organization."  (PX 2 1:15–34.)

The solution to the business problem identified by the '142 patent has many historical antecedents.  For instance, during World War II, the Post Office would direct foreign mail to inspectors who looked for descriptions of "ship, plane and troop movements," and would either "delete [such material] from the letters" or "return[] the entire letter to the sender" if partial deletion was not feasible.  (Ex. C, U.S. Gov't, Office of Censorship, *A Report on the Office of Censorship*, at 6, 21 (1945) (describing procedures and rules for screening and distributing mail during the Second World War).)  Indeed, in trying to differentiate his "invention" from a prior art reference, one inventor specifically analogized the claimed invention to mail censorship:

> Q. . . . [H]ow is Gatekeeper [a product that embodied the '142 patent] different than FormMail [a prior art reference]?



(Ex. A, Wood Dep. 257:4–22.)

IV made a similar observation to the Court in its technology tutorial:

> In a business email environment business rules are applied at the "post office."  In the typical environment, the post office resides on a mail server, where the company's emails are received, processed, and routed to recipients.  *Conceptually, this post office is not much different than a United States Postal Service office that processes letters and packages, except that the process is all computer-implemented and done electronically in a matter of seconds.*  The business rules are automatically applied to each incoming message, and the post office takes action on messages that trigger the business rules.  Other messages are simply routed normally to their designated recipients.

(Ex. D (IV's Technology Tutorial) at 49 (emphasis added).)

The '142 patent is directed at a basic business practice that cannot be monopolized.  As the table below illustrates—and the patent itself concedes—the abstract idea at the heart of the asserted claims of the '142 patent could easily be (and routinely is) performed by humans:

| Claim 22, '142 Patent | Abstract Idea | Long-Known, Conventional Idea Performed By Humans |
|---|---|---|
| A computer implemented process for reviewing an e-mail message, comprising: | [Preamble] | [Preamble] |
| receiving the e-mail message at a first post office, the e-mail message having at least one specified recipient; | Receiving a message | All letters addressed to ABC Manufacturing are directed to company's mail room.  The mail room receives a letter addressed to ABC Mfg.'s CEO. |
| deferring the e-mail message by: automatically combining the selected e-mail message with a new distribution list specifying at least one second post office for receiving the e-mail message for review by an administrator associated with the second post office and a rule history specifying at least one business rule determined to be applicable to the e-mail message; and | Deferring delivery and specifying (1) a new recipient for the message and (2) a condition that is met by the message | ABC Mfg. has a rule that any letters addressed to the CEO should be opened and scanned for content.  If the letter is from a potential customer requesting a price quote, it is to be delivered to the shop foreperson.  Other letters are to be delivered to the CEO's assistant.<br><br>The clerk in the mail room opens a letter and determines it is a request for a price quote.  He attaches a routing slip to the letter that specifies (1) it should be directed to the shop foreperson and (2) it requests a price quote. |
| automatically delivering the selected e-mail message to an administrator at the second post office on the distribution list instead of a specified recipient of the e-mail message; | Delivering the message to the new recipient | The letter is delivered to the shop foreperson, not to the CEO. |
| persistently storing the e-mail message at the second post office until the e-mail message is reviewed; | Storing the message | The foreperson places the letter in a file that will remind him to review the letter in two days |

| Claim 22, '142 Patent | Abstract Idea | Long-Known, Conventional Idea Performed By Humans |
|---|---|---|
| automatically reviewing the e-mail message after a specified time interval to determine an action to be applied to the e-mail message; and | Reviewing the message after a set amount of time has passed to determine an action | Two days later, the shop foreperson reviews the request for a price quote to determine whether the proposal is one that ABC wants to respond to.  He determines that it is. |
| automatically applying the action to the e-mail message. | Performing an action on the message | ABC prepares a price quote and sends to the prospective customer. |

There is no meaningful difference between the abstract concept embodied in the asserted claims and numerous patent claims the Federal Circuit has held invalid under § 101, such as claims covering (1) extracting data from a document, reviewing that data to find information, and storing information meeting certain conditions, *Content Extraction*, 776 F.3d at 1348; (2) "generating tasks [based on] rules . . . to be completed upon the occurrence of an event," *Accenture*, 728 F.3d at 1344 (internal citations and brackets omitted); (3) reviewing data from previous transactions to detect fraud, *CyberSource*, 654 F.3d at 1375; (4) reviewing information to separate it into different categories and distribute it, *Cyberfone Sys. LLC v. CNN Interactive Grp., Inc.*, 558 F. App'x 989, 992 (Fed. Cir. 2014); and (5) using "a set of expert rules for evaluating and selecting from . . . different therapeutic treatment regiments," *SmartGene, Inc. v. Advanced Biological Labs., SA*, 555 F. App'x 950, 955 (Fed. Cir. 2014) (internal quotations omitted).  Like the claims at issue in *Content Extraction*, *CyberSource*, *Accenture*, *Cyberfone*, and *SmartGene*, the asserted '142 patent claims are directed to an abstract idea.

