# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

INTELLECTUAL VENTURES I LLC,  :
                              :
        Plaintiff,         :
                              :
    v.               :     C.A. No. 10-1067-LPS
                              :
SYMANTEC CORPORATION,    :
                              :
        Defendant.      :
                              :

---

INTELLECTUAL VENTURES I LLC,  :
                              :
        Plaintiff,         :
                              :
    v.               :
                              :     C.A. No. 12-1581-LPS
TREND MICRO INCORPORATED and  :
TREND MICRO, INC. (USA),    :
                              :
        Defendants.    :
                              :

---

Joseph J. Farnan, III, Brian E. Farnan, FARNAN LLP, Wilmington, DE

Parker C. Folse III, Brooke A.M. Taylor, SUSMAN GODFREY L.L.P., Seattle, WA

Richard W. Hess, Weston O'Black, John P. Lahad, SUSMAN GODFREY L.L.P., Houston, TX

    Attorneys for Plaintiff Intellectual Ventures I LLC.

Karen Jacobs, Michael J. Flynn, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE

    Attorneys for Defendants.

Yar R. Chaikovsky, D. Stuart Bartow, PAUL HASTINGS LLP, Palo Alto, CA

David L. Larson, McDERMOTT, WILL & EMERY LLP, Menlo Park, CA

Christopher D. Bright, McDERMOTT, WILL & EMERY LLP, Irvine, CA

Attorneys for Defendants Trend Micro Incorporated and Trend Micro, Inc. (USA).


Jack B. Blumenfeld, Thomas C. Grimm, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE

Dean G. Dunlavey, Joseph H. Lee, LATHAM & WATKINS LLP, Costa Mesa, CA

Neil A. Rubin, Kathy Yu, LATHAM & WATKINS LLP, Los Angeles, CA

Douglas E. Lumish, Jeffrey G. Homrig, Michelle P. Woodhouse, Brett Sandford, LATHAM & WATKINS LLP, Menlo Park, CA

Robert J. Gajarsa, Michael J. Gerardi, LATHAM & WATKINS LLP, Washington, DC

Attorneys for Defendant Symantec Corporation.

---

## MEMORANDUM OPINION

April 22, 2015
Wilmington, Delaware

*[signature]*

**STARK, U.S. District Judge:**

Pending before the Court are Defendant Symantec Corporation's ("Symantec") motion

for patent invalidity under 35 U.S.C. § 101 (C.A. No. 10-1067 ("Symantec case") D.I. 698) and

Defendants Trend Micro Incorporated and Trend Micro, Inc. (USA)'s ("Trend Micro") motion

for judgment of invalidity under 35 U.S.C. § 101 (C.A. No. 12-1581 ("Trend Micro case") D.I.

175) of certain claims of U.S. Patent Nos. 6,460,050 (the "'050 patent"), 6,073,142 (the "'142

patent"), and 5,987,610 (the "'610 patent") (collectively, "patents-in-suit") asserted by

Intellectual Ventures I LLC ("IV").

For the reasons discussed below, the Court will grant in part and deny in part Symantec's

and Trend Micro's motions. Specifically, the Court concludes that Symantec and Trend Micro

("Defendants") have proven that IV's '050 and '142 patents are not patent eligible but have

failed to prove that IV's '610 patent is not patent eligible.

## BACKGROUND

### Nature and Stage of the Proceedings

IV sued Symantec, Trend Micro, Check Point Software Technologies Inc., Check Point

Software Technologies Ltd., and McAfee, Inc. on December 8, 2010 alleging infringement of the

'050, '142, and '610 patents, as well as U.S. Patent No. 7,506,155 (the "'155 patent"). (D.I. 1)[1]

Check Point and McAfee settled and are no longer parties. (D.I. 382-83, 491) Symantec, Trend

Micro, and IV stipulated to dismissal of all claims related to the '155 patent. (D.I. 616-17)

Symantec filed an answer and counterclaims against IV on January 31, 2011. (D.I. 23)

---

[1]Unless otherwise specified, all docket citations in the remainder of this Opinion are to
the Symantec case.

Trend Micro filed an answer and counterclaims against IV on February 14, 2011. (D.I. 28)

On November 21, 2012, the Court severed the Trend Micro case from the Symantec case. (D.I. 412) The Court construed disputed claim terms on December 12, 2012. (D.I. 425, 426)

IV asserted the following claims against Symantec in a jury trial that commenced on January 26, 2015:

- claims 9, 16, and 22 of the '050 patent;
- claims 1, 7, 21, and 22 of the '142 patent; and
- claim 7 of the '610 patent.

On February 6, 2015, the jury returned a verdict finding IV had failed to prove that Symantec infringes the asserted claims of the '050 patent and had proven that Symantec infringes the asserted claims of the '142 and '610 patents. (D.I. 676) The jury found that Symantec had failed to prove that any of the asserted claims were invalid due to anticipation or obviousness. (*Id.*) The jury awarded IV $17 million in damages. (*Id.*)

IV has asserted the following claims against Trend Micro:

- claims 9, 13, 16, 22, and 24 of the '050 patent;
- claims 1, 7, 17, 21, 22, 24, and 26 of the '142 patent; and
- claim 7 of the '610 patent.

(C.A. 12-1581 D.I. 176 at 4, 17, 23)[2] A jury trial in the Trend Micro case is scheduled to begin on May 11, 2015. (C.A. No. 12-1581 D.I. 172) Recently, IV advised Trend Micro and the Court it is no longer asserting the '610 patent against Trend Micro. (*See, e.g.,* C.A. No. 12-1581 D.I.

---

[2]As used hereinafter in this Opinion, and unless otherwise stated, "asserted claims" refers to this list of claims that have been asserted by IV against Trend Micro, which also includes all of the claims asserted against Symantec.

191 ("On March 19, 2015, IV informed Trend that it will limit the upcoming trial to the '050 and '142 patents, and will not try the '610 patent."); transcript of Apr. 10, 2015 hearing ("Tr.") at 181, 184-85)

On January 6, 2015, the Court issued a pretrial order in the Symantec case stating that it would "resolve any § 101 issues in connection with post-trial motions and briefing, including hearing any testimony that must be presented[,] only after the conclusion of the forthcoming trial." (D.I. 615 at 3)

On March 4, 2015, the Court issued a schedule for briefing and oral argument on the § 101 issues in both cases. (D.I. 692) The parties completed briefing on April 2, 2015. The Court heard oral argument on April 10, 2015. (*See* Tr.)

**Patents-in-Suit**

The '050 patent, entitled "Distributed content identification system," generally discloses a method for classifying content of received files by creating a content identifier and then comparing that content identifier to a database of other identifiers. It was filed on December 22, 1999 and issued on October 1, 2002. The patent is directed to filtering e-mail messages, and particularly spam and viruses, by generating a digital identifier for a message, forwarding that identifier to a processing system, determining whether the forwarded identifier matches a characteristic of other identifiers, and then processing the message based on the results of that determination. (*See* '050 patent at 2:37-43)

The '142 patent, entitled "Automated post office based rule analysis of e-mail messages and other data objects for controlled distribution in network environments," was filed on June 23, 1997 and issued on June 6, 2000. It relates generally to providing an efficient way for business

organizations to control the handling of emails and other data objects. Pursuant to business rules, messages are gated, then reviewed by an administrator, and eventually (if safe) directed to their intended recipients. (*See* '142 patent at 3:3-20, 4:40-54)

The '610 patent, entitled "Computer virus screening methods and systems," was filed on February 12, 1998 and issued on November 16, 1999. The patent is directed to "screen[ing] computer data for viruses within a telephone network before communicating the computer data to an end user." ('610 patent at 1:59-61) The patent recites "inhibiting communication of at least a portion of the computer data" being transmitted if the data contains a virus. ('610 patent at 14:42-47)

## LEGAL STANDARDS

### Symantec's Rule 52(c) Motion[3]

"Under Fed. R. Civ. P. 52(c), the court has discretion to enter judgment on any issue after hearing the evidence." *In re Brimonidine Patent Litig.*, 666 F. Supp. 2d 429, 453 (D. Del. 2009) (internal citations omitted), *aff'd in part, rev'd in part*, 643 F.3d 1366 (Fed. Cir. 2011). Rule 52(c) provides that "[i]f a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue." "[T]he court weighs the evidence and assesses the credibility of witnesses to determine whether or not the [movant] has demonstrated a factual and legal right to relief by a preponderance of the evidence." *In re Brimonidine*, 666 F. Supp. 2d at

---

[3]Symantec brings its motion under Federal Rule of Civil Procedure 52(c). In the alternative, Symantec requests judgment as a matter of law under Rule 50(b).

4

453.

**Trend Micro's Motion**

Trend Micro filed its motion pursuant to the Court's oral order of March 4, 2015. (C.A. No. 12-1581 D.I. 171)[4] Pursuant to Rule 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). An assertion that a fact cannot be – or, alternatively, is – genuinely disputed must be supported either by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B). If the moving party has carried its burden, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587 (internal quotation marks and emphasis omitted). The Court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

---

[4]Trend Micro did not state in its briefs the rule under which it was moving, but at the hearing said it did not oppose application of a summary judgment standard. (*See* Tr. at 20) IV does not object to application of this standard either. (*See id.* at 71) The Court agrees it is appropriate to apply the Rule 56 summary judgment standard to Trend Micro's motion.

To defeat a motion for summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586; *see also Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (stating party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted). However, the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment;" a factual dispute is genuine only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (stating entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial"). Thus, the "mere existence of a scintilla of evidence" in support of the nonmoving party's position is insufficient to defeat a motion for summary judgment; there must be "evidence on which the jury could reasonably find" for the nonmoving party. *Anderson*, 477 U.S. at 252.

