IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| INTELLECTUAL VENTURES I LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 10-1067 (LPS) |
| | ) | |
| SYMANTEC CORPORATION, | ) | REDACTED - PUBLIC VERSION |
| | ) | |
| Defendants. | ) | |

**OPENING BRIEF IN SUPPORT OF SYMANTEC CORPORATION'S MOTION UNDER RULE 50(B) FOR JUDGMENT AS A MATTER OF LAW ON NONINFRINGEMENT, INVALIDITY, AND DAMAGES FOR U.S. PATENT NO. 5,987,610**

OF COUNSEL:

Dean G. Dunlavey
Joseph H. Lee
LATHAM & WATKINS LLP
650 Town Center Drive, 20th Floor
Costa Mesa, CA  92626-1925
(714) 540-1235

Douglas E. Lumish
Jeffrey G. Homrig
Michelle P. Woodhouse
LATHAM & WATKINS LLP
140 Scott Drive
Menlo Park, CA  94025
(650) 328-4600

Neil A. Rubin
Kathy Yu
LATHAM & WATKINS LLP
355 South Grand Avenue
Los Angeles, CA  90071-1560
(213) 485-1234

Robert J. Gajarsa
Michael J. Gerardi
LATHAM & WATKINS LLP
555 11th Street, NW
Washington, DC  20004-1304
(202) 637-2200

MORRIS NICHOLS ARSHT & TUNNELL LLP
Jack B. Blumenfeld
Thomas C. Grimm
Karen Jacobs
Michael J. Flynn
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@mnat.com
tgrimm@mnat.com
kjacobs@mnat.com
mflynn@mnat.com

*Attorneys for Defendant Symantec Corporation*

Originally Filed:  July 6, 2015
Redacted Version Filed:  July 7, 2015

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................................. ii

I.      NATURE AND STAGE OF PROCEEDING AND SUMMARY OF
        ARGUMENT .......................................................................................................1

II.     STATEMENT OF FACTS ...................................................................................1

III.    ARGUMENT ........................................................................................................1

        A.    Legal Standard ...........................................................................................1

        B.    IV's Damages Award Was Based On An Improper EMVR Theory And
              Cannot Be Sustained ..................................................................................2

              1.    The EMVR Has Stringent Evidentiary Requirements................................3

              2.    IV's Reliance On The EMVR Was Legally Unsupportable......................4

              3.    Even If the Liability Verdict Were to Stand, IV Would Be Entitled
                    To Only Nominal Damages, But In No Event More Than A
                    $500,000 Lump Sum Royalty .................................................................7

              4.    Damages Should Be Reduced As A Matter Of Law Without A
                    New Trial ...............................................................................................8

              5.    IV's Damages Theory Was Also Legally Deficient Because
                    Mr. Wagner Improperly Relied On Irrelevant Settlement
                    Agreements .............................................................................................8

        C.    Symantec Does Not Infringe Claim 7 Of The '610 Patent ...................................10

        D.    Claim 7 Is Invalid As Anticipated And Obvious................................................13

IV.     CONCLUSION ..................................................................................................20

## TABLE OF AUTHORITIES

Page(s)

### CASES

*Amazon.com, Inc. v. Barnesandnoble.com*,
　293 F.3d 1343 (Fed. Cir. 2001) ..............................................................................................18

*Cybor Corp. v. FAS Techs., Inc.*,
　138 F.3d 1448 (Fed. Cir. 1998) ..............................................................................................10

*Dynacore Holdings Corp. v. U.S. Philips Corp.*,
　363 F.3d 1263 (Fed. Cir. 2004) ..............................................................................................17

*Gomez v. Allegheny Health Servs., Inc.*,
　71 F.3d 1079 (3d Cir. 1995) .....................................................................................................1

*Helios Soft. et al. v. Awareness Tech. et al.*,
　C.A. No. 11-1259-LPS, D.I. 321 (D. Del. Apr. 13, 2015) ..........................................2-3, 4, 5, 6

*Hurlbut v. Schillinger*,
　130 U.S. 456 (1889) ..................................................................................................................4

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
　694 F.3d 51 (Fed. Cir. 2012) ........................................................................................3, 4, 6, 9

*Limelight Networks, Inc. v. Akamai Technologies, Inc.*,
　134 S. Ct. 2111 (2014) ............................................................................................................11

*Lucent Techs., Inc. v. Gateway, Inc.*,
　580 F.3d 1301 (Fed. Cir. 2009) ........................................................................................3, 4, 9

*Microsoft Corp. v. i4i Ltd. P'ship*,
　131 S. Ct. 2238 (2011) ............................................................................................................13

*Novartis Pharm. Corp. v. Abbott Labs.*,
　375 F.3d 1328 (Fed. Cir. 2004) ................................................................................................1

*Rembrandt Soc. Media, LP v. Facebook, Inc.*,
　561 F. App'x 909 (Fed. Cir. 2014) ...........................................................................................7

*ResQNet.com, Inc. v. Lansa, Inc.*,
　594 F.3d 860 (Fed. Cir. 2010) ..................................................................................................9

*Rude v. Westcott*,
　130 U.S. 152 (1889) ..................................................................................................................9

*SSL Servs., LLC v. Citrix Sys.*,
　769 F.3d 1073 (Fed. Cir. 2014) ..............................................................................................13

*Tronzo v. Biomet, Inc.*,
　236 F.3d 1342 (Fed. Cir. 2001) ................................................................................................8

*TWM Mfg. Co. v. Dura Corp.*,
  789 F.2d 895 (Fed. Cir. 1986) ..................................................................................................4

*Uniloc USA, Inc. v. Microsoft Corp.*,
  632 F.3d 1292 (Fed. Cir. 2011) .................................................................................................7

*VirnetX, Inc. v. Cisco Sys., Inc.*,
  767 F.3d 1308 (Fed. Cir. 2014) ........................................................................................passim

*Whitserve, LLC v. Computer Packages, Inc.*,
  694 F.3d 10 (Fed. Cir. 2012) ..............................................................................................2, 19

*Wyers v. Master Lock Co.*,
  616 F.3d 1231 (Fed. Cir. 2010) .................................................................................................1

## I.     NATURE AND STAGE OF PROCEEDING AND SUMMARY OF ARGUMENT

Symantec moves under Federal Rule of Civil Procedure 50(b) for judgment as a matter of law (JMOL) on damages because, based on the record evidence, including the testimony of Intellectual Ventures' ("IV's") damages expert, no reasonable jury could find that that the entire market value rule (EMVR) applies or that the third-party settlement agreements upon which IV relied were comparable to the hypothetical license.  JMOL should also be granted on liability because no reasonable jury could find that Symantec infringes claim 7 of U.S. Patent No. 5,987,610 (the "'610 patent") or that claim 7 is not invalid as anticipated and obvious.[1]

## II.    STATEMENT OF FACTS

The relevant facts are addressed in the argument section below.