3.      **The Asserted Claims Add Nothing Inventive To The '142 Patent's Abstract Idea**

a.      The '142 Patent Claims Generic Computer Components And Functions, And Adds Nothing Inventive

The asserted claims of the '142 patent do not clear the § 101 hurdle by including an "inventive concept" that transforms them into something significantly more than the abstract concept itself.  To the contrary, the specification emphasizes that the asserted claims can be implemented on a conventional network, using conventional computers that run conventional operating systems and conventional e-mail clients.  (PX 2 3:25–26, 5:46–47, 5:49, 9:51–58.) The written description discusses formless computing concepts such as a "post office" (*id.* 5:52), a "mail server" (*id.* 5:56), an "e-mail client application" (*id.* 5:63), an "organizational database" (*id.* 6:8), a "receipt engine" (*id.* 6:31), a "rule engine" (*id.* 6:32), "data storage" (*id.* 6:33), a "routing engine" (*id.* 6:34), "routing tables" (*id.* 6:35), a "daemon process" (*id.* 11:54), and an "executable" (*id.* 21:31).

Like the written description, the claims refer to generic computer components such as a "post office," a "receipt mechanism," a "rule engine," a "distribution mechanism," a "distribution engine," a "message store," and a "database."  (*Id.* cls. 1, 7, 21, 22.)  Those nebulous components have no limiting structure, add nothing inventive, and address simple, well-known, and conventional functions that any computer could perform, such as "storing a database of business rules," "receiving a plurality of e-mail messages," "selecting at least one e-mail message," "delivering each non-selected e-mail message," "combining the selected e-mail message with a new distribution list . . . and a rule history," "delivering the selected e-mail message," "persistently storing the selected e-mail message" (*id.* cl. 21) and "automatically reviewing" messages (*id.* cl. 22).  The claim constructions agreed upon by the parties (D.I. 214-1 at 1–2) and adopted by the Court (D.I. 425 at 13–22) are also highly general.  For instance, IV

12

agreed that the "receipt mechanism," "distribution mechanism," and "distribution engine" could be any "mechanism" that performs these functions.  (D.I. 214-1 at 2.)

Nowhere does the '142 patent recite specific hardware, special programming, or algorithms that implement any inventive, non-generic function beyond the abstract idea, and nowhere does it "purport to improve the functioning of the computer itself."  *Alice*, 134 S. Ct. at 2359.  Put differently, the asserted claims are not directed to a new piece of hardware or software as their "invention," but rather the use of generic and conventional computing equipment to perform the basic business idea of controlling the delivery of messages based upon their content or intended recipient.  As such, the patent fails to claim "significantly more" than the ineligible concept of applying business rules to control how messages are processed.  *Id.* at 2355.

Recent court decisions confirm the well-understood, routine, and conventional nature of the generic computer functions addressed in the asserted '142 patent claims.  "Receiving" and "delivering" data are "not even arguably inventive."  *buySAFE*, 765 F.3d at 1355 ("receiving a request" and "transmitting an offer in return"); *see also Alice*, 134 S. Ct. at 2352 n.2 ("obtaining" data from clients and "instructing" clients to take various steps); *Content Extraction*, 776 F.3d at 1348 ("extract[ing] data from a document").  "Nearly every computer . . . [is] capable of performing the basic . . . storage . . . functions" required by the claims.  *Alice*, 134 S. Ct. at 2360; *Content Extraction*, 776 F.3d at 1348 (step of storing data does not contain an "inventive concept"); *Accenture*, 728 F.3d at 1338 ("storing" data is non-inventive).  "[T]here is no 'inventive concept'" in the use of a "generic . . . computer to perform well-understood, routine, and conventional activities commonly used in industry."  *Content Extraction*, 776 F.3d at 1348 (quoting *Alice*, 134 S. Ct. at 2359).  Such conventional, non-inventive activities include "selecting" e-mail messages, "combining the selected e-mail message with a new distribution list

13

. . . and a rule history," and "automatically reviewing messages" (PX 2 31:16-37)—functions that any computer can perform.  *Content Extraction*, 776 F.3d at 1345 ("recognizing portions of . . . documents corresponding to a . . . data field" is non-inventive); *Digitech Image Techs., LLC v. Elecs. For Imaging, Inc.*, 758 F.3d 1344, 1351 (Fed. Cir. 2014) ("gathering and combining data" is non-inventive); *CyberSource*, 654 F.3d at 1375 (automatically matching new credit card transactions against past transactions is non-inventive); *Cyberfone*, 558 F. App'x at 991–92 ("using categories to organize, store, and transmit information" is non-inventive).