## **Lack of Patentable Subject Matter**

Under 35 U.S.C. § 101, "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." There are three exceptions to § 101's broad patent-eligibility principles: "laws of nature, physical

6

phenomena, and abstract ideas." *Diamond v. Chakrabarty*, 447 U.S. 303, 309 (1980). Pertinent here is the third category, "abstract ideas," which "embodies the longstanding rule that an idea of itself is not patentable." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355 (2014) (internal quotation marks omitted). "As early as *Le Roy v. Tatham*, 55 U.S. 156, 175 (1852), the Supreme Court explained that '[a] principle, in the abstract, is a fundamental truth; an original cause; a motive; these cannot be patented, as no one can claim in either of them an exclusive right.' Since then, the unpatentable nature of abstract ideas has repeatedly been confirmed." *In re Comiskey*, 554 F.3d 967, 977-78 (Fed. Cir. 2009).

In *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289 (2012), the Supreme Court set out a two-step "framework for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts." *Alice*, 134 S. Ct. at 2355. First, courts must determine if the claims at issue are directed at a patent-ineligible concept. *See id.* If so, the next step is to look for an "'inventive concept' – *i.e.*, an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Id.*

"Simply appending conventional steps, specified at a high level of generality, [is] not *enough* to supply an inventive concept." *Id.* at 2357 (internal quotation marks omitted; emphasis in original). In *Bilski v. Kappos*, 130 S. Ct. 3218, 3231 (2010), for example, the Supreme Court held that the claims involved were drawn to the patent-ineligible abstract idea of "hedging, or protecting against risk," which was a "fundamental economic practice." Similarly, in *Alice*, 134 S. Ct. at 2356, the Supreme Court found that the claims were drawn to the patent-ineligible

7

abstract idea of "intermediated settlement," which was also a "fundamental economic practice." In both cases, the Supreme Court found that the additional steps delineated in the claims did not embody an "inventive concept" sufficient to ensure that the patents amounted to more than patents upon the ineligible fundamental concepts themselves.

In determining, at the second step, if a patent embodies an inventive concept, courts may consider whether the process "is tied to a particular machine or apparatus" or "transforms a particular article into a different state or thing." *Bilski*, 130 S. Ct. at 3225. "[T]o impart patent-eligibility to an otherwise unpatentable process under the theory that the process is linked to a machine, the use of the machine must impose meaningful limits on the claim's scope." *CyberSource Corp. v. Retail Decision, Inc.*, 654 F.3d 1366, 1375 (Fed. Cir. 2011) (internal quotation marks omitted). To be "a meaningful limit on the scope of the claims," the addition of a machine "must play a significant part in permitting the claimed method to be performed, rather than function solely as an obvious mechanism for permitting a solution to be achieved more quickly." *SiRF Tech., Inc. v. Int'l Trade Comm'n*, 601 F.3d 1319, 1332-33 (Fed. Cir. 2010). Hence, the "mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Alice*, 134 S. Ct. at 2358. "Given the ubiquity of computers, wholly generic computer implementation is not generally the sort of additional feature that provides any practical assurance that the process is more than a drafting effort designed to monopolize the abstract idea itself." *Id.*

"[T]he machine-or-transformation test is a useful and important clue, an investigative tool, for determining whether some claimed inventions are processes under § 101." *Bilski*, 130 S. Ct. at 3227. However, it is "not the sole test for deciding whether an invention is a patent-

8

eligible 'process.'" *Id.* "[I]n applying the § 101 exception, [courts] must distinguish between patents that claim the building blocks of human ingenuity and those that integrate the building blocks into something more, thereby transforming them into a patent-eligible invention." *Alice*, 134 S. Ct. at 2354 (internal citation and quotation marks omitted). The "concern that drives the exclusionary principle [i]s one of pre-emption." *Id.* That is, where a patent would pre-empt use of basic tools of scientific and technological work, *i.e.*, laws of nature, natural phenomena, and abstract ideas, the patent would "impede innovation more than it would tend to promote it, thereby thwarting the primary object of the patent laws." *Id.* (internal quotation marks omitted).

## Standard of Proof for Lack of Patentable Subject Matter

"Whether a claim is drawn to patent-eligible subject matter under § 101 is an issue of law . . . ." *In re Bilski*, 545 F.3d 943, 951 (Fed. Cir. 2008), *aff'd* 561 U.S. 593 (2010). Beyond this principle, however, there is no clarity at this time as to the standard of proof that must be applied to factual disputes that may be intertwined with the issue of eligibility of a particular patent or claim.

Symantec and Trend Micro contend that because patent eligibility is a question of law, they are not obligated to persuade the Court by clear and convincing evidence of the ineligibility of the patents-in-suit. (*See* D.I. 724 at 2; C.A. No. 12-1581 D.I. 190 at 2; *see also Microsoft Corp. v. i4i Ltd. Partnership*, 131 S. Ct 2238, 2253 (2011) ("Where the ultimate question of patent validity turns on the correct answer to legal questions . . . [the clear and convincing standard] has no application.") (Breyer, J., concurring)) IV disagrees, arguing that the clear and convincing burden of proof applies to both Defendants' motions. (*See* D.I. 722 at 2; C.A. No. 12-1581 D.I. 183 at 2)

9

The Supreme Court, in its recent § 101 opinions – *Alice*, *Bilski*, *Mayo*, and *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 133 S. Ct. 2107 (2013) – did not cite any standard of proof to be applied. Nor is there any binding precedent from the Federal Circuit deciding whether patent ineligibility must be proven by clear and convincing evidence. In the *en banc* opinion in *CLS Bank International v. Alice Corp. Pty. Ltd.*, 717 F.3d 1269, 1284 (Fed. Cir. 2013) (en banc), the per curiam plurality opinion for five judges mentioned that the presumption of validity applied to a section 101 ineligibility challenge, but did not address the evidentiary standard. Judge Rader, in a dissenting opinion for five judges, explained that the clear and convincing evidence standard applied, along with the presumption of validity. *See id.* at 1304-05 (Rader, J., dissenting). The Supreme Court did not address this issue in its opinion in *Alice* and, plainly, the dissenting opinion from the Federal Circuit is not controlling.[5]

In *Ultramercial, Inc. v. Hulu, LLC*, 722 F.3d 1335, 1338-39 (Fed. Cir. 2013) ("*Ultramercial I*"), *vacated sub nom. WildTangent, Inc. v. Ultramercial, LLC*, 134 S. Ct. 2870 (2014), the Federal Circuit held that the presumption of validity applied and, therefore, the clear and convincing evidentiary burden also applied to challenges to patent eligibility under § 101. This opinion was later vacated. *See* 134 S. Ct. at 2870. Thereafter, on remand, the majority did

---

[5]The Supreme Court, in its opinion in *Alice*, referred to "invalidity" once – in describing the declaratory judgment plaintiff's request for relief in its complaint, 134 S. Ct. at 2353 – while throughout the remainder of the opinion it referred to patent "eligibility." Section 282, which the Supreme Court construed in *i4i* and found requires application of the clear and convincing evidentiary burden to challenges to patent **validity**, does not expressly refer to issues of patent **eligibility** or § 101. *See* 35 U.S.C. § 282 ("Presumption of validity; defenses"); *compare also* § 282(b)(2) (referring to "**[i]nvalidity** of the patent or any claim in suit on any ground specified in part II as a **condition for patentability**") *with* 35 U.S.C. [Part II, Chapter 10] §§ 102-03 (referring, respectively, to "**Conditions for patentability; novelty**" and "**Conditions for patentability; non-obvious subject matter**") (emphasis added).

10

not address either the presumption or standard of proof issues, although Judge Mayer, in a concurring opinion, stated his view that "while a presumption of validity attaches in many contexts, . . . no equivalent presumption of eligibility applies in the section 101 calculus." *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 720-21 (Fed. Cir. 2014) ("*Ultramercial II*") (Mayer, J., concurring). The concurring opinion from the Federal Circuit is not controlling.

In these circumstances, District Courts, including this District, have taken varying approaches. *See, e.g.*, *In re TLI Communications LLC Patent Litigation*, 2015 WL 627858, at *19 n.48 (E.D. Va. Feb. 6, 2015) (citing sample of District Court views); *see also Cal. Inst. of Tech. v. Hughes Commc'ns Inc.*, 2014 WL 5661290, at *2 n.6 (C.D. Cal. Nov. 3, 2014) (explaining that "[e]ligibility questions mostly involve general historical observations, the sorts of findings routinely made by courts deciding legal questions"). Frequently, decisions from this District have assessed § 101 challenges by applying a burden of clear and convincing evidence. *See, e.g.*, *Tenon & Groove, LLC v. Plusgrade S.E.C.*, 2015 WL 1133213, at *3 (D. Del. Mar. 11, 2015) ("[T]he court is convinced – by clear and convincing evidence – that the patents-in-suit nonetheless claim an abstraction – an idea, having no particular concrete or tangible form.") (internal quotation marks omitted); *Tuxis Techs., LLC v. Amazon.com, Inc.*, 2014 WL 4382446, at *6 (D. Del. Sept. 3, 2014) ("Because the evidence is clear and convincing that claim 1 of the '513 patent is directed towards an unpatentable abstract idea, it is invalid under 35 U.S.C. § 101."). In other cases, this District may have treated the issue solely as a question of law without applying a clear and convincing evidentiary burden. *See, e.g.*, *Intellectual Ventures I, LLC v. Motorola Mobility LLC*, 2015 WL 846532, at *3 (after citing clear and convincing standard for proof of "invalidity," stating that "[w]hether a claim is drawn to patent-eligible

11

subject matter under 35 U.S.C. § 101 is a threshold inquiry to be determined as a matter of law in establishing the validity of the patent."). In at least one very recent case, a Judge from this District expressly stated that the standard of proof on § 101 is an unsettled question and need not be resolved in the context of the particular motion then before the Court. *See, e.g.*, *Messaging Gateway Solutions, LLC v. Amdocs, Inc.*, C.A. No. 14-732-RGA, slip op. at 5 (D. Del. Apr. 15, 2015) (describing parties' dispute as to standard of proof and concluding that Court "need not decide the issue today" as the challenged claims were "patent-eligible under either standard").