## III.   ARGUMENT

### A.     Legal Standard

"To prevail on a renewed motion for JMOL following a jury trial, a party must show that the jury's findings, presumed or express, are not supported by substantial evidence or, if they were, that the legal conclusion(s) implied [by] the jury's verdict cannot in law be supported by those findings."  *Novartis Pharm. Corp. v. Abbott Labs.*, 375 F.3d 1328, 1332 (Fed. Cir. 2004) (quotation marks omitted); *see also Gomez v. Allegheny Health Servs., Inc.*, 71 F.3d 1079, 1083 (3d Cir. 1995).  "The question is not whether there is literally no evidence supporting the unsuccessful party, but whether there is evidence upon which a reasonable jury could properly have found its verdict."  *Gomez*, 71 F.3d at 1083.

In cases concerning complex technology, adequate expert testimony is required to support a verdict of infringement.  *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1240 n.5 (Fed. Cir.

---

[1] Symantec expressly incorporates herein the arguments and references in its prior written and oral Rule 50(a) motions and briefs.  *See* Tr. 1140-57, 2166-69; D.I. 657-58; D.I. 669-70.

2010).  General or conclusory expert testimony, such as that offered by IV's experts, must be disregarded as a matter of law and is not enough to sustain a jury's verdict on issues of infringement, validity, or damages.  *See, e.g.*, *Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 23 (Fed. Cir. 2012).

**B.     IV's Damages Award Was Based On An Improper EMVR Theory And Cannot Be Sustained**

JMOL of no damages should be granted because, even if the liability verdict were to stand (which it should not), IV failed to present a legally sufficient basis for damages.  IV chose to base its damages claim for the '610 patent on an EMVR  theory.  Because IV made proffers that it would present sufficient evidence to support such a theory, the Court overruled Symantec's pretrial objections and permitted IV's damages expert, Michael Wagner, to sponsor exhibits and testify as to Symantec's more than $216 million in total sales revenue from the '610 Accused Products, as to which he applied a 4% royalty rate to arrive at a damages opinion of more than $8 million.  *E.g.,* Tr. 973.[2]

The Court's March 4, 2015 letter (D.I. 691 at 2) states:

> I am not sure at this point whether there is sufficient evidence in the record to support the jury's finding that the features of the accused products covered by the '610 patent "drove demand" for those products.  If I ultimately conclude that the record lacks sufficient evidence to support the jury's verdict on this point, my inclination is that the damages amount awarded to Intellectual Ventures on the '610 patent will have to be substantially reduced, given Mr. Wagner's admission that he offered the jury no opinion on damages that was not based on the entire market value rule.  In that instance, damages would likely be reduced to an amount supported by the opinion of Symantec's expert.

On April 13, 2015, the Court issued a Memorandum Opinion in *Helios Soft. et al. v. Awareness Tech. et al.*, No. 1:11-cv-01259-LPS, D.I. 321 (D. Del. Apr. 13, 2015) ("*Helios*")

---

[2] Before and throughout trial, Symantec objected to IV's pursuit of an EMVR theory and Mr. Wagner's damages testimony on the '610 patent and to the EMVR jury instruction.  *See, e.g.*, D.I. 511-13; D.I. 548-49; D.I. 579 at 13-14; D.I. 608 Ex. 12; D.I. 631 at 1-3; D.I. 655 at 60-61; D.I. 664-65; Tr. 572–576, 1877, 1883-87, 2182, 2191-93.

(Ex. A) and granted an order excluding the patentee's damages expert's testimony for failing to satisfy the EMVR.  Ex. A, *Helios* at 8-12.  The case law that the Court discussed in *Helios* applies here and the cross-examination testimony of IV's damages expert established that the EMVR does not apply.  Consequently, the $8 million lump-sum damages award cannot be sustained.

Although the Court has indicated (D.I. 691 at 2) that its inclination would be to reduce damages to the $500,000 amount supported by Symantec's expert, Christopher Bakewell (*see, e.g.,* Tr. 1968-69, 1980), IV should at best only be entitled to nominal damages (e.g., $1).  This is because IV failed to meet its burden of proving damages with reliable and sufficient evidence in its case-in-chief and Symantec moved for, and was entitled to, JMOL on this issue at the conclusion of IV's presentation.

### 1.    The EMVR Has Stringent Evidentiary Requirements

The Federal Circuit repeatedly has held that the EMVR is rarely applicable to products containing multiple components or features, only one of which is patented.  "[W]hen claims are drawn to an individual component of a multi-component product, ***it is the exception, not the rule***, that damages may be based upon the value of a multi-component product."[3]  *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014) (citing *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67-68 (Fed. Cir. 2012)).  This is true even if the accused product is the "smallest saleable patent practicing unit."  *VirnetX*, 767 F.3d at 1327-28; *LaserDynamics*, 694 F.3d at 68-69; *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1332-33 (Fed. Cir. 2009); *Helios* at 9-11.