The asserted claims of the '142 patent further fail to "'specify how the computer hardware and database are specially programmed to perform the steps claimed.'"  *Dealertrack*, 674 F.3d at 1333 (citation omitted).  Neither the claims nor the written description discloses specific algorithms, system logic, program instructions, or special hardware to carry out the claimed functions.  The absence of such specificity allows the claimed methods to be performed "by human thought alone," *CyberSource*, 654 F.3d at 1373, without a computer, as Mr. Wood and Mr. Geiger explained.  (Ex. B, Geiger Dep. 272:5–21; Ex. A, Wood Dep. 257:4–22.)  Moreover, prior to e-mail, "business rules" were typically "managed by the personnel, human resources, or other departments" of the organization.  (PX 2 1:33–34.)

Because the claimed methods and systems have been performed by people long before the introduction of computers, the computers do not supply an "inventive concept" that meaningfully transforms the claims into significantly more than the abstract idea to which they are addressed.  *CyberSource*, 654 F.3d at 1373; *see also Alice*, 134 S.Ct. at 2357 ("'Simply appending conventional steps, specified at a high level of generality,' was not 'enough' to supply an 'inventive concept.'") (quoting *Mayo,* 132 S.Ct. at 1300).  Performing those basic steps "'more quickly'" or "more efficiently" on a computer is not enough to confer patent eligibility

14

on an otherwise patent-ineligible abstract idea. *Bancorp*, 687 F.3d at 1278–79 ("Using a computer to accelerate an ineligible mental process does not make that process patent-eligible.").

> b.   The Asserted Claims Fail The Machine-Or-Transformation Test

The asserted '142 patent claims also do not satisfy the machine-or-transformation test. First, they are not tied to a particular machine. As discussed above, the components in the claims are defined only by reference to the function that they are to perform—functions any generic computer can perform. This incidental reliance on computers is not sufficient to satisfy the "particular machine" test. *See, e.g.*, *Ultramercial*, 772 F.3d at 716–17; *Dealertrack*, 674 F.3d at 1333–34; *CyberSource*, 654 F.3d at 1373, 1375. Second, the asserted claims do not transform articles into a different state or thing. The claimed systems and methods receive, review, transmit, and store data, but "the mere manipulation or reorganization of data . . . does not satisfy the transformation prong." *CyberSource*, 654 F.3d at 1375. Thus, the claims "amount to 'nothing significantly more' than an instruction to apply the abstract idea . . . using some unspecified, generic computer components"—which is "not 'enough' to transform [the] abstract idea into a patent-eligible invention." *Alice*, 134 S. Ct. at 2360 (citation omitted).

## B.   The Asserted Claims Of The '050 Patent Are Invalid Under § 101

The '050 patent is a classic example of "solving a problem by" using a computer to perform a general-purpose method in the same manner "as a person would do it by head and hand" or "by using a pen and paper." *Flook*, 409 U.S. at 65 n.3; *CyberSource*, 654 F.3d at 1372. Even the named inventors acknowledged that the claimed method could have been implemented by a human being rather than by a computer.

1.     The "Invention" Consists Of Using A Number To Uniquely Identify
Something And Determining Whether The Thing Has A
Characteristic Based On The Number

The '050 patent, filed on December 22, 1999, is directed to a "distributed content

classification system" for identifying potentially harmful electronic messages, such as "spam."

(PX 1 3:7–8.)  As the inventors acknowledged, "distributed" systems for identifying "spam" that

operated by sending messages offsite for either automatic review or screening by "actual people"

were known in the art at the time of filing.  (*Id.* 1:31–45.)  The patent purports to improve on

these well-known systems by "provid[ing] a service which quickly and efficiently identifies a

characteristic of the content of a given transmission on a network at the request of the recipient."

(*Id.* 2:13–16.)  The disclosed "distributed content classification system" receives an "identifier"

number from a client that uniquely identifies a particular message; determines information about

the message, such as whether it is an unwanted bulk message (i.e., "spam") by comparing the

message's identifier to identifiers of prior messages; and transmits the result of that

determination back to the client.

The specification emphasizes that its concepts can be implemented using generic

software and hardware.  It explains that the system can be fully implemented in "executable

code," written in a routine programming language, and "designed to interact with any number of

commercial or free e-mail systems."  (*Id.* 3:65–36, 4:31–34.)  The specification provides no

guidance on how to program a general purpose computer to implement the invention and it does

not disclose anything but general purpose hardware.  As one of the named inventors conceded,

the asserted claims do not require ████████████████████████████████████████

████████████████████████████████████████  (Ex. E, Talley Dep. 41:2–43: 23, 44:16–

45:11.)  Both inventors acknowledged that ████████████████████  to implement the

16

method, as was done in prior art systems.  (Ex. F, Pace Dep. 131:16–132:7; *see also* Ex. E, Talley Dep. 42:7–24, 45:6–11, 46:3–14, 46:18–47:25.)