Given the Court's conclusions on the merits of the pending motions, it is unnecessary to resolve the parties' dispute over the standard of proof. For the reasons explained below, the Court would find the '050 and '142 patents are patent ineligible even assuming it must impose on Defendants a burden of clear and convincing evidence. Similarly, the Court would conclude that the '610 patent is not patent ineligible even if this issue must be resolved as a question of law on which Defendants confront, at most, a burden of a preponderance of the evidence.

## DISCUSSION

Symantec and Trend Micro argue that the asserted claims are patent-ineligible under the analytical framework set forth in *Mayo* and *Alice*. (*See* D.I. 699 at 2; C.A. No. 12-1581 D.I. 176 at 2) Symantec contends that "[e]ach of IV's asserted claims [in the Symantec case] covers generic computer implementation of abstract ideas" and "do[es] not provide an 'inventive concept'" that would satisfy the *Mayo* test for subject-matter eligibility. (D.I. 699 at 2, 5) Trend Micro similarly argues that "[b]ecause the asserted claims of the patents-in-suit are directed to abstract ideas, and because the added computer-related limitations are merely generic and do not add inventive concepts beyond the abstract ideas themselves, none of the asserted claims of the

three patents-in-suit are eligible for patent protection." (C.A. No. 12-1581 D.I. 176 at 29)

IV responds that "[t]he Court should reject Symantec's sweeping indictment of software patentability, especially when it comes to the Patents-in-Suit, which pass *every* test the Supreme Court and the Federal Circuit have articulated for patent eligibility." (D.I. 722 at 1 (emphasis in original)) IV focuses on the Federal Circuit's post-*Alice* opinion in *DDR Holdings, LLC v. Hotels.com*, 773 F.3d 1245 (Fed. Cir. 2014), which IV contends gives the most "relevant guidance." (D.I. 722 at 6) Specifically, IV argues that "*DDR Holdings* shows that patent eligibility extends at least to (1) claims providing a solution 'necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks,' (2) claims that specify interactions yielding results that 'override[] the routine and conventional sequence' of Internet or computer events, and (3) claims that resolve a 'particular Internet-centric problem.'" (D.I. 722 at 6, 8) (citing *DDR Holdings*, 773 F.3d at 1258-59) IV further contends that Defendants' analysis, if accepted, would improperly result in all software patents being patent-ineligible.[6] (*See id.* at 25) Among other things, IV cites recent guidance from the U.S. Patent and Trademark Office ("PTO") on patent eligibility[7] and an amicus brief

---

[6]As is obvious from the Court's resolution of the pending motions, the Court does not agree with IV's contention.

[7]*See* "2014 Interim Guidance on Patent Subject Matter Eligibility (Interim Eligibility Guidance) for USPTO personnel to use when determining subject matter eligibility under 35 U.S.C. 101 in view of recent decisions by the U.S. Supreme Court, including *Alice Corp.*, *Myriad*, and *Mayo*" (available at www.uspto.gov/patent/laws-and-regulations/examination-policy (last visited April 13, 2015) at "Abstract Idea Examples," part 1, example 1, claim 1 (and accompanying analysis); *see also* D.I. 723-2 at 1-3.

13

filed in the Federal Circuit by a software association to which Defendants belong,[8] all of which (in IV's view) further undermine the strength of Defendants' position. (*See id.* at 1, 10-12)

With this general description of the parties' positions, the Court will now address the specific challenges to the eligibility of each of the three patents-in-suit.

**'050 Patent**

The asserted claims (9, 13, 16, 22, and 24) of the '050 patent are method claims. Claims 9, 16, and 22 are independent. Claim 13 depends from claim 9. Claim 24 depends from claim 23, which depends from claim 22.

> *Independent claim 9* recites as follows:
>
>> A method for identifying characteristics of data files, comprising:
>>
>> receiving, on a processing system, file content identifiers for data files from a plurality of file content identifier generator agents, each agent provided on a source system and creating file content IDs using a mathematical algorithm, via a network;
>>
>> determining, on the processing system, whether each received content identifier matches a characteristic of other identifiers; and
>>
>> outputting, to at least one of the source systems responsive to a request from said source system, an indication of the characteristic of the data file based on said step of determining.

---

[8]*See McRO, Inc. v. Bandai Namco Games Am., Inc.*, No. 15-1080 (Fed. Cir. Mar. 6, 2015), amicus brief of BSA | The Software Alliance (D.I. 723-1). The Court does not find IV's references to the amicus brief to be persuasive.

*Dependent claim 13* recites:

> The method of claim 9 wherein each said data file is an email message and said step of determining comprises determining whether said email is SPAM.

*Independent claim 16* recites:

> A method of filtering an email message, comprising:

> receiving, on a second computer, a digital content identifier created using a mathematical algorithm unique to the message content from at least two of a plurality of first computers having digital content ID generator agents;

> comparing, on the second computer, the digital content identifier to a characteristic database of digital content identifiers received from said plurality of first computers to determine whether the message has a characteristic; and

> responding to a query from at least one of said plurality of computers to identify the existence or absence of said characteristic of the message based on said comparing.

*Independent claim 22* recites:

> A method for providing a service on the Internet, comprising:

> collecting data on a processing system from a plurality of systems having a client agent generating digital content identifiers created using a mathematical algorithm for each of a plurality of files on the Internet to a server having a database;

> characterizing the files on the server system based on said digital content identifiers received relative to other digital content identifiers collected in the

database; and

transmitting a substance identifier from the server to the client agent indicating the presence or absence of a characteristic in the file.

*Dependent claim 23* (referenced in claim 24) recites:

The method of claim 22 wherein said step of collecting comprises collecting a digital identifier for a data file.

*Dependent claim 24* recites:

The method of claim 23 wherein said file content is an e-mail.

## *Mayo* Step 1: Are the asserted claims directed to a patent-ineligible "abstract idea"?

"First, given the nature of the invention in this case, we determine whether the claims at

issue are directed to a patent-ineligible abstract idea." *DDR Holdings*, 773 F.3d at 1255 (citing

*Alice*, 134 S. Ct. at 2355). Independent claims 9, 16, and 22 cover the following concepts:

- receiving one or more file/digital content identifiers generated using a mathematical algorithm (which is unique to "message content" in claim 16);

- comparing the received identifer(s) to other identifer(s) (and "classifying the files" based on this comparison in claim 22); and

- outputting either (a) a descriptor of the content (claim 9), (b) an identification of whether or not the message is of a certain type/classification (claim 16), or (c) an indication of the presence or absence of a characteristic (claim 22).

*(See generally* D.I. 425 (construing relevant claim terms))

Symantec argues that the '050 patent is a "classic example" of solving a problem "by

using a computer to perform a general-purpose method in the same manner 'as a person would

do it by head and hand' or 'by using a pen and paper.'" (D.I. 699 at 15 (citing *CyberSource*, 654 F.3d at 1372)) "[C]omputational methods which can be performed ***entirely*** in the human mind are the types of methods that embody the 'basic tools of scientific and technological work' that are free to all men and reserved exclusively to none." *CyberSource*, 654 F.3d at 1373 (quoting *Gottschalk v. Benson*, 93 S. Ct. 253, 255 (1972)). Trend Micro argues that the asserted claims are similar to those found to be patent-ineligible in *Cybersource* and other cases. (C.A. No. 12-1581 D.I. 176 at 5-10 (citing, *e.g.*, *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1347 (Fed. Cir. 2014) (finding claims directed to collecting data, recognizing data, and storing data to be abstract)))

The Court agrees with Defendants that the asserted claims of the '050 patent are strikingly similar to the claims in *Cybersource* that were directed to "obtaining credit card information relating to [consumer] transactions," "utilizing [a] map of credit card numbers to determine if the credit card transaction is valid," and "verifying the credit card information . . . based upon parameters . . . that may provide an indication whether the transaction is fraudulent." 654 F.3d at 1373. The claims of the '050 patent are directed to receiving information related to a file (an identifier) from a querying computer, characterizing the file based on the identifier and other stored identifiers, and communicating a result of the characterization back to a querying computer.

The asserted claims of the '050 patent are also similar to the claims found to be abstract in *Content Extraction*. (*See* C.A. No. 12-1581 D.I. 176 at 6-10) The '050 patent covers the steps of collecting, recognizing, and storing data, like the claims at issue in *Content Extraction*. The only additional step in the '050 patent is communicating a result of the "recognizing" step back

17

to a querying computer, but this step, too, is abstract. *See buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014) (holding that "receiving a request" and "transmitting an offer in return" were abstract concepts).