A patentee must satisfy a stringent evidentiary burden if it seeks to avail itself of this

---

[3] All emphases in this brief are added unless otherwise noted.

exception.  In particular, to rely on the EMVR a patentee must first prove that the allegedly

infringing component of a multi-feature accused product "drives" (*LaserDynamics*, 694 F.3d at

63), "creates" (*VirnetX*, 767 F.3d at 1326), "is" (*Lucent*, 580 F.3d at 1336), or "constitutes"

(*TWM Mfg. Co. v. Dura Corp.*, 789 F.2d 895, 901 (Fed. Cir. 1986)) the basis for consumer

demand for the *entire* accused product.  In the words of the Supreme Court, the EMVR can apply

only when "it clearly appears that the defendant's [product] derived its entire value from the use

of the plaintiff's invention, and if it had not been [infringing,] it would not have been [sold] at

all."  *Hurlbut v. Schillinger*, 130 U.S. 456, 472 (1889).  As this Court held in *Helios*, "[t]o satisfy

the entire market value rule, [the patentee's damages expert] needed to provide 'a higher degree

of proof,' that 'the presence of [the patented] functionality is what motivates consumers to buy

the [accused product] in the first place.'"  *Id*. at 11-12, quoting *LaserDynamics*, 694 F.3d at 68.

## 2.  IV's Reliance On The EMVR Was Legally Unsupportable

IV did not come close to providing the "higher degree of proof" necessary to satisfy the

EMVR.  The cross-examination of Mr. Wagner established that the '610 Accused Products

included multi-component products, but that he did not have any basis for concluding that the

allegedly infringing component (virus detection and prevention "in the cloud") "drove demand"

for the entire accused product.  It also established that Mr. Wagner had done nothing to apportion

damages in the event that the EMVR was not applicable:

> Q:  [T]he 216-million-dollar figure reflects revenues from multi-component products,
> only one component of which is accused of infringing the '610 patent.  Right?
>
> A:  That is accurate.
>
> Q:  And you have done nothing to try to break out from the 216 million dollars if the
> entire market value rule does not apply how much of a reduction there should be
> from the 216 million dollars, have you?
>
> A:  I have not.

Tr. 1110; *see also id.* 1110-11, 2129.

Mr. Wagner admitted that Symantec marketed the non-accused features (such as spam protection, image control, and data protection) to encourage product purchases:

> Q:  Do you agree that for every bundled product that is accused of infringing the '610 patent, when there is an AntiSpam feature, Symantec markets that?
>
> A:  They do.
>
> Q:  And when there is an Image Control feature, Symantec markets that.  Right?
>
> A:  They do.
>
> Q:  And when there is a Data Protection feature, Symantec markets that.  Correct?
>
> A:  I think they would.

Tr. 1111; *see also id.* 1090-93, DTX-2708.

Like the excluded damages expert in *Helios*, Mr. Wagner "never conducted a market analysis or otherwise provided evidence showing that it is the patented features that drive the demand for the accused products."  *See Helios* at 11.  Indeed, Mr. Wagner unequivocally admitted that he had no evidence that it was the allegedly infringing component, as opposed to the non-infringing components, that "drove sales" of the accused products:

> Q:  And in connection with showing which feature or which features drive demand for these bundles, you don't have any survey evidence showing that it is the AntiVirus component that drives demand, do you?
>
> A:  I have seen no surveys in this case.
>
> Q:  And *in connection with why an individual customer purchased something that offered both AntiSpam and AntiVirus, you have no evidence that shows that a particular customer chose because of the AntiVirus component, do you*?
>
> A:  *I do not*.  That would be a survey, which I just said was not done in this case.[4]

---

[4] Mr. Wagner went even further, expressly stating that the legal basis for the EMVR will *always be absent* for products like those accused here:  "there [are] no technology products that I know in the marketplace that I studied that there's only one single feature that drives demand." Tr. 1091.  And beyond that, IV accused several '610 Accused Products of infringing both the

. . .

Q: ***So in connection with sales of these bundled products***, which include both AntiSpam and AntiVirus components, ***you are unable to tell the jury that there is evidence that it was the AntiVirus component as opposed to the AntiSpam that drove that sale.  Correct?***

A: ***I cannot.***

Tr. 1111-13.  These admissions establish beyond dispute that IV's reliance on the EMVR was legally unsupportable.

IV cannot avoid this fatal deficiency in its damages case by citing to Mr. Wagner's testimony that he had relied on Dr. McDaniel's statements that "doing antivirus in the cloud" is "critical to Symantec even being in this marketplace," Tr. 1114, and "the '610 patent is critical to offer . . . cloud services or security as a service," Tr. 961.  Even if Dr. McDaniel had had an evidentiary basis for those conclusory assertions – which he did not – the statements would not justify use of the EMVR.  "It is not enough to merely show" – or, as here, simply assert without evidentiary support – "that the [patented] method is viewed as valuable, important, ***or even essential*** to the use of the [entire accused product]"; "[n]or is it enough to show that [the accused product] without [the patented] method would be commercially unviable."  *LaserDynamics,* 694 F.3d at 68; *see also VirnetX*, 767 F.3d at 1326-27 (same).  For IV to rely on the EMVR, it had to prove that the patented functionality "is what motivated consumers to buy the ['610 Accused Products] in the first place."  *See Helios* at 11-12; *LaserDynamics,* 694 F.3d at 68.  It never did so.  Indeed, its own expert, Mr. Wagner, admitted there was no such evidence.

Because IV did not establish that the patented technology drove the demand for the '610 Accused Products, the EMVR did not apply and "the law require[d] [IV] to apportion [its

---

'610 patent and the '142 patent and sought to collect separate damages for each patent.  *See, e.g.*, D.I. 673, *Final Jury Instructions*, at 27-28.  Logically, and as a matter of law, if the technology covered by the '142 patent contributed any value to those products, the EMVR necessarily could not be applicable.

claimed] royalty down to a reasonable estimate of the value of the claimed technology."

*VirnetX*, 767 F.3d at 1329; *see also Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318

(Fed. Cir. 2011).  Because Mr. Wagner admitted that he made no effort to perform such an

apportionment, Tr. 1110-11, the $8 million damages award cannot stand.