Representative claim 9 recites a "method for identifying characteristics of data files" comprising (1) "receiving, on a processing system, file content identifiers" sent from "source system[s]" over a "network"; (2) "determining . . . whether each received content identifier matches a characteristic of other identifiers"; and (3) "outputting, to at least one of the source systems . . . an indication of the characteristic of the data file based on said step of determining." (PX 1 8:13–27.)  Claim 16 recites a similar method of "filtering an email message" by (1) "receiving . . . a digital content identifier"; (2) "comparing . . . the digital content identifier to a characteristic database . . . to determine whether the message has a characteristic"; and (3) "responding" to the system sending the content identifier by "identify[ing] the existence or absence of said characteristic."  (*Id.* 8:45–50.)  Claim 22 discloses a method for "providing a service on the Internet" by (1) "collecting data . . . from a plurality of systems having a client agent generating digital content identifiers"; (2) "characterizing the files . . . based on said digital content identifiers"; and (3) "transmitting a substance identifier . . . indicating the presence or absence of a characteristic in the file."  (*Id.* 9:20–10:7.)

Each asserted claim requires the systems to perform the same set of conventional steps— create an identifier on one system, send the identifier to a second system, determine whether a characteristic exists, and send the results of the determining step back to the first system.  The Court's claim constructions confirm this.  The first system generates "digital content identifiers" that "reflect[] at least a portion of the content of a data file" using "software . . . that creates and transmits" such identifiers, and the second system "determines . . . whether each received content identifier has the same characteristic as other content identifiers."  (D.I. 415 at 4–13.)

17

### 2.    The '050 Patent Is Directed To An Abstract Idea

The '050 patent is directed to the abstract idea of using a number to uniquely identify something and determining whether the thing has a characteristic based on the number.  The asserted claims each describe a method of receiving a file identifier generated using prior art techniques; running an unspecified algorithm on the file identifier to understand the content of the file represented by the identifier; and transmitting information about the file based on the algorithm.  This method merely applies the abstract concept of using an identification number to recognize and correlate data, a technique that is commonly used when it is too resource intensive (or unhelpful) to review the contents of a file.

The abstract idea of the '050 patent is very general.  As just one example, automobile license plates have been used by law enforcement for decades as unique identifiers for vehicles in order to obtain information about the vehicle.  When a dispatcher receives a license plate number from a police officer, checks the number against reports for stolen vehicles, and sends a message back to the officer regarding the vehicle's status, the dispatcher is practicing the abstract idea found in the asserted claims of the '050 patent.  This point is illustrated by the table below:

| Claim 9, '050 Patent | Abstract Idea | Long-Known, Conventional Idea Performed By Human |
|---|---|---|
| A method for identifying characteristics of data files, comprising: | [Preamble] | [Preamble] |
| receiving, on a processing system, file content identifiers for data files from a plurality of file content identifier generator agents, each agent provided on a source system and creating file content IDs using a mathematical algorithm, via a network; | Receive number that identifies an object | Jones, a dispatch officer, receives a call from Smith, one of several officers patrolling for stolen cars, asking whether a car with license plate number "24680" has been reported stolen. |

18

| Claim 9, '050 Patent | Abstract Idea | Long-Known, Conventional Idea Performed By Human |
|---|---|---|
| determining, on the processing system, whether each received content identifier matches a characteristic of other identifiers; and | Match the identifier against previously-received identifiers to ascertain some characteristic of the object | Jones looks at a list of cars reported stolen to the police, generated by all patrol officers, and finds that a car with license plate number "24680" has been reported as stolen. |
| outputting, to at least one of the source systems responsive to a request from said source system, an indication of the characteristic of the data file based on said step of determining. | Output a result (e.g., an indication of the characteristic including whether the characteristic exists) | Jones tells Smith that the license plate number "24680" indicates that car has been reported stolen. |

This concept is as abstract, if not more so, than the abstract concepts found in claims the Federal Circuit invalidated in cases like *CyberSource* and *Content Extraction*. *CyberSource*'s invalid method claims proposed identifying online credit card fraud by: (1) obtaining information about other credit card transactions using the same Internet address as the transaction in question, (2) constructing a map of credit card numbers based upon the other transactions, and (3) determining the validity of the transaction using the map. 654 F.3d at 1373. Indeed, the *Cybersource* claims were *less* abstract than the asserted '050 patent claims—but still not patentable—in that they were directed at specific identifying information (IP addresses), not "file content identifiers," and a specific goal (identifying fraud). Here, the claims are even less specific and do not limit the types of "identifiers" or "characteristics" in any meaningful way, much like the patent-ineligible claims in *Content Extraction* were "drawn to the abstract idea of (1) collecting data, (2) recognizing certain data within the collected data set, and (3) storing that recognized data in a memory." 776 F.3d at 1347.