IV relies on *DDR Holdings* as the most analogous precedent, asserting, "As in *DDR Holdings*, the '050 Patent does *not* 'generically claim 'use of the Internet' to perform an abstract business practice' and *does* provide solutions necessarily rooted in computer technology to problems specifically arising in the realm of computer networks. *DDR Holdings*, 773 F.3d at 1258-59. No analog to the '050 claims exists absent computers." (D.I. 722 at 15) (emphasis in original) Even accepting, arguendo, IV's proposition that *DDR Holdings* stands for the premise that "claims providing a solution 'necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks'" are always patent eligible (D.I. 722 at 8 (citing *DDR Holdings*, 773 F.3d at 1258-59)), the underlying ideas in the asserted claims of the '050 patent are *not* "necessarily rooted in computer technology." Instead, in the Court's view, the '050 patent is directed to a generic computer implementation of abstract ideas: receiving identity information, comparing it to other information, and communicating results based on the identifying information.

Another helpful way of assessing whether the claims of the patent are directed to an abstract idea is to consider if all of the steps of the claim could be performed by human beings in a non-computerized "brick and mortar" context. *See, e.g., buySAFE*, 765 F.3d at 1353 ("[§ 101] also excludes the subject matter of certain claims that by their terms read on . . . a human-controlled series of physical acts . . . ."). With respect to the '050 patent, Defendants persuasively analogize the steps of the asserted claims to two such hypothetical scenarios: police

18

officers looking for stolen cars or parking enforcement officers determining how many unpaid

tickets belong to owners of illegally parked cars. These analogies are depicted in the table below:

| Limitations of '050 Patent Claim 9 | Routine Steps Performed when Looking for Stolen Cars | Routine Steps Performed to Determine Number of Unpaid Tickets Associated with Car |
|---|---|---|
| "receiving, on a processing system, file content identifiers for data files from a plurality of file content identifier generator agents, each agent provided on a source system and creating file content IDs using a mathematical algorithm, via a network" | Jones, a dispatch officer, receives a call from Smith, one of several officers patrolling for stolen cars, asking whether a car with license plate number "24680" has been reported stolen. | A parking enforcement dispatcher in Wilmington receives a radio call from one of several parking enforcement officers, asking about an illegally-parked car with license plate number "12345." |
| "determining, on the processing system, whether each received content identifier matches a characteristic of other identifiers" | Jones looks at a list of cars reported stolen to the police, generated by all patrol officers, and finds that a car with license plate number "24680" has been reported as stolen. | The dispatcher looks down a list of license plate numbers having unpaid tickets, generated from all the city enforcement officers, and finds that four unpaid tickets show up for the entry "12345." |
| "outputting, to at least one of the source systems responsive to a request from said source system, an indication of the characteristic of the data file based on said step of determining." | Jones tells Smith that the license plate number "24680" indicates that car has been reported stolen. | The dispatcher replies, "That vehicle has four outstanding tickets." |

(D.I. 699 at 18-19; C.A. No. 12-1581 D.I. 176 at 6-7) The above examples illustrate that the

concepts of the '050 patent are directed to an abstract idea and are not necessarily rooted in

computer technology.

The analysis above is based solely on the claims, specification, and file history of the '050 patent; what is referred to in the context of claim construction as intrinsic evidence. *See Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015). Thus, the Court determines that the asserted claims of the '050 patent are directed to an abstract idea as a matter of law.

The parties have also put extrinsic evidence before the Court. When this additional evidence is considered, it bolsters the conclusions the Court has already reached based solely on the intrinsic evidence: that the asserted claims of the '050 patent are directed to an abstract idea.

The inventors of the '050 patent admitted in deposition testimony that the invention of the '050 patent could be implemented by humans, albeit more slowly and less accurately than it is performed by a conventional computer:

> Q.   Okay. So if we were to consider people to be a
>      form of computer, then it could be performed by
>      people, you could put people – another way to say it
>      is you could put people in place of the computers
>      here and the invention would work the same, just
>      more slowly and less accurately. . . .
>
> A.   Yes, because people are essentially general purpose
>      computers, so yes.

(D.I. 700 Ex. E at 47)

> Q.   So other than breaking the emails down into smaller
>      parts, how could one have compared like to like in
>      the way that you wanted to?
>
> A.   You would have used a human, who are very good
>      at comparing things.
>
> Q.   You could have used a person?
>
> A.   Yes.

(D.I. 700 Ex. F at 131-32) IV has not identified any contradictory evidence from the patent's inventors.

Instead, as part of its effort to counter the conclusion that the asserted claims of the '050 patent are directed to an abstract idea, IV analogizes its claims to those discussed in recent guidance from the PTO. Specifically, IV cites a hypothetical claim the PTO indicated would be deemed patent eligible by an examiner. *See* Interim Eligibility Guidance, *supra* note 6. The PTO's hypothetical claim is directed to creating "sanitized" versions of computer files by "extracting, via file parsing, the malicious code" from computer files. *Id.* The PTO's example is necessarily rooted in computer technology because malicious code or "viruses" have no significance outside the realm of computer technology. The '050 patent, by contrast, is directed to abstract steps that could generally be performed outside of a computing context.

Thus, the Court disagrees with IV's contention that the asserted claims of the '050 patent are "inextricably tied to computer technology and distinct from the types of concepts found by the courts to be abstract." (D.I. 723-2 at 2) Instead, the Court concludes that – regardless of the standard of proof – the asserted claims of the '050 patent are directed to an abstract idea of receiving identifying information, comparing it to other information, and outputting an indication based on the identifying information. Thus, it is necessary to proceed to the second step of the analysis.

## *Mayo* **Step 2: Do the asserted claims include an "inventive concept" sufficient to "ensure that the patent in practice amounts to significantly more" than a patent upon an ineligible concept?**

The asserted claims of the '050 patent may still be patent-eligible if they include an "inventive concept" sufficient to "ensure that the patent in practice amounts to significantly

more" than a patent upon an ineligible concept. *Alice*, 134 S. Ct. at 2355. A "generic computer implementation" recited in the asserted claims, however, will "fail to transform [an] abstract idea into a patent-eligible invention." *Id.* at 2357. Thus, something other than a generic computer implementation must be identified in order for there to be an inventive concept.

The non-computer limitations common to all of the independent, asserted claims cover the abstract idea of "receiving an identifier for a data file, matching it against previously-received identifiers to ascertain a characteristic of the data file, and outputting a result." (*See* C.A. No. 12-1581 D.I. 176 at 4-7) "Simply appending conventional steps, specified at a high level of generality, [is] not *enough* to supply an inventive concept." *Alice*, 134 S. Ct. at 2357 (internal quotation marks omitted; emphasis in original). At bottom, however, that is all that the limitations of the '050 patent claims do. Thus, the claim limitations common to all independent claims of the '050 patent, including all limitations of independent claim 9, do not include an "inventive concept" under *Mayo*.

IV points to other limitations found just in certain asserted claims as demonstrating the patent eligibility of at least those certain claims. The Court disagrees.

With respect to claim 16, IV contends that the word "unique" (the "uniqueness limitation") relates to the "hashing" functionality covered by the '050 patent. (C.A. No. 12-1581 D.I. 183 at 22) IV touts the uniqueness limitation as part of an "innovative combination" of limitations that comprise an inventive concept. *Id.* at 22. But hashing is just one of many mathematical algorithms that could be used to implement the uniqueness limitation of claim 16. According to *DDR Holdings*, the very case on which IV places such heavy reliance, "[w]e know that mathematical algorithms, including those executed on a generic computer, are abstract

22

ideas." 773 F.3d at 1256; *see also* '050 patent at 4:2-3; U.S. Pat. No. 5,884,033 (cited in file history of '050 patent and describing use of hashing as early as 1996). The uniqueness limitation does not add an "inventive concept" that would make claim 16 patent-eligible under *Mayo*.

Similarly, the "characterizing" limitation in claim 22 does not add an inventive concept necessary to save claim 22 from ineligibility. The Court construed the characterizing limitation in claim 22 to mean "classifying the files on the server system by comparing their digital content identifiers to other digital identifiers collected in the database." (D.I. 425 at 13) This is similar to a limitation at issue in *Cybersource* – reciting "utilizing the map of credit card numbers to determine if the credit card transaction is valid" – which was part of a claim found to be patent-ineligible. *See* 654 F.3d at 1373. Thus, the characterizing limitation does not qualify as an inventive concept.

Likewise, none of the asserted claims are made patent eligible by the set of alternative steps for outputting either (a) a descriptor of the content (claim 9), (b) an identification of whether or not the message is of a certain type/classification (claim 16), or (c) an indication of the presence or absence of a characteristic (claim 22). Each of these limitations is essentially the same for purposes of the § 101 analysis as each covers communicating descriptive information about content or a message using a generic computer implementation. These limitations are part of the same abstract idea, and none add any inventive concept to the asserted claims.

Nor do the limitations in dependent claims 13, 23, or 24, which limit the independent claims on which they depend to the particular technological environment of SPAM email detection, render these three claims patent eligible. In *Alice*, the Supreme Court noted that "limiting the use of an abstract idea 'to a particular technological environment'" is "not enough

23

for patent eligibility." 134 S. Ct. at 2358. As discussed above, all of the independent claims are directed to an abstract idea. The limitations added in dependent claims 13, 23, and 24 do nothing other than limit the use of the abstract idea to the field of SPAM email detection. These limitations, then, do not add any "inventive concept" and claims 13, 23, and 24 are not patent eligible.