> ### 3.  Even If the Liability Verdict Were to Stand, IV Would Be Entitled To Only Nominal Damages, But In No Event More Than A $500,000 Lump Sum Royalty

After Mr. Wagner testified and IV concluded its case-in-chief, and again before the case

was submitted to the jury, Symantec timely moved for JMOL that IV was not entitled to its

requested damages – i.e., that IV should recover only nominal damages if liability were

established.  *See* Tr. 1140-57; 2166-69; D.I. 657-58, 669-70.  The Court deferred ruling on

Symantec's motions.  Symantec, therefore, was compelled to present rebuttal testimony from

Mr. Bakewell as to the appropriate reasonable royalty for '610 patent.  Tr. 1968-69, 1980.  This

procedural reality does not change the fact that IV had the burden to prove damages in its case-

in-chief but failed to do so.  As a result, in accord with Symantec's timely Rule 50(a) motion

(which has not been denied by this Court and is renewed now), nominal damages are all that IV

should be awarded as a matter of law.  *See, e.g., Rembrandt Soc. Media, LP v. Facebook, Inc.*,

561 F. App'x 909, 911 (Fed. Cir. 2014) (unpublished) (patentee's failure to present damages

evidence at trial because the district court excluded the testimony of its damages expert did not

foreclose the "possibility of nominal damages").

If the Court were to award compensatory damages to IV, despite IV's failure of proof in

its case-in-chief, the maximum properly-apportioned reasonable royalty award is the $500,000

lump-sum royalty presented by Mr. Bakewell.  Tr. 1968-69, 1980.

### 4. Damages Should Be Reduced As A Matter Of Law Without A New Trial

When a patentee fails to introduce "legally competent evidence to support [the jury's] damages award" and the district court reduces the award after post-trial motions to "the maximum damages possible given the lack of competent evidence in the record" (i.e., the amount proffered by the defendant), there are no Seventh Amendment concerns to trigger the right to a new trial. *Tronzo v. Biomet, Inc.*, 236 F.3d 1342, 1351-52 (Fed. Cir. 2001). Moreover, in this case a new trial on damages would be a "pointless" exercise because Mr. Wagner cannot submit new testimony beyond the scope of his expert report to simply "redo" his prior, legally deficient opinions and spin an apportionment analysis from whole cloth. *See id.* at 1352 ("[R]e-presenting this issue to the jury would [be] pointless because, as a matter of law, the compensatory damages award could not exceed the [reduced amount] already awarded."). Accordingly, whether the Court reduces the jury's award to nominal damages or to the $500,000 apportioned damages calculated by Mr. Bakewell, IV is not entitled to a new trial on damages.

### 5. IV's Damages Theory Was Also Legally Deficient Because Mr. Wagner Improperly Relied On Irrelevant Settlement Agreements

Mr. Wagner's testimony was untenable as a matter of law for a second independent reason – he relied on the terms of two unrelated settlement licenses resulting from lawsuits (the 2006 Trend/Fortinet Settlement Agreement and the 2008 Trend/Panda Settlement Agreement, the "Trend Agreements") as his ***sole*** evidence to justify his 4% royalty rate. *See* Tr. 952:9–953:8; PX 444; PX 445. These agreements do not involve IV, Symantec, or the '610 patent.[5]

---

[5] In addition, neither of the Trend Agreements concerns the allegedly inventive technology that IV's expert, Dr. McDaniel, said was "critical" to the accused products—"doing antivirus in the cloud." *See* Tr. 1114:3-11; *see* PX 444; PX 445. The Trend Agreements also provide additional rights and intellectual property (such as the exchange of software), involve various different types of products (none directly comparable to the '610 Accused Products), vary in geographical scope, and include covenants not-to-sue. *See* Tr. 952, 955-58; PX 444; PX 445.

A patentee may rely on licenses to guide the reasonable royalty analysis only if it meets its burden to prove that the licenses are "sufficiently comparable to the hypothetical license at issue in suit." *Lucent*, 580 F.3d at 1325, 1329.  Settlement agreements are generally unreliable evidence for determining reasonable royalty rates.  *See Rude v. Westcott*, 130 U.S. 152, 164 (1889) ("[A] payment of any sum in settlement of a claim for an alleged infringement cannot be taken as a standard to measure the value of the improvements patented."); *LaserDynamics*, 694 F.3d at 77 ("The propriety of using prior settlement agreements to prove the amount of a reasonable royalty is questionable.").  Indeed, when settlement agreements – like the Trend Agreements here – concern different parties and technology and do not involve the patent-in-suit, they are wholly irrelevant and cannot be relied upon to establish a reasonable royalty.  *See id.* at 80 (licenses with different patents and technology are "irrelevant evidence" of a reasonable royalty rate); *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 872-73 (Fed. Cir. 2010) ("A reasonable royalty based on such speculative evidence violates the statutory requirement that damages under § 284 be 'adequate to compensate for the infringement.'").

IV's positions as to comparability also were irreconcilably inconsistent.  Although Mr. Wagner testified that Dr. McDaniel had told him the technology was "very similar" because the Trend Agreements concern a patent that "teach[es] how to detect a virus at a particular location" – a "gateway node" (Tr. 953:12-20) – he also testified that the "critical" inventive feature of claim 7, the feature that supposedly accounted for all of the revenues of the '610 Accused Products, was that "the '610 patent teaches you to do it at the cloud."  *Id.*  Thus, whatever it was in the Trend patent that supported the 4% royalty in the Trend Agreements, it necessarily was not supplied by the '610 patent.[6]  For this reason as well, Mr. Wagner's opinion

---

[6] The '610 patent expressly cites to the patent covered in the Trend Agreements and states that

as to the '610 patent was legally deficient and could not support the jury's damages award.[7]

### C.    Symantec Does Not Infringe Claim 7 Of The '610 Patent

JMOL of noninfringement should be granted because the jury lacked an adequate legal basis or substantial evidence to conclude that Symantec literally and directly infringed claim 7.[8]

The '610 patent is directed to a process by which messages are screened, viruses are detected and removed, and cleaned messages are routed to the recipient. *See, e.g.*, PX-3 at 14:34-47; *see also id.* at 5:11-12, Fig. 3. Claim 7, which depends from independent claim 1, requires the completion of five steps: (1) "*routing* a call between a calling party and a called party of a telephone network"; (2) "*receiving*" computer data "within the telephone network" from a party; (3) "*detecting*" a virus in the received data "within the telephone network"; (4) "*inhibiting* communication of at least a portion of the computer data" in response to detecting the virus; and (5) "*determining*" that virus screening is to be applied to the call based upon" an "*identification code*." PX-3 at 14:34-47, 14:66–15:3. IV failed to establish that each '610 Accused Product practices each and every one of those steps. *See Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998) (en banc) (each and every element of a claim must be practiced to infringe).