3.     **The Asserted Claims Add Nothing Inventive To The '050 Patent's Abstract Idea**

      a.     The '050 Patent Claims Generic Computer Components And Functions, And Adds Nothing Inventive

The generic computer elements in the asserted claims of the '050 patent do not provide an "inventive concept" that is "significantly more" than the abstract idea they address.  Although the method "may be implemented in executable code," written in a conventional programming language and "designed to interact with any number of commercial or free e-mail systems," neither the written description nor the claims provide any detail regarding how it should be implemented.  (PX 1 3:65–66, 4:31–34.)  To the contrary, the specification explains that the supposed invention can be implemented using generic software and hardware.  For example, the algorithm for generating the identifier file can be "any hashing algorithm"[2] and the algorithm for comparing the identifier to other identifiers is unspecified.  (*Id.* 4:2–3.)  These generic components perform the generic computer functions of receiving files, processing files according to undefined algorithms, and transmitting the results back to the original server.  (*Id.* 8:13–27.)  Again, the claims merely append conventional steps to an abstract idea in a way that cannot salvage them from invalidity.  *Alice*, 134 S. Ct. 2357.

The inventors confirmed these fatal deficiencies at their depositions.  Mr. Talley agreed

███████████████████████████████████████████████████████████████████████████.  (Ex. E, Talley Dep. 41:2–43:23, 44:16–45:11.)  And both inventors admitted that one █████████████████████

---

[2]    Hashing algorithms are a well-known type of algorithm that generates a small number that represents the content of a file.  (*See, e.g.,* Trial Tr. at 466:20–467:10 (Direct Testimony of Dr. McDaniel).)  The patent acknowledges that hashing algorithms were well-known, conventional techniques when the application was filed (PX 1 3:65–4:14), as did the inventors (Ex. E, Talley Dep. 34:23–37:7; Ex. F, Pace Dep. 123:18–124:2; 127:21–128:6).

███████████████████████████████████████ (*See* Ex. E, Talley Dep. 46:18–

47:25; *see also id.* 42:7–24, 45:6–11, 46:3–14; Ex. F, Pace Dep. 131:16–132:7.)

Each method step in the asserted claims relies upon "routine input, memory, look-up,

comparison, and output capabilities" inherent to computers. *SmartGene, Inc. v. Advanced Bio.*

*Labs., SA*, 555 F. App'x 950, 951 (Fed. Cir. 2014). "Receiving" and "outputting" data are

"purely conventional" steps that are among "the most basic functions of a computer." *Alice*, 134

S. Ct. at 2359 (citing *Mayo*, 132 S. Ct. 1298); *see also, e.g., Accenture*, 728 F.3d at 1338, 1343–

45 ("transmit[ing] and receiv[ing]" is non-inventive); *buySAFE*, 765 F.3d at 1355 ("receiving a

request" and "transmitting an offer in return" over a network is "not even arguably inventive").

And there is nothing inventive in "determining . . . whether each received content identifier

matches a characteristic of other identifiers" (PX 1 cl. 9), just as there is nothing inventive in

"recognizing portions of . . . documents corresponding to" a particular set of criteria, *Content*

*Extraction*, 776 F.3d at 1345, or "detecting . . . fraud based on information relating past

transactions to a particular 'Internet address,'" *CyberSource*, 654 F.3d at 1375. Nor does

requiring that the method be implemented on two or more computers rather than one sufficiently

limit the abstract idea of the '050 patent so as to save its validity. *Content Extraction*, 776 F.3d

at 1347–48 (rejecting arguments that repeating steps multiple times or reciting both a computer

and a scanner saved claims under § 101).

Two of the asserted claims limit the invention to a method for "filtering an e-mail

message" (claim 16) and "a service on the Internet" (claim 22). But "limiting the use of an

abstract idea 'to a particular technological environment'" is not sufficient. *Alice*, 134 S. Ct. at

2350 (quoting *Bilski*, 130 S. Ct. at 3218). The Internet and e-mail are "ubiquitous information-

transmitting medium[s]," not "novel machine[s]" that can "save a patent" under § 101.