IV argues, "*Taken as a whole*, these claimed steps [in the asserted claims of the '050 patent] narrowly define a set of actions tied to a specific way of describing file content and classifying computer files." (D.I. 722 at 22 (emphasis added)) However, the combination of limitations pointed to by IV is nothing more than a generic computer implementation of the human-executable abstract idea discussed above. The Court broadly construed key phrases in the '050 patent – including, for example, construing "file content identifier" as anything "reflecting at least a portion of the content of a data file, but not constituting merely an excised portion of that data file." (D.I. 426 at 1-2) The Court's broad constructions do not narrow the claims in any meaningful way for purposes of § 101. Receiving and sending information – including a "file content identifier" or a "response describing . . . content or identifying a characteristic" – over a network "is not even arguably inventive." *buySAFE*, 765 F.3d at 1355; *see also Alice*, 134 S. Ct. at 2359; *Walker Digital, LLC v. Google, Inc.*, 2014 WL 4365245, at *6 (D. Del. Sept. 3, 2014) (noting that "storing" information in a database "add[s] no inventive element").

IV argues that the asserted claims satisfy the machine-or-transformation test because they use a generic computer for implementation, the "computer (the machine) is critical for implementing the claims of the Patents-in-Suit," and "'none of these limitations could be performed by a human alone.'" (D.I. 183 at 30 (citing *Helios Software, LLC v. SpectorSoft*

24

*Corp.*, 2014 WL 4796111, at *17 (D. Del. Sept. 25, 2014))[9] IV also argues that "[c]reation of the file content identifiers requires specialized software or programming." (D.I. 722 at 22) But the specification belies IV's assertions and discloses no specialized machine or programming that would play a significant part in permitting the claimed method to be performed. (*See* '050 patent at 4:2-3 ("It should be recognized however that *any* hashing algorithm can be utilized."), 4:30-34 ("It should be understood that the executable may be written in, for example, perl script and *can be designed to interact with any number of commercial or free e-mail systems, or other data transfer systems* in applications other than e-mail.") (emphasis added)) The asserted claims do not require any particular machine for implementation. Moreover, IV does not argue, and the Court does not find, that any of the asserted claims of the patents-in-suit transform an article.

Regarding exclusion of certain patents from eligibility under § 101, the Supreme Court stated in *Alice*, 134 S. Ct. at 2354, "We have described the concern that drives this exclusionary principle as one of pre-emption." Here, "limiting the abstract concept [of the '050 patent] to a computer implementation and to a specific industry . . . do[es] not provide additional substantive limitations to avoid preempting the abstract idea." *Accenture Global Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1345 (Fed. Cir. 2013), *cert. denied*, 134 S. Ct. 2871 (2014). IV has pointed to nothing in the claims or specification of the '050 patent that would adequately alleviate the preemption concerns that arise if the '050 patent claims are deemed patent eligible.

---

[9]*Helios* is distinguishable for a number of reasons. The Court's statement in *Helios* that "none of these limitations could be performed by a human alone" is not applicable to any of the asserted claims of the '050 (or '142) patents, which consist entirely of limitatons that could be performed by humans or limitations directed to generic computer implementation. In addition, the patents at issue in *Helios*, unlike the '050 (or '142) patents, were "necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks." *DDR Holdings*, 773 F.3d at 1258-59.

The Court's conclusion that the claims of the '050 patent lack an inventive concept is based solely on the intrinsic evidence, as described above. The extrinsic evidence provides further support for this conclusion. Specifically, the inventors of the '050 patent admitted that hashing was well known at the time of invention of the '050 patent. (*See* D.I. 700, Ex. E, deposition of Brooks Talley, at 34-37 ("Q. . . . Do you agree that it's fair to say that prior to the conception of the '050 patent it was well known to use hashing as a way to reduce a large amount of data to a small amount of data to confirm that two data objects were the same? . . . A. Yes."); D.I. 700, Ex. F, deposition of Mark Pace, at 123-24 ("Q. What was the algorithm you were using to change the email into something else? A. At the time I believe we used the MD5 hash. Q. The MD5 hash was something that existed at the time? A. That's correct. Q. And it had existed for a while? A. That's correct."))

In light of the foregoing, the Court determines that the asserted claims of the '050 patent are ineligible under § 101.[10] Accordingly, the Court will grant Defendants' motions with respect to IV's '050 patent.

**'142 Patent**

Asserted claims 1, 17, 21, 22, 24, and 26 are independent; asserted claim 7 depends from claim 1. Claims 1, 7, and 24 are directed to "post office" apparatuses. Claims 17, 21, 22, and 26 are process claims directed to the same basic functionality performed by the components of the asserted apparatus claims.

---

[10]For purposes of Trend Micro's motion, the Court finds that there is no genuine issue of material fact as to the patent ineligibility of the asserted claims of the '050 patent.

*Independent claim 1* recites as follows:

A post office for receiving and redistributing e-mail messages on a computer network, the post office comprising:

a receipt mechanism that receives an e-mail message from a sender, the e-mail message having at least one specified recipient;

a database of business rules, each business rule specifying an action for controlling the delivery of an e-mail message as a function of an attribute of the e-mail message;

a rule engine coupled to receive an e-mail message from the receipt mechanism and coupled to the database to selectively apply the business rules to the e-mail message to determine from selected ones of the business rules a set of actions to be applied to the e-mail message; and

a distribution mechanism coupled to receive the set of actions from the rule engine and apply at least one action thereof to the e-mail message to control delivery of the e-mail message and which in response to the rule engine applying an action of deferring delivery of the e-mail message, the distribution engine automatically combines the e-mail message with a new distribution list specifying at least one destination post office for receiving the e-mail message for review by an administrator associated with the destination post office, and a rule history specifying the business rules that were determined to be applicable to the e-mail message by at least one rule engine, and automatically delivers the e-mail message to a first destination post office on the distribution list instead of a specified recipient of the e-mail message.

27

*Dependent claim 7* recites:

The post office of claim 1, further comprising:

a primary message store, coupled to the receipt engine, for receiving and non-persistently storing e-mail messages; and

a secondary message store, coupled to the distribution engine, for receiving therefrom, and persistently storing an e-mail message in response to the rule engine specifying the action that the e-mail message be reviewed by an administrator recipient prior to delivery to a specified recipient.

*Independent claims 17* recites:

A process for controlling the delivery of e-mail message in a business, comprising:

providing to a post office a set of business rules derived from business communication policies, each business rule defining an action applied to an e-mail message based on the attribute of the message;

receiving messages at the post office;

to at least one message received at the post office, applying the business rules to the attributes of the message to determine at least one action of deferring delivery to be applied to the message;

automatically combining the e-mail message with a new distribution list specifying at least one destination post office for receiving the e-mail message for review by an administrator associated with the destination post office and a rule history specifying at least one business rule determined to be applicable to the e-mail message; and

automatically delivering the e-mail message to a destination post office on the distribution list

28

instead of a specified recipient of the e-mail message.

*Independent claim* 21 recites:

A process for deferring the delivery of selected e-mail messages, comprising:

storing a database of business rules, each business rule specifying an action for controlling the delivery of an e-mail message as a function of an attribute of the e-mail message;

receiving a plurality of e-mail messages at a first post office, each e-mail message having at least one specified recipient;

selecting at least one e-mail message from the plurality of e-mail messages by applying at least one business rule to the e-mail message;

delivering each non-selected e-mail message to its specified recipients; and

deferring the selected e-mail message by:

automatically combining the selected e-mail message with a new distribution list specifying at least one new destination post office for receiving the e-mail message for review by an administrator associated with the destination post office and a rule history specifying at least one business rule determined to be applicable to the e-mail message;

automatically delivering the selected e-mail message to a destination post office on the distribution list instead of a specified recipient of the e-mail message;

persistently storing the selected e-mail message in a storage area of the destination post office until the selected e-mail message is reviewed prior to any further delivery of the e-mail message to its

29

specified recipients or to another destination post office on the distribution list.

*Independent claim* 22 recites:

A computer implemented process for reviewing an e-mail message, comprising:

receiving the e-mail message at a first post office, the e-mail message having at least one specified recipient;

deferring the e-mail message by:

automatically combining the selected e-mail message with a new distribution list specifying at least one second post office for receiving the e-mail message for review by an administrator associated with the second post office and a rule history specifying at least one business rule determined to be applicable to the e-mail message; and

automatically delivering the selected e-mail message to an administrator at the second post office on the distribution list instead of a specified recipient of the e-mail message;

persistently storing the e-mail message at the second post office until the e-mail message is reviewed;

automatically reviewing the e-mail message after a specified time interval to determine an action to be applied to the e-mail message; and

automatically applying the action to the e-mail message.

*Independent claim 24* recites:

A post office for receiving and redistributing data objects on a computer network, the post office comprising:

30

a receipt mechanism that receives a data object from a sender, the data object having at least one specified recipient;

a database of business rules, each business rule specifying an action for controlling the delivery of a data object as a function of an attribute of the data object;

a rule engine coupled to receive a data object from the receipt mechanism and coupled to the database to selectively apply the business rules to the data object to determine from selected ones of the business rules a set of actions to be applied to the data object; and

a distribution mechanism coupled to receive the set of actions from the rule engine and apply at least one action thereof to the data object to control delivery of the data object and which in response to the rule engine applying an action of deferring delivery of the data object, the distribution engine automatically combines the data object with a new distribution list specifying at least one new destination post office for receiving the data object for review by an administrator associated with the destination post office and a rule history specifying at least one business rule determined to be applicable to the data object by at least one rule engine, and automatically delivers the data object to a first destination post office on the distribution list instead of a specified recipient of the data object.