---

that patent's technology can be used to detect viruses in embodiments of the '610 patent. *See* PX 3 at 12:26-30. Since the 4% Trend royalty is attributable to Trend's technology, the Trend Agreements logically cannot say anything about what incremental value is added by the additional functionality supposedly provided by the '610 patent.

[7] Mr. Wagner also testified about the ████████ settlement agreement between Invention Investment Fund I and Intel Corporation (the "Intel Agreement"), claiming that it provided a "reasonableness check" on his royalty opinions for the patents-in-suit even though it provided

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████ The Intel Agreement was even more irrelevant than the Trend Agreements and only served to further skew the damages horizon.

[8] IV did not assert indirect infringement or infringement under the doctrine of equivalents.

First, the jury lacked an adequate evidentiary basis to conclude that *Symantec itself* practices each step of the claim.  It was undisputed that the email messages processed by the '610 Accused Products are addressed to Symantec's .cloud servers.  Tr. 510-513, 1537; PX 377-02.  Thus, under the rubric of the claim, Symantec is the "called party."  Once Symantec receives a message from a third party, the "call" in claim 7 is complete.  In this way, only third parties "route" the email message from a sender to Symantec.  As Dr. McDaniel testified, if a customer sets up a '610 Accused Product to operate with the outbound messages from the customer's Gmail account, "*that Gmail server*, rather than send it to the end recipient's e-mail, the receiver of the e-mails's [sic] home computer, it *will send it to Symantec*."  Tr. 512.  Accordingly, Symantec cannot infringe claim 7 as a matter of law.  *See Limelight Networks, Inc. v. Akamai Techs., Inc.*, 134 S. Ct. 2111, 2118 (2014) ("[P]erformance of all the claimed steps [in the patented method] cannot be attributed to a single person, so direct infringement never occurred.").  IV's technical expert, Dr. McDaniel, admitted that Symantec could not infringe if it is the called party.  *See* Tr. 2095 ("So if the jury finds Symantec is the called party, you will agree, as it relates to [the '610] patent, [Symantec] can't infringe?  A.  If it is in the called party network, of course not.").

Second, the '610 Accused Products do not practice the second and third steps of claim 7. Those steps require data to be received and viruses to be detected "within the telephone network."  The Court construed that phrase to mean:  "in the voice or data network connecting the calling party and called party, exclusive of the networks and gateway nodes of the called party and calling party."  D.I. 425 at 24-25.  But, again, because email messages processed by the '610 Accused Products are addressed to Symantec's .cloud servers (Tr. 510-513, 1537; PX 377-02), Symantec *is* the "called party" of the claim.

Symantec's networks are private and outside of the telephone network.  As Dr. McDaniel admitted, private networks "are often used by corporations and homes to create private, secure networks that, by definition, cannot be accessed from the public Internet" and "can never be within the telephone network."  Tr. 700-01.  The trial record established that the '610 Accused Products receive data and detect viruses *only* on that type of non-public network.  *See*, *e.g.*, DTX 2659 at 833; DTX 2659-010; DTX 2690-004.  Mr. Fletcher (a designer of the accused functionality) explained that Symantec's data centers, which all exist on private networks that require private IP addresses with a 10.x.x.x format, scan for viruses only within those private networks, and are not "directly addressable from outside . . . on the Internet."  *See* Tr. 1312-13. Symantec's expert, Dr. Spafford, confirmed those facts.  *See* Tr. 1520-39.  Even Dr. McDaniel admitted that the .cloud products scan for viruses on an inaccessible private network.  *See* Tr. 516 ("[I]t is a private network."), 704 ("[Y]ou understand that this is saying that the Symantec servers that do the scanning use the 10.x.x.x. addresses?  A. Without a doubt."); *see also* Tr. 707 ("[N]obody on the [Internet] could talk to these computers.").  In light of that unambiguous evidence, no reasonable jury could find that Symantec's products operate on a network that is part of the "telephone network" required by claim 7.  *See also, e.g.*, PX 3 at 2:57-58.

Third, even if one were to accept IV's theory as to "routing," the '610 Accused Products do not practice each of the "routing," "detecting," *and* "inhibiting" steps of claim 7.  Claim 7 is directed to a method that *removes* malicious content from a message and delivers the cleaned message to the recipient.  Symantec's system is simpler:  if Symantec detects malicious content, the entire email message is blocked.  Symantec never transmits any portion of it to the intended recipient and thus never routes it.  Dr. McDaniel admitted this unequivocally.  *See* Tr. 519-21. This was further confirmed by Mr. Fletcher, Tr. 1305-07, and Dr. Spafford, Tr. 1533-40.  Thus,

as a matter of simple logic, the '610 Accused Products cannot infringe claim 7: if they "inhibit[]" any "communication" in response to a virus being detected, they block the *entire* email message and never "route" it. Conversely, a message can only be "routed" if no virus was "detected" and the message was not "inhibited."

### D. Claim 7 Is Invalid As Anticipated And Obvious

Symantec established that claim 7 is anticipated by at least the Trend Micro or Intel references and rendered obvious by the Trend Micro, Intel, and Quantum Leap references. *See* Tr. 1778-96. No reasonable jury could have concluded otherwise.