21

*Ultramercial*, 772 F.3d at 716–17; *buySAFE*, 765 F.3d at 1355 ("[S]end[ing] information over a network . . . is not even arguably inventive."). The '050 patent also fails to "specify how the computer hardware and database are specially programmed to perform the steps claimed.'" *Dealertrack*, 674 F.3d at 1333 (citation omitted). No particular type of computer, device, or programming language is required to implement the system. (Ex. E, Talley Dep. 41:2–43:23, 44:16–45:11.) It is insufficient to say that an abstract concept "*may* be implemented in executable code." (PX 1 3:65–66.)

Finally, the asserted claims of the '050 patent are quintessential examples of patent-ineligible attempts to recycle solutions for a known problem by using a computer to perform a general-purpose method in the same manner "as a person would do it by head and hand" or "by using a pen and paper." *Flook*, 409 U.S. at 65 n.3; *CyberSource*, 654 F.3d at 1372. As the inventors admitted, all of the asserted claims can be performed by people. (*See* Ex. F, Pace Dep. 131:16–132:7; Ex. E, Talley Dep. 42:7–24, 45:6–11, 46:3–14, 46:18–47:25.) The '050 patent only purports to provide a system that performs such activity more "quickly and efficiently." (*Id.* 2:13–16.) But, again, that is not enough to make the claims eligible for patenting. *See Bancorp*, 687 F.3d at 1278–79 (using computer to perform tasks "'more quickly'" or "more efficiently" does not save claims under § 101); *see also, e.g.*, *Alice*, 134 S. Ct. at 2359 (finding claims to be patent-ineligible under § 101 even though computer "track[ed] multiple transactions" and "issue[d] simultaneous instructions").

The asserted '050 patent claims add no "inventive concept" to the abstract idea of reviewing identifying information to understand characteristics of data and, therefore, are invalid under § 101.

    b.  The Asserted Claims Fail The Machine-Or-Transformation Test

  The '050 patent claims also fails the machine-or-transformation test.  Both the patent

specification and the deposition testimony of its inventors confirm that the asserted claims are

not tied to a particular machine.  *See, e.g.*, *Ultramercial*, 772 F.3d at 716–17; *Dealertrack*, 674

F.3d at 1333–34; *CyberSource*, 654 F.3d at 1373, 1375.  And the patented method merely covers

the manipulation, receipt, review, and transmission of data over a network.  These rudimentary

functions are nothing more than the "mere manipulation or reorganization of data," which "does

not satisfy the transformation prong."  *CyberSource*, 654 F.3d at 1375.  This provides further

evidence that the claims are ineligible under § 101.

**C.**  **The Asserted Claim Of The '610 Patent Is Invalid Under § 101**

  Finally, the '610 patent, like the '050 and '142 patents, merely "stat[es] an abstract idea

while adding the words 'apply it with a computer.'"  *Alice*, 134 S. Ct. at 2358.  The lone asserted

claim should therefore be found invalid under § 101.

    **1.**  **The "Invention" Consists Of Screening Data At A Location Other**
       **Than The Location Of Either The Sender Or The Intended Recipient**

  The '610 patent, filed on February 12, 1998, teaches methods and systems for

"screen[ing] computer data for viruses within a telephone network before communicating the

computer data to an end user."  (*Id.* 1:59–64, 3:49–51.)  As one of its inventors conceded, the

key idea of the '610 patent is the business concept of providing conventional virus screening as a

subscription service to customers.  (*Id.* 11:65–12:7; Ex. G, Franczek Dep., at 60:24–62:4.)  The

patent does not claim the idea of virus scanning or any improvement to known ways of screening

viruses.  To the contrary, the specification concedes that, at the time the '610 patent was filed,

"[m]any computer users ha[d] virus screening and detection software installed on their

computers" (PX 3 1:10–11); that for purposes of the purported invention, virus scanning can be

performed on a "conventional telephone network processor" (*id.* 3:35-39); and that the scanning methods disclosed in two prior art patents could be used to implement the invention (*id.* 1:10-23, 12:27-31).

Although the specification describes generic telephone and computer equipment capable of performing virus scanning at a remote location, it does not disclose any specific hardware or require the use of any special programming or algorithms that would enable it to do so. Network connections are made through generic "telephone lines" that connect to well-known Internet service providers, online services, or dial-up computers. (*Id.* 4:10–22.) Various embodiments of the invention are capable of routing computer data to users (*id.* 6:1–7, 7:64–8:12), using identification codes to determine which calls should be screened (*id.* 5:20–27), sending warning messages about viruses (*id.* 6:36–44), and reading and writing data about scanned files to and from a memory (*id.* 10:20–11:25). Each function is explained in terms of well-known technologies and protocols.