*Independent claim 26* recites:

A process for deferring the delivery of selected data objects, comprising:

storing a database of business rules, each business rule specifying an action for controlling the delivery of a data object as a function of an attribute of the data object;

31

receiving a plurality of data objects at a first post
office, each data object having at least one specified
recipient;

selecting at least one data object from the plurality
of data objects by applying at least one business rule
to the data object;

delivering each non-selected data object to its
specified recipients;

deferring the selected data object by:

automatically combining the selected data object
with a new distribution list specifying at least one
new destination post office for receiving the data
object for review by an administrator associated
with the destination post office; and a rule history
specifying at least one business rule determined to
be applicable to the data object;

automatically delivering the selected data object to a
destination post office on the distribution list
instead of a specified recipient of the data object;
and

persistently storing the data object in a storage area
until the data object is reviewed prior to any further
delivery of the data object to its specified recipients.

## *Mayo* Step 1

The asserted claims of the '142 patent cover the following concepts:

- receiving one or more emails or data objects ("messages")
  addressed to at least one recipient (all claims);

- providing at least one business rule applicable to the
  message(s) (all claims);

- each business rule specifying an action based on an
  attribute of the message(s) (claims 1, 7, 17, 21, 24, and 26);

- selectively applying one or more business rules to
  determine at least one action to be applied to the message(s)
  (claims 1, 17, 21, 24, and 26);

- applying at least one of the action(s) (claims 1, 22, and 24);

- deferring delivery of at least one message by attaching a
  new distribution list to the message(s) and sending them to
  an administrator with a rule history list specifying at least
  one rule applicable to the message(s) (all claims);

- delivering non-selected message(s) to their original
  recipient(s) (claims 21 and 26);

- persistently storing selected messages(s) until they may be
  reviewed by the administrator (claims 7, 21, 22, and 26);
  and

- automatically reviewing persistently stored message(s) that
  have not been reviewed by the administrator after a
  specified time interval to determine and apply an action to
  the message(s) (claim 22).

Symantec contends that "[t]he asserted claims of the '142 patent represent a classic case
of merely '[s]tating an abstract idea while adding the words 'apply it with a computer.'" (D.I.
699 at 6 (citing *Alice*, 134 S. Ct. at 2358)) According to Symantec, "[t]he specification itself
discloses that the 'invention' consists of applying known methods of reviewing and routing paper
documents within a company to email communications." (*Id.* (citing '142 patent at 1:15-34,
65-67)) The Court concludes that the asserted claims of the '142 patent are directed to human-
practicable concepts, which could be implemented in, for example, a brick-and-mortar post
office. *See generally Walker Digital*, 2014 WL 4365245, at *9 (D. Del. Sept. 3, 2014) (finding
claims directed to concepts that have "long been practiced by human headhunters and
matchmakers" as patent-ineligible under § 101).

33

IV argues that the '142 patent addresses a problem "specifically arising in the realm of computer networks." (D.I. 722 at 13 (citing *DDR Holdings*, 773 F.3d at 1257)) Specifically, IV argues that the '142 patent overrides the "fundamental operating paradigm" – of expeditious delivery of messages to their intended recipients – by gating and deferring delivery of email messages based on business rules. (*Id.*) IV argues that email is meaningfully distinguishable from "snail mail" for purposes of § 101 because email is "done on a computer." (*Id.*) (emphasis omitted) IV adds that the claim limitations are "necessarily rooted in computer technology," particularly calling out the claim limitations that require "automatically" performing certain actions as purportedly showing that the claims are patent eligible under *DDR Holdings*. (*Id.*)

The Court disagrees. Instead, the claims of the '142 patent are in essence directed to generic computer implementation of an abstract idea, which does not make the abstract idea patent eligible.

Addressing each of the asserted claims of the '142 patent individually is unnecessary since "all the claims are 'substantially similar and linked to the same abstract idea.'" *Content Extraction*, 776 F.3d at 1348 (quoting and approving district court's analysis of representative claim limitations). Each of the limitations summarized above is directed to an abstract idea previously implemented in brick-and-mortar post offices. Moreover, each of the collections of human-executable concepts in the asserted claims is directed to the same abstract idea of implementing post office functionality via a computer.

As with the '050 patent, Symantec and Trend Micro provide persuasive analogies between the '142 patent claims and the "brick-and-mortar" world. These examples are reproduced below for representative claims 17 and 22, demonstrating that the '142 patent covers

an abstract idea. (Claims 17 and 22 include each of the concepts in all of the asserted claims except for claim 21's limitation of delivering non-selected message(s) to their original recipient(s), which in the tables below the Court adds to Defendants' hypotheticals.)

| Limitations of '142 Patent Claim 17 [language from claim 21 inserted in brackets] | Routine Steps Performed in a Corporate Mailroom |
|---|---|
| "providing to a post office a set of business rules derived from business communication policies, each business rule defining an action applied to an email message based on the attribute of the message" | The central corporate mailroom at Acme Corporation has a set of business rules for handling correspondence addressed to people in the company. The rules are posted on the mailroom wall for mailroom employees to consult. |
| "receiving messages at the post office" | The mailroom receives correspondence addressed to the corporation or its employees. |
| "to at least one message received at the post office, applying the business rules to the attributes of the message to determine at least one action of deferring delivery to be applied to the message" | One of the business rules of the corporation is that correspondence addressed to the CEO is always sent to an administrator for review unless it has been marked as "Personal" on the front of the envelope. In one instance, the mailroom receives an incoming letter without such a marking. |
| "automatically combining the e-mail message with a new distribution list specifying at least one destination post office for receiving the email message for review by an administrator associated with the destination post office and a rule history specifying at least one business rule determined to be applicable to the e-mail message; and" | A mailroom employee tasked with stamping incoming mail stamps the envelope, "Deliver to Administrator: CEO, Not Personal" |
| "automatically delivering the [] message to a destination post office on the distribution list instead of a specified recipient of the [] message." | In the next round of hourly deliveries, mailroom staff delivers the letter to the administrator's mail drop instead of the CEO suite. |

35

| ["delivering each non-selected e-mail message to its specified recipients"] (claim 21) | The mailroom staff delivers messages directly, without any deferral, to other Acme employees. |

(C.A. No. 12-1581 D.I. 176 at 19-20)

| Limitations of '142 Patent Claim 22 [language from claim 21 inserted in brackets] | Routine Steps Performed in a Corporate Mailroom |
| --- | --- |
| "receiving the e-mail message at a first post office, the email message having at least one specified recipient" | All letters addressed to ABC Manufacturing are directed to company's mail room. The mailroom receives a letter addressed to ABC Mfg.'s CEO. |
| "deferring the e-mail message by: automatically combining the selected e-mail message with a new distribution list specifying at least one second post office for receiving the email message for review by an administrator associated with the second post office and a rule history specifying at least one business rule determined to be applicable to the e-mail message; and" | ABC Mfg. has a rule that any letters addressed to the CEO should be opened and scanned for content. If the letter is from a potential customer requesting a price quote, it is to be delivered to the shop foreperson. Other letters are to be delivered to the CEO's assistant. The clerk in the mail room opens a letter and determines it is a request for a price quote. He attaches a routing slip to the letter that specifies (1) it should be directed to the shop foreperson and (2) it requests a price quote. |
| "automatically delivering the selected e-mail message to an administrator at the second post office on the distribution list instead of a specified recipient of the e-mail message" | The letter is delivered to the shop foreperson, not to the CEO. |
| "persistently storing the e-mail message at the second post office until the e-mail message is reviewed" | The foreperson places the letter in a file that will remind him to review the letter in two days. |

36

| "automatically reviewing the e-mail message after a specified time interval to determine an action to be applied to the e-mail message; and" | Two days later, the shop foreperson reviews the request for a price quote to determine whether the proposal is one that ABC wants to respond to. He determines that it is. |
| --- | --- |
| "automatically applying the action to the e-mail message." | ABC prepares a price quote and sends to the prospective customer. |
| ["delivering each non-selected e-mail message to its specified recipients"] (claim 21) | Letters addressed to other ABC employees are delivered directly, without any deferral, to addressees. |

(D.I. 699 at 10-11)

IV argues that these analogies are inaccurate, as the analogies – unlike the asserted patent claims – are not limited to "email" messages. But the suggestion that this makes the claims patent eligible is unavailing. As Defendants observe, in *Alice* the Supreme Court found ineligible patent claims that were purely computer oriented, as did the Federal Circuit in *Ultramercial* and *Content Extraction*. (*See, e.g.*, Tr. at 56) Aside from the limitations that include or require a generic computer implementation, the limitations of the asserted claims are human-executable and directed to fundamental (mailroom) business practices similar to those found patent ineligible in *Bilski* and *Alice*.

As with the '050 patent, the Court's conclusion that the asserted claims of the '142 patent fail *Mayo*'s step 1 is derived solely from the claims, specification, and file history. Additionally, as with the '050 patent, the parties have provided extrinsic evidence. Again, this extrinsic evidence confirms the Court's conclusion that the asserted claims are directed to an abstract idea.

In particular, Trend Micro quotes from IV's technology tutorial, submitted June 5, 2012 (C.A. No. 12-1581 D.I. 177, Ex. E at 49), to show that even IV believes that, conceptually, the "post office" components, which are central to implementing the asserted claims, are "not much

different" from brick-and-mortar U.S. Post Offices. In the tutorial, *IV* told the Court:

> In a business email environment business rules are applied at the
> "post office." In the typical environment, the post office resides on
> a mail server, where the company's emails are received, processed,
> and routed to recipients. ***Conceptually, this post office is not
> much different than a United States Postal Service office*** that
> processes letters and packages, except that the process is all
> computer-implemented and done electronically in a matter of
> seconds. The business rules are automatically applied to each
> incoming message, and the post office takes action on messages
> that trigger the business rules. Other messages are simply routed
> normally to their designated recipients.