A claim is anticipated when each and every element is found within a single prior art reference. *VirnetX, Inc.*, 767 F.3d at 1323. A claim is invalid as obvious "if the claimed invention as a whole would have been obvious to a person having ordinary skill in the art at the time of the invention." *SSL Servs., LLC v. Citrix Sys.*, 769 F.3d 1073, 1089 (Fed. Cir. 2014). It is easier for a defendant to sustain the clear and convincing burden of invalidity when the prior art references were not presented to the PTO. *See Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2251 (2011). None of the claim 7 prior art references was presented to the PTO. Tr. 1779.

The only allegedly novel element in claim 7 is performing virus screening "within the telephone network." The '610 patent inventors testified that they did not invent "routing a call between a calling party and a called party of a telephone network" (step one of claim 7), "receiving computer data . . . within a telephone network" (step two), "inhibiting communication of at least a portion of computer data in response to detecting a virus," (step four), or delivering services from a remote location to specific subscribers (step five). Tr. 1429-30, 1433, 1446-47. They also repeatedly admitted that they did not invent screening viruses in computer data. Tr. 1428, 1430, 1440, 1446. And unrebutted testimony of Carey Nachenberg, one of skill in the art, established that virus screening was performed remotely in the cloud years before the '610 patent

was filed.  *See* Tr. 1198-1200.[9]

As shown at trial, virus screening within a telephone network was long known in the prior art, and there was nothing novel or non-obvious about claim 7 of the '610 patent.

**(1) U.S. Patent No. 5,960,170 ("Trend Micro").[10]**  The Trend Micro patent anticipates and renders obvious each and every step of claim 7, including detecting a virus "within a telephone network."  *See, e.g.*, DTX 2293 at Abstract, 2:50-61 3:41-47, 5:34-51; Tr. at 1781-82.

The Trend Micro patent expressly teaches the third step of claim 7 ("detecting" a virus "within a telephone network") by disclosing a virus detection server that "resides on a wide area network (WAN) . . . where the WAN is the Internet."  *See, e.g.*, *id.* at 5:39-51; *see id.* Figs. 1, 2, 4A, 4B, 5, 7, 2:63-67, 5:34-42, 5:47-55, 8:59-61, 6:49-51, 7:21-61, 8:17-42, 10:18-30, 10:52-67, 11:52–12:30, 24:21-36; Tr. 1786-88.  In particular, Trend Micro explains that an "agent" program operating in conjunction with a virus detection server can operate independently of client input and reside at a "proxy server" to "monitor[] network traffic" for an event, such as "receipt or transmission of electronic mail" or "downloading files over the internet," that would trigger an automatic virus scan and cleaning.  *See, e.g.*, DTX 2293 at 15:54-63, 16:23-57; *see also id.* at 24:51-65, 25:1-27:35 (describing how virus cleaning can proceed on proxy servers, which route communication between clients and the internet).  Trend Micro further details how viruses can be scanned and removed from unread e-mail messages (and their attachments) residing on a "postal node" before delivery to a client.  *See* DTX 2293 at 20:7-18, 20:38-50.

---

[9] The prosecution history of the '610 patent further confirms that screening viruses "within the telephone network" was essential to the alleged novelty of the claims.  Without that limitation, claim 1 (from which claim 7 depends) was originally rejected as anticipated and obvious in light of several references.  *See* DTX 2217 at 112-15, 119-21.  In response, the applicants amended claim 1 to add the "within the telephone network" limitation, and specifically argued that that limitation distinguished the prior art.  *Id.* at 135; *see id.* at 129-30, 132-36.  Only after that amendment was the claim allowed.  *Id.* at 137.

[10] The Trend Micro patent was also occasionally referred to as "Chen" at trial.

At trial, IV's principal argument about the Trend Micro patent was to assert that the third "detecting" step of claim 7 is not performed by the virus server "within the telephone network," but that virus checking is performed **only** by the client with the potential virus, and the client merely receives information from the virus server that the client can use for its local virus detection.  *See* Tr. 2034-37, 2040.  This argument misreads Trend Micro.  As outlined above, the Trend Micro agent located at a proxy server or postal node can itself operate on and remove viruses from messages before they ever reach a user's computer.  *See, e.g.*, DTX 2293 at 15:54-63, 16:23-65, 20:7-18, 20:38-50, 24:51-65, 25:1-27:35.  Moreover, while the virus detection servers in some Trend Micro embodiments provide information to a client so that the client can run certain tests, even in those embodiments, the "results" of the tests are "transmitted [back] to the virus detection server" where, "*[p]referably*, the [virus] determination . . . *is made by the virus detection server.*"[11]  DTX 2293 at 7:50-56, Fig. 5; Tr. 2099-2100, 2152-53.

The remaining limitations of claim 7 are clearly present in Trend Micro.  Trend Micro discloses the first ("**routing**") step of claim 7 by, for example, explaining that its "network interface [] is also a conventional device configured to allow communication between the client [] and other computers," including over a "conventional telephone line."  *See, e.g.*, DTX 2293 at 8:43-63; *see also id. at* 7:31-37, 5:66-6:10, 9:18-22, 20:7-18, 22:1-15, 24:50-58; Tr. at 1787, 1791.  Trend Micro teaches the second ("**receiving**") step of claim 7 by at least disclosing that a client can "receive[] electronic mail messages" and "download[] files from internet."  *See, e.g.*, DTX 2293 at 22:1-15; *see also id.* at Fig. 7, 8:43-67, 20:7-18, 16:23-57, 24:21-36; Tr. 1792.  Trend Micro also teaches the fourth ("**inhibiting**") step of claim 7 by explaining, for example,

---

[11] This preferred embodiment operates in a manner similar to a doctor requesting blood work from a lab to diagnose a patient.  Although the lab (like the client's computer) checks the patient's blood for certain indicators and could even forward samples to the doctor, the doctor (like the virus detection server) actually diagnoses the virus.

that the claimed invention can take "immediate actions" in response to detecting a virus "such as deleting a file, stripping out infected portions of a file, or replacing infected portions with a benign portion" before data is further communicated. *See, e.g.*, DTX 2293 at 15:54-59; *see also id.* at 3:34-40, 4:2-7, 8:21-33, 15:54-63, 16:23-57, 20:7-18; Tr. 1793-94. And Trend Micro teaches the final ("***identification code***") step of claim 7 by at least explaining that the claimed invention can include a "user identification code and an account validity indicator . . . in the access data module" and can identify the user and "use[] the data in the access data module to determine whether the user identification code is listed and whether the account is valid." *See, e.g.*, DTX 2293 at 11:6-13, 4:8-14, 6:34-40, 11:1-21; Tr. 1794-95.