Claim 7 (the only asserted claim), which depends upon claim 1, sets forth a method of (1) "routing a call between a calling party and a called party of a telephone network"; (2) "receiving, *within the telephone network*, computer data" from one of the two parties; (3) "determining that virus screening is to be applied to the call" using an "identification code"; (4) "detecting, *within the telephone network*, a virus"; and (5) "inhibiting communication of at least a portion of the computer data *from the telephone network*." (PX 3 14:34–47, 14:66–15:3 (emphasis added).) All of these steps describe either the most basic functions of a computer ("routing" callers, "receiving" data, "determining" whether to perform a service based on an "identification code," "inhibiting" transmission) or well-understood, conventional computer activities that the patent does not purport to improve ("detecting . . . a virus").

24

2.       **The '610 Patent Is Directed To An Abstract Idea**

The '610 patent is directed to the abstract idea of screening data at a location other than the location of either the sender or the intended recipient.  As the prosecution history (DTX 2217; Tr. 2150:5–2152:4) and the testimony of its inventors (Ex. G. Franczek Dep. 32:1–6; *see also* Ex. H, Bretscher Dep. 157:19–158:2) shows, the lone allegedly novel feature of the '610 patent is the application of conventional virus scanning techniques to a file *at a remote location*—i.e., "within the telephone network"—during transmission of the file.  But the concept of screening messages at a location other than the sender's or intended recipient's location is not merely fundamental and well-known; it is also highly abstract.  The concept is inherent in the idea of a post office, which inspects mail at a remote facility prior to delivery to an intended recipient.  The post office has even censored or blocked mail from reaching recipients if it met certain conditions.  (Ex. C at 6, 21-22.)  This is illustrated by the example in the table below:

| Claim 1, '610 Patent [Claim 7 Inserted In Brackets] | Abstract Idea | Long-Known, Conventional Idea Performed By Humans |
|---|---|---|
| A virus screening method comprising the steps of: | [Preamble] | [Preamble] |
| routing a call between a calling party and a called party of a telephone network; | Choosing a path for sending a message | The Postal Service determines the best path for delivering a letter sent by Adam, a U.S. Army soldier stationed in Great Britain during 1944, to Beth, who lives in Wilmington. |
| receiving, within the telephone network, computer data from a first party selected from the group consisting of the calling party and the called party; | Receiving data | The Postal Service receives a letter from Adam addressed to Beth. |

25

| Claim 1, '610 Patent [Claim 7 Inserted In Brackets] | Abstract Idea | Long-Known, Conventional Idea Performed By Humans |
|---|---|---|
| [determining that virus screening is to be applied to the call based upon at least one of an identification code of the calling party and an identification code of the called party;] | Using an ID code to determine whether screening should occur | Postal Service determines that because Adam's letter is not "diplomatic mail," the letter is to be screened to ensure that it does not disclose military secrets. (*See* Ex. C, at 22.) |
| detecting, within the telephone network, a virus in the computer data; and | Reviewing data for potential issues | The postal inspector opens the letter and concludes that a reference to "a trip to Paris in June" must be censored. |
| in response to detecting the virus, inhibiting communication of at least a portion of the computer data from the telephone network to a second party selected from the group consisting of the calling party and the called party. | Removing data before it reaches its intended recipient or blocking the data altogether | The post office redacts the reference and forwards the rest of the letter to Beth. |

Courts have repeatedly characterized the use of a remote third party as an intermediary for implementing tasks as an abstract idea. For instance, in *Alice*, the method claims at issue recited a process in which an intermediary receives information from "exchange institutions," "creates and updates 'shadow' records to reflect the value of each party's actual accounts held at 'exchange institutions,'" and "issues irrevocable instructions to the exchange institutions to carry out the permitted transactions." 134 S. Ct. at 2356. Similarly, in *Dealertrack*, the asserted claims were directed to an intermediary system that received data from car dealers, forwarded it to financial institutions, and provided replies back to the dealers. 674 F.3d at 1331; *see also*, *e.g.*, *Ultramercial*, 772 F.3d at 712 (claiming computer intermediary that permits Internet users to receive free media content if certain conditions are met); *Cyberfone*, 558 F. App'x at 991–92 (telephone-based intermediary receiving, categorizing, and resending data).

Just as the claims in *Alice* were directed to the abstract idea of "[using] a third party to mitigate settlement risk," 134 S. Ct. at 2356, and the claims in *Dealertrack* were directed to the

26

abstract idea of an information clearinghouse, 674 F.3d at 1331, claim 7 in the '610 patent is

directed to the abstract idea of using a third party to screen information at a remote location.

Without an "inventive concept," that abstract idea is ineligible for patenting under § 101.