(*Id.*) (emphasis added) IV has no convincing response to Defendants' argument, nor does it

supply any persuasive countervailing extrinsic evidence.

Thus, the Court concludes that the asserted claims of the '142 patent are directed to an

abstract idea of implementing well-known post office functionality using a computer. The Court

will turn its attention to step 2.

### *Mayo* Step 2

Symantec argues that "[t]he asserted claims of the '142 patent do not clear the § 101

hurdle by including an 'inventive concept' that transforms them into something significantly

more than the abstract concept itself." (D.I. 699 at 12) "To the contrary," Symantec continues,

"the specification emphasizes that the asserted claims can be implemented on a conventional

network, using conventional computers that run conventional operating systems and conventional

e-mail clients." (*Id.* at 12 (citing '142 patent at 3:25-26, 5:46-47, 5:49, 9:51-58)) Echoing these

contentions, Trend Micro argues that "the asserted claims add no more than well-understood,

conventional computer processing to practice the claimed abstract ideas in an automated setting."

(C.A. No. 12-1581 D.I. 176 at 22) IV responds by focusing on the fact that the '142 patent "does

not preempt every application of filtering email" (D.I. 722 at 19) and asserting that the '142 patent's limitations are quite detailed.

"A patent need not . . . preempt an entire field to run afoul of § 101." *Gametek LLC v. Zynga, Inc.*, 2014 WL 1665090, at *5 (N.D. Cal. Apr. 25, 2014). "[A]lthough courts have framed the 'second-step' analysis in terms of preemption, there is no rule that ideas that do not preempt an entire field are *per se* patent eligible. Rather, the test as articulated by *Alice* is that there must be an inventive contribution on top of the underlying abstract idea." *Money Suite Co. v. 21st Century Ins. & Fin. Servs., Inc.*, 2015 WL 436160, at *5 (D. Del. Jan. 27, 2015). As the Supreme Court articulated in *Alice*, the focus of the second step of the *Mayo* test is whether the claims "'*disproportionately* t[ie] up the use of the underlying' ideas." 134 S. Ct. at 2354 (quoting *Mayo*, 132 S. Ct. at 1294) (emphasis added).

Applying these legal principles here, the Court agrees with Symantec and Trend Micro that the asserted claims of the '142 patent disproportionately tie up use of the patent's underlying ideas. The fact that the '142 patent does not preempt the *entire* field of email filtering does not render the claims per se patent eligible.

Alluding to *DDR Holdings*, IV argues that the specificity of the "ordered combination of elements . . . overrides email's conventional 'unabated delivery' paradigm." (D.I. 722 at 19) But *DDR Holdings* is distinguishable at least because the claims at issue in that case were "necessarily rooted in computer technology . . . to overcome a problem specifically arising in the realm of computer networks." 773 F.3d at 1257. The asserted claims of the '142 patent are not "necessarily rooted" in computer networks. Instead, as explained above, the steps of the asserted claims may be performed by humans, with the exception of generic computer-implemented steps

39

that cannot serve as an inventive concept. Stating an abstract idea while adding the limitation "apply it with a computer," which is what is essentially done in the asserted claims, is insufficient.

IV cites *DDR Holdings* also to argue that the claims "do not merely recite the performance of some business practice known from the pre-Internet world along with a requirement to perform it on the Internet." *Id.* at 1257. But the core problem addressed by the '142 patent is the need to intercept and defer delivery of messages. This problem existed long before the Internet or the '142 patent. "[T]he basic character of a process claim drawn to an abstract idea is not changed by claiming only its performance by computers . . . ." *CyberSource*, 654 F.3d at 1375.

IV points to the "rule engine" in some of the asserted claims as evidence that the '142 patent cannot be implemented on a "conventional" computer. (D.I. 722 at 20-21) But the rule engine and all other components listed in the claims may be implemented purely in software and executed on any generic computer. (*See, e.g.*, '142 patent at 5:43-62, 6:51-55 (reciting "conventional" computer implementation)) Unlike with the sample PTO claims on which IV relies (*see* D.I. 723-2 at 2), the '142 patent's implementation is not "inextricably tied to computer technology and distinct from the types of concepts found by the courts to be abstract." Nor does the '142 patent's implementation supply an inventive concept under part two of the *Mayo* test.

IV also argues that the claims satisfy the machine-or-transformation test. But IV does not, and cannot, point to any specific machine used to implement any of the asserted claims. The claims are drawn only to a generic computer implementation of an abstract idea. Thus, again, the Court concludes that the asserted claims of the '142 patent lack an inventive concept.

In light of the foregoing analysis, the Court finds that the asserted claims of the '142

patent are ineligible under § 101.[11] The Court will grant Defendants' motions with respect to

IV's '142 patent.

## '610 Patent

Asserted claim 7 of the '610 patent is a method claim that depends from claim 1.

*Independent claim 1* recites as follows:

> A virus screening method comprising the steps of:
>
> routing a call between a calling party and a called party of a
> telephone network;
>
> receiving, within the telephone network, computer data from a first
> party selected from the group consisting of the calling party and the
> called party;
>
> detecting, within the telephone network, a virus in the computer
> data; and
>
> in response to detecting the virus, inhibiting communication of at
> least a portion of the computer data from the telephone network to
> a second party selected from the group consisting of the calling
> party and the called party.

*Dependent claim 7* recites as follows:

> The virus screening method of claim 1 further comprising
> the step of determining that virus screening is to be applied to the
> call based upon at least one of an identification code of the calling
> party and an identification code of the called party.

## *Mayo* Step 1

Symantec and Trend Micro argue that the '610 patent is directed to "screening data" and

---

[11]For purposes of Trend Micro's motion, the Court finds that there is no genuine issue of
material fact as to the patent ineligibility of the asserted claims of the '142 patent.

41

"screening information." (D.I. 699 at 25; C.A. No. 12-1581 D.I. 176 at 24) Symantec states that the "key idea of the '610 patent is the business concept of providing conventional virus screening as a subscription service to customers." (D.I. 699 at 23) IV counters Defendants' arguments by again alluding to *DDR Holdings*, stating that Symantec and Trend Micro "cannot legitimately dispute that computer viruses are 'a problem specifically arising in the realm of computer networks' and computers." (C.A. No. 12-1581 D.I. 183 at 19) IV insists, "*The human mind cannot screen for computer viruses* within the telephone network or elsewhere." (*Id.* at 20) (emphasis added)

The Court agrees with IV. The '610 patent is not directed to screening generic "data" or "information." Instead, the asserted claim specifically recites a *computer virus*, which has computer-centric implications that cannot be abstracted away so broadly. Furthermore, the human mind cannot perform the steps described in the specification for implementing virus screening functionality in a telephone network. For these and other reasons, as explained below, the Court is unpersuaded by Defendants' analysis.

The specification of the '610 patent describes how implementing claim 7 requires at least three computers configured in a specific manner, as depicted (for example) in the flowcharts (and accompanying text) shown as Figures 3, 4, and 5 (excerpted below). ('610 patent at 5:12-9:22)



*Fig. 3*

Figure 3 is "an embodiment of a virus screening method in accordance with the present

invention." (*Id.* at 5:12-13) Figure 3 shows that "computer data" is received from a "first party" ("calling" or "sending" party). The computer data is destined for a "second party" ("called," "client," or "receiving" party). It is inherent that this disclosure includes a computer for both the first and second parties. In block 102, the method of the patent determines whether or not virus screening should be applied to the computer data based on, for example, whether or not "the called party is a subscriber to a virus screening service." (*Id.* at 5:20-21) At block 112, the method screens computer data for at least one virus. An implementation of block 112 is illustrated in Figure 4 (below).



*Fig. 4*

44

Figure 4 is a "preferred embodiment of a method of screening the computer data" that

performs some initial processing of the data (i.e., removing transmission-specific data from the

computer data, decompressing, and decrypting the data). (*Id.* at 6:15-17, Fig. 4) The method in

Figure 4 then "create[s] a model of a computer," as indicated in block 206. (*Id.* at Fig. 4) "The

model is provided by a virus screening computer other than the client computer." (*Id.* at 7:66-67)

This virus screening computer is a third computer; it could not be the sending computer (since

virus detection takes place "within the telephone network" but the sending computer is not within

the telephone network. (*Id.* at 3:14-16; *see also* D.I. 425 at 24-25 (construing "within the

telephone network" to mean "in the voice or data network connecting the calling party and called



*Fig. 5*

45

party, exclusive of the networks and gateway nodes of the called party and calling party"))

"An embodiment of a method of creating the model is described with reference to FIG. 5" (shown above). (*Id.* at 8:9-10) As shown in Figure 5, block 210 determines certain parameters of the receiving computer, including "operating system, a hardware type, registry information, configuration information, and information from initialization files," in order to create an accurate model of the receiving computer in the virus screening computer's memory. (*Id.* at 8:14-17) If the computer data includes "an executable program such as an installation program or a plug-in program for a Web browser, the executable program is installed" on the virus screening computer. (*Id.* at 8:5-7) During installation, "a step of intercepting read requests generated by the installation program is performed." (*Id.* at 8:29-30) The virus screening computer analyzes the model computer in order to reply to these read requests appropriately. "The reply message is generated by gathering information from the model of the client computer[] and passing the information to the installation program." (*Id.* at 8:35-38) Similarly, the virus screening computer intercepts write requests from the executable program and modifies the model computer according to the write request instructions. (*Id.* at 8:51-59)

The result of the steps described above is a model of the client computer stored in the virus screening computer's memory. The model reflects the general state that the client computer would have been in had it executed the potentially virus-laden code. Virus screening techniques can then be applied to the model computer, as shown in block 220 in Figure 4, in order to determine whether the model computer has been infected.