  **(2) U.S. Patent No. 6,088,803 ("Intel").** The Intel patent also anticipates claim 7. In the alternative, Intel renders the claim obvious. *See* Tr. 1785-95.

  Intel teaches the core step of detecting a virus "within the telephone network" by at least disclosing a "network device 4" that "includes a virus checker 5" and that "may be implemented . . . as a content server or other stand-alone computer coupled to an ISP's . . . network, a corporate network, ***or anywhere on the Internet***" and can communicate with a client computer by "any suitable communications media known in the art." DTX 2294 at 2:26-40; 6:61-63; *see also, e.g., id.* at Fig. 1, 2:62–3:10, 8:36-47; Tr. 1788-89. The Intel patent further makes plain that "virus checking may be . . . provided by a network proxy or similar device" that is similarly connected. DTX 2294 at 8:57-60.

  IV responded to Intel by arguing that the virus scanning servers of the Intel invention were only "coupled to" the Internet, which IV interpreted to mean "connected to" but not "within" a telephone network. Tr. 2032-33. That argument bears no weight. As an initial matter, Dr. McDaniel conceded on cross-examination that something can be both "connected to"

and "within" the same thing.  *See* Tr. 2093-95 ("Q: I'm coupled to the floor right now? A: Yes.
Q: Connected to it; right? A: Sure. Q: It's part of this room? A: Sure. Q: Will you agree with me
I'm still within the room? A: Of course.").  Moreover, the reference specifically teaches that the
virus checker could be implemented as a "content server . . . coupled to anywhere on the
Internet," DTX 2294 at 2:26-40, and that those "[c]ontent servers" could "reside, for example, *on*
the Internet," *id.* at 2:22-23.  Intel goes on to explain that, in at least one embodiment, the virus
checker resides remotely from the client device to intercept files before downloading so that, if
the file requested by a client device "does not contain a virus, network device 4 transmits the file
to [the] client device" or, "if a virus is detected, the file will not be sent" or an "error/warning
message" is sent.  *Id.* at 3:2-10; *see also id.* at 1:52-55 ("[T]here is a need for a virus checking
system capable of efficiently scanning network content for viruses *prior to downloading such
content to end-users*.").

    The Intel patent's references to being "on" the Internet, "resid[ing]" on the Internet, and
detecting viruses remotely before transmitting a file to a client belie Dr. McDaniel's tortured
reading of Intel and establish that, in Intel, virus detection is done within the Internet and so
"within the telephone network" as required by the claim.  No reasonable jury could accept
Dr. McDaniel's conclusory argument to the contrary.  *See, e.g.*, *Dynacore Holdings Corp. v. U.S.
Philips Corp.*, 363 F.3d 1263, 1278 (Fed. Cir. 2004) (holding that an expert's "conclusory
assertion[], reached using words in ways that contradict their plain meaning," did not create a
triable issue of fact).

    Moreover, if Dr. McDaniel's attempted distinction between "connected to" and "within"
were valid, then Symantec's non-infringement would inexorably follow as a matter of law.
Symantec's accused servers are simply "connected to" the Internet to filter viruses.

Dr. McDaniel testified as to this fundamental architecture as proof of infringement (Tr. 516):

> Q. So is this a private network [of servers in which the e-mails are getting scanned for viruses] that is being shown . . . ?
>
> A. Right, it is a private network.
>
> Q. Is it **connected to** the Internet?
>
> A. It is.

IV cannot have it both ways. Either the Intel and Symantec servers are both "within" the telephone network because they are connected to it and claim 7 is invalid, or neither server is "within" the telephone network because each is simply "connected to" the Internet and so claim 7 is not infringed. A patent claim cannot, "like a nose of wax, be twisted one way to avoid anticipation and another to find infringement." *Amazon.com, Inc. v. Barnesandnoble.com*, 293 F.3d 1343, 1351 (Fed. Cir. 2001).

The remaining limitations of claim 7 are also found in Intel. Intel teaches the "*routing*" step of claim 7 by explaining, for example, how the claimed invention can "retrieve[] . . . requested data object[s] from content server 7" and, "[i]f the requested file does not contain a virus," "transmit[ ] the file to client device 1." *See, e.g.*, DTX 2294 at 2:62–3:10; *see also id.* at Figs. 1, 2, 2:15-25, 2:26-40, 8:36-47; Tr. 1791-92. Intel teaches the "*receiving*" step by at least disclosing an invention that can include a "network device 4" for "retriev[ing] the requested data object from content server 7" and that, "[o]nce the file is completely received, network device 4 invokes virus checker 5." *See, e.g.*, DTX 2294 at 2:68–3:05; *see also id.* at Fig. 2, 2:62–3:10, 2:26-38; Tr. 1792-93. Intel also discloses the "*inhibiting*" step by detailing how an infected file can be repaired and the transmission to the client device completed.[12] *See, e.g.*, DTX 2294 at

---

[12] Should IV argue that claim 7 can be satisfied by fully blocking the transmission of an e-mail/file, Intel also teaches the "inhibiting" step in the same way by explaining how, in one embodiment, if no virus is detected, the "network device 4" will "transmit[] the file to client

4:50-55.  And Intel teaches the "*identification code*" step of claim 7 by, for example, disclosing

how "network requests generated by users . . . that require secure access are forced to go through

a virus checker . . . .  Existing technology, such as router filters, may be used for this purpose."