### 3. The Asserted Claim Adds Nothing Inventive To The '610 Patent's Abstract Idea

#### a. The '610 Patent Claims Generic Computer Components And Functions, And Adds Nothing Inventive

The '610 patent proposes "wholly generic computer implementation" of its abstract idea

on virtually any computer over virtually any network. *Alice*, 134 S. Ct. at 2358. The method

steps of claim 7 could be carried out on any system capable of transmitting information over a

network between users and running conventional virus scanning software. (*Id.* 4:23–31.) The

specification also states that the user can connect to a system performing the claimed method

through an analog network, a digital network like ISDN or DSL, or cellular networks. (PX 3

2:1–24, 12:43–58.)[3]

The asserted claim directs these generic components to perform standard tasks such as

"routing a call," "receiving . . . computer data," and "determining that virus screening is to be

applied to the call" by using an identification code. (PX 3 14:34–47, 14:66–15:3.) The

specification mentions those steps in generic terms and says that "virus screening methods and

systems described in [two prior art patents issued to third parties] can be used in embodiments of

the present invention." (*Id.* 12:27–31.) Claims that "merely recite the use of . . . existing

---

[3]   In addition, IV successfully advocated claim construction positions designed to ensure that no restrictions were imposed on the means of implementing the claimed method. For instance, IV successfully obtained a construction of "within the telephone network" to mean "in the voice or data network connecting the calling party and called party, exclusive of the networks and gateway nodes of the called party and calling party." (D.I. 415 at 24.) At trial, IV successfully argued that the term includes any network that is connectable to the Internet in *any way*, even through the private networks of third parties.

technology" do not incorporate an "inventive concept." *Content Extraction*, 776 F.3d at 1348. Just as, for example, the addition of routine "optical character recognition" technology did not save the claims in *Content Extraction*, the addition of routine virus detection technology does not save the claims asserted here. *Id.*

These references to computers and virus scanning are not sufficient to make asserted claim 7 eligible for patenting under § 101. "Routing" communications, "receiving" data, and "inhibiting" (that is, preventing) the transmission of data are well-understood computer functions that do not make an abstract concept patentable. *Alice*, 134 S. Ct. at 2359 ("obtain data" and "issue automated instructions"); *see also buySAFE*, 765 F.3d at 1355 ("receiving a request" and "transmitting an offer in return" over a network is "not even arguably inventive"); *Accenture*, 728 F.3d at 1338, 1343–45 ("storing," "transmitt[ing] and receiv[ing]" are non-inventive). Likewise, using an identification code to determine if someone has subscribed to a virus-scanning service is not inventive. *See Planet Bingo, LLC v. VKGS LLC*, 576 F. App'x 1005, 1007–08 (Fed. Cir. 2014) ("[T]he steps of selecting, storing, and retrieving two sets of numbers [and] assigning a player identifier and a control number" are not inventive).

> b.   The Asserted Claims Fail The Machine-Or-Transformation Test

The asserted claim of the '610 patent also fails the machine-or-transformation test. First, as explained above, the claim is agnostic as to the type of computer hardware, computer software, or networking technology necessary to implement the asserted claim, and is therefore not tied to a particular machine. *See, e.g.*, *Ultramercial*, 772 F.3d at 716–17; *Dealertrack*, 674 F.3d at 1333–34; *CyberSource*, 654 F.3d at 1373–75. Second, the asserted claim does not "transform" anything because methods that involve "the mere manipulation or reorganization of data . . . [do] not satisfy the transformation prong" of this test. *CyberSource*, 654 F.3d at 1375.

## VI.    CONCLUSION

For the foregoing reasons, Symantec respectfully requests that the Court grant its motion

for judgment of invalidity pursuant to 35 U.S.C. § 101.

MORRIS NICHOLS ARSHT & TUNNELL LLP

OF COUNSEL:

*/s/ Karen Jacobs*

LATHAM & WATKINS LLP

_____

Dean G. Dunlavey
Joseph H. Lee
650 Town Center Drive, 20th Floor
Costa Mesa, CA 92626-1925
(714) 540-1235

Jack B. Blumenfeld (#1014)
Thomas C. Grimm (#1098)
Karen Jacobs (#2881)
Michael J. Flynn (#5333)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@mnat.com
tgrimm@mnat.com
mflynn@mnat.com
kjacobs@mnat.com

Douglas E. Lumish
Jeffrey G. Homrig
Michelle P. Woodhouse
Brett Sandford
140 Scott Drive
Menlo Park, CA 94025-1008
(650) 328-4600

*Attorneys for Defendant Symantec Corporation*

Neil A. Rubin
Kathy Yu
355 South Grand Avenue
Los Angeles, CA 90071-1560
(213) 485-1234

Robert J. Gajarsa
Michael J. Gerardi
555 11th St., NW
Washington, DC 20004-1304
(202) 637-2200

Original Filing Date:  March 13, 2015
Redacted Filing Date:  March 20, 2015