Although the embodiment described in the specification with respect to Figures 3, 4, and 5 is not the only way to implement claim 7, it is necessary in practicing the claim to in some way

46

imitate the receiving computer's configuration in order to properly detect whether a harmful

virus in an executable file may infect the receiving computer. The coordination between a virus

detecting computer, a sending computer, and a receiving computer is something "necessarily

rooted in computer technology in order to overcome a problem specifically arising in the realm of

computer networks." *DDR Holdings*, 773 F.3d at 1258-59.[12]

Further, the specification confirms that the '610 patent is directed to solving the problem

of individual computer users having periodically to update their virus detection software locally

on their computers in order to ensure adequate protection from computer viruses. (*See* '610

patent at 1:10-23) The patent is also directed to problems of users having to be concerned about

viruses getting downloaded onto their computers via the Internet. As the specification of the

'610 patent describes:

> Embodiments of the present invention advantageously screen
> computer data for viruses within a telephone network before
> communicating the computer data to an end user. As a result, end
> users can download computer data via the telephone network
> without concern of receiving various predetermined computer
> viruses.

(*Id.* at 1:59-67)

The Federal Circuit in *DDR Holdings*, 773 F.3d at 1259, held that the "Internet-centric"

claims at issue there were patent eligible. Claim 7 of the '610 patent is "Internet-centric." In

---

[12]Defendants argue unpersuasively that the '610 patent is all and only about "where" virus detection is done – i.e., in the telephone network (*see, e.g.*, Tr. at 51-54) – but this characterization fails to account for the fact that the asserted claim also contains limitations addressing the "what," including the excision of virus-infected portions of computer data (*see* '610 patent at 11:54-64) and the use of three computers. While it is correct that the asserted claim does not delineate the entirety of the "what" – for example, it is not limited to a specific type of virus detection – that fact does not alter the Court's conclusion that Defendants' depiction of the asserted claim is inaccurately broad.

fact, the key idea of the patent is that virus detection can take place remotely between two entities *in a telephone network*. This is advantageous because it saves resources on the local caller and calling machines and more efficiently executes virus detection at a centralized location in the telephone network. Claims that "purport to improve the functioning of the computer itself" or "effect an improvement in any other technology or technical field" may be patentable under § 101. *Alice*, 134 S. Ct. at 2359.

As with the other patents, Defendants provide hypotheticals showing why they believe the asserted claim of the '610 patent is patent-ineligible. Unlike with respect to the '050 and '142 patents, however, the analogies are not persuasive. Nonetheless, the Court reproduces them below:

| Limitations of '610 Patent Claim 1 [language from claim 7 inserted in brackets] | Routine Steps Performed by a World War II Post Office |
|---|---|
| "routing a call between a calling party and a called party of a telephone network" | The Postal Service determines the best path for delivering a letter sent by Adam, a U.S. Army soldier stationed in Great Britain during 1944, to Beth, who lives in Wilmington. |
| "receiving, within the telephone network, computer data from a first party selected from the group consisting of the calling party and the called party" | The Postal Service receives a letter from Adam addressed to Beth. |
| "[determining that virus screening is to be applied to the call based upon at least one of an identification code of the calling party and an identification code of the called party]" | The Postal Service determines that because Adam's letter is not "diplomatic mail," the letter is to be screened to ensure that it does not disclose military secrets. |
| "detecting, within the telephone network, a virus in the computer data; and" | The postal inspector opens the letter and concludes that a reference to "a trip to Paris in June" must be censored. |

| "in response to detecting the virus, inhibiting communication of at least a portion of the computer data from the telephone network to a second party selected from the group consisting of the calling party and the called party." | The post office redacts the reference and forwards the rest of the letter to Beth. |

(D.I. 699 at 25-26)

| Limitations of '610 Patent Claim 1 [language from claim 7 inserted in brackets] | Routine Steps Performed by Phone Answering Service |
|---|---|
| "routing a call between a calling party and a called party of a telephone network" | Bob is a subscriber to Acme Answering Service ("Acme"), which connects telephone calls through to Bob's various phone lines or takes messages pursuant to his instructions. |
| "receiving, within the telephone network, computer data from a first party selected from the group consisting of the calling party and the called party" | Bob's patient Mary places a call to Bob; Acme receives the call. |
| "[determining that virus screening is to be applied to the call based upon at least one of an identification code of the calling party and an identification code of the called party]" | Acme confirms that the called party is Bob prior to screening the call. |
| "detecting, within the telephone network, a virus in the computer data; and" | The operator on duty at Acme asks Mary if she has an emergency; she says no. |
| "in response to detecting the virus, inhibiting communication of at least a portion of the computer data from the telephone network to a second party selected from the group consisting of the calling party and the called party." | Acme does not forward the call to Bob, but instead takes down Mary's number and indicates that her call will be returned. |

(C.A. No. 12-1581 D.I. 176 at 26-27)

Trend Micro further analogizes the asserted claims to the claims at issue in *Vehicle Intelligence and Safety LLC v. Mercedes-Benz USA, LLC*, 2015 WL 394273, *8 (N.D. Ill. Jan.

49

29, 2015). In *Vehicle Intelligence*, the claims were directed to "methods for screening equipment operators for impairment (e.g., intoxication, physical impairment, medical impairment, or emotional impairment) to prevent their operation of moving equipment" and were found to be directed to an abstract idea. (C.A. No. 12-1581 D.I. 176 at 27)

The Court finds all of Defendants' hypotheticals unpersuasive. The Court did not construe the phrase "detecting . . . a virus in the computer data" from claim 7, as no party asked the Court to do so. (*See* D.I. 425) Nevertheless, it is evident from the specification that the steps for detecting a computer virus in a telephone network are not as straightforward as observing individuals for signs of intoxication, reading wartime correspondence, or asking someone if she is having an emergency. For example, the specification of the '610 patent describes, in one embodiment, "installing downloaded data using the virus-screening processor" such that "viruses can be detected in installed data (which may differ from the downloaded data)." ('610 patent at 14:18-21) This is, of course, merely one possible implementation of claim 7 and does not limit the plain and ordinary meaning of the claim language, but it is also the type of functionality that is "necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks." *DDR Holdings*, 773 F.3d at 1257. The concept of detecting a computer virus in installed data (and doing so in a telephone network) does not make sense outside of a computer context.

For the reasons stated above, and particularly in light of *DDR Holdings*, Defendants have failed to prove that claim 7 is directed to an abstract idea.[13]

_____

[13]In addition, the Court considered the extrinsic evidence, primarily inventor testimony (*see* D.I. 699 at 23-25), in confirming its conclusion that Defendants have failed to prove by even a preponderance of the evidence that claim 7 is patent ineligible. Basically, Defendants cite

*Mayo* **Step 2**

It is not necessary for the Court to consider step two of the *Mayo* test, since the asserted claim of the '610 patent is not directed to an abstract idea. However, the Court notes that the specification of the '610 patent recites a specific machine configured in a specific way to implement claim 7, as discussed above with regard to Figure 3, 4, and 5 of the '610 patent and accompanying sections of the specification. Thus, the '610 patent satisfies the machine-or-transformation test, which is an important clue that the claim includes an inventive concept and is not directed to patent-ineligible subject matter.

IV states that "virus detection 'within the telephone network' would not be preempted if a call were not routed between the calling party and the called party or if computer data were not received within the telephone network, as required by the claim language." (C.A. No. 12-1581 D.I. 183 at 27) IV continues: "[T]he '610 Patent captures only one form of virus detection, and its continued eligibility will not preclude the use of other virus detection techniques – even if they occur 'within the telephone network.'" (*Id.*) The Court agrees with IV that the asserted claim of the '610 patent does not disproportionately preempt virus detection.

Additionally, claim 7 recites "inhibiting communication of at least a portion of the computer data," which indicates that the claim covers situations where the virus detecting computer is excising virus-infected code. This is similar to the PTO's patent eligible sample claim directed to excising malignant software code, which the PTO described as "inextricably

_____

inventor testimony to support the persuasiveness of their "brick and mortar" analogies and to suggest that virus screening in general was well known. (*See id.*) However, the ***novelty*** – or lack thereof – of virus screening before the priority date of the '610 patent is not dispositive of the patent-***eligibility*** of virus screening ***in a telephone network*** with the additional limitations of claim 7.

tied to computer technology and distinct from the types of concepts found by the courts to be abstract." (*See* D.I. 723-2 at 2) Excising virus-infected code is something that requires a machine that "play[s] a significant part in permitting the claimed method to be performed, rather than function[ing] solely as an obvious mechanism for permitting a solution to be achieved more quickly." *SiRF Tech.*, 601 F.3d at 1333.

Hence, again, the Court concludes that Defendants have failed to prove by even a preponderance of the evidence that the asserted claim of the '610 patent is patent-ineligible under § 101. The Court will deny Defendants' motions with respect to IV's '610 patent.

## CONCLUSION

For the reasons given above, the asserted claims of the '050 and '142 patents are directed to patent-ineligible subject matter under 35 U.S.C. § 101. The Court will grant Symantec and Trend Micro's motions to the extent that it will order that the '050 and '142 patents are not patent eligible. However, Defendants have failed to prove that the asserted claim of the '610 patent is patent-ineligible. Thus, the Court will deny Defendants' motions to the extent they are directed to the '610 patent.

Appropriate orders follow.