*See, e.g.*, DTX 2294 at 8:36-47.  Router filters that were known in the art at the time of the Intel

patent could route network requests utilizing information such as a user's IP address or a user's

Remote Authentication Dial In User Service (RADIUS) credentials—an "identification code" of

the calling or called party, as that term has been construed by the Court.  *See* Tr. 1795.

　　　　**(3) U.S. Patent No. 5,842,002 ("Quantum Leap").**  Dr. McDaniel expressly conceded

that Quantum Leap discloses the step of "detecting" a virus within the telephone network—the

only step of claim 7 allegedly not present in the Trend Micro and Intel prior art.  Tr. 2095.  As

Dr. Rubin explained, one of ordinary skill in the art would have combined Quantum Leap with

either Intel or Trend Micro.  *See, e.g.*, Tr. 1796.  Dr. McDaniel's conclusory rebuttal that "there

isn't really a motivation because they're all different, very different kinds of systems" – is

inadequate as a matter of law for the jury to conclude otherwise.  *See, e.g.*, *Whitserve*, 694 F.3d

at 23.  Thus, based solely on Quantum Leap's uncontested disclosure of the "detecting" step of

claim 7, Quantum Leap in combination with Trend Micro and/or Intel renders claim 7 obvious.

　　　　Furthermore, Quantum Leap also discloses a virus screening method including every

other step of claim 7, except for the final "identification code" step, which would have been

obvious for one of skill in the art to add to the disclosed invention.  *See, e.g.*, DTX 2221 at

Abstract; Tr. 1783-84, 1791-97.  Quantum Leap teaches the first "*routing*" step by at least

disclosing that "[d]ata traffic between workstations 38 connected to the telephone network 34 via

modems 36 and the mainframe file server 30 is constantly checked for viruses because the traffic

---

device 1" but that "if a virus is detected, the file will not be sent."  *See, e.g.*, DTX 2294 at 3:2-
3:10; *see also id.* at 2:62–3:10, 3:46-48, 3:65-67; Tr. at 1794.

must pass through the virus trapping device." *See, e.g.,* DTX 2221 at 6:58-62; *see also id.* at 6:22-40; Tr. 1792.  The reference teaches the "***receiving***" step by, for example, disclosing that a "mainframe file server" receives "[d]ata traffic" from "workstations 38 connected to the telephone network." *See, e.g.,* DTX 2221 at 6:58-62; *see also id.* at Figs. 2, 3, 4; 6:22-49, 6:50-62; Tr. 1793.  Undisputed by Dr. McDaniel (Tr. 2095), Quantum Leap also discloses the "***detecting***" step of claim 7 at least by teaching how a virus "trapping device 10" can be positioned so that "data traffic passing through the telecommunications network 34 is protected from viruses[.]" *See, e.g.,* DTX 2221 at 6:50-62; *see also id.* at Fig. 4; 3:51-55, 6:41-49; Tr. 1789-90.  And Quantum Leap also teaches the "***inhibiting***" step by at least disclosing that, "[u]pon detection of a virus," any of several commands can be executed, including "deleting the [offending] file[.]" *Id.* at 8:26-34; *see also id.* at 8:50-59 (disclosing that the trap device only transmits a portion of a file if a virus is detected); Tr. 1794.

As for the final "***determining***" step, it would have been obvious to one of ordinary skill in the art to include the additional step with the method taught by Quantum Leap.  As Dr. Rubin explained, one of ordinary skill in the art would have sought to limit the scanning of viruses in Quantum Leap  based on identification codes of users to ensure that only paying customers received access to anti-virus resources by combining the "determining step" disclosed in the closely-related Trend Micro and/or Intel patents with the Quantum Leap. *See, e.g.*, Tr. 1796.  No secondary considerations of non-obviousness would alter that fact. *See, e.g.*, Tr. 1718-19, 1796.

## IV.   CONCLUSION

For the foregoing reasons, Symantec respectfully requests that the Court grant judgment as a matter of law that Symantec does not infringe claim 7 of the '610 patent, that the claim is invalid as anticipated and obvious, and that if any damages are due, IV is entitled only to nominal damages or, at most, a $500,000 lump-sum royalty.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Michael J. Flynn*

_____

Jack B. Blumenfeld (#1014)
Thomas C. Grimm (#1098)
Karen Jacobs (#2881)
Michael J. Flynn (#5333)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@mnat.com
tgrimm@mnat.com
mflynn@mnat.com
kjacobs@mnat.com

*Attorneys for Defendant Symantec Corporation*

OF COUNSEL:

Dean G. Dunlavey
Joseph H. Lee
LATHAM & WATKINS LLP
650 Town Center Drive, 20th Floor
Costa Mesa, CA 92626-1925
(714) 540-1235

Douglas E. Lumish
Jeffrey G. Homrig
Michelle P. Woodhouse
LATHAM & WATKINS LLP
140 Scott Drive
Menlo Park, CA 94025
(650) 328-4600

Neil A. Rubin
Kathy Yu
LATHAM & WATKINS LLP
355 South Grand Avenue
Los Angeles, CA 90071-1560
(213) 485-1234

Michael J. Gerardi
Robert J. Gajarsa
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC  20004-1304
(202) 637-1019

July 6, 2015

## CERTIFICATE OF SERVICE

I hereby certify that on July 7, 2015, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on July 7, 2015, upon the following in the manner indicated:

Joseph J. Farnan, III, Esquire                    *VIA ELECTRONIC MAIL*
Brian E. Farnan, Esquire
FARNAN LLP
919 North Market Street, 12th Floor
Wilmington, DE  19801
*Attorneys for Plaintiff*

Parker C. Folse, III, Esquire                    *VIA ELECTRONIC MAIL*
Brooke A.M. Taylor, Esquire
SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA  98101-3000
*Attorneys for Plaintiff*

John P. Lahad, Esquire                    *VIA ELECTRONIC MAIL*
Weston O'Black, Esquire
Richard W. Hess, Esquire
Max L. Tribble, Esquire
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 1500
Houston, TX  77002
*Attorneys for Plaintiff*


*/s/ Michael J. Flynn*

_____

Michael J. Flynn (#5333)